**EXHIBIT 11**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PSARA ENERGY, LTD.<br><br>Plaintiff<br><br>SPACE SHIPPING, LTD.; ADVANTAGE AVENUE SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET and GULSUN NAZLI KARAMEHMET WILLIAMS<br><br>Defendants. | : | No. |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT**

Plaintiff PSARA ENERGY, LTD., by and through undersigned counsel, for its Verified Complaint against Defendants: SPACE SHIPPING LTD.; ADVANTAGE AVENUE SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET and GULSUN NAZLI KARAMAEHMET WILLIAMS alleges and pleads as follows:

**I. JURISDICTION, VENUE, AND PARTIES**

1. This is an admiralty and maritime claim within the meaning of rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract, *i.e.* an executed bareboat charter party for the employment of a seagoing cargo vessel. This case also falls under this court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is brought under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or

Maritime Claims, and Asset Forfeiture Actions (hereinafter "Supplemental Rule B") and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

2.     At all times material hereto Plaintiff, PSARA ENERGY, LTD. (hereinafter "PSARA" or "Plaintiff"), was a corporation organized under the laws of the Republic of the Marshall Islands and the registered owner of the Motor Tanker CV STEALTH, a crude oil tanker vessel registered in Malta.

3.     At all times material hereto Defendant, SPACE SHIPPING, LTD. (hereinafter "SPACE"), was and is a foreign company organized under the laws of Malta and the bareboat charterer of the M/T CV STEALTH under a bareboat charter party contract dated February 23,2010 ("the bareboat charter"). A copy of the bareboat charter and addenda thereto are attached to this Original Verified Complaint as **EXHIBIT 1**. Though incorporated in Malta, the business of SPACE is actually carried on entirely by Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

4.     At all times material hereto Defendant, ADVANTAGE AVENUE SHIPPING, LLC (hereinafter "ADVANTAGE AVENUE SHIPPING"), was and is a corporate entity organized under the laws of the Republic of the Marshall Islands, and the registered owner of the Motor Tanker ADVANTAGE AVENUE, a tanker vessel registered in the Marshall Islands, with IMO No. 9419450 and international call sign V7KZ8. Though incorporated in the Marshall Islands, the business of ADVANTAGE AVENUE SHIPPING is actually carried on entirely by Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

5. At all times material hereto Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES (hereinafter "GEDEN LINES") was and is a foreign corporate entity organized under the laws of Turkey with its principal place of business located at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey.

6. At all times material hereto ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS") was a foreign limited liability company organized under the laws of the Marshall Islands. ADVANTAGE TANKERS, LLC, is a holding company that owns 100% of defendant ADVANTAGE AVENUE SHIPPING. Though incorporated in the Marshall Islands, the business of ADVANTAGE TANKERS is actually carried on entirely by Defendant GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

7. At all times material hereto ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS") was a foreign limited liability company organized under the Laws of the Marshall Islands. ADVANTAGE HOLDINGS, LLC is a holding company that owns 100% of defendant ADVANTAGE TANKERS. Though incorporated in the Marshall Islands, the business of ADVANTAGE HOLDINGS is actually carried on entirely by Defendant GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

8. At all times material hereto FORWARD HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS") was a foreign limited liability company organized under the laws of the Marshall Islands. FORWARD HOLDINGS, LLC, is a holding company that owns 100% of defendant ADVANTAGE HOLDINGS. Though incorporated in the Marshall Islands, the business of FORWARD HOLDINGS is actually carried on entirely by Defendant GEDEN

LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

9 At all times material hereto MEHMET EMIN KARAMEHMET (hereinafter "EMIN KARAMEHMET") is an individual person and a citizen and resident of the Republic of Turkey and, respectively, through a Panamanian corporation that he entirely controls - Buselten Finance, S.A, - is the 100% shareholder of non-party GEDEN HOLDINGS, and of SPACE SHIPPING; and through another Turkish business entity he controls - Cukurova Holdings - he is 100% shareholder of Defendant GEDEN LINES.

10. At all times material hereto GULSUN NAZLI KARAMEHMET–WILLIAMS (hereinafter "KARAMEHMET WILLIAMS") is an individual person and a dual citizen of the Republic of Turkey and the Swiss Confederation and a resident of the United Kingdom. KARAMEHMET-WILLIAMS is the adult daughter and only child of EMIN KARAMEHMET and through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS she is the 85% controlling shareholder of ADVANTAGE TANKERS.

11. The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants, to wit: the M/T ADVANTAGE AVENUE that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules as pled more fully in Section IV of this Verified Complaint.

**II. THE SUBSTANTIVE CLAIMS**

12. Under the bareboat charter party dated February 23, 2010 ("the bareboat charter") and addenda thereto dated: June 2, 2010; June 21, 2010; and January 29 2010 Plaintiff chartered its vessel CV STEALTH for a "a term of 5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm

period" to "Geden Holdings Limited,[1] Malta or nominee always guaranteed by Geden Line." *See* **EXHIBIT 1**, box 21. The vessel was delivered to the service of the nominee of Geden Holding Ltd. *i.e.* SPACE and to GEDEN LINE and was used and operated for profit by them as part of GEDEN LINES' non-owned, chartered -in fleet.

13. By subsequent addendum to the bareboat charter, Geden Holdings became the performance guarantor of SPACE. *See* **EXHIBIT 1**. *See* also Addendum dated June 2, 2010, and performance guarantee of Geden Holdings, dated March 4, 2010 hereto attached as **EXHIBIT 2.**

14. Plaintiff delivered the vessel into the bareboat chartered service and rendered, and continues to render, the contractual performance required of it. However, Defendant SPACE (hereinafter also referred to as "Charterer"), though possessing and using the CV STEALTH, is failing and refusing to perform its hire payment obligations under the bareboat charter party contract, and is in default and indebted to Plaintiff in respect of unpaid hire, as set out below.

15. Under the terms of the bareboat charter the latest date for the redelivery of the CV STEALTH to Plaintiff was on June 22nd 2015. However, Charterer, in breach of the bareboat charter has failed to redeliver her to Plaintiff - her lawful owner - and at the same time is failing since May 2015 to pay Plaintiff the daily hire as the bareboat charter requires.

16. The outstanding amount which remains unpaid from May 1, 2015 through September 30, 2016 is USD 6,520,373.71.

17. To secure its claim for unpaid bareboat charter hire, Plaintiff through court proceedings has attached funds of SPACE in the United Kingdom in the amount of USD 2,000,975.00, and in proceedings in the United States it had attached the vessel ADVANTAGE

[1] Geden Holdings Limited (hereinafter "Geden Holdings") was a holding company incorporated in Malta. It held 100% of the shares of SPACE and 100% of the shares of several one-ship-companies as is more specifically pled in this Original Verified Complaint.

ANTHEM by means of a suit in admiralty under Supplemental Rule B.[2] The owners of the ADVANTAGE ANTHEM stipulated and provided substitute security in the total amount of USD 1,700,000.00 for the release of the said vessel.[3] However, the sums attached are insufficient to secure further and additional bareboat charter hire that has been earned by the CV STEALTH subsequent to these attachments and Defendant SPACE continues refusing to pay. The said unsecured and unpaid additional amount is USD 2,819,398.71, exclusive of interest and costs. Copies of Plaintiff's issued invoices for unpaid bareboat charter hire, since May 1, 2015 are hereto attached as **EXHBIT 3.**

18. The Charterer continues to possess the CV STEALTH but is unjustly failing to pay Plaintiff charter hire for such accrued amounts as Plaintiff has been unable to secure, *i.e.* USD 2,819,398.71, and is contesting without lawful reason or cause its liability for the payment of USD 6,520,373.71 of the earned bareboat charter hire.

## III. UNDERLYING PROCEEDINGS ON THE MERITS

19. Box 35 and clause 30(a) of the bareboat charter party (EXHIBIT 1) provide for arbitration of all disputes arising out of the contract in London.

20. Plaintiff is claiming the said amount of unpaid and unsecured hire in ongoing arbitration proceedings in London against SPACE.

21. Plaintiff estimates the legal costs that will be incurred to pursue these claims in London maritime arbitration proceedings will be approximately USD 600,000.00. As it is customary in London arbitration, legal costs, including lawyers' fees, are awarded to the

[2] of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, hereinafter referred to as "Rule B".

[3] United States District Court for the Eastern District of Louisiana, Civil Action 16-1305; Plaintiff had also filed an attachment under Rule B in the United States District Court for the Southern District of Texas in Civil Action, 15-01645 and had obtained substitute security. However, it agreed to dismiss its claims as it obtained substitute security with the noted attachment of its charterer's funds in the United Kingdom, as noted in C.A. 15-01645 in Doc. 46, at p. 2 and in the foregoing ¶ 18.

prevailing party.

22. This action is an ancillary proceeding, brought in order to obtain jurisdiction over Defendant Charterer and to obtain security for Plaintiff's claims in the London arbitration proceedings.

## IV. IDENTITY OF THE CORPORATE DEFENDANTS AND THEIR INTERRELATIONSHIPS

23. In June of 2015, when Charterer had fallen substantially in arrears in its bareboat charter hire payment obligations, and the contractual redelivery of the vessel to Plaintiff was approaching, Plaintiff became concerned and made enquiries regarding the status of the CV STEALTH and the other crude oil tanker vessels that were being operated by Defendant GEDEN LINE. Plaintiff was astounded to discover that the entire "owned" – as opposed to "chartered-in" fleet of GEDEN LINES had been surreptitiously transferred to new owners, as shown in TABLE I below:

**TABLE I**

| VSL FORMER NAME | FORMER OWNER | VSL NEW NAME | NEW OWNER |
|---|---|---|---|
| PROFIT | Profit Shipping, Ltd. | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |
| TARGET | Target Shipping, Ltd. | ADVANTAGE AROW | Advantage Arrow Shipping, LLC |
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |
| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |

| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, Ltd. |
|---|---|---|---|
| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, Ltd. |

24. Not only had the said vessels been transferred, but they had been renamed and reflagged from the Maltese shipping register to that of the Marshall Islands.

25. Investigation into the ship register/ship mortgage record of the Republic of the Marshall Islands revealed that all of the above 11 crude oil tankers which were formerly owned by one-ship-companies, in turn, 100% controlled by shareholder Geden Holdings, had been transferred in approximately the first five (5) months of 2015 - without any notice to or the knowledge of Plaintiff - to new one-ship-companies 100% controlled by a new holding company: ADVANTAGE TANKERS, LLC. ADVANTAGE TANKERS is ultimately 85 % controlled by the daughter and only child of Defendant EMIN KARAMEHMET, *i.e.* Defendant KARAMEHMET–WILLIAMS. The said ship mortgage records contain a diagrammatic representation of the said new ownership structure which is hereto attached as **EXHIBIT 4.**

A. ***SUCCESSOR CORPORATION RELATIONSHIP***

26. The grouping of the following corporate entities: ADVANTAGE TANKERS; its subsidiary AVENUE SHIPPING; ADVANTAGE HOLDINGS; FORWARD HOLDINGS; and 10 other one-ship-company entities, subsidiaries of ADVANTAGE TANKERS[4] (said grouping hereinafter collectively referred to for the sake of brevity as "Advantage-Group") comprise, respectively, successor corporate business entities of the grouping formerly constituted of:

[4] Foreign limited liability companies: Advantage Solar Shipping, LLC; Advantage Sky Shipping, LLC; Advantage Start Shipping, LLC; Advantage Arrow Shipping, LLC; Advantage Avenue Shipping, LLC; Advantage Award Shipping, LLC; Advantage Atom Shipping, LLC; Advantage Summer Shipping, LLC; Advantage Spring Shipping, LLC; Advantage Sun Shipping, LLC

GEDEN HOLDINGS; GEDEN LINES; SPACE SHIPPING; and 10 other former one-ship-companies[5], as shown in TABLE I (hereinafter collectively referred to, for the sake of brevity, as "Geden-Group").

27. As particularized in the following paragraphs 28-38, the Advantage-Group corporate entities are successor corporations of the Geden-Group corporate entities in that: a) the former have acquired and are respectively in possession of the trading assets of the latter[6] (hereinafter "the 11 tanker vessels"), as illustrated in the foregoing Table I; b) they occupy and carry on business from the same business premises, *i.e.* Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey; c) they transact their business by and through identical personnel as the latter; d) they share common officers and directors with the latter; e) they have taken over and are servicing the same customers as were being served by the latter; f) they have virtually the same financing banks financing their business as the latter; g) they have assumed numerous of the latter's obligations, including long term charter parties with Shell Western Supply and Trading, Ltd.; h) there is continuity of shareholders as a result of the controlling Seller corporation, GEDEN HOLDINGS, ultimately purported retention of control so that its shareholders became a constituent part of the purchasing corporation, *i.e.* Advantage Holdings; i) the controlling shareholder of Geden Holdings and GEDEN LINES - EMIN KARAMEHMET – continues to maintain a substantial financial interest in the Advantage Group companies, as GEDEN LINES (which is 100% controlled by him) manages and operates all of

---

[5] Foreign limited liability companies: Profit Shipping, Ltd.; Blue Shipping, Ltd.; Blank Shipping, Ltd.; Target Shipping, Ltd.; True Shipping Ltd.; Value Shipping, Ltd; Bravo Shipping, Ltd; Barbaros Maritime, Ltd; Pink Shipping, Ltd; Reef Shipping Ltd.; Prima Shipping, Ltd.

[6] The said assets are the tankers: PROFIT now renamed ADVANTAGE SOLAR; BLUE now renamed ADVANTAGE SKY; BLANK now renamed ADVANTAGE START; TARGET now renamed ADVANTAGE ARROW; TRUE now renamed ADVANTAGE AVENUE; VALUE now renamed ADVANATGE AWARD; BRAVO now renamed ADVANTAGE ATOM; POWER now renamed ADVANTAGE ANTHEM; PINK now renamed ADVANTAGE SUMMER; REEF now renamed ADVANTAGE SPRING; ROYAL now renamed ADVANATGE SUN. For the sake of brevity these vessels will be collectively referred to as "the 11 tankers".

its 11 tankers formerly held by the one-ship-companies of the Geden Group; j) GEDEN LINES exercises complete control over all of the corporate entities of the Advantage Group as its administrative, operations, technical, commercial, safety manager; k) following the purported sale of the 11 tankers, Geden Holdings ceased its ordinary business operations, through its subsidiary one ship companies and wound down its remaining business of operating chartered-in tonnage.

28. As part of a business reorganization arrangement conceived and implemented by the management of the Geden-Group, in concert with EMIN KARAMEHMET and KARAMEHMET–WILLIAMS, the one-ship-companies of the Geden-Group "sold" the respective vessels each one of them had owned to its homologous Advantage-Group one-ship-company, with these transactions occurring approximately during the first and second quarter of 2015. The said "sales", were in actual fact part of a "reorganization", and makeover of the ownership structure whereby newly minted corporate one-ship-companies of the Advantage-Group would take over ownership of the assets with the control, however purportedly remaining with Geden Holdings, Ltd. *See* "Consent Letter" agreement dated February 6, 2015 between Geden Holdings, Ltd. and Shell Western Supply and Trading, Ltd. hereto attached as **EXHIBIT 5** at Bates No. D01248, at ¶ 2 thereof, wherein Geden Holdings assures Shell Western Supply and Trading, Ltd that each of the Advantage Group one-ship-companies would be "wholly owned by the Shareholder", *i.e.* Geden Holdings.

29. Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies, to the respective Advantage-Group one-ship-companies, all of the time charter parties under which the said respective vessels, before and at the time of the transfer, were being employed by Shell Western Supply and Trading, Ltd. continued seamlessly

with the Advantage-Group one-ship-companies. This was accomplished under contractual arrangements with Shell Western, worked out by GEDEN HOLDINGS / GEDEN LINES and KARAMEHMET-WILLIAMS, whereby the said charterer parties, several of which had significant unexpired terms, were renewed for a 5-year period, at rates and on such other terms as were agreed on behalf of the Advantage-Group one-ship-companies by GEDEN HOLDINGS. *Id.* at D01248 - D01250.

30. Notwithstanding the purported transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, Geden Holdings represented and warranted to the Geden-Group's sole customer - Shell Western Supply and Trading, Ltd that it retained ownership over the Advantage-Group one-ship-companies. *Id.* at Bates No. D01248, at ¶ 2 thereof.

31. Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, all day-to-day shore-side operations of the 11 tankers continue to be performed by and through GEDEN LINES, including safety management, security management, crewing, victualing, supplying, technical monitoring and supervision, drydocking, repairs, accounting, insuring, and generally every function necessary in order to keep and maintain the said vessels trading as merchant vessels in the same manner and to the same extent that GEDEN LINES had performed same before the said transfer of ownership for same 11 tankers. *See e.g.* Ship Management Agreement for the M/T ADVANTAGE AVENUE dated February 25, 2015, hereto attached as **EXHIBIT 6** at pp. 2425-2434; *See* also extract from Loan Agreement dated February 4, 2015 of Norddeutsche Landesbank Girozentale (hereinafter "NLDB") Loan Agreement with ADVANTAGE AVENUE SHIPPING extract hereto attached as **EXHIBIT 7** at p. 2510,

defining "Approved Manager" as "Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (Manager)", and designating "Genel Denizcilik" as Technical Manager and Operations Manager. *Id.* at p.2640.

32.     The operation and management of the 11 tankers of the Advantage-Group is performed by EMIN KARAMEHMET - owned GEDEN LINES using the same employees; working out of the same address (Buyukdere Ca., Yapi Kredi Plaza, A Blok K: 12 34330-Levent-Istanbul-Turkey), as previously, when the same 11 tankers were owned by the Geden-Group.

33.     Notwithstanding the transfer of ownership of the 11 tankers from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, the majority of the lenders that financed the acquisition of the vessels by the Advantage-Group one-ship companies remained the same, with new rollover-like refinancing arrangements and ship mortgaging arrangements having been negotiated and worked out by Geden Holdings / GEDEN LINES executives and directors  on behalf of ADVANTAGE TANKERS. *See* **EXHIBIT 5** at ANNEX I.

34.     Notwithstanding the transfer of the 11 tankers from the Geden-Group to the Advantage-Group, GEDEN LINES, which is controlled by EMIN KARAMAHMET, continues to maintain a substantial financial interest in the 11 tankers enjoying a significant economic benefit as operator and manager of the ADVANTAGE TANKERS fleet of approximately USD 4,015,000.00 annually as compensation for its services.

35.     Notwithstanding the transfer of the 11 tankers from the Geden-Group to the Advantage-Group, GEDEN LINES, in its capacity as the sole operator and manager of the 11

tankers, and thereby its controlling shareholder EMIN KARAMEHMET, exercise complete control over all of the operational, technical, and all other business activities of the 11 one-ship-companies of the Advantage Group.

36. Geden Holdings, GEDEN LINES, ADVANTAGE TANKERS, and the respective one-ship-companies of the Geden-Group and Advantage-Group have in common key management personnel including: the same Chief Executive Officer, who is also a director of GEDEN HOLDINGS, GEDEN and ADVANTAGE TANKERS; and the same Chief Financial Officer, who is also a director of Geden Holdings.

37. Following the sale of the 11 tankers, their respective former one-ship-company owners ceased to own vessels and their parent company Geden Holdings ceased to be a holding company of corporate one-ship vessel owners.

38. The holding company role of Geden Holdings and the one-ship-companies of the Geden-Group, following the transfer of the vessels was taken over by ADVANTAGE TANKERS and its subsidiary one-ship-companies, and thereby ADVANTAGE TANKERS and its subsidiary one-ship-companies have assumed the obligations previously incumbent on Geden Holdings and its one-ship-subsidiaries necessary for the continuation of their respective business operations.

39. By reason of the foregoing facts pled in averments ¶¶ 28-38, ADVANTAGE TANKERS and the one-ship-companies it holds, and Geden Holdings and the one-ship-companies and single-vessel chartering companies it holds have either entered into a *de facto* merger, or ADVANTAGE TANKERS and the one-ship-companies it holds is a mere continuation of the business of Geden Holdings, and the one-ship companies that formerly owned the said vessels, with the latter entities having been absorbed by the former, as evidenced

by the identity of assets, location, management, personnel, and stockholders.

40. Accordingly, ADVANTAGE TANKERS and the one-ship-companies it holds, including ADVANTAGE AVENUE SHIPPING are liable for Plaintiff's claims respectively as the successor corporations of EMIN KARAMEHMET - controlled Geden Holdings, SPACE SHIPPING and True Shipping, and the M/T ADVANTAGE AVENUE may be attached as security for Plaintiff's claims.

***B FRAUDULENT CONVEYANCE ALLEGATIONS***

41. Plaintiff realleges ¶¶ 1-40 of the above and foregoing Original Verified Complaint and further avers as follows:

42. In agreeing to bareboat charter its vessel the CV STEALTH to SPACE, a Maltese corporation without any known tangible assets or business performance record, and to accept the performance guarantee of Geden Holdings in place of the originally agreed performance guarantee of GEDEN LINES (*See* supra ¶ 13 and EXHIBIT 1, *i.e.* bareboat charter at box 21), Plaintiff relied on express affirmative representations of fact made on behalf of Geden Holdings / GEDEN LINES by their common CEO and director Tugrul Tokgoz. Specifically, Tokgoz represented that Geden Holdings was the parent company of the "special purpose companies", *i.e.* the-one-ship companies which at the time owned the 11 tankers. A Copy of the March 4, 2010 letter of Geden Holdings containing such representations in writing is hereto attached as **EXHIBIT 8.**

43. The performance guarantee of Geden Holdings (EXHIBIT 2), contemporaneously issued with the March 4, 2010 letter, is a continual guarantee extending over the entire duration of the performance of the charter party, and indeed, for at least 7 years past the delivery of the vessel, and specifically provides in relevant part that that it is given in consideration of Plaintiff's

refraining from arresting or otherwise detaining any of the assets of Geden Holdings.

44. Plaintiff relied on the representations made in the March 4, 2010 letter (**EXHIBIT 8**) particularly the representation that Geden Holdings owned and would continue to own through its one-ship-companies the 11 tankers and thereby agreed to continue chartering the CV STEALTH to SPACE and accept the performance guarantee of Geden Holdings.

45. Unbeknownst to Plaintiff, Geden Holdings during the first 5 months of 2015 divested itself of its entire interest in the 11 tankers; "sold" same to the Defendants comprising the Advantage-Group; and the Defendants implemented a restructuring scheme that had been in their planning and contemplation as pled below.

46. During 2012 and 2013, as a result of a faltering tanker market and high prices that had been paid for the construction of the 11 tankers and the acquisition of other tonnage, the Geden-Group experienced severe economic difficulties and pressing demands by various creditors that included attachment of vessels of the group. In consultation with their lending banks, GEDEN LINES commissioned business restructuring specialist AlixPartners UK LLP to develop a proposed plan for the restructuring of their business. A report was prepared by AlixPartners, dated March 6, 2013 under the title "Project Hermitage Restructuring". *See* Report of AlixPartners hereto attached as **EXHIBIT 9**[7] (hereinafter referred to as "Project Hermitage").

47. Project Hermitage recommended the replacement of Geden Holdings as the group's holding company by another new business entity - a "newco" - which, under the recommended plan, "[p]rovides for recategorization of exposure from "Geden Holdings Ltd." to

[7] The Alix Partners' report specifically states: "This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). EXHIBIT 10 at Bates No. P-001832. As to the factual content of the AlixPartners report it provides in relevant part: "The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company" *Id.* at Bates No. P-001833. *Emphasis added.*

Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support." *See* EXHIBIT 9 at Bates No. P-001870. The plan of Project Hermitage also recommended the sale of the vessels or the one-ship-companies to "Newco"; the continuation of the management of the vessels by GEDEN LINES; the rollover financing of the existing debt to the financing banks; the retention of the equity of Geden Holdings; the transfer of the surplus of equity in the assets to Newco (EXHIBIT 9 (flow chart) Bates No..P-001846); and the ring-fencing of potential sources of disruption (such as arrests and sister-ship arrests). *Id.* at Bates No. P-001870.

48. Even though the recommendations of Project Hermitage were not adopted by Defendants in their exact proposed form, they were nonetheless substantially adopted and implemented as evidenced by the following events: a) Geden Holdings / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the incorporation of Advantage Tankers, LLC, in the Marshall Islands, *i.e.* the "Newco" contemplated by Project Hermitage[8]; b) Geden Holdings / GEDEN LINES, by and through their common chief executive officer and chief financial officer, made arrangements for the rollover financing of the loans of Geden Holdings' one-ship-companies with Advantage Tankers taking on the role of corporate guarantor; c) Geden Holdings / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the one-ship-companies controlled by GEDEN HOLDINGS to "sell" their vessels to newly minted Marshall Islands corporate entities that comprise the Advantage Group shown in the foregoing TABLE I; d) Geden Holdings / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, arranged for the management of the 11 tankers to continue

[8] At all times material hereto, all Defendants have the same Chief Executive officer - Tugrul Tokgoz- and the same Chief Financial Officer -Mehmet Matt - who also hold overlapping roles as directors and /or officers of the respective corporate Defendants of the one-ship-companies controlled by ADVANTAGE TANKERS. .

being performed by GEDEN LINES under new 5 year contracts; e) by transferring all of the tangible operating assets of Geden Holdings to the Advantage Tankers one-ship-companies, *i.e.* the 11 tankers, Geden Holdings effectively "ringfenced" them, thereby blocked creditors of Geden Holdings from seeking recourse against its assets.

49. Project Hermitage specifically referred to the bareboat charter of the CV STEALTH and other chartered-in tonnage of other owners in the following terms: "Group D, Geden Oldco: 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable." With specific reference to Plaintiff's vessel the CV STEALTH Project Hermitage notes: "not ours". *See* EXHIBIT 9 at P-001856.

50. The actions of the Defendants in implementing the recommendations of the AlixPartners - authored Project Hermitage in the manner described in the foregoing manifests the design, plan, and intent of the Defendants to deal with their assets in a fraudulent manner to the detriment and prejudice of their creditors, specifically including Plaintiff as noted in ¶ 49 *supra.*

51. Defendant SPACE SHIPPING, LLC's sole business is to act as the nominee of Geden Holdings in the performance of the bareboat charter. As pled in the foregoing Plaintiff entered in the bareboat charter relying on the representations and warranties that Geden Holdings was the owner of the 11 tankers and other vessels, and its performance guarantee.

52. At all times material hereto and as pled in the foregoing, Geden Holdings, which is 100% controlled by EMIN KARAMEHMET was entirely stripped of its shipping assets, *i.e.* the 11 tankers which were transferred to ADVANTAGE TANKERS, a company 85% controlled by his only child KARAMEHMET WILLIAMS, and 15% by his hand-picked CEO of GEDEN LINES and Geden Holdings, Tugrul Tokgoz, thereby leaving Plaintiff without any of the

recourse that it had agreed to forego (*i.e.* the attachment of Geden Holdings' owned vessels) in consideration for Geden Holdings' performance guarantee.

53. Plaintiff invokes the power of this honorable court as a court of admiralty "...to protect its jurisdiction from being thwarted by a fraudulent transfer, [by] .... authorizing an attachment to secure an independent maritime claim." *Swift Co Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 694-695 (1950).

54. As pled in the foregoing, Defendant EMIN KARAMEHMET is the controlling (100%) shareholder of Defendant Geden Holdings which in turn is the controlling shareholder (100%) of all 11 one-ship-companies of the Geden-Group as shown in the foregoing TABLE 1 – including the former registered owner of the M/T TRUE renamed ADVANTAGE AVENUE. Moreover, EMIN KARAMEHMET, through Geden Holdings is the controlling shareholder (100%) of SPACE.

55. As pled in the foregoing, Defendant KARAMEHMET WILLIAMS, through the intermediary Defendant LLC's FORWARD HOLDINGS and ADVANTAGE HOLDINGS is the 85% shareholder of ADVANTAGE TANKERS, and through it, the controlling shareholder of ADVANTAGE AVENUE SHIPPING, LLC, the new registered owner of the former M/T TRUE.

56. Defendants represent that on or about April 1, 2015, the M/T TRUE was sold by her registered owner True Shipping, Ltd. to her new registered owner Advantage Avenue Shipping LLC which re-flagged and renamed her the ADVANTAGE AVENUE.

57. As noted in the foregoing, the relationship of EMIN KARAMEHMET to KARAMEHMET WILLIAMS is that of father and only child.

58. Based on the expressed rationale for the transfer of the 11 tankers from Geden

Holdings to ADVANTAGE TANKERS noted in the foregoing, *i.e.* the "ringfencing" of the assets, in order to avoid "arrests"; the close family relationship between EMIN KARAMEHMET and KARAMEHMET WILLIAMS that constitutes the latter an insider of the former in relation to his status as 100% shareholder of Plaintiff's obligors Geden Holdings / GEDEN LINES and SPACE; the transfer of what was substantially all of the assets of the said obligors of Plaintiff; the failure of the Defendants to disclose to Plaintiff the impending transfer of the assets from the Geden-Group to the Advantage-Group; and all of the factual circumstances pled in the foregoing ¶¶ 41-57 there are reasonable grounds and probable cause to believe that the said transfer was intended to hinder, delay, or defraud the creditors of SPACE and same may and should be set aside as a fraudulent conveyance.

## IV. APPLICATION FOR ATTACHMENT UNDER SUPPLEMENTAL ADMIRALTY RULE B

59. None of the Defendants are, or were, at the time of the filing of this suit present within the district or can be found in the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Law Claims and under the laws of Pennsylvania governing personal jurisdiction. *See* Attorney Declaration of Mary Elisa Reeves attached hereto as **EXHIBIT 10**. Nevertheless, Defendants have within the District tangible or intangible personal property in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment consisting of debts, credits, or effects.

60. More specifically there is present, or imminently due to arrive in the Eastern District of Pennsylvania, the Motor Tanker ADVANTAGE AVENUE a tanker vessel registered in the Marshall Islands, with IMO No. 9419450 and international call sign V7KZ8, as pled in the foregoing.

61. Defendants have used and continue to use the purportedly corporate separateness,

and incorporated status of their surrogate entities ADVANTAGE SHIPPING, ADVANTAGE TANKERS, ADVANTAGE HOLDINGS, and FORWARD HOLDINGS abusively, to wit: to engage in fraudulent corporate restructuring and asset reallocation practices in order to escape their lawful obligation to pay bareboat charter hire until the redelivery of the CV STEALTH to Plaintiff- her lawful owner.

62. Plaintiff has maritime claims against the Defendants arising out of the breach of a maritime contract (*i.e.* – the bareboat charter party with CV STEALTH dated February 23, 2010, and the performance guarantee dated April 4, 2010).

69. The amounts of Plaintiff's claims as reasonably as it can be estimated is as follows:

| | | |
|---|---|---|
| A. | Unpaid Charter Hire due and owing ..................... $ | 2,819,398.71 |
| B. | Interest at 6% compounded quarterly for 1 year...........$ | 146,315.17 |
| E. | Recoverable Legal Fees and Costs................................$ | 600,000.00 |
| **Total Claim**.............................................................S | | **3,565,713.88** |

63. Therefore, Plaintiff's total claim for breach of the maritime contracts against Defendants is in the aggregate sum of **USD 3,565,713.88.**

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A. That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants be cited to appear and answer the allegations of this Original Verified Complaint;

B. That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, all of the assets of the Defendants presently within this District, or assets expected in this District during the pendency of this action, including, but not limited to the M/T

ADVANTAGE AVENUE and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D. That judgment be entered against each of the Defendants in the sum of Three Million Five Hundred Sixty-Five Thousand Seven Hundred Thirteen Dollars and Eighty-Eight Cents (**USD 3,565,713.88**) together with interest and costs, be applied in satisfaction thereof;

E. That the Court grant such other and further relief as it deems, just, equitable and proper.

Respectfully submitted,

Date: September ____, 2016
Philadelphia, PA

REEVES MCEWING, LLP

By: Mary E. Reeves

Mary Elisa Reeves, Esq.
719 E. Passyunk Avenue
Philadelphia, PA 19147
Telephone: 267-324-3773
E-mail: reeves@lawofsea.com
Attorney Id # 44194

*Attorneys for Plaintiff*

*Of Counsel:*

/s/ George A. Gaitas

George A. Gaitas
Federal Bar No. 705176
Chalos & Co, P.C.
7210 Tickner Street
Houston, Texas 77055
Telephone: 713-936-2427
Fax: 866-702-4577
E-mail:gaitas@chaloslaw.com
*Pro Hac Vice Application forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | § | |
| § **Plaintiff** | § | |
| | § | |
| **SPACE SHIPPING, LTD.; ADVANTAGE AVENUE SHIPPING, LLC; GEDEN HOLDINGS LTD; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET§ EMIN KARAMEHMET and GULSUN NAZLI KARAMEHMET WILLIAMS** | § § § § § § § § § § | **C.A. NO.** **ADMIRALTY** |
| **Defendants.** | § | |

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. §1746, Despoina Bacha, declares under the penalty of perjury:

1. I am an individual of sound mind, and have never been convicted of a crime of moral turpitude.

2. I am a citizen of Greece and a resident of Athens and a lawful representative of the Plaintiff in the above action and duly authorized on its behalf to make this verification.

3. I have read the foregoing Verified Complaint and exhibits thereto in the above captioned action and know the contents thereof; and

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed in Athens, Greece this 24th day of August, 2016

Despoina Bacha

DESPINA E. BACHA
LAWYER, MEMBER OF
PIRAEUS ASSOCIATION BAR
22, DIOVOUNIOTOU STR.,
NEO FALIRO, PIRAEUS

2nd original

| 1. Shipbroker<br>**Arrow Tankers A/S**<br>**Bredgade 31 B, 4.**<br>**DK-1260 Copenhagen K**<br>**Denmark** | **BIMCO STANDARD BAREBOAT CHARTER**<br>**CODE NAME: "BARECON 2001"**<br>PART I<br><br>2. Place and date<br>**Copenhagen, 23rd February 2010** | |
|---|---|---|
| 3. Owners/Place of business (Cl. 1)<br>**Psara Energy Limited**<br>**Ajeltake Road, Ajeltake Island**<br>**Majuro, MH 96960**<br>**Marshall Island** | 4. Bareboat Charterers/Place of business (Cl. 1)<br>**Geden Holdings Limited, Malta or nominee always guaranteed by Geden Line. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed.** | |
| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br>**Name: m.t. CV STEALTH**<br>**Flag: Malta** | | |
| 6. Type of Vessel<br>**Crude oil carrier** | 7. GT/NT<br>**58,418 / 31,117** | |
| 8. When/Where built<br>**2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | 9. Total DWT (abt.) in metric tons on summer freeboard<br>**104,499** | |
| 10. Classification Society (Cl. 3)<br>**ABS** | 11. Date of last special survey by the Vessel's classification society<br>**N/A** | |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>**Attached Vessel's Q88. Vessel to be redeliverd with SS passed** | | |
| 13. Port or Place of delivery (Cl. 3)<br>**WW DLOSP at one safe port / safe anchorage ATDNSHINC**<br>**Vessel to be delivered with SS passed** | 14. Time for delivery (Cl. 4)<br>**15th April 2010, 00:01 hrs lt** | 15. Cancelling date (Cl. 5)<br>**30th August 2010, 23:59 hrs lt** |
| 16. Port or Place of redelivery (Cl. 15)<br>**DLOSP at one safe port, berth or anchorage WW in CHOPT always within trading limits ATDNSHINC** | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br>**SS/DD passed without extensions** | |
| 18. Running days' notice if other than stated in Cl. 4<br>**See Rider Clause 15.** | 19. Frequency of dry-docking (Cl. 10(g))<br>**As required by class without extensions** | |
| 20. Trading limits (Cl. 6)<br>**Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.**<br><br>**The vessel not to trade in ice, break ice nor follow ice breakers in ice.** | | |
| 21. Charter period (Cl. 2)<br>**5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period** | 22. Charter hire (Cl. 11)<br>**USD 9,750 gross pdpr the first 365 days after delivery**<br>**USD 10,750 gross pdpr for the 2nd charter year**<br>**USD 11,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year**<br>**USD 10,750 gross pdpr for 4th charter year**<br>**USD 10,750 gross pdpr for 5th charter year**<br>**USD 13,250 for the optional period** | |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>**10%** | | |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

First issued by The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974 as "Barecon 'A'" and "Barecon 'B'". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

2nd original

# "BARECON 2001" STANDARD BAREBOAT CHARTER

PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br>**As per Clause 10 F** | 25. Currency and method of payment (Cl. 11)<br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br>**TBA** | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br>**N/A** | 33. Brokerage commission and to whom payable (Cl. 27)<br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br>**Seven (7) working days** | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br>**30a** |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br>**N/A** | 38. Name and place of Builders (only to be filled in if PART III applies)<br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br>**N/A** | 40. Date of Building Contract (only to be filled in if PART III applies)<br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br>a) **N/A**<br>b) **N/A**<br>c) **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| | |
|---|---|
| Signature (Owners) | Signature (Charterers) |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"BARECON 2001" STANDARD BAREBOAT CHARTER

2nd original

PART I

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

## PART II
## "BARECON 2001" Standard Bareboat Charter

**1. Definitions**
In this Charter, the following terms shall have the meanings hereby assigned to them:
*"The Owners"* shall mean the party identified in Box 3;
*"The Charterers"* shall mean the party identified in Box 4;
*"The Vessel"* shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.
*"Financial Instrument"* means the mortgage, deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.

**2. Charter Period**
In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

**3. Delivery**
*(not applicable when Part III applies, as indicated in Box 37)*
**(a)** The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy And in every respect ready in hull, machinery and equipment for service under this Charter.
The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.
**(b)** The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.
**(c)** The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.

**4. Time for Delivery**
*(not applicable when Part III applies, as indicated in Box 37)*
The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15 as per **Box 18.**
~~Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.~~
The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.

**5. Cancelling**
*(not applicable when Part III applies, as indicated in Box 37)*
**(a)** Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.
**(b)** If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.
**(c)** Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.

**6. Trading Restrictions**
The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe. **When required by Owner, the Charterers shall keep the Owners and Mortgages advised on intended employment of Vessel.**
The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

**7. Surveys on Delivery and Redelivery**
*(not applicable when Part III applies, as indicated in Box 37)*
The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-hire Survey including loss of time, if any, and the Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof.

**8. Inspection**
The Owners shall have the right at any time after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:- **provided it does not interfere with the operation of the Vessel a/o crew, but not to be unrasonably withheld.**
**(a)** to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;
**(b)** in dry-dock if the Charterers have not dry-docked Her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and
**(c)** for any other commercial reason they consider necessary (provided it does not unduly interfere with

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.
All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the Charter Period.
The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel.

9. **Inventories, Oil and Stores**
A complete inventory of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively. The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel.

10. **Maintenance and Operation**
(a)(i) Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, except as provided for in Clause 14(l), if applicable, at their own expense they shall at all times keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times. If **necessary as deemed by class, the Charterers to take immediate steps to have the necessary repairs done within a reasonable time (prior to or upon SS-drydocking) failling which the Owners shall have the right of withdrawing the Vessel from the service of the Charterers and without prejudice to any claim the Owners may otherwise have against the Charterers under this Charter.**

(ii) New Class and Other Safety Requirements - In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent. of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30.

(iii) Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof.
The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(b) Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.
Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.

(c) The Charterers shall keep the Owners and the mortgagee(s) advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required.

(d) Flag and Name of Vessel – **Charterers have the right to reflag the ship and install and display their funnel insignia and fly their own house flag, but name cannot be changed.** ~~During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.~~

(e) Changes to the Vessel – Subject to Clause 10(a)(ii), the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter.

(f) Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.

**(g)** Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State.

**11. Hire**

**(a)** The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.

**(b)** **Payment of hire shall be made as per daily hire in Box 22 basis per calender month in advance. First hire payable prorata upto end of the month starting from vessel's actual delivery date/time.** ~~The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated in Box 22 which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.~~

**(c)** Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26.

**(d)** Final payment of hire, if for a period of less than ~~thirty (30) running days~~ **a month**, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.

**(e)** Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. ~~The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.~~

*(f) Any delay in payment of hire shall entitle the* Owners to interest at the rate per annum as agreed in Box 24. If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply.

**(g)** Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.

**12. Mortgage**

*(only to apply if Box 28 has been appropriately filled in)*

~~*) (a) The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

*) **(b)** The Vessel chartered under this Charter is financed by a mortgage according to the Financial Instrument. The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with the Financial Instrument. The Charterers confirm that, for this purpose, they have acquainted themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s). The Owners warrant that they have not effected any mortgage(s) other than stated in Box 28 and that they shall not agree to any ~~amendment of the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

*) *(Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28).*

**13. Insurance and Repairs**

*(a) During the Charter Period the Vessel shall be kept* insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve, which approval shall not be un-reasonably withheld. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any), and The Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the Financial Instrument, if any, and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for.

The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.

All time used for repairs under the provisions of sub-clause 13(a) and for repairs of latent defects according to Clause 3(c) above, including any deviation, shall be for the Charterers' account.

**(b)** If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.

**(c)** The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to comply with the insurance provisions of the Financial Instrument.

**(d)** Subject to the provisions of the Financial Instrument, if any, should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 13(a), all insurance payments for such loss shall be paid to the Owners who shall distribute the moneys between the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a total loss as defined in this Clause.

**(e)** The Owners shall upon the request of the Charterers, promptly execute such documents as may

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

## PART II
## "BARECON 2001" Standard Bareboat Charter

be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.
*(f)* *For the purpose of insurance coverage against hull* and machinery and war risks under the provisions of sub-clause 13(a), the value of the Vessel is the sum indicated in Box 29.

~~**14. Insurance, Repairs and Classification**~~
~~*(Optional, only to apply if expressly agreed and stated in Box 29, in which event Clause 13 shall be considered deleted).*~~
~~**(a)** During the Charter Period the Vessel shall be kept insured by the Owners at their expense against hull and machinery and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or appurtenances covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. Insurance policies shall cover the Owners and the Charterers according to their respective interests.~~
~~**(b)** During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve which approval shall not be unreasonably withheld.~~
~~**(c)** In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.~~
~~**(d)** The Charterers shall, subject to the approval of the Owners or Owners' Underwriters, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances provided for under the provisions of sub-clause 14(a). The Charterers to be secured reimbursement through the Owners' Underwriters for such expenditures upon presentation of accounts.~~
~~**(e)** The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.~~
~~**(f)** All time used for repairs under the provisions of sub-clauses 14(d) and 14(e) and for repairs of latent defects according to Clause 3 above, including any deviation, shall be for the Charterers' account and shall form part of the Charter Period.~~
~~The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.~~
~~**(g)** If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.~~
~~**(h)** Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 14(a), all insurance payments for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~
~~**(i)** If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause 14(a), this Charter shall terminate as of the date of such loss.~~
~~**(j)** The Charterers shall upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to the insurers and claim a constructive total loss.~~
~~**(k)** For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 14(a), the value of the Vessel is the sum indicated in Box 29.~~
~~**(l)** Notwithstanding anything contained in sub-clause 10(a), it is agreed that under the provisions of Clause 14, if applicable, the Owners shall keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.~~

**15. Redelivery**
At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place as indicated in Box 16, in such ready safe berth as the **Charteres** ~~**Owners**~~ may direct. The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than **5/3/2/1** ~~**fourteen (14)**~~ running days' definite notice of expected date and port or place of redelivery. Any changes thereafter in the Vessel's position shall be notified immediately to the Owners.
The Charterers warrant that they will not permit the Vessel to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the Vessel within the Charter Period. Notwithstanding the above, should the Charterers fail to redeliver the Vessel within The Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 per cent. or to the market rate, whichever is the higher, *for the number of days by which the Charter Period is* exceeded. All other terms, conditions and provisions of this Charter shall continue to apply.
Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.
The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.

**16. Non-Lien**
The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and *interest of the Owners in the Vessel. The Charterers* further agree to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter Period a notice reading as follows:
"This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and by the terms of the Charter Party neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

**17. Indemnity**
**(a)** The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel

*This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.*

2nd original

## PART II
## "BARECON 2001" Standard Bareboat Charter

by the Charterers, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.
Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.
**(b)** If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, **by the mortgage holder the** Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.
In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention.

**18. Lien**
The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.

**19. Salvage**
All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**20. Wreck Removal**
In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

**21. General Average**
The Owners shall not contribute to General Average.

**22. Assignment, Sub-Charter and Sale**
**(a)** The Charterers shall not assign this Charter nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve.
**(b)** The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting an assignment of this Charter.

**23. Contracts of Carriage**
*) **(a)** The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause.
~~*) (b) The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto.~~
~~*) Delete as applicable.~~

**24. Bank Guarantee**
~~*(Optional, only to apply if Box 27 filled in)*~~
~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter.~~ **Corporate Guarantee to be attached to the BBCHP.**

**25. Requisition/Acquisition**
**(a)** In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter.
**(b)** In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".

**26. War**
**(a)** For the purpose of this Clause, the words "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
**(b) The Charteres shall be at liberty to trade the Vessel in War Risk Areas and any applicable additional premium shall be for the Charterers' account, but with full indemnity to Owners in regards to ransoms/accidents/deaths or loss of cargo, Charterers to show evidence of extra premia being paid.** ~~The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Owners, may be, or are likely to be,~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

~~exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners shall have the right to require the Vessel to leave such area.~~

**(c)** The Vessel shall not load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

~~**(d)** If the insurers of the war risks insurance, when Clause 14 is applicable, should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such insurers as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.~~

**(e)** The Charterers shall have the liberty:

**(i)** to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

**(ii)** to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

**(iii)** to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

**(f)** In the event of outbreak of war (whether there be a declaration of war or not) (i) between any two or more of the following countries: the United States of America; Russia; the United Kingdom; ~~France;~~ and the People's Republic of China, (ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter shall apply until redelivery.

**27. Commission**

The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33 on any hire paid under the Charter. ~~If no rate is indicated in Box 33, the commission to be paid by the Owners shall cover the actual expenses of the Brokers and a reasonable fee for their work.~~

~~If the full hire is not paid owing to breach of the Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire.~~

**28. Termination**

**(a)** Charterers' Default

The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if:

**(i)** the Charterers fail to pay hire in accordance with Clause 11. However, where there is a failure to make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice;

**(ii)** the Charterers fail to comply with the requirements of:
**(1)** Clause 6 (Trading Restrictions)
**(2)** Clause 13(a) (Insurance and Repairs)
provided that the Owners shall have the option, by written notice to the Charterers, to give the Charterers a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice;

**(iii)** the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as practically possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced.

**(b)** Owners' Default

If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners.

**(c)** Loss of Vessel

This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.

~~**(d)** Either party shall be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.~~

**(e)** The termination of this Charter shall be without prejudice to all rights accrued due between the parties

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

prior to the date of termination and to any claim that either party might have.

**29. Repossession**
In the event of the termination of this Charter in accordance with the applicable provisions of Clause 28, the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities. Pending physical repossession of the Vessel in accordance with this Clause 29, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners. The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably practicable following the termination of the Charter. The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative. All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers.

**30. Dispute Resolution**
*) **(a)** This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.
The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.
The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.
Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.
In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.
~~*) (b) This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~
~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~
~~*) (c) This Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~
**(d)** Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.
In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:-
(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.
(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.
(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.
(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.
(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.
(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.
(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.
*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*
**(e)** If Box 35 in Part I is not appropriately filled in, sub-clause 30(a) of this Clause shall apply. Sub-clause 30(d) shall apply in all cases.
*) *Sub-clauses 30(a), 30(b) and 30(c) are alternatives; indicate alternative agreed in Box 35.*

**31. Notices**
**(a)** Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, e-mail registered or recorded mail or by personal service.
**(b)** The address including e-mail(s) of the Parties for service of such communication shall be as stated in Boxes 3 and 4 respectively.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**"BARECON 2001" Standard Bareboat Charter**

OPTIONAL PART

## PART III
## PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY

*(Optional, only to apply if expressly agreed and stated in Box 37)*

1. ~~**Specifications and Building Contract**~~

~~(a) The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.~~

~~(b) No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.~~

~~(c) The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.~~

~~(d) The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein. Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers). The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred. Any liquidated damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties. The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.~~

2. ~~**Time and Place of Delivery**~~

~~(a) Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.~~

~~(b) If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.~~

~~(c) If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon~~

~~(i) if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or~~

~~(ii) if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/ or take delivery of the Vessel from the Builders and deliver her to the Charterers;~~

~~(iii) in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;~~

~~(iv) if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.~~

~~(d) Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.~~

3. ~~**Guarantee Works**~~

~~If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.~~

4. ~~**Name of Vessel**~~

~~The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.~~

5. ~~**Survey on Redelivery**~~

~~The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery. Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred. The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**"BARECON 2001" Standard Bareboat Charter**

**OPTIONAL PART**

## PART IV
## HIRE/PURCHASE AGREEMENT

*(Optional, only to apply if expressly agreed and stated in Box 42)*

~~On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for.~~

~~*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.*~~

~~The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter.~~

~~The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account.~~

~~In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers.~~
~~The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession.~~

~~The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment.~~

~~The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description.~~

~~The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

"BARECON 2001" Standard Bareboat Charter

OPTIONAL PART

## PART V

## PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY

*(Optional, only to apply if expressly agreed and stated in Box 43)*

~~**1. Definitions**~~

~~For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them:~~

~~"The Bareboat Charter Registry" shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.~~

~~"The Underlying Registry" shall mean the registry of the state in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.~~

~~**2. Mortgage**~~

~~The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 12(b) (Part II) shall apply.~~

~~**3. Termination of Charter by Default**~~

~~If the Vessel chartered under this Charter is registered in a Bareboat Charter Registry as stated in Box 44, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 28, the Charterers shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 45.~~

~~In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 44, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter.~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

ARROW
TANKERS A/S

**RIDER CLAUSES TO CHARTER PARTY**

**M.T. "CV STEALTH "**

**DATED 23rd February 2010**

**CLAUSE 1. CANCELLATION OF BAREBOAT CHARTER:**

Owners during this charter have the right to sell the Vessel to a third party at any time hereunder with the following conditions:

(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and the new owner shall comply in full with a] I the terms and conditions of this Charter Party.

(b) Charterers always to have the right of first refusal to buy the Vessel.

(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably withheld.

**CLAUSE 2. DRY DRY-DOCKS:**

Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always un-extended at Charterers cost and expenses.

**CLAUSE 3. BUNKER CLAUSE:**

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time.

**CLAUSE 4. CHARTERERS LIABILITIES:**

Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage, costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

**CLAUSE 5. OIL POLLUTION:**

Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident, provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

2nd original

m.t. CV STEALTH - CP dated 23rd February 2010

cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

**CLAUSE 6. RISKS AND INSURANCE OF THE VESSEL:**

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk of the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and

2nd original

to arrange and pay for extra cover required by protection and Indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv)To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v)Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi)To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x)Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi)Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

2nd original

m.t. CV STEALTH – CP dated 23rd February 2010

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii)all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers expense, such alternative insurance as the Owners may in their discretion determine to be necessary to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

**CLAUSE 7. INTEREST:**

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges

2nd original

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

**CLAUSE 8. CHARTERERS' COVENANTS:**

The Charterers Covenant with the Owners undertake throughout the term of this Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel' s dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;



2nd original

(e) They will notify the Owners forthwith by telex, telefax or e -mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.

**CLAUSE 9. INDEMNITY:**

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying

up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof

2nd original

is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

**CLAUSE 10. TERMINATION EVENTS:**

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d) Any license, approval, consent authorization or registration at any time necessary for the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

2nd original

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

**CLAUSE 11. OWNERS' RIGHTS ON A TERMINATION EVENT:**

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

(i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

(ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

2nd original

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their absolute discretion think fit.

**CLAUSE 12. <u>CONTRADICTION CLAUSE</u>**

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

**CLAUSE 13. <u>THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:</u>**

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.

2nd original

**CLAUSE 14.**

MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

**CLAUSE 15.**

Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery. Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

**CLAUSE 16.**

Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

**CLAUSE 17.**

Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

**CLAUSE 18.**

Local time for laycan, GMT for hire calculation.

**CLAUSE 19.**

Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)

2nd original

ARROW

**m.t. CV STEALTH – CP dated 23rd February 2010**

**CLAUSE 20.**

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET ) to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Owners

For the Charterers

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for
M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :

By : Himoza Dimareli
Title : Director

Charterers:

By : [illegible]
Title : [illegible]

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for
M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**

USD 8,750 gross pdpr for the first 365 days after delivery
USD 9,750 gross pdpr for the 2nd charter year
USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year
USD 9,750 gross pdpr for the 4th charter year
USD 9,750 gross pdpr for the 5th charter year
USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**

To be deleted.

**Delivery:**

Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

| Owners : | Charterers: |
|---|---|
| By : Mimoza Dimarelli | By : Tugan Tokan |
| Title : DIRECTOR | Title : DIRECTOR |

**ADDENDUM NO 3**

**Dated 23 January 2013**

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")
as amended by an Addendum No 1 dated 2nd June 2010
and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed that:

1. The payment of a portion of the daily charter hire of an amount of USD 3.225 arising from the charter hires starting 1st December 2012 until 1st December 2013 shall be deferred. With effect from 1st December 2013 the total amount of deferred charter hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal instalments until 22nd June 2015 and added to the daily charter hire.

2. Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box 22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3. In the event of default of payment by the charterers under the bareboat charters of the Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or undertakings thereto remain unaltered and in full force and effect.

.......................... Tarkan Tekcan
For and on behalf of
the Charterers

.......................... Tarkan Tekcan
For and on behalf of
the Guarantor

..........................
For and on behalf of
the Owners
Georgios Amanatidis
Sole Director

# 2

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

**IRREVOCABLE PERFORMANCE GUARANTEE**

In consideration of you, Psara Energy Limited / Marshall Island (hereinafter the "Company" ), entering into a Bareboat Charterparty and MoA as per rider clause 13 of "BARECON 2001" dated 23 February 2010 and any and all subsequent addenda thereto (the "Contract") with Space Shipping Ltd / Malta (the "Charterer") as charterer and or buyer, we, subject to the provision of the paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire and or the purchase price of the vessel MT CV STEALTH under the Charterparty according to the Contract, providing the Charterer with sufficient funds to fulfill the Contract, due and punctual payment to you of all amounts (if any) owing by the Charterer under or pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days from the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers to you to your account as specified in the Contract. Such demand is to specify the amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking, confirmed by your countersignature hereunder, that subject to our payment of any overdue amount under this guarantee within 7 days of receipt of your demand, you will not execute your right of withdrawal of the Vessel as per the Contract and you will refrain from arresting or otherwise detaining any of our assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgement orders the Charterers to make repayment. If the Charterers fails to honour the judgement within seven (7) days after that the final judgement had been rendered in the proceedings then we shall pay to you to the extent the judgement orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of  (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00  Fax +90 212 283 1604

04, March, 2010                    GEDEN HOLDINGS LTD of MALTA

Countersigned:
04, March, 2010                    SUPER SHIPPING LTD of MALTA

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**
Date: 13-Aug-16
Currency: USD
No: T0110/DN/80

**M/T C.V.STEALTH / T 0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 76 | | |
| From 01-Sep-16 00:00 to 30-Sep-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 30.00000 | | |
| **Bare boat hire daily** (01-Sep-16 00:00-30-Sep-16 24:00) | $435,000.00 | |
| Total amount USD | $435,000.00 | $0.00 |
| Balance Due | | $435,000.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**
Date: 15-Jul-16
Currency: USD
No: T0110/DN/79

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 75 | | |
| From 01-Aug-16 00:00 to 31-Aug-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-Aug-16 00:00-31-Aug-16 24:00) | $449,500.00 | |
| Total amount USD | $449,500.00 | $0.00 |
| Balance Due | | $449,500.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA, MALTA

**DEBIT NOTE**
Date: 15-Jun-16
Currency: USD
No: T0110/DN/78

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 74 | | |
| From 01-Jul-16 00:00 to 31-Jul-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-Jul-16 00:00-31-Jul-16 24:00) | $449,500.00 | |
| Total amount USD | $449,500.00 | $0.00 |
| Balance Due | | $449,500.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA, MALTA

**DEBIT NOTE**
Date: 26-May-16
Currency: USD
No: T0110/DN/77

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 73 | | |
| From 01-Jun-16 00:00 to 30-Jun-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 30.00000 | | |
| **Bare boat hire daily** (01-Jun-16 00:00-30-Jun-16 24:00) | $435,000.00 | |
| Total amount USD | $435,000.00 | $0.00 |
| Balance Due | | $435,000.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

p.p.
Eftichia Petala
Freight Collection Dpt



**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA, MALTA

**DEBIT NOTE**
Date: 26-Apr-16
Currency: USD
No: T0110/DN/76

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 72 | | |
| From 01-May-16 00:00 to 31-May-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-May-16 00:00-31-May-16 24:00) | $449,500.00 | |
| Total amount USD | $449,500.00 | $0.00 |
| Balance Due | | $449,500.00 |

Freight is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**

Date: 15-Mar-16
Currency: USD
No: T0110/DN/75

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 71 | | |
| From 01-Apr-16 00:00 to 30-Apr-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 30.00000 | | |
| **Bare boat hire daily** (01-Apr-16 00:00-30-Apr-16 24:00) | $435,000.00 | |
| Total amount USD | $435,000.00 | $0.00 |
| Balance Due | | $435,000.00 |

*Hire is payable as per charter party to:*

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

Nikos Markomichelakis
Operations Manager

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA, MALTA

**DEBIT NOTE**
Date: 15-Feb-16
Currency: USD
No: T0110/DN/74

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 70 | | |
| From 01-Mar-16 00:00 to 31-Mar-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 31.0000 | | |
| **Bare boat hire daily** (01-Mar-16 00:00-31-Mar-16 24:00) | $449,500.00 | |
| Total amount USD | $449,500.00 | $0.00 |
| *Balance Due* | | $449,500.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: **STEALTH MARITIME CORPORATION S.A.**
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

Nikos Markomichel
Operations Manager

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**
Date: 18-Jan-16
Currency: USD
No: T0110/DN/73

M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 63 | | |
| From 01-Feb-16 00:00 to 29-Feb-16 24:00<br>Hire Rate: 14,500.00 USD/per Day<br>Total Days: 29.00000 | | |
| **Bare boat hire daily** (01-Feb-16 00:00-29-Feb-16 24:00) | $420,500.00 | |
| Total amount USD | $420,500.00 | $0.00 |
| Balance Due | | $420,500.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Eftichia Petala
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**

Date: 15-Dec-15
Currency: USD
No: T0110/DN/72

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 68 | | |
| From 01-Jan-16 00:00 to 31-Jan-16 24:00<br>Hire Rate: 10,725.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-Jan-16 00:00-31-Jan-16 24:00) | $332,475.00 | |
| Total amount USD | $332,475.00 | $0.00 |
| Balance Due | | $332,475.00 |

*Hire is payable as per charter party to:*

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Eftichia Petala
Freight Collection Dpt

Nikos Markomichelakis
Operations Manager

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**
Date: 23-Nov-15
Currency: USD
No: T0110/DN/71

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 67<br>From 01-Dec-15 00:00 to 31-Dec-15 24:00<br>Hire Rate: 10,725.00 USD/per Day<br>Total Days: 31.00000 | | |
| Bare boat hire daily (01-Dec-15 00:00-31-Dec-15 24:00) | $332,475.00 | |
| Total amount USD | $332,475.00 | $0.00 |
| Balance Due | | $332,475.00 |

Freight is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Eftichia Petala
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**

331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**

Date: 21-Sep-15
Currency: USD
No: T0110/DN/69

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Charterers Expenses** (Calculated interest on outstanding hires from 30-Apr-15) | $9,197.79 | |
| Total amount USD | $9,197.79 | $0.00 |
| Balance Due | | $9,197.79 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perdinias Kyriakos
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA, MALTA

**DEBIT NOTE**
Date: 15-Oct-15
Currency: USD
No: T0110/DN/70

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 66 | | |
| From 01-Nov-15 00:00 to 30-Nov-15 24:00<br>Hire Rate: 10,725.00 USD/per Day<br>Total Days: 30.00000 | | |
| **Bare boat hire daily** (01-Nov-15 00:00-30-Nov-15 24:00) | $321,750.00 | |
| Total amount USD | $321,750.00 | $0.00 |
| Balance Due | | $321,750.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

## STEALTH MARITIME CORPORATION S.A.

331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

**DEBIT NOTE**
Date: 24-Sep-15
Currency: USD
No: T0110/DN/68

**M/T C.V.STEALTH / T 0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 65 | | |
| From 01-Oct-15 00:00 to 31-Oct-15 24:00<br>Hire Rate: 10,725.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-Oct-15 00:00-31-Oct-15 24:00) | $332,475.00 | |
| **SUPPLEMENTARY HIRE**<br>From 22-Jul-15 11:00 to 31-Jul-15 24:00<br>Hire Rate: 975.00 USD/per Day<br>Total Days: 9.54167 | $9,303.12 | |
| **SUPPLEMENTARY HIRE**<br>From 01-Aug-15 00:00 to 31-Aug-15 24:00<br>Hire Rate: 975.00 USD/per Day<br>Total Days: 31.00000 | $ 30,225.00 | |
| Total amount USD | $372,003.12 | $0.00 |
| Balance Due | | $372,003.12 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

# STEALTH MARITIME CORPORATION S.A.

331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

**DEBIT NOTE**

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET
VALLETTA,MALTA

Date: 26-Aug-15
Currency: USD
No: T0110/DN/67

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 64 | | |
| From 01-Sep-15 00:00 to 30-Sep-15 24:00<br>Hire Rate: 10,725.00 USD/per Day<br>Total Days: 30.00000 | | |
| **Bare boat hire daily** (01-Sep-15 00:00-30-Sep-15 24:00) | $321,750.00 | |
| Total amount USD | $321,750.00 | $0.00 |
| Balance Due | | $321,750.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Makomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET

**DEBIT NOTE**
Date: 27-Jul-15
Currency: USD
No: T0110/DN/66

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 63 | | |
| From 01-Aug-15 00:00 to 31-Aug-15 24:00<br>Hire Rate: 9,750.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-Aug-15 00:00-31-Aug-15 24:00) | $302,250.00 | |
| Total amount USD | $302,250.00 | $0.00 |
| Balance Due | | $302,250.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**

331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET

**DEBIT NOTE**

Date: 10-Jun-15
Currency: USD
No: T0110/DN/65

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 62 | | |
| From 01-Jul-15 00:00 to 31-Jul-15 24:00<br>Hire Rate: 9,750.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-Jul-15 00:00-31-Jul-15 24:00) | $302,250.00 | |
| Total amount USD | $302,250.00 | $0.00 |
| Balance Due | | $302,250.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

**STEALTH MARITIME CORPORATION S.A.**
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET

**DEBIT NOTE**

Date: 26-May-15
Currency: USD
No: T0110/DN/64

**M/T C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 61 | | |
| From 01-Jun-15 00:00 to 22-Jun-15 02:39<br>Hire Rate: 11,822.00 USD/per Day<br>Total Days: 21.11042 | | |
| From 22-Jun-15 02:39 to 30-Jun-15 24:00<br>Hire Rate: 9,750.00 USD/per Day<br>Total Days: 8.88958 | | |
| **Bare boat hire daily** (01-Jun-15 00:00-30-Jun-15 24:00) | $336,240.78 | |
| Total amount USD | $336,240.78 | $0.00 |
| Balance Due | | $336,240.78 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK:
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

# STEALTH MARITIME CORPORATION S.A.

331, KIFISIAS AVE., 14561 KIFISIA

P.O. Box 52939,14610
Kifisia GREECE

M/S: SPACE SHIPPING LTD
198 OLD BAKERY STREET

**DEBIT NOTE**

Date: 21-Apr-15
Currency: USD
No: T0110/DN/63

**M/V C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| **Bare Boat Charter Hire Calculation** | | |
| Billing Period: 60 | | |
| From 01-May-15 00:00 to 31-May-15 24:00<br>Hire Rate: 11,822.00 USD/per Day<br>Total Days: 31.00000 | | |
| **Bare boat hire daily** (01-May-15 00:00-31-May-15 24:00) | $366,482.00 | |
| Total amount USD | $366,482.00 | $0.00 |
| Balance Due | | $366,482.00 |

Hire is payable as per charter party to:

DnB NOR Bank ASA
London Branch
8TH FLOOR, THE WALBROOK BUILDING,
25 WALBROOK
London -EC4N 8AF
ENGLAND
SWIFT CODE: DNBAGB2L
SORT CODE: 40 51 14
ACCOUNT NR: 63078001
IBAN: GB82DNBA40511463078001
IN FAVOUR OF: STEALTH MARITIME CORPORATION S.A.
CORRESPONDENT BANK
BANK OF NEW YORK, NEW YORK
SWIFT CODE: IRVTUS3N

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

## SCHEDULE 11 – Organisational Chart

1.14.6180.00 21327756 v4

**CONSENT LETTER**

From: Geden Holdings Ltd (the "Shareholder")
85 St.John's Street, Valletta, Malta

To: Shell Western Supply and Trading Limited (the "Charterer")
Barbados

06.02.2015

Dear Sirs

1 We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel "Royal", dated 17 October 2012) (the "Existing Charters") and entered into between the companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in respect of the vessels listed in Annex 1 hereto (the "Vessels").

2 As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

3 Upon each Vessel Sale:

(a) the relevant Existing Owner will delete that Vessel from Maltese flag and the relevant New Owner will register that Vessel in its name under Marshall Islands flag;

(b) the relevant ship mortgage over that Vessel registered in the name of the banks and financial institutions listed in Annex 1 hereto as Existing Mortgagees shall be discharged and shall be replaced (as part of the financing and/or refinancing arrangements between that New Owner and its financiers) with a new ship mortgage s to be registered in the name of the banks and financial institutions listed in Annex 1 hereto as New Mortgagees;

(c) subject to the respective New Owners being acceptable to Charterer following Charterer's KYC and other relevant checks, the Existing Charters will be terminated by mutual agreement between the respective Existing Owners and Charterer and new charters (the "New Charters") will be entered into between the Charterer and the relevant New Owner on terms, inter alia, as follows:

(i) each New Charter shall come into effect on the time on which the relevant Vessel is delivered to, and accepted by, the relevant New Owner from the relevant Existing Owner pursuant to that Vessel Sale (the "Vessel Sale Effective Dates");

(ii) the duration of each New Charter shall be 5 years from the Vessel Sale Effective Date plus the optional period (3 years for aframaxes and 1 year for suezmaxes);

(iii) the charter hire (the "Hire") will be the aggregate of a base rate and profit sharing amount (the "PSA"). The Base Rate payable by the Charterer to the relevant New Owner shall be US$17,500 per day other than the vessels Advantage Sun, Advantage Sky, Advantage Solar, Advantage Start whereas the base rate shall be US$18,500 during the initial period of 24 months (the "Base Rate"); The PSA will be calculated as the monthly averages of certain trading routes as described in the relevant charter parties.

(iv) the terms of each New Charter shall otherwise be substantially the same as the terms of its corresponding Existing Charter, save as contemplated by this paragraph 3(c) and for logical amendments.

4 A pro-forma of New Charter is annexed to this Letter as Annex 2.

5 The Shareholder confirms to the Charterer that:

(a) it shall procure that an opinion on matters of Maltese law relating to the Title Transfers is given from Fenech & Fenech to the Charterer, in form and substance reasonably satisfactory to the Charterer, within 30 days from the date of this Letter;

(b) it shall provide to the Charterer promptly on reasonable request such information regarding the New Owners as the Charterer requires for KYC purposes.

6 The Shareholder hereby:

(a) notifies the Charterer of its intention to complete the Vessel Sales;

(b) confirms that it shall be keep the Charterer (i) updated of the intended dates and schedule for the completion of each Vessel Sale and (ii) notified on the date on which each Vessel Sale is completed; and

(c) requests that the Charterer consents to the termination of the Existing Charters and entry into the New Charters (substantially on the terms above), each to come into effect on the relevant Vessel Sale Effective Date.

(d) agrees to procure that upon each Vessel Sale the relevant Existing Owner executes a Memorandum of Termination with Charterer agreeing and confirming that all rights and obligations of the parties under the Existing Charter shall cease and determine with effect from the date of termination provided that this shall not affect or prejudice any claim or demand that either party may have against the other under or in connection with the Existing Charter arising before the date of termination (it being acknowledged and agreed by the Existing Owner that it shall have no claim against the Charterer for early or wrongful termination of the Charter or early redelivery of the Ship.

(e) agrees to procure that upon each Vessel Sale each New Owner and the respective New Mortgagee enters into a subordination and non-disturbance agreement with Charterer in a form acceptable to the Charterer and New Mortgagee.

7 For the avoidance of any doubt, if, due to any reason whatsoever, any of the above matters fails to be fulfilled until 30 April 2015 , as a consequence the matters contained in this letter becomes null and void. The Existing Charters shall however remain valid and binding in all respects between the parties thereof.

8 The Charterer, by countersigning this Letter, hereby agrees and consents to the contents contained herein.

9 This Letter and any non-contractual obligations arising under or in connection with it shall be governed by English law.

Yours faithfully

..................................

For and on behalf of
GEDEN HOLDINGS LTD.

Name: Tuğrul Tokgöz
Title: Director

Agreed, consented and accepted:

..................................

For and on behalf of
SHELL WESTERN SUPPLY AND TRADING LIMITED

Name: David Chapman
Title: General Manager

ANNEX 1

VESSELS

| Vessel | Existing Owner | New Owner | Existing Mortgagee | New Mortgagee |
|---|---|---|---|---|
| Profit (tbr Advantage Solar) | Profit Shipping Ltd. of Malta | Advantage Solar Shipping LLC of the Marshall Islands | DVB Bank NV | DVB Bank NV |
| Target (tbr Advantage Arrow) | Target Shipping Ltd. of Malta | Advantage Arrow Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Bravo (tbr Advantage Atom ) | Bravo Shipping Ltd. of Malta | Advantage Atom Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| True (tbr Advantage Avenue) | True Shipping Ltd. of Malta | Advantage Avenue Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Blue (tbr Advantage Sky) | Blue Shipping Ltd. of Malta | Advantage Sky Shipping LLC of the Marshall Islands | Commerzbank AG | Hayfin Capital Management LLP |
| Blank (tbr Advantage Start ) | Blank Shipping Ltd. of Malta | Advantage Start Shipping LLC of the Marshall Islands | Bank of America NA | CIT Finance LLC |

| Value (tbr Advantage Award) | Value Shipping Ltd. of Malta | Advantage Award Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
|---|---|---|---|---|
| Power (tbr Advantage Anthem) | Barbaros Maritime Ltd. of Malta | Advantage Anthem Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Royal (tbr Advantage Sun) | Prima Shipping Ltd. of Malta | Advantage Sun Shipping LLC of the Marshall Islands | Credit Europe NV | CIT Finance LLC |

ANNEX 2

PRO-FORMA OF NEW CHARTER

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*Incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

# Time Charter Party

LONDON, 22 May 2015

IT IS THIS DAY AGREED between Advantage Award Shipping LLC of Bahamas (hereinafter referred to as "Owners"), being owners of the good motor/steam* vessel called M/T Advantage Award (hereinafter referred to as "the vessel") described as per Clause 1 hereof and Shell Western Supply and Trading of Barbados (hereinafter referred to as "Charterers"):

**Description And Condition of Vessel**

1. At the date of delivery of the vessel under this charter and throughout the charter period:
   (a) she shall be classed by a Classification Society which is a member of the International Association of Classification Societies;
   (b) she shall be in every way fit to carry crude petroleum and/or its products;
   (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator, radar, computers and computer systems) in a good and efficient state;
   (d) her tanks, valves and pipelines shall be oil-tight;
   (e) she shall be in every way fitted for burning, in accordance with the grades specified in Clause 29 hereof:
      (i) at sea, fuel oil for main propulsion and fuel oil/marine diesel oil* for auxiliaries;
      (ii) in port, fuel oil/marine diesel oil* for auxiliaries;
   (f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals as appropriate upon expansion by day and night without delay;
   (g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;
   (h) she shall comply with the description in the OCIMF Harmonised Vessel Particulars Questionnaire appended hereto as Appendix A, provided however that if there is any conflict between the provisions of this questionnaire and any other provision, including this Clause 1, of this charter such other provisions shall govern;
   (i) her ownership structure, flag, registry, classification society and management company shall not be changed without Charterers' approval

**Safety Management**

   (j) Owners will operate:
      (i) a safety management system certified to comply with the International Safety Management Code ("ISM Code") for the Safe Operation of Ships and for Pollution Prevention;
      (ii) a documented safe working procedures system (including procedures for the identification and mitigation of risks);
      (iii) a documented environmental management system;
      (iv) documented accident/incident reporting system compliant with flag state requirements;
   (k) Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and environmental reporting requirements, in accordance with the "Shell Safety and Environmental Monthly Reporting Template" appended hereto as Appendix B;
   (l) Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners.
   (m) Owners will arrange at their expense for a SIRE inspection to be carried out four months plus or minus fifteen days after Charterers' SIRE inspection provided vessel is not on floating storage. In the event vessel is engaged in storage or otherwise unavailable for inspection within the stipulated window Owners will request a SIRE inspection at the earliest opportunity thereafter.

**Shipboard Personnel And their**

2. (a) At the date of delivery of the vessel under this charter and throughout the charter period:
      (i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required

* Delete as appropriate.

D01254

Duties

by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;

(ii) all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1995 or any additions, modifications or subsequent versions thereof;

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge there from to be carried out quickly and efficiently;

(v) the terms of employment of the vessel's staff and crew will always remain acceptable to The International Transport Worker's Federation and the vessel will at all times carry a Blue Card;

(vi) the nationality of the vessel's officers given in the OCIMF Vessel Particulars Questionnaire referred to in Clause 1(h) will not change without Charterers' prior agreement

(b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers;

(i) prosecute all voyages with the utmost despatch;

(ii) render all customary assistance; and

(iii) load and discharge cargo as rapidly as is safely possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

Duty to Maintain

3. (a) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(b) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.
Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.

(c) If Owners are in breach of their obligations under Clause 3(a)), Charterers may so notify Owners in writing and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(a), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

(d) Owners shall advise Charterers immediately, in writing, should the vessel fail an inspection by, but not limited to, a governmental and/or port state authority, and/or terminal and/or major charterer of similar tonnage. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects which have caused the failure of such inspection.

(e) If, in Charterers reasonably held view:

(i) failure of an inspection, or,

(ii) any finding of an inspection,

referred to in Clause 3 (d), prevents normal commercial operations then Charterers have the option to place the vessel off-hire from the date and time that the vessel fails such inspection, or becomes commercially inoperable, until the date and time that the vessel passes a re-inspection by the same organisation, or becomes commercially operable, which shall be in a position no less favourable to Charterers than at which she went off-hire.

(f) Furthermore, at any time while the vessel is off-hire under this Clause 3 (with the exception of Clause 3(e)(ii)), Charterers have the option, where Owners fail to exercise significant due diligence as required under this Charter or if the vessel has become unsuitable to Shell's Ship Quality Assurance, to terminate this charter by

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

giving notice in writing, such termination only becoming effective if Owners are unable to rectify outstanding issues within 30 days of receipt of such notice. ~~to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (f) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof).~~

Period, Trading Limits and Safe Places

4. (a) Owners agree to let and Charterers agree to hire the vessel for a period of 5 (five) years plus or minus 30 days in Charterers' option, commencing from the time and date of delivery of the vessel, and Charterers shall have an option to extend the charter party for an additional 3 (three) years. (Such option to be declared within 90 days to the end of initial 5 year period) for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular: Crude oil, Dirty Petroleum Products (including Fuel Oil, VGO, Carbon Black, Special Industrial Fuel Oil, LSWR, but excluding asphalt) and Clean Petroleum Products. (All time and costs incurred preparing vessel's tanks, lines and pumps for the carriage of clean petroleum product to be for Charterers' account.)

In any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35, Charterers may order the vessel to ice-bound waters however the vessel shall not force ice or follow icebreakers or to any part of the world outside such limits provided that Owner's consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order. Always excluded from trading limits are any States where employing the vessel in any carriage, trade or voyage would expose the vessel, Owners or Charterers to any sanction imposed by the US and/or UN and/or EU.

(b) Any time during which the vessel is off-hire under this charter may be added to the charter period in Charterers' option up to the total amount of time spent off-hire. In such cases the rate of hire will be that prevailing at the time the vessel ~~would, but for the provisions of this Clause, have been redelivered.~~ was off-hire.

(c) Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.

(d) Unless otherwise agreed, the vessel shall be delivered by Owners ~~dropping outward pilot at a port in~~ when/where ready, with or without cargo, at sea or in port at Owners' option and redelivered to Owners dropping outward pilot at a port in Worldwide - WIWL at Charterers' option.

(e) The vessel will deliver with last cargo(es) of Crude Oil or Dirty Petroleum Products and will redeliver with last cargo(es)of Crude Oil or Dirty Petroleum Products

(f) Owners ~~are required to give~~ keep Charterers closely advised ~~days prior notice of~~ delivery prospects and Charterers are required to give Owners approximate 30, 20 15, 10, 7 and definite 5, 3, 2, 1 days prior notice of redelivery.

Laydays/ Cancelling

5. The vessel shall not be delivered to Charterers before 1st May 2015 and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 31st July 2015

Owners to Provide

6. Owners undertake to provide and to pay for all provisions, wages (including but not limited to all overtime payments except as provided in Additional Clause (4), and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof and Additional Clause 6, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water except that used for Charterers' purposes such as cleaning, rinsing or

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*Incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

flushing of tanks and/or lines; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a Period when the vessel is on-hire.

Charterers to Provide

7. (a) Charterers shall provide and pay for all fuel ~~(except fuel used for domestic services)~~, towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22) ; and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

(b) In respect of bunkers consumed for Owners' purposes these will be charged on each occasion by Charterers on a "first-in-first-out" basis valued on the prices actually paid by Charterers.

(c) If the trading limits of this charter include ports in the United States of America and/or its protectorates then Charterers shall reimburse Owners for port specific charges relating to additional premiums charged by providers of oil pollution cover, when incurred by the vessel calling at ports in the United States of America and/or its protectorates in accordance with Charterers orders.

Rate of Hire

8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at ~~the rate of XX United States Dollars per day, and pro rata for any part of a day, from the time and date of her delivery (local time) to Charterers until the time and date of redelivery (local time) to Owners. Charterers to pay an additional $XXXX per month for communications/victualing, payable with hire.~~ a market related rate,which shall be payable on the 4th day each month in accordance with the calculation in the attached spreadsheet and based on the previous month's inputs, as described in Appendix A (annexed to this Charter Party).

Payment of Hire

9. Subject to Clause 3 (c) and 3 (e), payment of hire shall be made in immediately available funds to:

Beneficiary : Advantage Award Shipping LLC
Bank : Unicredit Bank AG, Hamburg / IBAN : DE58200300000016248130

in United States Dollars per calendar month in advance, less:

(i) any hire paid which Charterers reasonably estimate to relate to agreed off-hire periods, and;
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and;
(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (c) or 24 hereof,

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment:

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due, including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and;

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the ~~Chase Manhattan Bank~~ *Wall Street Journal* in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

Space Available to

10. The whole reach, burthen and decks on the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

Charterers — vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 500 tonnes (excluding lubes and water), at any time during the charter period.

Segregated Ballast — 11. In connection with the Council of the European Union Regulation on the Implementation of IMO Resolution A747(18) Owners will ensure that the following entry is made on the International Tonnage Certificate (1969) under the section headed "remarks":
"The segregated ballast tanks comply with the Regulation 13 of Annex 1 of the International Convention for the prevention of pollution from ships, 1973, as modified by the Protocol of 1978 relating thereto, and the total tonnage of such tanks exclusively used for the carriage of segregated water ballast is _____ The reduced gross tonnage which should be used for the calculation of tonnage based fees is _____".

Instructions And Logs — 12. Charterers shall from time to time give the master all requisite instructions and sailing directions which shall be confirmed in writing, and the master shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

Bills of Lading — 13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign Bills of Lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise;

(i) from signing Bills of Lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such Bills of Lading fail to conform to the requirements of this charter, or (except as provided in Clause 13 (b)from the master otherwise complying with Charterers' or their agents' orders;

(ii) from any irregularities in papers supplied by Charterers or their agents.

(b) If Charterers by telex, facsimile or other form of written communication that specifically refers to this Clause request Owners to discharge a quantity of cargo either without Bills of Lading and/or at a discharge place other than that named in a Bill of Lading and/or that is different from the Bill of Lading quantity, then Owners shall discharge such cargo in accordance with Charterer's instructions in consideration of receiving the following indemnity which shall be deemed to be given by Charterers on each and every such occasion and which is limited in value to ~~200%~~ 400% of the CIF value of the cargo carried on board;

"(i) Charterers shall indemnify Owners and Owners' servants and agents in respect of any liability loss or damage of whatsoever nature (including legal costs as between attorney or solicitor and client and associated expenses) which Owners may sustain by reason of delivering such cargo in accordance with Charterers' request.

(ii) If any proceeding is commenced against Owners or any of Owners' servants or agents in connection with the vessel having delivered cargo in accordance with such request, Charterers shall provide Owners or any of Owners' servants or agents from time to time on demand with sufficient funds to defend the said proceedings.

(iii) If the vessel or any other vessel or property belonging to Owners should be arrested or detained, or if the arrest or detention thereof should be threatened, by reason of discharge in accordance with Charterers instruction as aforesaid, Charterers shall provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and Charterers shall indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not same may be justified.

(iv) Charterers shall, if called upon to do so at any time while such cargo is in Charterers' possession, custody or control, redeliver the same to Owners.

(v) As soon as all original Bills of Lading for the above cargo which name as discharge port the place where delivery actually occurred shall have arrived and/or come into Charterers' possession, Charterers shall produce and deliver the same to Owners whereupon Charterers' liability hereunder shall cease.

Provided however, if Charterers have not received all such original Bills of Lading by 24.00 hours on the day 36 calendar months after the date of discharge, that this indemnity shall terminate at that time unless before that time Charterers have received from Owners written

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*Incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

notice that:
a) Some person is making a claim in connection with Owners delivering cargo pursuant to Charterers request or,
b) Legal proceedings have been commenced against Owners and/or carriers and/or Charterers and/or any of their respective servants or agents and/or the vessel for the same reason.
When Charterers have received such a notice, then this indemnity shall continue in force until such claim or legal proceedings are settled. Termination of this indemnity shall not prejudice any legal rights a party may have outside this indemnity.
(vi) Owners shall promptly notify Charterers if any person (other than a person to whom Charterers ordered cargo to be delivered) claims to be entitled to such cargo and/or if the vessel or any other property belonging to Owners is arrested by reason of any such discharge of cargo.
vii) This indemnity shall be governed and construed in accordance with the English law and each and any dispute arising out of or in connection with this indemnity shall be subject to the jurisdiction of the High Court of Justice of England".

(c) Owners warrant that the Master will comply with orders to carry and discharge against one or more Bills of Lading from a set of original negotiable Bills of Lading should Charterers so require.

**Conduct of Vessel's Personnel**

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

**Bunkers at Delivery and Redelivery**

15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the price actually paid, on a "first-in-first-out" basis. Such prices are to be supported by paid invoices.
Vessel to be delivered to and redelivered from the charter with, at least, a quantity of bunkers on board sufficient to safely reach the nearest main bunkering port.
Notwithstanding anything contained in this charter all bunkers on board the vessel shall, throughout the duration of this charter, remain the property of Charterers and can only be purchased on the terms specified in the charter at the end of the charter period or, if earlier, at the termination of the charter.

**Stevedores, Pilots, Tugs**

16. Stevedores, when required, shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that;

(a) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and;
(b) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

**Super-Numeraries**

17. Charterers may send representatives at their time, risk and expense in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except alcohol. Charterers paying at the rate of United States Dollars 15 (fifteen) per day for each representative while on board the vessel.

**Sub-letting/ Assignment/ Novation**

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. Additionally Charterers may assign or novate this charter to any company of the Royal Dutch/ Shell Group of Companies.

**Final Voyage**

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for;

(a) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*Incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

hereof, and;

(b) bunkers on board at redelivery pursuant to Clause 15.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

Loss of Vessel

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

Off-hire

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner);

(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or;

(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or;

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or;

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or;

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then;

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder, or otherwise, the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(vi) Not withstanding the paragraph above, if the vessel is placed under arrest or is detained by authorities pending investigation of Owners' (including, but not limited to Owners' affiliated parties, their agents or their representatives) failure to pay any monies that are owed, or are disputed to be owed by Owners (including, but not limited to Owners' affiliated parties, their agents or their representatives), Charterers may place the vessel off-hire. The period off-hire shall be calculated from the time that the authorities place the vessel under arrest until she is again ready and in an efficient state to resume her service from a position not less favorable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

a. Owners will at all times keep Charterers informed about any pending claims or request for security or dispute that might result in a creditor or claimant enforcing their rights against the vessel or against Owners

(including, but not limited to Owners' affiliated parties, their agents or their representatives.) If the Owners fail so to notify Charterers, any costs associated with releasing cargo from an arrested vessel and/or the additional costs associated with fixing a replacement vessel for a voyage charter, shall be for the Owners' account.

b. Owners undertake to discuss with Charterers all possible measures to avoid arrest of vessel or other action by creditors or claimants.

c. In the event the vessel is placed under arrest or is detained by authorities as described above and Owners fail to fulfill their obligations under sections a and b above in any respect, then Charterers may also deduct any idle time that Charterers might incur by reason of the vessel being placed off-hire under this clause. Charterers will endeavor their best efforts for the earliest employment consistent with their normal trading practice, but in any case, such idle time that may be deducted from hire not to exceed 15 days.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between;

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed less adverse weather periods, and;

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period except where Charterers declare their option to add off-hire periods under Clause 4 (b)).

(f) All references to "time" in this charter party shall be references to local time except where otherwise stated.

**Periodical Drydocking**

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals of as required by Classification Society Rules or in the event of an emergency/unforeseen circumstances

On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than 90 days (emergency/unforeseen circumstances excepted) before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any Bill of Lading or this charter with the exception of any slops which are the property of Charterers from their instructions to clean at various intervals. Such slops to be disposed of by Owners, but Charterers to reimburse disposal costs.

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at

which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However;

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and;

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account.

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however:

(a) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and;

(b) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

**Detailed Description and Performance**

24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows:-

| Average speed in knots | Maximum average bunker consumption per day main propulsion fuel oil/ diesel oil | auxiliaries fuel oil/diesel oil |
|---|---|---|
| Laden | tonnes | tonnes |
| 12.5 | 36.5 | * |
| 13 | 39.5 | * |
| 13.5 | 42.5 | * |
| 14 | 46.5 | * |
| 14.5 | 50.5 | * |
| Ballast | | |
| 12.5 | 31.5 | ___/___ |
| 13 | 34.5 | ___/___ |
| 13.5 | 38.5 | |
| 14 | 44.5 | |
| 14.5 | 46.5 | |

Discharge Consumption (including IGS): 60mt/ operation (30mt/day based on 48 hour discharge of 80,000 mt)
Load Consumption: 15mt/ operation (7.5mt/day based on 48 hour load)

Idle / Anchorage: 6 mt/day

~~The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown.~~

The service speed of the vessel is 14.5 knots laden and 14.5 knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating a decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be.

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages excluding lighterings and voyages less than 48 consecutive hours during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being:

(i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility;

(ii) any days, noon to noon, when winds exceed force 4 on the Beaufort Scale ~~for more than 12 hours.~~

(b) If during any calendar year from the date on which the vessel enters service the vessel falls below or exceeds the performance guaranteed in Clause 24 (a) then if such shortfall or excess results;

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24 (a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be included in the performance calculation;

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be included in the performance calculation.

The results of the performance calculation for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total performance calculation for such period.

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating 31 December excepting the year of vessel's redelivery. The balance of the year in which the vessel enters service shall be included in the following calendar year's performance review.

Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two one months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require.

(d) Owners and Charterers agree that this Clause 24 is assessed on the basis that Owners are not entitled to additional hire for performance in excess of the speeds and consumptions given in this Clause 24.

(e) In the event of the vessel remaining at a place or port within tropical or sub-tropical waters for more than 28 days resulting in fouling of the vessel's hull and/or rudder and/or propeller then Charterers to arrange for underwater cleaning at their time and expense and the interim period shall be excluded from performance calculations.

(f) In the event of an annual underperformance claim being substantiated, such claim shall be off-set against over-

performance attributable to any other "Newco" vessel (aframax/suezmax/vlcc) currently on time-charter to Shell. 'Over-performance' shall be defined as any consumption 5% lesser than the warranted consumption. 'Under-performance' shall be defined as any consumption 5% greater than the warranted consumption. If the performance falls outside of this +/- 5% band, then the full value of the claim shall be calculated from the warranted consumption. Under no circumstances shall such off-setting result in a balance becoming payable by Charterers to Owners. This off-setting arrangement shall apply throughout the entire duration of the charter, but after one (1) year of vessel's delivery the calculation methodology to be mutually agreed. If unable to mutually agree a calculation methodology within 30 days of the aforementioned anniversary date, then Clause 24 shall revert to having no offset agreement until a methodology can be agreed.

Salvage

25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers, provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.
All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

Lien

26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

Exceptions

27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c) Clause 27(a) shall not apply to, or affect any liability of Owners or the vessel or any other relevant person in respect of;

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or;

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. Any such claim shall be subject to the Hague-Visby Rules or the Hague Rules or the Hamburg Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant Bill of Lading (whether or not such Rules were so incorporated) or, if no such Bill of Lading is issued, to the Hague-Visby Rules unless the Hamburg Rules compulsorily apply in which case to the Hamburg Rules.

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

Injurious Cargoes

28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

Grade of Bunkers

29. See Appendix C. Charterers shall supply fuel oil ~~in accordance with ISO Standard 8217 RMG 380 Revised 2005~~ with a maximum viscosity of 380 CST centistokes at 50 degrees centigrade and/or marine diesel oil for main propulsion and fuel oil with a maximum viscosity of centistokes at 50 degrees centigrade and/or diesel oil for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost

thereof. Charterers shall have the option to instruct the Owners to comingle bunkers when required, compatibility test first having being carried out as per ASTM D4740 and Charterers to be responsible for any expense, damage, time, risk etc which may be caused by the commingling of bunkers. Compatibility test kits and components to be supplied by Charterers at their time/cost.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with ISO Standard 8217 for Marine Residual Fuels and Marine Distillate Fuels as applicable.

**Disbursements**

30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.

**Laying-up**

31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay up. Charterers may exercise the said option any number of times during the charter period.

**Requisition**

32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such governments in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33. If war or hostilities break out between any two or more of the following countries: U.S.A., the countries or republics having been part of the former U.S.S.R (except that declaration of war or hostilities solely between any two or more of the countries or republics having been part of the former USSR shall be exempted), P.R.C., U.K., Netherlands, then both Owners and Charterers shall have the right to cancel this charter.

**Additional War Expenses**

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, including any countries listed by the Joint War Committee in London

Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

Any payments by Charterers under this clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers.

**War Risks**

35. (a) The master shall not be required or bound to sign Bills of Lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified in writing or by radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or

with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation. If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all Bills of Lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

**Both to Blame Collision Clause**

36. If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

**New Jason Clause**

37. General average contributions shall be payable according to York/Antwerp Rules, 1994, as amended from time to time, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following position shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

**Clause Paramount**

38. Charterers shall procure that all Bills of Lading issued pursuant to this charter shall contain the following:

"(1)Subject to <u>sub-clause (2)</u> or <u>(3)</u> hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2)If there is governing legislation which applies the Hague Rules compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If there is governing legislation which applies the United Nations Convention on the Carriage of Goods by Sea 1978 (hereafter the "Hamburg Rules") compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules."

"(4)If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules, or Hamburg Rules, as applicable, such term shall be void to that extent but no further."

"(5)Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

Insurance/ ITOPF

39. Owners warrant that the vessel is now, and will, throughout the duration of the charter:

(a) be owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited;

(b) be properly entered in West of England P & I Club, being a member of the International Group of P and I Clubs;

(c) have in place insurance cover for oil pollution for the maximum on offer through the International Group of P&I Clubs but always a minimum of United States Dollars 1,000,000,000 (one thousand million);

(d) have in full force and effect Hull and Machinery insurance placed through reputable brokers on Institute Time Clauses or equivalent for the value of United States Dollars 85,000,000 as from time to time may be amended with Charterers' approval, which shall not be unreasonably withheld.

Owners will provide, within a reasonable time following a request from Charterers to do so, documented evidence of compliance with the warranties given in this Clause 39.

Export Restrictions

40. The master shall not be required or bound to sign Bills of Lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.

Charterers shall procure that all Bills of Lading issued under this charter shall contain the following clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this Bill of Lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this Bill of Lading so far as the cargo so discharged is concerned".

The foregoing provision shall apply mutatis mutandis to this charter, the references to a Bill of Lading being deemed to be references to this charter.

Business Principles

41. Owners will co-operate with Charterers to ensure that the "Business Principles", as amended from time to time, of the Royal Dutch/Shell Group of Companies, which are posted on the Shell Worldwide Web (www.Shell.com), are complied with.

Drugs and Alcohol

42. (a) Owners warrant that they have in force an active policy covering the vessel which meets or exceeds the standards set out in the "Guidelines for the Control of Drugs and Alcohol On Board Ship" as published by the Oil Companies International Marine Forum (OCIMF) dated January 1990 (or any subsequent modification, version, or variation of these guidelines) and that this policy will remain in force throughout the charter period, and Owners will exercise due diligence to ensure the policy is complied with.

(b) Owners warrant that the current policy concerning drugs and alcohol on board is acceptable to ExxonMobil and will remain so throughout the charter period.

Oil Major

43. If, at any time during the charter period, the vessel becomes unacceptable to ~~any Oil Majors Charterers~~

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

Acceptability ~~shall have the right to terminate the charter.~~ two of the following Oil Majors (Total, Exxon, Chevron, BP, Conoco, ENI or Statoil) Charterers will give notice to Owners and Owners will have a period of 45 days from the date Owners are notified for reinstating the approval(s). After 45 days, if the vessel is still unacceptable to two or more of the above mentioned Oil Majors, Charterers have the right to place the vessel off-hire until such time that Owners reinstate the Oil Major approval(s), the vessel is again acceptable to those Oil Majors, subject to trading pattern, availability of inspectors and willingness to inspect.

b) If at any time during the charter period, the vessel becomes unacceptable to more than two of the following Oil Majors (Total, Exxon, Chevron, BP, Conoco, ENI or Statoil) Charterers have the right to place the vessel off-hire until such time that the vessel is again acceptable to those Oil Majors, subject to trading pattern, availability of inspectors and willingness to inspect. Once the vessel becomes unacceptable to a third Oil Major (as defined above) the off-hire period shall be effective from original notice to Owners of putting the vessel off-hire

c) During the period the vessel is off-hire, Owners have the right to trade the vessel for their own account to enable inspections of the vessel at discharge port locations.

Pollution and Emergency Response

44. Owners are to advise Charterers of organisational details and names of Owners personnel together with their relevant telephone/facsimile/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies.

ISPS Code/US MTSA 2002

45. (a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and the US Maritime Transportation Security Act 2002 (MTSA) in relation to the Vessel and thereafter during the currency of this charter, Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) and the "owner"(as defined by the MTSA) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company" and the requirements of MTSA relating to the vessel and the "owner". Upon request Owners shall provide documentary evidence of compliance with this Clause 45(a) (i).

(ii) Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Owners or "the Company"/"owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for Owners' account.

(b) (i) Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this charter contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Charterers to comply with this sub-Clause 45(b) shall be for Charterers' account.

(c) Notwithstanding anything else contained in this charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers' account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the security plan required by the ISPS Code/MTSA shall be for Owners' account.

(d) Notwithstanding any other provision of this charter, the vessel shall not be off-hire where there is a loss of time caused by Chartererers' failure to comply with the ISPS Code/MTSA(when in force ).

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Law and Litigation

46. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

(b) All disputes arising out of this charter shall be referred to Arbitration in London in accordance with the Arbitration Act 1996 (or any re-enactment or modification thereof for the time being in force) subject to the following appointment procedure:

(i) The parties shall jointly appoint a sole not later than 28 days after service of a request in writing by either party to do so.

(ii) If the parties are unable or unwilling to agree the appointment of a sole arbitrator in accordance with (i) then each party shall appoint one arbitrator, in any event not later

**Code word for this Charter Party**
**"SHELLTIME 4"**

MAR11 Update (*Incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

than 14 days after receipt of a further request in writing by either party to do so. The two arbitrators so appointed shall appoint a third arbitrator before any substantive hearing or forthwith if they cannot agree on a matter relating to the arbitration.

(iii) If a party fails to appoint an arbitrator within the time specified in (ii) (the "Party in Default"), the party who has duly appointed his arbitrator shall give notice in writing to the Party in Default that he proposes to appoint his arbitrator to act as sole arbitrator.

(iv) If the Party in Default does not within 7 days of the notice given pursuant to (iii) make The required appointment and notify the other party that he has done so the other party may appoint his arbitrator as sole arbitrator whose award shall be binding on both parties as if he had been so appointed by agreement.

(v) Any Award of the arbitrator(s) shall be final and binding and not subject to appeal

(vi) For the purposes of this clause 46(b)any requests or notices in writing shall be sent by fax, e-mail or telex and shall be deemed received on the day of transmission.

(c) *It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay.*

Confidentiality 47. All terms and conditions of this charter arrangement shall be kept private and confidential

Construction 48. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

Appendix A: OCIMF Vessel Particulars Questionnaire for the vessel, as attached, shall be incorporated herein.

Appendix B: Shell Safety and Environmental Monthly Reporting Template, as attached, shall be incorporated herein.

Additional Clauses: 1 through 20 as attached, shall be incorporated herein.

SIGNED FOR OWNERS
FULL NAME
POSITION
Tubman Taylor
[signature]

SIGNED FOR CHARTERERS
FULL NAME Jan Koch
POSITION Acting General Manager

D01269

SHELLTIME 4

1. Bunker Emissions
See Clause 5

2. Stopia/Topia

Owners warrant that where the vessel is a "Relevant Ship", they are a "Participating Owner" as defined, as applicable, in the Small Tanker Oil Pollution Indemnification Agreement ("STOPIA") or in the Tanker Oil Pollution Indemnification Agreement ("TOPIA"), and that the vessel is entered in STOPIA or TOPIA (as applicable) and shall so remain during the currency of this charter provided always that STOPIA or TOPIA (as applicable) is not terminated in accordance with its provisions.

3. AMS Clause for Time Charters:

A. If the vessel loads or carries cargo destined for the United States or passing through US transit, charterers shall comply with the current US Customs regulations (19 CFR 4.7) or subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

1. Have in place a SCAC ("Standard Carrier Alpha Code")
2. Have in place an ICB ("International Carrier Bond"); and
3. Submit a cargo declaration by AMS ("Automated Manifest System") to the US Customs and provide the owners at the same time with a copy thereof.

B. Should any failure of Charterers to comply with this clause result in any delay then, notwithstanding any provision in this charter party to the contrary, the vessel shall remain on hire.
C. If the charterers ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the owners, the owners shall promptly reimburse charterer for those amounts.
D. The assumption of the role of the carrier by charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of the carrier under any bill of lading, other contract, law or regulation.

4. New Equipment Clause:

If any of the major oil companies institute new requirements for new equipment/features, always compatible with vessel's design and characteristics, and such requirements become necessary in order to maintain customers' approval, the sharing of time and cost of material and installation will be discussed between Charterers and Owners. During these discussions, appropriate consideration will be given regarding the potential effect of the new requirements on the available fleet of similar vessels and the market. If it is reasonable to conclude that the additional requirements will result in higher spot rates, thereby resulting in increased hire rates to owners, such costs for new equipment shall be for owners account.

5. Sulphur Emissions Clause

1. (a) Should Charterers trade the Vessel into a SOx Emission Control Area ("SECA") as defined in Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), or into a Member State of the EU following the entry into force of EU Directive 2005/33/EC of 6th July 2005 (the "Directive"), then the Charterers shall supply fuels: (i) of such specifications and grades that will comply with the maximum sulphur content requirements of the SECA or Directive as applicable, except that in the case of the Directive the Charterers shall only be obliged to supply compliant gasoil; and in the case of the SECA (ii) from bunker suppliers who comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

(b) Owners warrant, in the event the vessel trades in a SECA, or into a Member State of the EU following the entry into force of the Directive, that the Vessel: (i) complies with Regulation 14 and 18 of MARPOL Annex VI and with the requirements of the SECA or the Directive as applicable; (ii) is able to consume fuels of the required sulphur content when ordered by the Charterers to trade within the SECA or in a Member State of the EU in which the Directive applies; and (iii) will provide segregated storage for this fuel. Subject to having supplied the Vessel with fuels in accordance with this clause, the Charterers shall not be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's non-compliance with Regulations 14 and 18 of MARPOL Annex VI. (c) or the Directive. Subject to having supplied the Vessel with fuels in accordance with this clause, the Charterers shall not be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's non-compliance with Regulations 14 and 18 of MARPOL Annex VI or the Directive.

6. Piracy Clause

Sub-Clause (1). If the vessel proceeds to or through an area in which there is a current risk of piracy, verified by a competent international authority, Owners will at all times adhere to the latest version of Best Management Practices (including with respect to routing) ("BMP"), and Owners shall be entitled:

(a) to take reasonable preventative measures to protect the vessel, her crew and cargo by proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course;

(b) to follow any orders given by the flag state, any governmental or supra governmental organization; and

(c) where there is an actual, imminent act of piracy, to take a safe and reasonable alternative route in place of the normal, direct or intended route to the next port of call, provided that such alternative route does not, in the case of the Gulf of Aden, physically extend beyond the transit of the Gulf of Aden in which case Owners shall give Charterers notice as soon as reasonably practicable of the alternative route, an estimate of time and bunker consumption and a revised estimated time of arrival.

Sub-Clause (2). Subject to sub-Clause (5) below, Charterers shall pay Owners' reasonable, documented costs and expenses in respect of any additional hull and machinery, **and/or**, if applicable, war risks insurance premiums ***and/or other insurance against the risk of piracy***, and/or additional, reasonable and contractual, crew costs arising out of actual or threatened acts of piracy or any preventive or other measures taken by Owners pursuant to Sub-Clause 1(a) of this Clause.

Sub-Clause (3). The vessel shall remain on-hire for any time lost taking the measures referred to in Sub-Clause 1 of this Clause.

Sub-Clause (4). Where, notwithstanding the taking of any of the measures referred to in sub-Clause 1 above, and where not caused by a lack of due diligence on Owners' part, and where Charterers have not exercised the option to require Owners to purchase off-hire insurance pursuant to sub-Clause (5) below, the vessel is captured by pirates, hire shall be payable at 100% of the hire rate for the duration of any such capture.

Sub-Clause (5). Charterers shall have the option, where the vessel is scheduled to transit the Gulf of Aden, or other areas of known piracy risk, to require Owners to either:
(a) extend existing war risk insurance; or
(b) purchase off-hire insurance, **charter hire to be the previous month's daily hire rate or USD14,500/day, whichever is higher.**
which in either case will cover loss of hire, the cost of which shall be reimbursed by Charterers, provided always that:

- (i) Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under the foregoing insurances arising out of compliance with Charterers' orders;
- (ii) the terms of cover and cost have been disclosed to, and agreed by, Charterers prior to the purchase of such insurance; and
- (iii) that following the exercise of such option, the vessel shall go off-hire for any time lost as a result of a capture by pirates.

Sub-Clause (6). The safety and protection of crew and vessel is Owners' obligation and it is for Owners to determine the level of threat and the measures considered appropriate to discharge that obligation. If Owners deploy government-supplied Military Armed Guards or Private Armed Guards, then it is an express condition of this charter that Owners will, on a voyage-by-voyage basis:

(a) give Charterers advance notice of such intended deployment as soon as reasonably practicable but not less than five (5) days' notice prior to such deployment and throughout such voyage Owners will adhere to the response submitted in the Vessel Security Questionnaire;

(b) confirm in advance of deployment that such deployment has been notified to Owners' P&I and War Risks underwriters without objection (with evidence, satisfactory to Charterers, of Owners' exchanges with underwriters);

(c) ensure in advance of, and throughout, any deployment that such deployment complies with all flag state requirements, laws of the flag state, and any other applicable laws; and

(d) continue to adhere to the latest BMP.

Sub-Clause (7). All reasonable costs and expenses directly associated with the deployment of government-supplied Military Armed Guards and/or Private Armed Guards ~~and/or unarmed guards~~ shall be split 50:50 between Owners and Charterers. **In the event unarmed guards are used, all reasonable costs and expenses directly associated with the deployment of unarmed guards to be for Charterers' account** with ~~Charterers' portion capped at US$[-] per voyage~~. **In either case**, subject always to Owners supplying documentary evidence of such total costs. Save as aforesaid, Owners will indemnify and hold Charterers harmless against all claims, liabilities, costs and expenses of whatsoever nature which arise directly in connection with the deployment of government-supplied Military Armed Guards and/or Private Armed Guards and/or unarmed Guards.

## 7. Marine Letter of Indemnity

Further to this charter the vessel may be required to carry out other such cargo operations as Charterers may reasonably require, including but not limited to one or more of the following and always provided weather and voyage permitting, as well as that the vessel is capable of such operations.

i) to commingle different grades of cargo providing such grades fall within the cargo description set out in this charter,

ii) to breach vessel's natural segregation,

iii) to dope the cargo with additive supplied by Charterers.*

iv) to add dye supplied by Charterers to the cargo,*

v) to blend cargo on board,*

vi) to carry additives/dye supplied at loading port in drums on deck,

vii) to load and discharge freshwater or seawater shore line flush/line plug before, during or after a cargo loading operation

* These operations shall be carried out or supervised by an Inspector appointed by the Charterers.

Upon receipt of Charterers' written instructions in respect of the foregoing a Letter of Indemnity in the following form will be deemed to have been provided by Charterers.

In consideration of Owners complying with Charterers' above request, Charterers hereby agree as follows:

1. To indemnify Owners, Owners servants and agents and to hold all of them harmless in respect of any liability, loss, damage or expense of whatsoever nature and which they may sustain in connection with complying with Charterers' request including loss or damage caused by an inspector appointed by Charterers, except to the extent that such liability, loss, damage or expense could have been avoided by the exercise of due diligence by Owners.

2. In the event of any proceedings being commenced against Owners or any of Owner's servants or agents in connection with complying with Charterers request as aforesaid, to provide them on demand with sufficient funds to defend the same, provided however that Charterers shall be consulted in the preparation of defence of any such proceedings.

3. If in connection with complying with Charterers' request as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify Owners in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified subject to Charterers' involvement in any negotiations in the provision of such bail or security.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon Owners proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. This indemnity shall be limited in value to 200% of the CIF value of the total cargo onboard and shall terminate at 24.00 hours on the day 36 calendar months after the date of discharge unless before that time Charterers have received from Owners written notice of a claim pursuant to this indemnity.

6. This indemnity shall be governed by and construed in accordance with English law and each and any dispute arising out of or in connection with this indemnity shall be subject to the jurisdiction of the High Court of Justice of England.

**8. Vessel Disposal**

The Owners will not, without the prior written consent of Charterers, sell, lease, transfer or dispose of any interest in the vessel during the term of this charter.

**9. CO2 Emissions**

9.1 Where a Governmental Authority or other competent local or international regulatory body (including but not limited to the EU, the USA or the IMO) imposes upon Charterers an obligation to control, reduce or in any way account for ship-borne CO2 emissions ("Emissions Targets"), without prejudice to the terms and conditions in this charter, Owners will co-operate with Charterers, including by following all reasonable orders, in order to facilitate Charterers' compliance with the Emissions Targets.

9.2 Any carbon credits gained during the performance of this charter, whether by following Charterers' orders pursuant to Clause 12.1, or otherwise, will be recorded by a process to be mutually agreed and will be for the account of Charterers.

**10. Pumping**

Owners warrant that the Vessel shall be fitted with cargo pumps which, when the Vessel is laden with a homogeneous cargo, are capable of: discharging her full cargo within 24 hours or of maintaining an average pressure of 100 PSI at ship's rail provided that shore facilities permit and excluding time required for stripping and COW operations

**11. Heating**

Owners warrant that the Vessel is capable of;

1. Maintaining crude and dirty petroleum cargoes at loaded temperature but maximum up to 145 degrees Fahrenheit.
2. If time/voyage permits, raising cargo temperature up to a maximum temperature of up to 145 degrees Fahrenheit.
3. Maximum loading temperature shall not exceed 165 degrees Fahrenheit.

Charterers to allow Owners sufficient time for the Vessel to raise temperature bearing in mind length of laden passage, outside ambient air and sea temperatures and weather conditions.

**12. Cargo Retention**

In the event that any cargo remaining on board upon completion of discharge is liquid (+) and pumpable and reachable by Vessel's means as determined by an independent surveyor, Charterers shall have the right to deduct from hire, when deemed reasonable, the value of this liquid equal to the f.o.b. port of loading value of such cargo, plus prorata freight and insurance due with respect thereto.

Charterers hereby agree to indemnify Owners against any liability, under this clause, to a Bill of Lading holder resulting from non-delivery of any such cargo in respect of which a deduction from freight is made provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater than the amount of the deduction from freight.

Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

This clause does not apply unless Charterers can demonstrate to Owners that they themselves have suffered an identical loss as a result of cargo remaining on board by way of deduction from sub-time Charterer hire or retention of freight.

(+) note :
R.o.b. will be considered liquid if:
It can be sampled and tests show that it has a dynamic viscosity of less than 600 centipoise by rheometric testing, using a Ferranti, Brookfield or similar viscometer, at the temperature it has when in the ship's tanks.

**13. Bunker Quality/Off Spec Bunkers:**

Should bunker analysis confirm that bunkers are off-spec, (as per agreed specification in appendix C with Vessel bunker description ), Owners will notify Charterers and provide the bunker analysis performed by DNV and Charterers will be notified regarding Owners intentions. Should Owners agree to use the bunkers supplied then Charterers are not entitled to present Owners with a speed or consumption claim for any period during which Vessel is using bunkers that do not meet the specified requirements. Owners shall not be obliged to use bunkers not within the agreed specs in this charter.

If Owners and Charterers cannot find a solution for the consumption of off-spec bunkers then, upon request of Owners, Charterers are to arrange to pump out off-spec fuel at their own time and expense and vessel to remain on-hire.

Charterers reserve the right to appoint an independent inspector to witness the re-testing of the alleged off spec bunkers.

**14. Ship to Ship Lightering:**

Charterers have the option to load or discharge the Vessel via ship-to-ship transfer, weather permitting and subject to Master's approval, which is not to be unreasonably withheld.

Charterers to provide and pay for all necessary equipment, including hoses and adequate and sufficient number of Yokohama or Yokohama-style fenders, for such safe lightering operation to Master's full satisfaction. Charterers shall arrange supervisory personnel on board, including mooring Master to assist the performance of the lightering operations.

Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-To-Ship Transfer Guide.

The master has the right to suspend the lightening operation, if in his sole opinion, the safety of the Vessel or the smooth conduct of the operation is in jeopardy, in which case the Vessel will remain on hire and all expenses will be for Charterers' account.

**15. USA Trading/TVEL CL**

Any time lost during which the Vessel awaiting U.S. Coast Guard TVEL inspection, or in the case of calls at non-U.S. ports where any similar certificate is required to be issued by a state authority prior to loading or discharging cargo, and until such time as she has secured TVEL certificate / COC or any similar certificate, Vessel will be considered on hire provided that Vessel is found acceptable. All relevant TVEL / COC etc costs to be Charterers account.

**16. BIMCO EU Advance Cargo Declaration Clause for TC Parties**

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU or loads cargo outside the EU destined for an EU port or place, the Charterers shall comply with the current EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and in their own name, time and expense shall:

(i) Have in place an EORI number (Economic Operator Registration and Identification);

(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii) Submit an ENS (Entry Summary Declaration) cargo declaration electronically to the EU Member States' Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the EU Advance Cargo Declaration Regulations shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## 17. Shell Anti-Bribary Clause

Owners and Charterers (either directly or through any of their affiliates', directors, officers, employees, masters, crewmembers, agents, managers, representatives or parties acting for or on behalf of them or their affiliates) shall:

a) comply with the applicable laws, rules, regulations, decrees and/or official government orders, including but not limited to the United Kingdom Bribery Act of 2010 as amended and the United States of America Foreign Corrupt Practices Act of 1977 as amended, or any other applicable jurisdiction, relating to anti-bribery and anti-money laundering and that they shall each respectively take no action which would subject themselves or the other to fines or penalties under such laws, regulations, rules, decrees or orders ("Relevant Requirements");

b) not make, offer or authorise, any payment, gift, promise, other advantage or anything of value whether directly or through any other person or entity, to or for the use and benefit of any government official or any person where such payment, gift, promise or other advantage would comprise or amount to a facilitation payment and/or violate the Relevant Requirements;

c) have and shall maintain in place throughout the term of this Charter its own policies and procedures to ensure compliance with this clause, and will enforce them where appropriate;

d) promptly report to the other party any request or demand for any payment, gift, promise, other advantage or anything of value received by the first party in connection with the performance of the Charter; and

e) have the right to audit the other party's records and reports in relation to this Charter at any time during and within seven (7) years after termination of the Charter. Such records and information shall include at a minimum all invoices for payment submitted by the other party along with complete supporting documentation. The auditing party shall have the right to reproduce and retain copies of any of the aforesaid records or information. If there are anti-trust issues with or a party objects to a direct audit, the auditing party may appoint an independent company who is approved by the audited party (such approval not to be unreasonably withheld and to be given within 7 days of the request) to conduct the audit and provide the auditing party with its findings on the audited party's compliance with the Relevant Requirements without disclosing the records or information to the auditing party.

Either Owner or Charterer may terminate the Charter at any time upon written notice to the other, if in their reasonable judgment supported by credible evidence the other is in breach of this clause or such a breach is imminent. The timing of this entitlement (which shall be at the non-breaching party's discretion) is either:

i) with immediate effect at any time prior to commencement of loading; or

ii) if the laden voyage has not been completed and the cargo discharged, once the laden voyage has been completed and the cargo discharged.

This right shall be without prejudice to any other rights the non-breaching party may have in respect of such breach.

## 18. Hull Scrub & Propeller Polish

Charterers may request additional intermediate hull scrubs or propeller polishes, "Charterers Additional Hull Scrub & Propeller Polish". Upon Charterers making such a request Owners will make best efforts to arrange this

at the next available and suitable port. Charterers shall release the Vessel to Owners who shall pay for all costs associated with the hull scrub and propeller polishes, including but not limited; survey costs, inspection costs, diving costs, cleaning costs and any berth and anchorage costs. Owners will invoice Charterers for the costs with the next monthly hire statement. Owners will provide Charterers with a cost estimate of the operations no later than five (5) days before the operation is due to take place, for Charterers approval. The time spent hull scrubbing and cleaning shall not count as off hire time pursuant to Cl.21 of the Charter Party and Owners shall invoice Charterers for those approved costs with the next monthly hire statement.

**19. Time Bar**

All claims for additional costs and expenses recoverable by Owners from Charterers pursuant to (i) Clause 7 ("Charterers to Provide"), (ii) Clause 34 ("Additional War Expenses") and (iii) Additional Clause 4 ("Piracy") must be received from Owners by Charterers in writing along with supporting documentation within one hundred and twenty (120) days of the relevant voyage being completed (where the voyage is deemed to be completed upon completion of discharge and disconnection of hoses at the final discharge port) otherwise Charterer's liability for such costs shall be extinguished

**20. Electronic Bills of Lading**

Notwithstanding anything contained in this charter, Charterers may, at their sole discretion, require the Owner to issue and sign in electronic form and transmit electronically any Bill of Lading to be issued pursuant to clause 13(an "eDoc").

It is expressly agreed that any applicable requirement of law, contract, custom or practice that any Bill of Lading issued pursuant to this charter shall be made or evidenced in writing, signed or sealed, shall be satisfied by such eDoc and the parties agree not to contend in any dispute arising out of or in connection with any eDoc or any eDoc which has been converted to paper that such eDoc is invalid on the grounds that it is not in writing or that it is not equivalent to an original paper document signed by hand, or, as the case may be, sealed.

Specifically, eDocs systems which shall be used for these purposes include the ESS-Databridge™.

## APPENDIX A

Vessel hire rate will be determined in accordance with the TD7 formula as below.

1. BITR Route TD7

- The average WS rate assessment for the month in question for the Baltic Exchange's BITR TD7 route will be inserted into the attached formula.
- Charterers to pay a base hire rate of USD 17,500 pdpr. If the Time Charter Equivalent (TCE) calculated in accordance with the attached formula falls between the base hire rate and a ceiling hire rate of USD 45,000 pd, fifty (50) percent of the amount the TCE exceeds the base rate will be added to the hire. In the event the TCE exceeds the ceiling hire rate (USD 45,000 pd) one hundred (100) percent of such excess is to be added to the hire.
- The worldscale flat rate in effect for the model voyage on the first day of the month.
- Actual vessel consumptions for IFO and MGO on the voyage parameters (14.5 knots / 2 days load, 2 days discharge, etc)
- The Platts bunkerwire mean of quotes for the month in question for Rotterdam LS (1%) IFO 380
- The Platts bunkerwire mean of quotes for the month in question for LSMGO (0.1%)
- Port costs at load port (Sullom Voe) and discharge port (Wilhelmshaven) based on a proforma estimate of port costs as determined by a mutually agreed ship agency.
- For the optional period, Owners' option to either maintain the above rate mechanism or to revert to full floating mechanism.

a. Contingencies:

i. The BITR rates, using the above assumptions are published by the Baltic Exchange. In the event that the Baltic Exchange changes the assumptions currently made, and as set out above, the Parties shall either agree that the new assumptions may be used to fix the rates, or, if no agreement can be reached, the current assumptions shall remain and the Charter rates shall continue to be fixed using such current assumptions. In the event that the Baltic Exchange ceases, for whatever reason, to publish the BITR rates, or, if, the Parties have not agreed to use the any new assumptions published by the Baltic Exchange and cannot agree the rates using the current assumptions, the rates shall be fixed, instead by the London Tanker Brokers Panel who shall be jointly appointed and paid for by both Parties. The London Tanker Brokers Panel shall use the same assumptions as mentioned above in relation to route TD7

ii. Worldscale/Baltic Exchange may introduce new or remove or change current fixed differentials (like OPA, ECA, change of port for bunker price etc.) and/or may amend the TCE Calculation Processes, in which case same to be incorporated to robin formulae accordingly provided consistent with underlying market practice.

iii. Should bunker regulations change such that different quality of bunkers are required, such new quality to be included as the benchmark bunker price for the assessment.

iv. In the event port costs (in US Dollars) change by more than 5% in either direction, a new proforma may be obtained and the formula updated for the following months.

SHELLTIME 4

## TD 7 Formula

Ship Specific
Determined Monthly
Sullom Voe / Wilhelmshaven

| | |
|---|---|
| WS Rate | WS |
| Bunker (LSFO) Price | |
| MDO Price | $ |
| Port cost (Load) | $ |
| Port cost (Discharge) | $ |
| | |
| Flat Rate | 7.85 |
| Cargo Qty | 80,000 |
| ECA DIFFERENTIAL | $ |
| Income | $ |
| | |
| Laden Distance | 597 |
| Ballast Distance | 598 |
| Laden Speed | 14.5 |
| Ballast Speed | 14.5 |
| Days Laden | 1.72 |
| Days Ballast | 1.72 |
| Weather Margin Laden (5%) | 0.09 |
| Weather Margin Ballast (5%) | 0.09 |
| Days Loading | 2.00 |
| Days Discharging | 2.00 |
| Days Idle/Anchor | 0.50 |
| | |
| Bunker Consumption | |
| - Laden | 40.00 |
| - Ballast | 0.00 |
| - Load | 0.00 |
| - Discharge | 0.00 |
| - Idle | 0.00 |
| MDO Consumption | |
| - Laden (Incl wx margin) | 50.50 |
| - Ballast (Incl wx margin) | 46.50 |
| - Load | 7.50 |
| - Discharge | 30.00 |
| - Idle | 5.00 |
| | |
| Bunker Cost | |
| - Laden (Incl wx margin) | - |
| - Ballast (Incl wx margin) | - |
| - Load | - |
| - Discharge | - |
| - Idle | - |
| MDO Cost | |
| - Laden (Incl wx margin) | $ |
| - Ballast (Incl wx margin) | $ |
| - Load | $ |
| - Discharge | $ |
| - Idle | $ |
| | |
| Commission (2.5%) | $ |
| Bunker Cost | - |
| MDO Cost | $ |
| Port Costs | $ |
| | |
| Total Costs | $ |
| | |
| Net Revenue | $ |
| | |
| Total Days | 8.11 |
| | |
| TCE | $ |

## APPENDIX B

| Shell Safety and Environmental Monthly Reporting Template | Return to: Shell Trading HSE & Shipping Standards<br>Charterers marked for the attention of: OTS/43<br>Fax: +44(0)20 7934 7472<br>Phone: +44(0)20 7934 8079<br>Email: STASCOHSEData@shell.com |
|---|---|

| Time Chartered Vessel Name | |
|---|---|
| Management Company | |
| Month | |

| OIL SPILL INCIDENTS<br>(Any amount entering the water)<br>Approximate volume in barrels and brief details | |
|---|---|
| ANY OTHER INCIDENTS<br>resulting in or having potential for injury, damage or loss | |

FOR DEFINITIONS OF INCIDENT CLASSIFICATION AND EXPOSURE HOURS PLEASE SEE OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF) BOOKLET "Marine Injury Reporting Guidelines" (February 1997) or any subsequent version, amendment, or variation to them

| A. No. Of crew: | |
|---|---|
| B. Days in month / period: | |
| EXPOSURE HOURS (A x B x 24): | |

| LOST TIME INJURIES (LTI'S) Including brief details / any treatments |
|---|
| |

| TOTAL RECORDABLE CASE INJURIES (TRC'S) including brief details / any treatments |
|---|
| |

PLEASE CONFIRM YOUR RETURN CONTACT DETAILS:

| Name: |
|---|
| Phone: |
| Fax: |
| Email: |

Return for each calendar month – by 10th of following month.

| Shell Safety and Environmental Monthly Reporting Template | Return to: **Shell Trading HSE & Shipping Standards**<br>Charterers marked for the attention of: OTS/43<br>Fax: +44 (0)20 7934 7472<br>Phone: +44 (0)20 7934 8079<br>Email: STASCOHSEData@shell.com |
|---|---|

| | |
|---|---|
| Time Chartered Vessel Name | |
| Management Company | |
| Month | |

Notes: Please enter zero i.e. "0" where any amount is nil (rather than entering "Nil" or N/A")
Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter "3".
Cargo loaded for LNG vessels should also be reported as tonnes and not as m3.
If not possible to measure your refrigerants accurately by weighing, please use best estimate.

| | |
|---|---|
| Monthly Consumption – Fuel Oil mt | |
| Sulphur content of Fuel Oil (percentage weight) | |
| Monthly Consumption – Diesel and/or Gas Oil mt | |
| Monthly Consumption (LNG ships only) – Fuel Gases mt | |

| | |
|---|---|
| Monthly Distance Steamed | |
| Monthly Cargo Loaded – mt | |

| | |
|---|---|
| Halon Release – (ltrs) | |
| Refrigerant Gas – Type | |
| Refrigerant Gas – ROB carried fwd from end last month (kgs) | |
| Refrigerant Gas – Received (kgs) | |
| Refrigerant Gas Consumption – (kgs) | |
| Refrigerant Gas – ROB end of this month (kgs) | |

| | |
|---|---|
| Garbage Disposal m3 – At Sea | |
| Garbage Disposal m3 – Incinerated on Board | |
| Garbage Disposal m3 – Sent Ashore | |

| | |
|---|---|
| OIL SPILL INCIDENTS<br><br>(Other than those entering the water)<br>Approx. volume & brief details | |

| SHIP MANAGEMENT AGREEMENT | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD SHIP MANAGEMENT AGREEMENT CODE NAME: "SHIPMAN 98" PART I |
|---|---|

| | |
|---|---|
| 1.Date of Agreement<br>10 February 2015 | Name of Vessel<br>ADVANTAGE AVENUE |
| 2. Owners (name, place of registered office and law of registry) (Cl. 1) | 3. Managers (name, place of registered office and law of registry) (Cl. 1) |
| Name<br>Advantage Avenue Shipping LLC | Name<br>Genel Denizcilik Nakliyati A.Ş. |
| Place of registered office<br>Trust Company Complex, Ajeltake Road, Ajeltake Islands, Majuro, Marshall Islands MH96960 | Place of registered office<br>Büyükdere Caddesi Yapı Kredi Plaza<br>A Blok Kat:12 34330 Levent / İstanbul |
| Law of registry<br>MARSHALL ISLAND | Law of registry<br>Turkiye |
| 4. Day and year of commencement of Agreement (Cl. 2) February 2015 | |
| 5. Crew Management (state "yes" or "no" as agreed) (Cl. 3.1)<br>YES | 6. Technical Management (state "yes" or "no" as agreed) (Cl.3.2)<br>YES |
| 7. Commercial Management (state "yes" or "no" as agreed) (Cl. 3.3)<br>YES | 8. Insurance Arrangements (state "yes" or "no" as agreed) Cl. 3.4)<br>YES |
| 9. Accounting Services (state "yes" or "no" as agreed) (Cl. 3.5)<br>YES | 10. Sale or purchase of the Vessel (state "yes" or "no" as agreed) (Cl.3.6)<br>YES |
| 11. Provisions (state "yes" or "no" as agreed) (Cl. 3.7)<br>YES | 12. Bunkering (state "yes" or "no" as agreed) (Cl, 3.8)<br>YES |
| 13. Chartering Services Period (only to be filled in if "yes" stated in Box 7) (Cl. 3.3 (i))<br>5 YEARS | 14. Owners' Insurance (state alternative (i), (ii) or (iii) of Cl. 6.3)<br>YES |
| 15. Annual Management Fee (state annual amount) (Cl. 8.1)<br>USD 365,000 (per annum) | 16. Severance Costs (state maximum amount) (Cl. 8.4(ii))<br>As per Crewing agreement |
| 17. Day and year of termination of Agreement (Cl. 17)<br><br>5 YEARS FROM DATE OF AGREEMENT | 18. Law and Arbitration (state alternative 19.1, 19.2 or 19.3; if 19.3 place of arbitration must be stated) (Cl. 19)<br>English Law |
| 19. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Owners (Cl. 20)<br><br>operations@advantagetankers.com | 20. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Managers) (Cl. 20)<br>Genel Denizcilik Nakliyati A.Ş.<br>Büyükdere Caddesi Yapı Kredi Plaza A Blok<br>Kat:12 34330 Levent / İstanbul<br>Fax: +90 212 283 16 04-05<br>Tel: +90 212 319 51 00 |

It is mutually agreed between the party stated in Box 2 and the party stated in Box 3 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel), "B" (Details of Crew) "C" ("Initial Budget") and "D" (Associated Vessels) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes "A", "B", "C" and "D" shall prevail over those of PART II to the extent of such conflict but no further.

| | |
|---|---|
| Signature(s) (Owners)<br><br>Signed by:<br><br>For & On behalf of the Owner<br>TUGRUL TOKGOZ | Signature(s) (Managers)<br><br>Signed by:<br><br>For & On behalf of the Manager<br>ORHAN KARADEMIR / COO |

PART II
"Shipman 98" Standard Ship Management Agreement

1. Definitions

In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.

"Owners" means the party identified in Box 2.

"Managers" means the party identified in Box 3.

"Vessel" means the vessel or vessels details of which are set out in Annex "A" attached hereto.

"Crew" means the Master, officers and ratings of the numbers, rank and nationality specified in Annex "B" hereto.

"Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

"Severance Costs" means the costs which the employers are legally obliged to pay to or in respect of the Crew as a result of the early termination of any employment contract for service on the Vessel.

"Crew Insurances" means insurances against crew risks which shall include but not limited to death, sickness, repatriation, injury, shipwreck unemployment indemnity and loss of personal effects.

"Management Services" means the services specified in sub-clauses 3.1 to 3.8 as indicated affirmatively in Boxes 5 to 12.

"ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention as adopted by the International Maritime Organization (IMO) by resolution A.741 (18) or any subsequent amendment thereto.

"STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 or any subsequent amendment thereto.

2. Appointment of Managers

With effect from the day and year stated in Box 4 and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers, and the Managers hereby agree to act as the Managers of the Vessel.

3. Basis of Agreement

Subject to the terms and conditions herein provided, during the period of this Agreement, the Managers shall carry out Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform this Agreement in accordance with sound ship management practice.

3.1 Crew Management

(only applicable if agreed according to Box 5)

The Managers shall provide suitably qualified Crew for the Vessel as required by the Owners in accordance with the STCW 95 requirements, provision of which includes but is not limited to the following functions:

(i) selecting and engaging the Vessel's Crew, including payroll arrangements, pension administration, and insurances for the Crew other than those mentioned in Clause 6;

(ii) ensuring that the applicable requirements of the law of the flag of the Vessel are satisfied in respect of manning levels, rank, qualification and certification of the Crew and employment regulations including Crew's tax, social insurance, discipline and other requirements;

(iii) ensuring that all members of the Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate flag State requirements. In the absence of applicable flag State requirements the medical certificate shall be dated not more than three months prior to the respective Crew members leaving their country of domicile and maintained for the duration of their service on board the Vessel;

(iv) ensuring that the Crew shall have a command of the English language of a sufficient standard to enable them to perform their duties safely;

(v) arranging transportation of the Crew, including repatriation;

(vi) training the Crew and supervising their efficiency;

(vii) conducting union negotiations;

(viii) operating the Managers' drug and alcohol policy unless otherwise agreed.

3.2 Technical Management

(only applicable if agreed according to Box 6)

The Managers shall provide technical management, which includes, but is not limited to, the following functions:

(i) provision of competent personnel to supervise the maintenance and general efficiency of the Vessel;

(ii) arrangement and supervision of dry dockings, repairs, alterations and the upkeep of the Vessel to the standards required by the Owners provided that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with the law of the flag of the Vessel and of the places where she trades, and all requirements and recommendations of the classification society;

D02426

(iii) arrangement of the supply of necessary stores, spares and lubricating oil;

(iv) appointment of surveyors and technical consultants as the Managers may consider from time to time to be necessary;

(v) development, implementation and maintenance of a Safety Management System (SMS)in accordance with the ISM Code (see sub-clauses 4.2 and 5.3).

(vi) development, implementation and compliance with International Port Facility Security Code (ISPS)

3.3 Commercial Management

(only applicable if agreed according to Box 7)

The Managers shall provide the commercial operation of the Vessel, as required by the Owners, which includes, but is not limited to, the following functions:

(i) providing chartering services in accordance with the Owners' instructions which include, but are not limited to, seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 13, consent thereto in writing shall first be obtained from the Owners.

(ii) arranging of the proper payment to Owners or their nominees of all hire and/or freight revenues or other moneys of whatsoever nature to which Owners may be entitled arising out of the employment of or otherwise in connection with the Vessel.

(iii) providing voyage estimates and accounts and calculating of hire, freights, demurrage and/or despatch moneys due from or due to the charterers of the Vessel;

(iv) issuing of voyage instructions;

(v) appointing agents;

(vi) appointing stevedores;

(vii) arranging surveys associated with the commercial operation of the Vessel.

3.4 Insurance Arrangements

(only applicable if agreed according to Box 8)

The Managers shall arrange insurances in accordance with Clause 6, on such terms and conditions as the Owners shall have instructed or agreed, in particular regarding conditions, insured values, deductibles and franchises.

3.5 Accounting Services

(only applicable if agreed according to Box 9)

The Managers shall

(i) establish an accounting system which meets the requirements of the Owners and provide regular accounting services, supply regular reports and records,

(ii) maintain the records of all costs and expenditure incurred as well as data necessary or proper for the settlement of accounts between the parties.

3.6 Sale or Purchase of the Vessel

(only applicable if agreed according to Box 10)

The Managers shall, in accordance with the Owners' instructions, supervise the sale or purchase of the Vessel, including the performance of any sale or purchase agreement, but not negotiation of the same.

3.7 Provisions (only applicable if agreed according to Box 11)

The Managers shall arrange for the supply of provisions.

3.8 Bunkering (only applicable if agreed according to Box 12)The Managers shall arrange for the provision of bunker fuel of the quality specified by the Owners as required for the Vessel's trade.

4. Managers' Obligations

4.1 The Managers undertake to use their best endeavors to provide the agreed Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder.

Provided, however, that the Managers in the performance of their management responsibilities under this Agreement shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances the Managers in their absolute discretion consider to be fair and reasonable.

4.2 Where the Managers are providing Technical Management in accordance with sub-clause 3.2, they shall procure that the requirements of the law of the flag of the Vessel are satisfied and they shall in particular be deemed to be the "Company" as defined by the ISM Code, assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code when applicable.

5. Owners' Obligations

5.1 The Owners shall pay all sums due to the Managers punctually in accordance with the terms of this Agreement.

5.2 Where the Managers are providing Technical Management in accordance with sub-clause 3.2, the Owners shall:

(i) procure that all officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95;

(ii) instruct such officers and ratings to obey all reasonable orders of the Managers in

connection with the operation of the Managers' safety management system.

5.3 Where the Managers are not providing Technical Management in accordance with sub-clause 3.2, the Owners shall procure that the requirements of the law of the flag of the Vessel are satisfied and that they, or such other entity as may be appointed by them and identified to the Managers, shall be deemed to be the "Company" as defined by the ISM Code assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code when applicable.

**6. Insurance Policies**

The Owners shall procure, whether by instructing the Managers under sub-clause 3.4 or otherwise, that throughout the period of this Agreement:

6.1 at the Owners' expense, the Vessel is insured for not less than her sound market value or entered for her full gross tonnage, as the case may be for:

(i) usual hull and machinery marine risks (including crew negligence) and excess liabilities;

(ii) protection and indemnity risks (including pollution risks, and Crew Insurances); and

(iii) war risks (including protection and indemnity and crew risks) in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with first class insurance companies underwriters or associations ("the Owners' Insurances");

6.2 all premiums and calls on the Owners' Insurances are paid promptly by their due date,

6.3 the Owners' Insurances name the Managers and, subject to underwriters' agreement, any third party designated by the Managers as a joint assured, with full cover, with the Owners obtaining cover in respect of each of the insurances specified in sub-clause 6.1:

~~(i) on terms whereby the Managers and any such third party are liable in respect of premiums or calls arising in connection with the Owners' Insurances; or~~

(ii) if reasonably obtainable, on terms such that neither the Managers nor any such third party shall be under any liability in respect of premiums or calls arising in connection with the Owners' Insurances or

~~(iii) on such other terms as may be agreed in writing.~~

Indicate alternative ~~(i), (ii) or (iii) in Box 14.~~ If Box 14 is left blank then (i) applies

6.4 written evidence is provided, to the reasonable satisfaction of the Managers, of their compliance with their obligations under Clause 6 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

**7. Income Collected and Expenses Paid on Behalf of Owners**

7.1 All moneys collected by the Managers under the terms of this Agreement (other than moneys payable by the Owners to the Managers) and any interest thereon shall be held to the credit of the Owners in a separate bank account.

7.2 All expenses incurred by the Managers under the terms of this Agreement on behalf of the Owners (including expenses as provided in Clause 8) may be debited against the Owners in the account referred to under sub-clause 7.1 but shall in any event remain payable by the Owners to the Managers on demand.

**8. Management Fee**

8.1 The Owners shall pay to the Managers for their services as Managers under this Agreement an annual management fee as stated in Box 15, which shall be payable by equal monthly instalments in advance, the first instalment being payable on the commencement of this Agreement (see Clause 2 and Box 4) and subsequent instalments being payable every month.

8.2 The management fee is fixed (see Box 15) for the first two years and increasing by 5% per year thereafter.

8.3 The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery. Without limiting the generality of Clause 7 the Owners shall reimburse the Managers for postage and communication expenses, travelling expenses, and other out of pocket expenses properly incurred by the Managers in pursuance of the Management Services.

8.4 In the event of the appointment of the Managers being terminated by the Owners or the Managers in accordance with the provisions of Clauses 17 and 18 other than by reason of default by the Managers, or if the Vessel is lost, sold or otherwise disposed of, the "management fee" payable to the Managers according to the provisions of sub-clause 8.1, shall continue to be payable for a further period of three calendar months as from the termination date. In addition, provided that the Managers provide Crew for the Vessel in accordance with sub-clause 3.1:

(i) the Owners shall continue to pay Crew Support Costs during the said further period of *three calendar months and*

(ii) The Owners shall pay an equitable proportion of any Severance Costs which may materialize, not exceeding the amount stated in Box 16.

8.5 If the Owners decide to lay-up the Vessel whilst this Agreement remains in force and such lay-up lasts for more than three months, an appropriate reduction of the management fee for the period exceeding three months until one month before the Vessel is again put into service shall be mutually agreed between the parties.

8.6 Unless otherwise agreed in writing all discounts and commissions obtained by the

Managers in the course of the management of the Vessel shall be credited to the Owners.

**9. Budgets and Management of Funds**

**9.1** The Managers shall present to the Owners annually a budget for the following twelve months in such form as the Owners require. The budget for the first year hereof is set out in Annex "C" hereto. Subsequent annual budgets shall be prepared by the Managers and submitted to the Owners not less than three months before the anniversary date of the commencement of this Agreement (see Clause 2 and Box 4).

**9.2** The Owners shall indicate to the Managers their acceptance and approval of the annual budget within one month of presentation and in the absence of any such indication the Managers shall be entitled to assume that the Owners have accepted the proposed budget.

**9.3** Following the agreement of the budget, the Managers shall prepare and present to the Owners their estimate of the working capital requirement of the Vessel and the Managers shall each month update this estimate, based thereon, the Managers shall each month request the Owners in writing for the funds required to run the Vessel for the ensuing month including the payment of any occasional or extraordinary item of expenditure, such as emergency repair costs, additional insurance premiums, bunkers, or provisions. Such funds shall be received by the Managers within ten running days after the receipt by the Owners of the Managers' written request and shall be held to the credit of the Owners in a separate bank account.

**9.4** The Managers shall produce a comparison between budgeted and actual income and expenditure of the Vessel in such form as required by the Owners monthly or at such other intervals as mutually agreed.

**9.5** Notwithstanding anything contained herein to the contrary, the Managers shall in no circumstances be required to use or commit their own funds to finance the provision of the Management Services.

**10. Managers' Right to Sub-Contract**

The Managers shall ~~not~~ have the right to sub-contract any of their obligations hereunder, including those mentioned in sub-clause 3.1 without the prior written consent of the Owners which shall not be unreasonably withheld. In the event of such a sub-contract, the Managers shall remain fully liable for the due performance of their obligations under this Agreement.

**11. Responsibilities**

**11.1 Force Majeure** - Neither the Owners nor the Managers shall be under any liability for any failure to perform any of their obligations hereunder by reason of any cause whatsoever of any nature or kind beyond their reasonable control.

**11.2** Liability to Owners –

(i) Without prejudice to sub-clause 11.1, the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or wilful default of the Managers or their employees, or agents or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a claim or claims shall never exceed a total of ten times the annual management fee payable hereunder.

(ii) Notwithstanding anything that may appear to the contrary in this Agreement, the Managers shall not be liable for any of the actions of the Crew, even if such actions are negligent, grossly negligent or wilful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under sub-clause 3.1, in which case their liability shall be limited in accordance with the terms of this Clause 11.

**11.3 Indemnity** - Except to the extent and solely for the amount therein set out that the Managers would be liable under sub- clause 11.2, the Owners hereby undertake to keep the Managers and their employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of the Agreement, and against and in respect of all costs, losses, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Managers may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

**11.4 "Himalaya"** - It is hereby expressly agreed that no employee or agent of the Managers (including every sub - contractor from time to time employed by the Managers) shall in any circumstances whatsoever be under any liability whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his party while acting in the course of or in connection with his employment and,

without prejudice to the generality of the foregoing provisions in this Clause 11, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 11 the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

**12. Documentation**

Where the Managers are providing Technical Management in accordance with sub-clause 3.2 and/or Crew Management in accordance with sub-clause 3.1, they shall make available, upon Owners' request, all documentation and records related to the Safety Management System (SMS) and/or the Crew which the Owners need in order to demonstrate compliance with the ISM Code and STCW 95 or to defend a claim against a third party.

**13. General Administration**

**13.1** The Managers shall notify Owners of all claims arising out of the Management Services hereunder and keep the Owners informed regarding any incident of which the Managers become aware which gives or may give rise to claims or disputes involving third parties.

**13.2** The owners shall bring or defend actions, suits or proceedings in connection with matters entrusted to the Managers according to this Agreement.

**13.3** The Owners shall obtain legal or technical or other outside expert advice in relation to the handling and settlement of claims and disputes or all other matters affecting the interests respect of the Vessel.

**13.4** The Owners shall arrange for the provision of any necessary guarantee bond or other security.

**13.5** Any costs reasonably incurred by the Managers in carrying out their obligations according to Clause 13 shall be reimbursed by the Owners.

**14. Auditing**

The Managers shall at all times maintain and keep true and correct accounts and shall make the same available for inspection and auditing by the Owners at such times as may be mutually agreed. On the termination, for whatever reasons, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all such accounts and all documents specifically relating to the Vessel and her operation.

**15. Inspection of Vessel**

The Owners shall have the right at any time after giving reasonable notice to the Managers to inspect the Vessel for any reason they consider necessary.

**16. Compliance with Laws and Regulations**

The Managers will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Vessel's flag, or of the places where she trades.

**17. Duration of the Agreement**

This Agreement shall come into effect on the day and year stated in Box 4 and shall continue until the date stated in Box 17. Thereafter it shall continue until terminated by either party giving to the other notice in writing, in which event the Agreement shall terminate upon the expiration of a period of two months from the date upon which such notice was given.

**18. Termination**

**18.1 Owners' Default**

(i) The Managers shall be entitled to terminate the Agreement with immediate effect by notice in writing if any moneys payable by the Owners under this Agreement and/or ~~the owners of any associated vessel, details of which are listed in Annex "D",~~ shall not have been received in the Managers' nominated account within ten running days of receipt by the Owners of the Manager's written request or if the Vessel is repossessed by the Mortgagees.

(ii) If the Owners:

(a) fail to meet their obligations under clause 5.2 and 5.3 of this Agreement for any reason within their control, or

(b) proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper,

The Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible. In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice in writing.

**18.2 Managers' Default**

If the Managers fail to meet their obligations under Clauses 3 and 4 of this Agreement for any reason within the control of the Managers, the Owners may give notice to the Managers of the default, requiring them to remedy it as soon as practically possible. In the event that the Managers fail to remedy it within a reasonable time to the satisfaction of the Owners, the Owners shall be entitled to terminate the Agreement with immediate effect by notice in writing.

**18.3 Extraordinary Termination**

This Agreement shall be deemed to be terminated in the case of the sale of the Vessel or if the Vessel becomes a total loss or is declared as a

constructive or compromised or arranged total loss or is requisitioned.

18.4 For the purpose of sub-clause 18.3 hereof

(i) the date upon which the Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Owners cease to be registered as Owners of the Vessel;

(ii) the Vessel shall not be deemed to be lost unless either she has become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.

18.5 This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or it if suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

18.6 The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

19. Law and Arbitration

19.1 This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

19.2 ~~This Agreement shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Agreement shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. In cases where neither the claim not any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~

19.3 This Agreement shall be governed by and construed in accordance with the laws of the ~~place mutually agreed by the parties and any dispute arising out of or in connection with this Agreement shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

19.4 If Box 18 in Part I is not appropriately filled in, sub-clause 19.1 of this Clause shall apply.

Note: 19.1, 19.2 and 19.3 are alternatives; indicate alternative agreed in Box 18.

20. Notices

20.1 Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, registered or recorded mail or by personal service.

20.2 The address of the Parties for service of such communication shall be as stated in Boxes 19 and 20, respectively.

**ANNEX "A" (DETAILS OF VESSEL OR VESSELS) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"**

| | |
|---|---|
| NAME OF VESSEL : | ADVANTAGE AVENUE |
| OWNER: | ADVANTAGE AVENUE SHIPPING LLC |
| IMO no: | 9419450 |
| Type: | OIL TANKER |
| Built: | 2010 - SAMSUNG HEAVY INDUSTRIES CO. LTD. KOJE, KOREA |
| Class: | DET NORSKE VERITAS |
| Tonnage: | 61341 GT / 35396 NT |
| Deadweight: | 115984,3 MT |
| LOA: | 240,63 mtrs |
| Breadth: | 43,80 mtrs |
| Main Engine: | MAN B&W 6S60MC-C , 13560 kW @ 105 RPM |
| Auxilliary Boilers: | KANGRIM PB-25 25000 kg/hr 6/16 kg/cm2 |

ANNEX "B" (DETAILS OF CREW) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

Date of Agreement : As mentioned in box 1
Detail of Crew : 25 Crew Members in total
Contract Duration : abt 4 months Senior Officers
abt 5 -7 months Junior Officers,
abt 6 months Ratings

| Numbers | Rank | Nationality |
|---|---|---|
| 1 | Master | Indian |
| 1 | Chief Officer | Indian |
| 1 | 2nd Officer | Indian |
| 1 | 3rd Officer | Indian |
| 1 | 4th Officer | Indian |
| 1 | Extra Officer | Indian |
| 1 | Chief Engineer | Indian |
| 1 | 2nd Engineer | Indian |
| 1 | 3rd Engineer | Indian |
| 1 | 4th Engineer | Indian |
| 1 | Elect. Eng. | Indian |
| 1 | Pumpman | Indian |
| 5 | Able Seaman | Indian |
| 2 | Ordinary Seaman | Indian |
| 1 | Fitter | Indian |
| 3 | Oiler | Indian |
| 1 | Chief Cook | Indian |
| 1 | Steward | Indian |

This complement is for standard trade. In case of Special requirements (STS, Storage etc.) the complement may be adopted accordingly.

ANNEX "C" (BUDGET) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

Date of Agreement : 10 FEBRUARY 2015
Manager's Budget for the first year with the effect from the commencement date of this agreement:
Please refer to operating Expense budget with detailed break down of the operating expenses

Estimated budget for 2015 in USD for MT ADVANTAGE AVENUE

| | Budget in USD |
|---|---|
| | Perday |
| Crewing | 4,400 |
| | |
| Victualing | 250 |
| | |
| Luboil | 500 |
| | |
| Technical | 1,000 |
| | |
| Insurance and other miscellaneous items | 1,100 |
| | |
| G&A - inclusive of management fees | 1,000 |
| | |
| Total | 8,250 |

Remarks:
Crewing is based on complement of 25 crew members with Indian officers & ratings.
Luboil based on 270 seagoing days and on today's prices.
Technical expenses include all costs for stores , spares services,class for engine and deck department
General include all costs for ; communication,represantations,travelling,vetting,transportation,ISM/ISPS,port expenses.
Excluding dry docking and related costs.

Execution copy

USD64,000,000

TERM LOAN FACILITY

Dated 4th February 2015

(1) The Companies listed in Schedule 1
as Borrowers

(2) Advantage Tankers LLC
as Guarantor

arranged by

(3) Norddeutsche Landesbank Girozentrale
as Arranger

with

(4) The financial institutions listed in Schedule 1
as Lenders

(5) Norddeutsche Landesbank Girozentrale
as Agent

(6) Norddeutsche Landesbank Girozentrale
as Security Trustee

(7) Norddeutsche Landesbank Girozentrale
as Swap Bank

---

FACILITY AGREEMENT

relating to the financing of

MV "TRUE" (tbr "ADVANTAGE AVENUE") and MV "TARGET" (tbr "ADVANTAGE ARROW")

---

Ince & Co LLP
International House
1 St Katharine's Way
London, E1W 1AY
Tel: +44 20 7481 0010
Fax: +44 20 7481 4968

Execution copy

USD64,000,000

TERM LOAN FACILITY

Dated 4th February 2015

(1) The Companies listed in Schedule 1
as Borrowers

(2) Advantage Tankers LLC
as Guarantor

arranged by

(3) Norddeutsche Landesbank Girozentrale
as Arranger

with

(4) The financial institutions listed in Schedule 1
as Lenders

(5) Norddeutsche Landesbank Girozentrale
as Agent

(6) Norddeutsche Landesbank Girozentrale
as Security Trustee

(7) Norddeutsche Landesbank Girozentrale
as Swap Bank

---

FACILITY AGREEMENT

relating to the financing of

MV "TRUE" (tbr "ADVANTAGE AVENUE") and MV "TARGET" (tbr "ADVANTAGE ARROW")

---

Ince & Co LLP
International House
1 St Katharine's Way
London, E1W 1AY
Tel: +44 20 7481 0010
Fax: +44 20 7481 4968

"**Advance**" means each of the TRUE Advance A, the TRUE Advance B, the TARGET Advance A and the TARGET Advance B being each borrowing (maximum of four (4)) of a proportion of the Total Commitments by the Borrowers or (as the context may require) the outstanding principal amount of such borrowing.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Agent**" includes any person who may be appointed as agent under this Agreement.

"**Annex VI**" means Annex VI (Regulations for the Preventions of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

"**Approved Manager**" means Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (*Manager*).

"**Approved Valuer**" means any of the ship brokers included in the list set out in Schedule 9 or such other independent reputable ship broker in respect of the crude tanker market approved by the Lenders from time to time.

"**Assignment Agreement**" means an agreement substantially in the form set out in Schedule 7 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

"**Auditors**" means any firm approved in advance by the Lenders (such approval not to be unreasonably withheld or delayed).

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the date of this Agreement to and including

(i) in respect of Loan A the earlier of:

(a)     31 March 2015 or such other date as the Agent, acting with the authorisation of the Lenders, may agree;

(b)     the Delivery Date of the second Vessel to be delivered; and

(c)     the date on which the Available Commitments are fully borrowed, cancelled or terminated

and (ii) in respect of Loan B the earlier of:

(a)     31 March 2015 or such other date as the Agent, acting with the authorisation of the Lenders, may agree; and

(b)     the date on which the Available Commitments are cancelled or terminated.

"**Available Commitment**" means a Lender's Commitment less (a) the amount of its participation in any outstanding Advance and (b) in relation to any proposed Utilisation, the

**SCHEDULE 2 - Vessel information**

| | |
|---|---|
| **Borrower:** | Advantage Avenue Shipping LLC |
| **Seller:** | True Shipping Ltd |
| **Name:** | 115,000 dwt oil tanker, built 2010 at Samsung Heavy Industries South Korea m.v. "TRUE" (tbr "ADVANTAGE AVENUE") IMO No 9419448 |
| **Scheduled Delivery Date:** | Tba |
| **Date and description of MoA:** | Memorandum of Agreement made or to be made between the Seller as seller and the Borrower as buyer |
| **Contract Price:** | USD44,000,000 |
| **Vessel Commitment:** | USD29,500,000 plus USD3,500,000 |
| **Flag State:** | Malta, to be reflagged to Marshall Islands |
| **Charter description:** | Time charter made or to be made between the Borrower and the Charterer for a term of five years commencing on or before the Utilisation Date at the Floor Rate plus any Additional Hire Payments. |
| **Charterer:** | Shell Western Supply and Trading of Barbados |
| **Classification:** | 115,000 dwt type crude oil tanker |
| **Classification Society:** | Det norske Veritas (DNV) |
| **Technical Manager:** | Genel Denizcilik |
| **Commercial Manager:** | Genel Denizcilik |
| **Management Agreement:** | Management Agreement dated made or to be made between the Technical Manager and the Commercial Manager as manager and the Borrower as owner |

# GEDEN HOLDINGS LTD.

**85 St.John's Street , Valletta . Malta**
**Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 14**

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

04. March. 2010

We hereby confirm that Geden Holdings Ltd., Malta is the Holding Company for all single purpose companies which owns one vessel each. The borrowers for the bank loans are SPCs, not Geden Holdings Ltd., Malta. Geden Holdings Ltd., Malta is the guarantor for the bank loans.

GEDEN HOLDINGS LTD of MALTA

# 9


Enterprise Improvement

Corporate Turnaround and Restructuring

Financial Advisory Services

Information Management Services

# Project Hermitage Restructuring

March 6 2013

www.alixpartners.com

DEKABANK copy, March 6 2013

# Important Disclaimer

This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). THIS REPORT IS NOT INTENDED TO BE RELIED UPON BY ANYONE OTHER THAN THE COMPANY, OR INDUCE ACTION OR FORBEARANCE BY ANYONE OTHER THAN THE COMPANY. This Report is strictly confidential and subject to the confidentiality provisions of the Engagement Letter.

The addressee of the Report is the Company. The Report may be made available to the following lenders: HSH Nordbank AG, DVB SE, Dekabank, Commerzbank AG, Bremer Landesbank, Norddeutsche Landesbank, Lloyds TSB Bank Plc, Natixis, Santander (the "Lenders") on a strict non-reliance basis only and subject to the provisions of this disclaimer. By taking receipt of this Report, the Lenders accept and agree to the non-reliance limitation set forth in the preceding sentence and the other provisions in this disclaimer. No other person other than the Company and the Lenders is authorized to have access to this Report, unless he has received AlixPartners' prior written consent and has signed and returned to AlixPartners an acceptable non-reliance report letter.

Should any unauthorized person obtain access to and read this Report, such person accepts and agrees to the following terms:

1. The unauthorized reader of this Report understands that the work performed by AlixPartners was performed in accordance with the instructions provided by the Company and was performed exclusively for the Company's sole benefit and internal use.
2. The unauthorized reader of this Report acknowledges that this Report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of the unauthorized reader.
3. The unauthorized reader agrees that AlixPartners, its partners, employees and agents neither owe nor accept any duty or responsibility to the unauthorized reader, whether in contract or in tort (including without limitation, negligence and breach of statutory duty), and shall not be liable in respect of any loss, damage or expense of whatsoever nature which is caused by any use the unauthorized reader may choose to make of this Report, or which is otherwise consequent upon the gaining of access to the Report by the unauthorized reader. Further, the unauthorized reader agrees that this Report is not to be referred to or quoted, in whole or in part, in any prospectus, registration statement, offering circular, public filing, loan, other agreement or document, and this Report is not to be distributed without AlixPartners prior written.

DEKABANK copy March 6 2013

# Important Disclaimer

The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company. AlixPartners further relied on the assurance of management and staff of the Company that they were unaware of any facts that would make the information provided to AlixPartners incomplete or misleading. In preparing the Report, AlixPartners has assumed, without any independent verification, the accuracy and completeness of all information received from the Company, available from public sources, or which was otherwise provided to us. AlixPartners is not responsible whatsoever for any misrepresentations made to AlixPartners during the course of its review. AlixPartners has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards.

Accordingly, AlixPartners cannot and does not express an opinion on the financial information and does not assume any responsibility for the accuracy or correctness of the projected financial or other data, information and assessments upon which the enclosed document is presented. AlixPartners expresses no view as to the accuracy, completeness or likelihood of the Company's business plan, scenarios, projections or forecasts contained in this Report.

The recipients of the Report, including the Lenders, accept that they will make their own investigation, analysis and decision relating to the possible or actual transaction/financing/credit relationship and/or matter related to such and will not use or rely upon this Report to form the basis of any such decisions. The Report cannot in any way serve as a substitute for inquiries and procedures which the Lenders will or should be undertaking for the purposes of satisfying themselves regarding the Client's business or financial position or for any other purpose in connection with the Lenders' relationship or transaction with the Client.

AlixPartners makes no representation or warranty regarding any actions the Lenders may or may not take in reliance on or in reference to matters presented in the Report. The Lenders accept and agree that AlixPartners, its affiliates, members, officers, partners, employees and agents (the "AlixPartners Entities") neither owe nor accept any duty or responsibility to the Lenders, whether in contract or in tort (including without limitation, negligence and breach of duty of any sort) or however otherwise arising. Any reliance the Lenders choose to place on the information or the Report is a matter of their judgment exclusively and at their own risk. Accordingly, no liability or responsibility whatsoever is accepted by the AlixPartners Entities for any loss howsoever arising from any use of, or in connection with, the Report.

The information in this Report is non-public and considered strictly confidential by the Company and AlixPartners.

DEKABANK copy, March 6 2013

# Important Disclaimer

This Report includes analyses of the Company's financial projections. These projections may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro- or macro-economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial uncertainty. Such assumptions involve significant elements of subjective judgment, which may or may not prove to be accurate, and consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The report is incomplete without reference to, and should be viewed solely in connection with, the oral briefing provided by AlixPartners which forms part of the Report.

The information in the Report reflects conditions and the views of AlixPartners as of this date, all of which are subject to change. AlixPartners undertakes no obligation to update or provide any revisions to the Report to reflect events, circumstances or changes that occur after the date the Report was prepared.

To the extent that any of the AlixPartners Entities provide any recipient of this Report with an oral presentation or explanations in relation to the Report or Client, the recipient of this Report acknowledges that such presentation and explanation will be given subject to the same terms and conditions as those specified in this disclaimer.

Neither the Report nor any of its contents may be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document, with or without attribution to AlixPartners, at any time or in any manner other than for the internal use of the Company, without the express, prior written consent of AlixPartners.

DEKABANK copy, March 6 2013



Contents

I. Executive Summary / Remarks from the Company

II. Background

III. Restructuring Proposal

IV. Financial Analysis

V. Conclusions

DEKABANK copy March 6 2013

AlixPartners

P-001835



Case 25-90138 Document 25-11 Filed in TXSB on 09/08/25 Page 130 of 182

# I. Executive Summary

AlixPartners

DEKABANK copy, March 6 2013

DRAFT & PRELIMINARY

# Executive Summary

- The November 20 Proposal provides the basis for a formal or informal standstill period during which the Company can develop, negotiate and implement a structure providing a viable long term solution

- The November 20 Proposal has shown to be effective as an interim measure providing liquidity and stability to the Company but it is unlikely to provide a definitive solution. One significant obstacle to its long-term implementation is the transfer of cash flows away from banks towards charterers

- In considering alternatives for a financial restructuring, the Company sought to achieve the following key objectives:
  - Compensate stakeholders adequately for their risk-weighted capital exposure and concessions
  - Constrain cross subsidization between stakeholders related to different underlying assets
  - Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)
  - Maximize options for stakeholders and potential for self-selection

- A long term plan involves grouping and ringfencing assets according to their debt service capacity and sensitivity to a recovery in rates.

- This can be achieved by executing arms-length sale transactions of the [SPVs] at market value into appropriate newcos:
  a) Newco Alpha: up to 29 vessels (mostly Tanker operations) financed by "Hamburg" banks, Natixis, Credit Europe (including Second Lien), NSF Second Lien and Lloyds; Alpha to be partially recapitalized with new equity and financed through 5 different facilites
  b) Newco Beta: 4 vessels financed by CCB and CDB.
  c) Group C: GB Global, NSF (South and East)
  d) Group D: the remaining vessels, essentially comprised of Icon, Octavian, Stealth, FSL

AlixPartners

DEKABANK copy, March 6 2013



Case 4:13-cv-01449 Document 33-6 Filed in TXSD on 08/07/13 Page 8 of 32

II. Background

DEKABANK copy, March 6 2013

AlixPartners



Case 23-90138 Document 25-11 Filed in TXSB on 08/02/25 Page 133 of 182

# Background

The Market

- Neither the tanker nor the bulker market recovered through 2012 and vessel earnings have remained low
  - The tanker market has shown signs of firmness in Q1 2013 but there is little optimism for a sustained recovery before Q3 2013
  - The bulker market continues to be very weak and has performed slightly below the Nov 20 Business Plan forecast during Q1 2013
- Asset values have continued to deteriorate through the end of 2012. The latest levels as per Clarkson Research sustained decline to multiyear lows:
  - 5yr old VLCC, Aframax and Product tankers at $57m, $28m, and $22m
  - 5yr old Capesize, Panamax, and Handysize at $33m, $18m, and $16m

Source: Clarkson Research

AlixPartners

DEKABANK copy, March 6 2013



# Background

## The Company

- The Company has actively been managing its portfolio since 2008, mainly via:
  - The investment of c.$700m in equity along with $1.8B of bank and sale-leaseback (18) financing
  - The Sale of 12 vessels upon delivery for net proceeds of $136m
  - The Sale of 17 vessels operating within the fleet for net proceeds of $79m
  - The sale –leaseback of 18 vessels to finance $665m in deliveries of which 7 in 2013 ($171m)
- Earnings from vessels financed by banks have fallen $45m short of debt service in the period 2011-2012. Similarly, earnings from bareboat vessels have fallen $43m short of obligations in the period 2011-2012.
- In order to maintain minimum operational liquidity, the Company has instituted a moratorium during the first quarter including the following measures
  - Deferral of 100% from all lenders other than CCB and CDB who have already agreed to a debt rescheduling starting from Q4 2012
  - Deferral of some November and December 2012 principal repayments
  - Deferral of 35% of the bareboat hire payments
  - Refinancing of Royal via Credit Europe facility; Repayment of 2012 bank principal overdue (1)
  - Management of supplier overdue through the quarter
- While all stakeholders have reserved their rights, some specific stakeholder actions have affected the cash flows
  - Unicredit has drawn on its deposit accounts
  - Icon issued a lien notice to the charterers and has directly received charter income
- With above measures and actions, available cash is projected at only c.$23.8m including retention at the end of March and c.$7.5m in restricted cash deposits

(1) Does not include default interest, margin increases and bank fees

DEKABANK copy March 6 2013

AlixPartners

# Company and Fleet Overview

The Company – Recent Events

- Flash
    1. The Flash ran aground at the end of June and is currently arrested in Tunisia
    2. The customer has invoked damage of goods (wet coal) and has refused to take delivery
    3. 180 days have elapsed as of Feb 2013, potentially giving rise to a Constructive Total Loss on a hull coverage of $110m
    4. The claim has been rejected by the Club on the basis that the damage is to cargo
    5. An arbitrator is to be appointed week of Mar 4 2013

- Baytur
    1. Baytur is expected to be delivered in the first week of April for $13.6m in proceeds

- Royal Refinancing
    1. The Royal was refinanced through a $37.5m facility with Credit Europe
    2. Credit Europe has cross-collateralized its second lien on the Namrun and the Scope (behind Natixis) with a second mortgage on the Royal
    3. $10m has been paid to HSH and $10m is outstanding to the yard

DEKABANK copy March 6 2013

AlixPartners

# Company and Fleet Overview

## Employment, Tanker

| Tankers | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Ref** | **Vessel** | **Type** | **Daily Charter Net Rate** | **Charterer** | **Maturity** | **Profit Share End Date** | **Option Rate** | **Option Maturity** | **Option (Month)** |
| 1 | MT AQUA | Aframax Tanker | 12,675 | CHEVRON | Apr-13 | - | 12,675 | Oct-13 | 6 |
| 2 | MT ACTION | Aframax Tanker | 12,706 | URSA SHIPPING | Mar-13 | - | 12,706 | May-13 | 2 |
| 3 | MT TARGET | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 4 | MT TRUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 5 | MT SPIKE | Aframax Tanker | 12,825 | URSA SHIPPING | Mar-13 | - | 12,825 | Oct-13 | 6 |
| 6 | MT AVOR | Aframax Tanker | 13,063 | URSA SHIPPING | Aug-13 | - | 13,063 | Feb-14 | 6 |
| 7 | MT VALUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 8 | MT BRAVO | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 9 | MT POWER | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 10 | MT PROFIT | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 11 | MT CENTER | Suezmax Tanker | 15,675 | NIDAS | Jun-13 | - | 19,500 | Jun-14 | 12 |
| 12 | MT BLUE | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 13 | MT PINK | Suezmax Tanker | 36,834 | GLENCORE | Jun-15 | - | 36,834 | Jun-15 | - |
| 14 | MT BLANK | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 15 | MT REEF | Suezmax Tanker | 37,080 | GLENCORE | Jul-15 | - | 37,080 | Jul-15 | - |
| 16 | MT HERO | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 17 | MT ROYAL | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 18 | MT ENJOY | Panamax Tanker | 13,825 | CSSA | Mar-14 | - | - | Mar-14 | - |
| 19 | MT MARKA | Panamax Tanker | 11,959 | Panamax International (P.I.) | Jun-13 | - | 12,925 | Dec-13 | 6 |
| 20 | MT CITRON | MR Pro/Chem Tanker | 13,380 | SHELL | May-13 | - | 13,380 | Jul-13 | 2 |
| 21 | MT CITRUS | MR Pro/Chem Tanker | 13,380 | SHELL | Jul-13 | - | 13,380 | Sep-13 | 2 |
| 22 | MT ACOR | Ice Class Pro/Chem Tanker | 11,700 | NORDEN | Apr-13 | - | - | May-13 | 1 |
| 23 | MT CARRY | Ice Class Pro/Chem Tanker | 11,150 | NORDEN | Aug-13 | - | - | Sep-13 | 1 |
| 24 | MT ROVA | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 25 | MT COTTON | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 26 | MT CARGO | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | May-13 | - | - | Jun-13 | 1 |
| 27 | MT ROCK | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Mar-13 | - | - | Apr-13 | 1 |
| 28 | MT ROCKET | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Jun-13 | - | - | Jul-13 | 1 |

AlixPartners

DEKABANK copy March 6 2013



# Company and Fleet Overview

## Employment, Bulk

| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
|---|---|---|---|---|---|---|---|---|---|
| | **Bulkers** | | | | | | | | |
| 31 | MV SCOPE | Capesize Bulk Carrier | 10,000 | SWISS MARINE | Oct-13 | - | - | May-14 | 7 |
| 32 | MV FLASH | Capesize Bulk Carrier | | ARRESTED | - | - | - | Jan-00 | - |
| 33 | MV PROUD | Capesize Bulk Carrier | 56,000 | COSCO | Jun-14 | - | - | Jun-14 | - |
| 34 | MV ANGEL | Capesize Bulk Carrier | 4,533 | SWISS MARINE | Mar-13 | - | - | Mar-13 | - |
| 35 | MV PRETTY | Capesize Bulk Carrier | 7,600 | SWISS MARINE | Feb-13 | - | - | May-13 | 3 |
| 36 | MV CASH | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 37 | MV COLLECTION | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 38 | MV CITY | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - |
| 39 | MV ASIA | Supramax Bulk Carrier | 7,014 | SUPREME BULK CARRIERS | Jan-13 | - | 7,014 | Apr-13 | 3 |
| 40 | MV FANTASTIC | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 41 | MV AMAZING | Supramax Bulk Carrier | 7,267 | SUPREME BULK CARRIERS | Feb-13 | - | 7,267 | May-13 | 3 |
| 42 | MV TARSUS | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | May-13 | - | 6,978 | Jul-13 | 2 |
| 43 | MV SPOT | Supramax Bulk Carrier | 10,925 | COPA | Feb-13 | - | - | Feb-13 | - |
| 44 | MV CLEAR | Supramax Bulk Carrier | 5,850 | Denmar Chartering & Trading GMBH Hamburg, Germany | May-13 | - | 5,850 | May-13 | |
| 45 | MV NAMRUN | Supramax Bulk Carrier | 7,256 | SUPREME BULK CARRIERS | Jan-13 | - | 7,256 | Apr-13 | 3 |
| 46 | MV BAYTUR | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 47 | MV SOUTH | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 48 | MV EAST | Supramax Bulk Carrier | 8,422 | WORLDWIDE INVESTMENT | Feb-13 | - | 8,422 | Feb-13 | - |
| 49 | MV WEST | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Jan-13 | - | 7,219 | Apr-13 | 3 |
| 50 | MV SECRET | Supramax Bulk Carrier | 8,422 | SUPREME BULK CARRIERS | Jan-13 | - | 8,422 | Apr-13 | 3 |
| 51 | MV SHARP | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 52 | MV CAPITAL | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 53 | MV METROPOL | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Mar-13 | - | - | Jan-00 | - |
| 54 | MV WORLD | Supramax Bulk Carrier | 8,265 | SIVA BULK | Apr-13 | - | 8,265 | Jul-13 | - |
| 55 | MV EARTH | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - |
| 56 | MV WIND | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - |
| 29 | MT CV STEALTH | Aframax Tanker | 11,700 | PT Armada | Mar-13 | - | 11,700 | Apr-13 | 1 |
| 30 | MT CS STEALTH | Aframax Tanker | 12,255 | Petrovietnam Transport Corp | Mar-13 | - | 12,255 | Mar-13 | |

AlixPartners

DEF - BANK copy March 5 2013



III. Restructuring Proposal

14

DEKABANK copy, March 6 2013

AlixPartners

P-001844

DRAFT & PRELIMINARY

# Restructuring Proposal

## Key Assumptions

- Key assumptions under the Plan include
  - All ships sold **at minimum of market value or value of loan** and on an arms-length basis.
  - There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa - type jurisdictions)
  - Stakeholders in groups **C and D will have the option to move into A** subject to loan modifications adhering to the conditions prevalent in that entity.
  - Stakeholders in **C and D can have their vessels redelivered** subject to acceptable terms for termination.
- The Company would prefer a coordinated financing approach in Newco
- The Second Lien debt relating to NSF and Credit Europe is transferred/novated upon the sale. There may be an opportunity to renegotiate terms of mezzanine debt (NSF, Credit Europe) as part of the sale but it has not been contemplated here
- Deposits related to facilities (Unicredit, Profit, etc.) are netted the outstanding loan amounts; the loans are reconstituted after the transaction and the deposits are eliminated

AlixPartners

DEKABANK copy, March [illegible] 2013

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco A

## Newco A Example

- **Newco Alpha:** Intended to form a viable standalone entity of up to 29 vessels (21 Tanker and 8 Bulker) in which the quality of vessel earnings would enable limited deferrals compared to those required in the November 20 proposal; New equity provided in the transaction to reduce total bank exposure and improve LTV coverage ratio for the majority of the facilities
- **Assumptions :** **1)** Sale of ships at market value from Olco to Newco **2)** Equity to fund any shortfall in collateral in Oldco **3)** New bank financing in Newco provided at 95% LTV **4)** New Equity in Newco as required for 95% LTV.

Note: Indicative transaction structure subject to legal due diligence

(1) Equity of $1.1m also as a result of transfer of Namrun at value greater then senior debt

(2) $52.6m financed in excess of market value of assets

AlixPartners

DEKABANK copy March 6 2013

P-001846

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

## Structuring: Facility #1

- **Facility#1:** Newco Alpha financing at 95% LTV, LIBOR +3% on a 15 year loan profile from delivery date based 20 year working life minus 5 years. Pro Forma debt in Facility#1 includes second liens behind Natixis related to Credit Europe ($16.1m)

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loans [1] | [B] Current Estimated Value | [C] Excess / (Shortfall) upon sale [B-A] | [D] Capital required in NewCo (LTV of 95%) [B*(1-95%)] | [E] Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | [F] Equity going into OldCo [Positive C] | [G] New debt drawdown [B - D] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FACILITY #1 | Hamburg banks paid down to 95% LTV including any current shortfalls | | | | | | | | | | |
| **Aframax** | NLB | **Target** | 99% | 95% | 28.7 | 29.0 | 0.3 | 1.5 | 1.5 | 0.3 | 27.6 |
| **Aframax** | NLB | **True** | 108% | 95% | 33.4 | 31.0 | (2.4) | 1.6 | 4.0 | 0.0 | 29.5 |
| **Aframax** | Unicredit | **Value** | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| **Aframax** | Unicredit | **Bravo** | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| **Aframax** | Unicredit | **Power** | 97% | 95% | 31.9 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| **Suezmax** | DVB NLB | **Profit** | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |
| **Suezmax** | CB NLB BrLB | **Blue** | 99% | 95% | 40.5 | 41.0 | 0.5 | 2.1 | 2.1 | 0.5 | 39.0 |
| **Suezmax** | H5H 1 | **Hero** | 99% | 95% | 48.5 | 49.0 | 0.5 | 2.5 | 2.5 | 0.5 | 46.6 |
| **MR** | H5H 2 | **Citron** | 107% | 95% | 22.5 | 21.0 | (1.5) | 1.1 | 2.6 | 0.0 | 20.0 |
| **MR** | H5H 2 | **Citrus** | 107% | 95% | 23.6 | 22.0 | (1.6) | 1.1 | 2.7 | 0.0 | 20.9 |
| **Handy** | DVB NLB SAN | **Acor** | 96% | 95% | 20.1 | 21.0 | 0.9 | 1.1 | 1.1 | 0.9 | 20.0 |
| **Handy** | DVB NLB SAN | **Carry** | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| **Handy** | DVB NLB SAN | **Rova** | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| **Handy** | DVB NLB | **Cotton** | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| **Handy** | DVB NLB | **Cargo** | 91% | 95% | 21.0 | 23.0 | 2.0 | 1.2 | 1.2 | 2.0 | 21.9 |
| **Handy** | DVB NLB | **Rock** | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| **Handy** | DVB NLB | **Rocket** | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| **Handymax** | DVB | **Asia** | 102% | 95% | 19.4 | 19.0 | (0.4) | 1.0 | 1.3 | 0.0 | 18.1 |
| **Mini Bulker** | DVB | **Earth** | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Mini Bulker** | DVB | **Wind** | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Subtotal Facility #1** | | **20** | **99%** | **95%** | **504.7** [1] | **511.0** | **(5.9)** [2] | **25.6** | **31.5** [3] | **12.2** | **485.5** |

[1] To be adjusted for repayments before closing of the transaction (figures do not include principal repayments made week ending Feb 22)
[2] Represents sum of shortfall only
[3] Total amount of equity related to sale / purchase of vessels in Facility #1
[4] $4.1m related to excess collateral in Unicredit facility could be eliminated and repaid/refinanced through NSF 2nd Lien

DEKABANK copy, March 8 2013

AlixPartners

P-001847



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #1

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan | [B] Current Estimated Value | [C] Excess / (Shortfall) upon sale [B-A] | [D] Capital required in NewCo (LTV of 95%) [B*(1-95%)] | [E] Capital required in NewCo (LTV of 95%) and to cover deficiency [D-Negative C] | [F] Equity going into OldCo [Positive C] | [G] New debt drawdown [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | True | 108% | 95% | 33.4 | 31.0 | 2.4 | 1.6 | 4.0 | 0.0 | 29.5 |

1. True is sold from Oldco to Newco Alpha at market value $31m (B)
2. Any shortfall against the mortgage is funded by $2.4m new equity (C) and the whole of the Oldco debt is paid down. If there is value above the mortgage, the excess cash remains in Oldco
3. NLB and New Equity recapitalize Newco at a maximum of 95% LTV; NLB has reduced its exposure by $3.9m and improved LTV by 13%

Note: Indicative transaction structure subject to legal due diligence

DEKABANK copy March 6 2013

AlixPartners

# Plan B – Split of Fleet via Newco: Alpha

## Structuring – Example #2

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan | [B] Current Estimated Value | [C] Excess / (Shortfall) upon sale [B-A] | [D] Capital required in NewCo (LTV of 95%) [B*(1-95%)] | [E] Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | [F] Equity going into OldCo [Positive C] | [G] New debt drawdown [B - E] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |

1. Profit is sold from Oldco to Newco Alpha at $41m market value (B)
2. If there is value above the mortgage, the excess cash remains in Oldco (C). Any shortfall would need to be funded via additional equity
3. DVB and New Equity recapitalize Newco at maximum of 95% LTV; NLB has reduced its exposure by $0.4m and improved LTV by 1%

Note: indicative transaction structure subject to legal due diligence

AlixPartners

DEKABANK copy March 6 2013

P-001849

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

## Structuring

- Facility#2: Lloyds vessels sold and refinancing provided on the same terms
- Facility#3: Natixis vessels sold and refinancing provided on the same terms; Namrun facility extended and ship potentially sold in 2-3 yrs
- Facility#4: Credit Europe sold and refinancing provided on the same terms
- Facility#5: Dekabank vessels sold and refinancing provided on PAYC basis and no covenants
- Facility#6: NSF Second Lien behind Unicredit on the same terms

| Type | Facility | Name | Current LTV | Pro forma LTV | [A] Actual Outstanding Loan | [B] Current Estimated Value | [C] Excess / (Shortfall) upon sale [B-A] | [D] Capital required in NewCo (LTV at 95%) [B*(1-95%)] | [E] Capital required in NewCo (LTV of 95%) and to cover deficiency [D-Negative C] | [F] Equity going into OldCo [Positive C] | [G] New debt drawdown [B - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FACILITY #2 | Lloyds facility rolled over into Newco Alpha on existing terms | | | | | | | | | | |
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |
| Suezmax | Lloyds | Blank | 68% | 68% | 32.2 | 47.0 | 14.8 | 14.8 | 14.8 | 14.8 | 32.2 |
| Suezmax | Lloyds | Reef | 75% | 75% | 34.6 | 46.0 | 11.4 | 11.4 | 11.4 | 11.4 | 34.6 |
| FACILITY #3 | Natixis facilities rolled over into Newco Alpha on existing terms | | | | | | | | | | |
| Capesize | Natixis 1 | Scope | 87% | 87% | 23.4 | 27.0 | n/a | n/a | n/a | n/a | 23.4 |
| Handymax | Natixis 2 | Namrun | 88% | 88% | 14.0 | 16.0 | n/a | n/a | n/a | n/a | 14.0 [2] |
| FACILITY #4 | Loan includes $37.5m new refinancing from Credit Europe plus $16.1m 2nd priority loans relating to the Scope and the Namrun | | | | | | | | | | |
| Suezmax | Credit Europe | Royal | 107% [1] | 107% | 53.6 | 50.0 | n/a | n/a | 0.0 | 0.0 | 53.6 |
| FACILITY #5 | Deka facility rolled over into Newco but paid only from available cash from these vessels | | | | | | | | | | |
| Handymax | Deka | Tarsus | 133% | 133% | 24.0 | 18.0 | n/a | n/a | n/a | n/a | 24.0 |
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| Handymax | Deka | Clear | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| FACILITY #6 | NSF 2nd Lien facilities | | | | | | | | | | |
| | | | n/a | n/a | 25.5 | n/a | n/a | | | | 25.5 |
| TOTAL Newco Alpha | | 29 | 97% | 95% | 799.3 | 795.0 | (5.9) [3] | 58.5 | 64.4 | 44.6 | 784.0 |
| | | | | | | MV of Newco Alpha Assets | | | Total Capital required | | New Alpha debt |

[1] Royal refinancing includes second lien ; LTV on first lien is 75%
[2] Equity value from the rollover of the Namrun loan on $16m in MV; equity not retained by Oldco due to 2nd Lien by Credit Europe
[3] Represents sum of shortfall only

DEKABANK Copy March 6 2013

AlixPartners



Case 25-90138 Document 25-11 Filed in TXSB on 09/02/25 Page 145 of 182

# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #3

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale (B-A) | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency (if negative C) | (F) Equity going into OldCo (Positive C) | (G) New debt drawdown (D - A) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |

1. Pink is sold from Oldco to Newco Alpha at market value (B)
2. The excess cash over the mortgage value remains in Oldco (C)
3. Lloyds and New Equity recapitalize Newco at a maximum of 95% LTV; Given that coverage is lower than 95% (85%,) no new equity is required upon refinancing of Newco with $37.3m in debt

Note: Indicative transaction structure subject to legal due diligence

AlixPartners

DEKABANK copy, March 5 2013

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

## Structuring – Example #4

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | | 0.0 | 0.0 | 0.0 | 25.0 |

Amount of loan novated is beyond market value at the time of the transaction; no recapitalization

1. Spot is sold from Oldco to Newco Alpha at $25m being equivalent to outstanding loans
2. Loans are novated to Newco
3. Loans are paid out of available cash on the vessel only

Deka New Financing: $25.0m (G)
Novation of loan
Deka Existing Financing: $25.0m
(D) No change in LTV
Cancellation of debt
Newco A
(B) $18.0m Asset
(B) $25.0m Purchase
SPC Spot Debt: $25.0m (A)
(D) No equity into Newco
New Equity: $0m (E)
(C) No equity into Oldco

Note: indicative transaction structure subject to legal due diligence

22

AlixPartners

DEKABANK copy, March 6 2013

P-001852

DRAFT – PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

## Structuring – Sources and Uses, Pro Forma Balance Sheet

| Sources | | Uses | |
|---|---|---|---|
| New equity [1] | 64.4 | Purchase of assets | 784.0 |
| New financing | 784.0 | Net bank debt paydown | 19.3 |
| | | Equity to cover collateral shortfall and excess value | 45.1 |
| **Total Sources** | **$848.4** | **Total Uses** | **$848.4** |

(1) Does not include additional liquidity for operational cash

DEKABANK copy. March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Beta

Structuring

- **Newco Beta:** Contains 4 Bulkers financed by Chinese banks. These are considerably under water yet they must be offered attractive terms given that the Chinese banks benefit from a Corporate Guarantee.
- **Assumptions :** Loans novated to Newco Beta on existing terms. **Subject to an appropriate rescheduling of obligations we do not envisage equity being required for Newco Beta.**

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan | [B] Current Estimated Value |
|---|---|---|---|---|---|---|
| **Capesize** | CCB | **Flash** | 100% | 100% | 33.1 | 33.0 |
| **Capesize** | CCB | **Proud** | 100% | 100% | 33.1 | 33.0 |
| **Capesize** | CDB | **Angel** | 119% | 119% | 43.0 | 36.0 |
| **Capesize** | CDB | **Pretty** | 125% | 125% | 45.1 | 36.0 |
| **Total Newco Beta** | | **4** | **112%** | **112%** | **154.3** | **138.0** |

DEKABANK copy: March 6 2013

AlixPartners

DRAFT – PRELIMINARY

# Plan B – Split of Fleet via Newco: Group C

Structuring

- **Group C:** Contains 11 Bulkers financed by GB Global as well as the NSF-financed vessels.
- **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Subject to adequate concessions, facilities could opt into Newco Alpha or desist from participation and take ships back

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan | [B] Current Estimated Value |
|---|---|---|---|---|---|---|
| **Kamsarmax** | GB Global | **Cash** | 96% | 96% | 26.0 | 27.0 |
| **Kamsarmax** | GB Global | **Coll./Chance** | 96% | 96% | 26.0 | 27.0 |
| **Kamsarmax** | GB Global | **City** | 96% | 96% | 26.0 | 27.0 |
| **Handymax** | NSF | **South** | 84% | 84% | 19.3 | 23.0 |
| **Handymax** | NSF | **East** | 84% | 84% | 19.3 | 23.0 |
| **Handymax** | GB Global | **West** | 103% | 103% | 23.7 | 23.0 |
| **Handymax** | GB Global | **Secret** | 103% | 103% | 23.7 | 23.0 |
| **Handymax** | GB Global | **Sharp** | 103% | 103% | 23.7 | 23.0 |
| **Handymax** | GB Global | **Capital** | 103% | 103% | 23.7 | 23.0 |
| **Handymax** | GB Global | **Metropol** | 103% | 103% | 23.7 | 23.0 |
| **Handymax** | GB Global | **World** | 103% | 103% | 23.7 | 23.0 |
| **Total Group C** | | **11** | **98%** | **98%** | **258.8** | **265.0** |

DEKA BANK copy, March 6 20

AlixPartners



# Plan B – Split of Fleet: Residual Oldco: Group D

Structuring

- **Group D, Geden Oldco:** 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable. Baytur will be sold April 2013.
- **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Proceeds from the sale to Newco Alpha would provide liquidity to pay down payables.

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan (PV of leases) | [B] Current Estimated Value |
|---|---|---|---|---|---|---|
| **Aframax** | FSL | **Aqua** | 234% | 234% | 60.8 | 26.0 |
| **Aframax** | FSL | **Action** | 234% | 234% | 60.8 | 26.0 |
| **Aframax** | Stealth | **Spike** | 177% | 177% | 55.0 | 31.0 |
| **Aframax** | Stealth | **Avor** | 176% | 176% | 54.5 | 31.0 |
| **Suezmax** | Icon 1 | **Center** | 145% | 145% | 67.9 | 47.0 |
| **Panamax** | Octavian 1 | **Enjoy** | 141% | 141% | 42.2 | 30.0 |
| **Panamax** | Octavian 2 | **Marka** | 128% | 128% | 41.0 | 32.0 |
| **Handymax** | Icon 2 | **Fantastic** | 157% | 157% | 29.9 | 19.0 |
| **Handymax** | Icon 2 | **Amazing** | 157% | 157% | 29.9 | 19.0 |
| **Chartered - Afra_Tanker** | not ours | **CV Stealth** | | | | |
| **Chartered - Afra_Tanker** | not ours | **CS Stealth** | | | | |
| **Subtotal SPVs** | | **11 [1]** | **169%** | **169%** | **441.9** | **261.0** |
| **Corporate facility** | Bank Asya | | | | 39.5 | |
| **Total Group D** | | | | | **481.4** | |

[1] Baytur sold before the transaction

DEKABANK copy, March 2013

AlixPartners

# Plan B – Summary

## Bank Exposure: By Facility

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 60.0 | 62.1 | 104% | 57.0 | 95% | (5.1) | -9% |
| HSH 2 | 43.0 | 46.1 | 107% | 40.9 | 95% | (5.3) | -12% |
| DVB | 25.0 | 25.3 | 101% | 23.8 | 95% | (1.5) | -6% |
| CB NLB BrLB | 41.0 | 40.5 | 99% | 39.0 | 95% | (1.5) | -4% |
| DVB NLB 5AN | 63.0 | 62.1 | 99% | 59.9 | 95% | (2.3) | -4% |
| HSH 1 | 49.0 | 48.5 | 99% | 46.6 | 95% | (2.0) | -4% |
| DVB NLB | 131.0 | 125.2 | 96% | 124.5 | 95% | (0.8) | -1% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 38.5 | 84% | 38.5 | 84% | 0.0 | 0% |
| Natixis 1 | 27.0 | 23.4 | 87% | 23.4 | 87% | 0.0 | 0% |
| Natixis 2 | 16.0 | 14.0 | 88% | 14.0 | 88% | 0.0 | 0% |
| Octavian 2 | 32.0 | 41.0 | 128% | 41.0 | 128% | 0.0 | 0% |
| Octavian 1 | 30.0 | 42.2 | 141% | 42.2 | 141% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon 1 | 47.0 | 67.9 | 145% | 67.9 | 145% | 0.0 | 0% |
| Icon 2 | 38.0 | 59.7 | 157% | 59.7 | 157% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,628.8** | **112%** | **1,609.5** | **110%** | **(19.3)** | **-1%** |

DEKABANK copy. March 6 2013

AlixPartners

Case 25-90138 Document 25-11 Filed in TXSB on 08/02/25 Page 152 of 182

# Plan B – Summary

Bank Exposure: By Bank

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 170.1 | 168.8 | 99% | 161.6 | 95% | (7.1) | -4% |
| DVB | 106.3 | 103.4 | 97% | 100.9 | 95% | (2.5) | -2% |
| Commerzbank | 14.8 | 14.6 | 99% | 14.0 | 95% | (0.6) | -4% |
| BrLB | 13.1 | 13.0 | 99% | 12.5 | 95% | (0.5) | -4% |
| Santander | 23.8 | 22.5 | 95% | 22.0 | 93% | (0.6) | -2% |
| HSH | 92.0 | 94.6 | 103% | 87.4 | 95% | (7.2) | -8% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,635.0** | **112%** | **(19.3)** | **-1%** |

DEKABANK copy, March 6 2013

AlixPartners



DEKABANK copy, March 6 2013

AlixPartners



# Assumptions

## General

- Business plan is based on the following main assumptions:

**Operations**

- 20 offhire days for drydocking
- Rates applied to reflect type of vessel, adjusted for contract terms
- Charter-out options exercised if below market rate
- No Opex inflation
- No working capital movements

**Investments**

- Dry docking taken from technical management schedule
- No asset sales
- Capex as per financing commitments
- Charter-in come off upon expiry
- Purchase obligations resold at loss/gain equal to current differential between market value and financial obligation

**Financing**

- No variation in current base rate
- Margins as per specific facilities (following pages)
- Amortization as per specific facilities
- No interest rate swap
- Refinancing of Royal providing $27.5m net liquidity post HSH repayment and before any repayment to yard ($10m)
- Extension of Namrun on same terms upon Nov-13 maturity; likely to be sold within 2-3 years

**Restructuring**

- No mechanism for bareboat catch-up
- Bareboat purchase options not exercised
- No restructuring fees
- All bank deferrals assumed to take on new profile or bullet repayment (no assumption on bareboat deferrals)

DEKABANK copy, March 9 2013

AlixPartners

# Assumptions

## Rates

- The Company's market projections imply CAGR increases of 8-11% for the majority of the fleet:

| $/day | 2013 | 2014 | 2015 | 2016 | 2017 | CAGR (12-17) |
|---|---|---|---|---|---|---|
| Aframax Tanker | 14,000 | 14,000 | 17,500 | 19,000 | 21,000 | 8% |
| Suezmax Tanker | 15,000 | 15,000 | 22,000 | 24,000 | 24,000 | 8% |
| Panamax Tanker | 13,500 | 13,500 | 14,500 | 17,500 | 17,500 | 5% |
| MR Pro/Chem Tanker | 13,000 | 13,000 | 15,000 | 15,000 | 15,000 | 3% |
| Ice Class Pro/Chem Tanker | 12,500 | 12,500 | 14,000 | 14,000 | 14,000 | 3% |
| Capesize Bulk Carrier | 15,000 | 17,500 | 20,000 | 22,000 | 22,000 | 11% |
| Kamsarmax Bulk Carrier | 12,500 | 15,000 | 15,000 | 20,000 | 20,000 | 15% |
| Supramax Bulk Carrier | 10,000 | 11,000 | 15,000 | 17,500 | 17,500 | 17% |
| Mini Bulk Carrier | 5,000 | 6,000 | 7,000 | 8,000 | 8,000 | 15% |

- The actual revenue increase accruing to the fleet through the projection differs as a result of the exercise of charter options and the JV structure on certain vessels (mainly Shell). Revenue CAGR through the period is 6.6%

AlixPartners

DEKABANK copy March 6 2013

P-001861

Case 25-90138 Document 25-11 Filed in TXSB on 08/02/25 Page 156 of 182

# Financial Analysis

## Summary of Terms: Newco Alpha

| NewCoAlpha #1 | Terms |
|---|---|
| Senior Facilities | - **NLB, Uni, DVB NLB, CB NLB BrLB, HSH1, HSH2, DVB NLB SAN, DVB NLB, DVB** |
| Amount | - $485.5m ($504.7m outstanding pre-transaction) |
| Interest | - Base Rate: LIBOR<br>- Margin: 300bps w/ potential step-up based on prevalent rates |
| Amortization | - 9-month grace period<br>- Straight line profile based on first 15 years of vessel life<br>- 5 year maturity |
| Covenants | - 95% LTV at close<br>- 85% in Q4 14; 80% in Q4 15 |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts |

| NewCoAlpha #2 | Terms |
|---|---|
| Senior Facilities | - **Lloyds** |
| Amount | - $104.1m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin: No change (300bps) |
| Amortization | - Current profile<br>- Elimination of cash sweep |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #3 | Terms |
|---|---|
| Senior Facilities | - **Natixis** |
| Amount | - $37.4m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Scope: 160bps<br>- Margin Namrun: 120bbps<br>- 300bps starting with refinancing of Namrun |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis

## Summary of Terms: Newco Alpha

| NewCoAlpha #4 | Terms |
|---|---|
| Senior Facilities | - **Credit Europe 1st and 2nd Lien on Royal, Namrun, Scope** |
| Amount | - $53.6m ($37.5m 1st plus $16.1m 2nd) |
| Interest | - Base Rate: n/a<br>- Interest Royal 1st Lien : 800bps<br>- Interest 2nd Lien: 1,000bps |
| Amortization | - Current profile |
| Covenants | - 2 year grace and 5 year profile |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #6 | Terms |
|---|---|
| Senior Facilities | - **NSF 2nd Lien (behind Unicredit)** |
| Amount | - $25.5m (no change) |
| Interest | - Base Rate: n/a<br>- Fixed Margin: 1,150bps |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - 2nd Mortgages with possibility of additional 2nd priority mortgages on entire facilities |
| Other | - n/a |

| NewCoAlpha #5 | Terms |
|---|---|
| Senior Facilities | - **Dekabank** |
| Amount | - $74.0 (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Tarsus: 245bps<br>- Margin Spot: 185bps<br>- Margin Clear: 245bps |
| Amortization | - Amortisation on a cash/pay-as-you-can basis from vessel earnings |
| Covenants | - Suspended |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts<br>- Coordination agreement prohibiting recourse to the remainder of the group |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis

## Summary of Terms: Newco Alpha

- The below tables summarises the features of debt on Newco Alpha

Note: surface area represents percentage share of total facility

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis

## Newco Alpha Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 36.0 | 35.5 | 36.2 | 37.2 | 37.9 | 37.5 | 44.7 | 44.8 | 42.9 | 42.7 |
| OPEX | - | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) |
| Drydock | - | (0.4) | (1.0) | (0.5) | - | (0.9) | (0.8) | (0.9) | (1.8) | (0.9) | - |
| **EBITDA** | - | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | 74.4 | - | - | - | - | - | - | - | - | - |
| Bank Interest (Senior) | - | (6.9) | (6.9) | (6.8) | (6.8) | (6.6) | (6.4) | (6.2) | (6.0) | (5.9) | (5.7) |
| Bank Principal Repayments [1] | - | - | (4.5) | (4.5) | (15.5) | (18.3) | (18.3) | (19.0) | (19.3) | (19.4) | (19.4) |
| NSF Interest (2nd lien) | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | **66.7** | **(12.2)** | **(12.1)** | **(23.0)** | **(25.6)** | **(25.4)** | **(26.0)** | **(26.1)** | **(26.0)** | **(25.9)** |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases [2] | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | **(64.4)** | - | - | - | - | - | - | - | - | - |
| **Net cashflow for period** | - | **21.0** | **5.6** | **7.1** | **(2.7)** | **(5.6)** | **(5.5)** | **1.2** | **0.0** | **(1.0)** | **0.1** |
| **Cumulative net cash balance** | - | **20.8** | **26.4** | **33.5** | **30.7** | **25.1** | **19.6** | **20.8** | **20.8** | **19.9** | **20.0** |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Senior Debt Balance* | - | *(754.5)* | *(754.5)* | *(750.0)* | *(745.5)* | *(730.0)* | *(711.7)* | *(693.4)* | *(674.4)* | *(655.1)* | *(635.6)* |
| *NSF 2nd lien Balance* | - | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* |
| Leverage: (Debt/EBITDA) | 0.00x | 10.44x | 10.96x | 10.13x | 9.49x | 9.44x | 9.26x | 6.60x | 6.70x | 6.79x | 6.36x |
| Hamburg Jumbo Facility LTV [3] | | 95% | 96% | 97% | 98% | 97% | 96% | 95% | 94% | 93% | 92% |
| Hamburg Jumbo Value (depreciated) | - | 511.0 | 504.7 | 498.5 | 492.2 | 485.9 | 479.6 | 473.4 | 467.1 | 460.8 | 454.5 |
| Vessels | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

(1) 9 months principal deferral on the Jumbo facility would be necessary to establish minimum liquidity requirements. Shortfall in absence of this shown above.
(2) Asset purchases net of new financing
(3) Equity cure for 85% covenant in Q4 14 and 80% for Q4 16
(4) Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy, March 6 2013

# Financial Analysis

## Summary of Terms: Newco Beta

- The below tables summarises the features of debt on Newco Beta

| NewCo Beta: | Terms |
|---|---|
| Senior Facilities | - CCB, CDB |
| Amount | - $154.3m (no change) |
| Interest | - No change to existing agreements |
| Amortization | - No change to existing agreements |
| Covenants | - No change to existing agreements |
| Security | - No change to existing agreements |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis

## Newco Beta Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 9.3 | 9.2 | 9.4 | 8.8 | 6.4 | 6.4 | 7.2 | 7.4 | 7.4 | 7.3 |
| OPEX | - | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Drydock | - | - | - | (0.9) | (0.9) | - | - | - | - | - | - |
| **EBITDA** | - | **7.1** | **7.0** | **6.4** | **5.8** | **4.2** | **4.2** | **5.0** | **5.2** | **5.2** | **5.1** |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | **7.1** | **7.0** | **6.4** | **5.8** | **4.2** | **4.2** | **5.0** | **5.2** | **5.2** | **5.1** |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | - | (1.3) | (1.3) | (1.2) | (1.2) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (0.9) |
| Bank Principal Repayments | - | (6.1) | (6.1) | (6.1) | (6.4) | (6.4) | (6.4) | (6.4) | (6.4) | (3.4) | (3.4) |
| Bareboat Payments | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | **(7.4)** | **(7.4)** | **(7.3)** | **(7.6)** | **(7.6)** | **(7.5)** | **(7.4)** | **(7.4)** | **(4.4)** | **(4.4)** |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - | - | - | - | - | - | - |
| **Net cashflow for period** | - | **(0.4)** | **(0.4)** | **(0.9)** | **(1.8)** | **(3.3)** | **(3.3)** | **(2.4)** | **(2.3)** | **0.8** | **0.7** |
| **Cumulative net cash balance** | - | **(0.4)** | **(0.8)** | **(1.7)** | **(3.5)** | **(6.8)** | **(10.2)** | **(12.6)** | **(14.8)** | **(14.1)** | **(13.3)** |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Debt Balance* | - | *(161.3)* | *(155.2)* | *(149.0)* | *(142.9)* | *(136.5)* | *(130.0)* | *(123.6)* | *(117.2)* | *(110.8)* | *(107.3)* |
| *Bareboat balance* | - | - | - | - | - | - | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 0.00x | 5.69x | 5.54x | 5.82x | 6.20x | 8.06x | 7.77x | 6.13x | 5.69x | 5.37x | 5.27x |
| Loan to value | 0% | 118% | 115% | 111% | 108% | 104% | 100% | 96% | 92% | 88% | 86% |
| Value (depreciated) | 138.0 | 136.7 | 135.4 | 134.1 | 132.8 | 131.4 | 130.1 | 128.8 | 127.5 | 126.2 | 124.9 |
| Vessels | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

[1] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy March 6 2013

# Financial Analysis

## Geden Oldco Quarterly Cashflow

| | Q1-13 | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | | |
| Income | 64.9 | 59.0 | 24.3 | 24.3 | 25.5 | 26.3 | 25.9 | 25.6 | 31.6 | 32.3 | 29.0 | 28.8 |
| OPEX | (29.8) | (28.9) | (12.5) | (12.4) | (12.3) | (12.5) | (12.5) | (12.4) | (12.3) | (12.5) | (11.4) | (11.0) |
| Drydock | (0.4) | (0.8) | - | - | (0.5) | - | - | - | - | (0.7) | (1.3) | - |
| **EBITDA** | **34.7** | **29.3** | **11.8** | **11.9** | **12.7** | **13.7** | **13.3** | **13.2** | **19.3** | **19.1** | **16.3** | **17.7** |
| Working capital changes [1] | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | **34.7** | **29.3** | **11.8** | **11.9** | **12.7** | **13.7** | **13.3** | **13.2** | **19.3** | **19.1** | **16.3** | **17.7** |
| **FINANCING ACTIVITIES** | | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | (10.6) | (9.8) | - | - | - | - | - | - | - | - | - | - |
| Bank Principal Repayments | (23.8) | (29.9) | (39.5) | - | - | - | - | - | - | - | - | - |
| Bareboat Payments | (17.8) | (19.8) | (20.8) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| Pre-Del Drawdown | 45.0 | 8.5 | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | 119.3 | 25.3 | 25.3 | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | (57.9) | (12.2) | (13.2) | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | **54.0** | **(38.0)** | **(48.2)** | **(20.8)** | **(20.4)** | **(20.6)** | **(20.7)** | **(20.7)** | **(20.3)** | **(20.5)** | **(18.6)** | **(18.6)** |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | | |
| Capex | (82.7) | (42.3) | - | - | - | - | - | - | - | - | [2] | - |
| Asset Sale net proceeds | - | 5.5 | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| **Net Investment** | **(82.7)** | **(36.8)** | **44.6** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(23.9)** | **-** |
| **Net cashflow for period** | **6.0** | **(45.5)** | **8.2** | **(8.9)** | **(7.7)** | **(6.9)** | **(7.4)** | **(7.6)** | **(0.9)** | **(1.4)** | **(26.2)** | **(0.8)** |
| **Cumulative net cash balance** | **41.0** | **(4.5)** | **3.7** | **(5.3)** | **(12.9)** | **(19.8)** | **(27.2)** | **(34.8)** | **(35.7)** | **(37.1)** | **(63.4)** | **(64.2)** |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | | |
| *Debt Balance* | *(1,109.5)* | *(1,064.2)* | - | - | - | - | - | - | - | - | - | - |
| *Bareboat balance* | *(471.3)* | *(453.4)* | *(433.7)* | *(412.8)* | *(392.0)* | *(371.7)* | *(351.1)* | *(330.3)* | *(309.6)* | *(289.3)* | *(268.8)* | *(250.3)* |
| Vessels | 56 | 55 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 20 | 20 |

[1] Working Capital change reflects paydown of corporate facility with cash from sale transaction; $10m ooutstanding to Rongsheng is left unpaid
[2] Purchase obligations on sale leasebacks assumed to generate cash loss equivalent to deficiency between current outstanding obligation and market value

AlixPartners

DEKABANK copy, March 2013

P-001868



# V. Conclusions

DEKABANK copy. March 6 2013

AlixPartners

# Current Proposal

## Strategy and Objectives

- The solution provides, directly or indirectly, for the primary objectives held by the different stakeholders.

| Objective | Comments |
|---|---|
| 1. Compensate stakeholders adequately for their risk-weighted capital exposure and concessions | • Assets with similar risk profile pooled together provides for better aligned incentives<br>• Lenders provided with adequate equity cushion, margins, and covenants<br>• Provides for recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support |
| 2. Constrain formal or informal cross subsidization between stakeholders related to different underlying assets | • While it reduces the portfolio effect of a broader fleet, combining similar assets together limits risk of cross subsidies going from high to low collateral vessels<br>• Pooling through creation of unique syndicate facility would facilitate granting of a second priority mortgage through the fleet as well as increase liquidity of bank assets, enabling lenders to sell out of assets without disrupting operations |
| 3. Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests) | • Common set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position<br>• Sister-ship arrest risk minimized given shareholding structure in Newco |
| 4. Maximize options for stakeholders and potential for self-selection | • Rebasing of assets can provide mechanism for transfer from one Newco profile to another (ie. Group C and D into A)<br>• Opting out of the scheme can be achieved via mutually agreed terms for redelivery of vessel to relevant lender |

AlixPartners

DEKABANK copy March 6 2013



Contents

A. Facility Description

B. Financials: Existing

C. Market Overview

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Appendix

## Facility Description

| Facility | HSH1 | HSH2 | Natixis1 | Natixis2 | Icon1 | Icon2 | Octavian1 | Octavian2 |
|---|---|---|---|---|---|---|---|---|
| Debt / Bareboat | Debt | Debt | Debt | Debt | Bareboat | Bareboat | Bareboat | Bareboat |
| Vessels | Hero | Citron / Citrus | Scope | Namrun | Center | Fantasic / Amazing | Enjoy | Marka |
| Lender group | HSH | HSH | Natixis | Natixis | Icon [DVB] | Icon [DVB NLB] | Octavian [DVB] | Octavian [NLB] |

DEKABANK copy March 6 2013

AlixPartners

# Appendix: Transaction Analysis

## Newco Beta Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Existing debt rollover | 154.3 | Purchase at outstanding debt level | 154.3 |
| **Total Sources** | **$154.3** | **Total Uses** | **$154.3** |

Additional liquidity to maintain operational cash balance not shown; Estimated at $20m and could be financed via equity of deferrals

DEKABANK copy, March 6 2013

AlixPartners

# Appendix: Transaction Analysis

## Residual Oldco Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Alpha Sale Receipts | 828.6 | Alpha Vessels Debt Repayment | 780.0 |
| Beta Sale Receipts | 154.3 | Beta Vessels Debt Repayment | 154.3 |
| Baytur Sale Receipts | 13.6 | Baytur Debt Repayment | 8.4 |
| Group C Sale Receipts | 258.8 | Group C Repayment | 258.8 |
| | | Change in Working Capital (Repayment of A/P) & corp. facility | 53.8 |
| **Total Sources** | **$1,255.3** | **Total Uses** | **$1,255.3** |

EKABANK copy, March 6 2013

AlixPartners



# Assumptions

Revenue

AlixPartners

DEKABANK copy March 6 2013



# Assumptions

Revenue

DEKABANK copy March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

## Newco Alpha Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 71.5 | 148.8 | 175.2 | 181.3 | 186.7 |
| OPEX | (33.7) | (67.2) | (67.2) | (67.3) | (67.2) |
| Drydock | (1.4) | (2.3) | (3.6) | (6.3) | (2.3) |
| **EBITDA** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | 74.4 | - | - | - | - |
| Bank Interest (Senior) | (13.8) | (26.7) | (23.8) | (20.8) | (17.6) |
| Bank Principal Repayments | (4.7) | (56.6) | (77.2) | (79.1) | (78.2) |
| NSF Interest (2nd lien) | (1.5) | (2.9) | (2.9) | (2.9) | (2.9) |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **54.4** | **(86.2)** | **(104.0)** | **(102.7)** | **(98.8)** |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | (64.4) | - | - | - | - |
| **Net Investment** | **(64.4)** | - | - | - | - |
| **Net cashflow for period** | **26.4** | **(6.8)** | 0.4 | 4.9 | 18.4 |
| **Cumulative net cash balance** | **26.4** | **19.6** | **20.0** | **24.9** | **43.3** |
| **RATIOS (Beg. of Period)** | | | | | |
| *Senior Debt Balance* | *(754.5)* | *(749.8)* | *(693.2)* | *(616.0)* | *(536.9)* |
| *NSF 2nd lien Balance* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* |
| Leverage: (Debt/EBITDA) | 21.40x | 9.77x | 6.88x | 5.96x | 4.80x |
| Hamburg Jumbo Facility LTV | 95% | 97% | 95% | 91% | 86% |
| Value (depreciated) | 511.0 | 498.5 | 473.4 | 448.3 | 423.2 |
| Vessels | 29 | 29 | 29 | 29 | 29 |

DEKABANK Copy, March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

## Newco Beta Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 18.5 | 31.0 | 29.2 | 31.3 | 32.1 |
| OPEX | (4.4) | (8.8) | (8.8) | (8.8) | (8.8) |
| Drydock | - | (1.7) | - | (1.3) | - |
| **EBITDA** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (2.6) | (4.6) | (3.9) | (3.3) | (2.7) |
| Bank Principal Repayments | (12.3) | (25.4) | (19.7) | (20.2) | (20.2) |
| Bareboat Payments | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **(14.8)** | **(30.0)** | **(23.6)** | **(23.5)** | **(22.8)** |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - |
| **Net Investment** | **-** | **-** | **-** | **-** | **-** |
| **Net cashflow for period** | **(0.8)** | **(9.4)** | **(3.2)** | **(2.2)** | **0.5** |
| **Cumulative net cash balance** | **(0.8)** | **(10.2)** | **(13.3)** | **(15.6)** | **(15.0)** |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(161.3)* | *(149.0)* | *(123.6)* | *(103.9)* | *(83.8)* |
| *Bareboat balance* | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 11.45x | 7.24x | 6.05x | 4.89x | 3.59x |
| Loan to value | 117% | 112% | 97% | 85% | 72% |
| Value (depreciated) | 138.0 | 132.8 | 127.5 | 122.3 | 117.0 |
| Vessels | 4 | 4 | 4 | 4 | 4 |

DEKABANK copy, March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

## Residual Oldco Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 172.5 | 103.2 | 121.6 | 121.3 | 105.5 |
| OPEX | (83.7) | (49.7) | (47.2) | (39.6) | (33.6) |
| Drydock | (1.2) | (0.5) | (2.0) | (1.9) | (2.3) |
| **EBITDA** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (20.5) | - | - | - | - |
| Bank Principal Repayments | (93.2) | - | - | - | - |
| Bareboat Payments | (79.2) | (82.4) | (77.9) | (64.0) | (49.6) |
| Pre-Del Drawdown | 53.4 | - | - | - | - |
| Bareboat Drawdowns | 169.8 | - | - | - | - |
| Pre-Del Repayments | (83.3) | - | - | - | - |
| **Net Financing Cashflow** | **(53.0)** | **(82.4)** | **(77.9)** | **(64.0)** | **(49.6)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | (125.0) | - | - | - | - |
| Asset Sale net proceeds | 50.1 | - | (23.9) | (37.2) | (24.1) |
| **Net Investment** | **(75.0)** | **-** | **(23.9)** | **(37.2)** | **(24.1)** |
| | | | | | |
| **Net cashflow for period** | **(40.3)** | **(29.5)** | **(29.4)** | **(21.5)** | **(4.2)** |
| | | | | | |
| **Cumulative net cash balance** | **(5.3)** | **(34.8)** | **(64.2)** | **(85.7)** | **(89.9)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(1,109.5)* | - | - | - | - |
| *Bareboat balance* | *(471.3)* | *(392.0)* | *(309.6)* | *(231.7)* | *(167.7)* |
| Vessels | 56 | 22 | 20 | 17 | 14 |

DEKABANK copy, March 6 2013

AlixPartners

P-001879

DRAFT & PRELIMINARY

# Appendix

## Bank Exposure: Hamburg reduced to 90% LTV

- Equity required if LTV improved to 90% is $90.0m ($25.6m more than at an LTV of 95%)

| | Estimated Value | Current debt | LTV Before | New Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 89.1 | 90% | (5.8) | -6% |
| NLB | 170.1 | 168.8 | 99% | 153.1 | 90% | (15.7) | -9% |
| DVB | 106.3 | 103.4 | 97% | 95.6 | 90% | (7.8) | -7% |
| Commerzbank | 14.8 | 14.6 | 99% | 13.3 | 90% | (1.3) | -9% |
| BrLB | 13.1 | 13.0 | 99% | 11.8 | 90% | (1.1) | -9% |
| Santander | 23.8 | 22.5 | 95% | 21.2 | 89% | (1.4) | -6% |
| HSH | 92.0 | 94.6 | 103% | 82.8 | 90% | (11.8) | -13% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,609.4** | **110%** | **(44.8)** | **-3%** |

DEKABANK copy. March

AlixPartners

P-001880

DRAFT & PRELIMINARY

# Appendix

## Potential loss on bareboat purchase obligations

- There exist a number of obligations to purchase at future dates under the following bareboat agreements. The cashflows reflect the following losses occurring via purchase and resale at the obligation date. It assumes no changes to market values but applies depreciation to current estimated values over the time until the purchase and resale date. If the vessels were retained rather than crystallize the loss, then there would be a greater cash outflow for refinancing plus further ongoing loss on vessels were these occur.

| | Purchase obligation [$m] | Estimated value today [$m] | Loss on resale | Depreciated value [$m] | Loss on resale | Purchase Ob. Date | Years | Monthly depreciation |
|---|---|---|---|---|---|---|---|---|
| Avor | 51.5 | 31 | -20.5 | 27.6 | -23.9 | Aug-15 | 2.6 | 0.11 |
| Enjoy | 38.5 | 30 | -8.5 | 25.5 | -13.0 | Apr-16 | 3.2 | 0.11 |
| Centre | 64.5 | 47 | -17.5 | 40.2 | -24.3 | Jun-16 | 3.4 | 0.17 |
| Marka | 37 | 32 | -5 | 26.0 | -11.0 | Apr-17 | 4.2 | 0.12 |
| Fantastic | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| Amazing | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| **TOTAL** | **234.5** | **178** | **-56.5** | **149.2** | **-85.3** | | | |

DEKABANK copy. March 6 2013

AlixPartners

P-001881

Case 25-90138 Document 25-11 Filed in TXSB on 08/02/25 Page 176 of 182

## Global Locations

AlixPartners is ready to field a team of relevant experts whenever and wherever they are needed. Our professionals work from 15 global offices in more than a dozen different countries. They speak more than 50 languages, and have experience in every corner of the world. Call us, we'll be there when it really matters.

**Chicago**
300 N. LaSalle Street
Suite 1900
Chicago, IL 60654
312.346.2500

**Dallas**
2101 Cedar Springs Road
Suite 1100
Dallas, TX 75201
214.647.7500

**Detroit**
2000 Town Center
Suite 2400
Southfield, MI 48075
248. 358.4420

**Dubai**
Gate Village 10, Level 03
P.O. Box 125115
Dubai Intl Financial Centre
Dubai, United Arab Emirates
+971.4.401.9246

**Düsseldorf**
Königsallee 59 a
40215 Düsseldorf
Germany
+49.211.97.55.10.00

**London**
20 North Audley Street
London W1K 6WE
United Kingdom
+44.20.7098.7400

**Los Angeles**
515 S. Flower Street
Suite 3050
Los Angeles, CA 90071
213.437.7100

**Milan**
Corso Matteotti 9
20121 Milan
Italy
+39.02.360.12000

**Munich**
Mauerkircherstr. 1 a
81679 München
Germany
+49.89.20.30.40.00

**New York**
40 West 57th Street
New York, NY 10019
212.490.2500

**Paris**
49/51 Avenue George V
75008 Paris
France
+33.1.76.74.72.00

**San Francisco**
4 Embarcadero Center
31st Floor, Suite 3110
San Francisco, CA 94111
415.848.0283

**Shanghai**
Suite 6111
Plaza 66 Building I
1266 Nan Jing West Road
Shanghai, 200040 China
+8621.6171.7555

**Tokyo**
Marunouchi Building 33F
2-4-1 Marunouchi
Chiyoda-ku
Tokyo 100-6333 Japan
+81.3.5533.4800

**Washington, DC**
1602 L Street, NW
Suite 300
Washington, DC 20036
202.756.9000

© AlixPartners, LLP, 2010

AlixPartners

DEKABANK copy, Mar 8 2013

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PSARA ENERGY, LTD.<br><br>Plaintiff<br><br>SPACE SHIPPING, LTD.; ADVANTAGE AVENUE SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET and GULSUN NAZLI KARAMEHMET WILLIAMS<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION No. |

**VERIFICATION**

I, MARY ELISA REEVES, do hereby declare and state that:

1. I am the senior partner in the firm Reeves McEwing LLP, and am counsel for Plaintiff in the above captioned matter;

2. I am familiar with the Original Verified Complaint, and submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendants, SPACE SHIPPING LTD. (hereinafter "SPACE SHIPPING"); ADVANTAGE AVENUE SHIPPING, LLC (hereinafter "AVENUE SHIPPING"); GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES (hereinafter "GEDEN"); ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS"); ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS"); FORWARD HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS"); MEHMET EMIN KARAMEHMET (hereinafter "EMIN KARAMEHET); and GULSUN NAZLI

KARAMEHMET WILLIAMS (hereinafter "KARAMEHMET WILLIAMS"), pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

3. I have personally inquired or have directed inquiries into the presence of the Defendants in this District.

4. I have checked with the office of the Pennsylvania Secretary of State, using the Secretary of State's database, to determine whether the Defendants can be located within this District. SPACE SHIPPING, AVENUE SHIPPING, GEDEN, ADVANTAGE TANKERS, ADVANTAGE HOLDINGS, FORWARD HOLDINGS, EMIN KARAMEHMET, and KARAMEHET WILLIAMS are not registered with the Pennsylvania Secretary of State. Accordingly, I have determined that, as of August 28, 2016, none of these Defendants are incorporated or registered as foreign corporations pursuant to the laws of Pennsylvania, and have neither nominated nor appointed any agent for the service of process within this District.

5. I have performed a search on DOBSEARCH.COM on the internet, and determined that there are no telephone listings or addresses for the named Defendants within this District.

6. I have performed a Google search as to whether the Defendants can be located within this District. The Google search results did not provide a listing for any of the named Defendants.

7. I am unaware of any general or managing agent(s) of the named Defendants within this District.

8. Based on my investigation, and to the best of my knowledge, information and belief, the Defendants cannot be found in the Eastern District of Pennsylvania, within the

meaning of Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

9. The foregoing statements are made under penalty of perjury,

Date: September 8, 2016
Philadelphia, PA

Respectfully Submitted,

REEVES MCEWING LLP

By: Mary E. Reeves
Mary Elisa Reeves, Esq.

719 E. Passyunk Avenue
Philadelphia, PA 19147
Telephone: 267-324-3773
E-mail: reeves@lawofsea.com
Attorney Id # 44194

*Attorneys for Plaintiff*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

PSARA ENERGY, LTD.

## DEFENDANTS

SPACE SHIPPING, LTD., ET AL.

(b) County of Residence of First Listed Plaintiff MARSHALL ISLANDS
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant MALTA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
MARY ELISA REEVES, ESQUIRE
Reeves McEwing, LLP
719 E. Passyunk Avenue
Philadelphia, PA 19147
(267) 324-3773

Attorneys *(If Known)*
N/A

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
☐ 110 Insurance
☒ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
Other:
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1333

Brief description of cause:
BREACH OF MARITIME CONTRACT - RULE B

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 3,565,713.88

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE ____________ DOCKET NUMBER ____________

DATE 9/8/16

SIGNATURE OF ATTORNEY OF RECORD Mary E. Reeves

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PSARA ENERGY, LTD. :
:
Plaintiff :
:
SPACE SHIPPING, LTD.; ADVANTAGE AVENUE SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET and GULSUN NAZLI KARAMEHMET WILLIAMS :

: CIVIL ACTION NO.

:
Defendants. :

**CASE MANAGEMENT TRACK DESIGNATION FORM**

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through §2255 ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

[c] Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that Are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks ( X )

| ~~[illegible]~~ 9/8/16 | Mary Elisa Reeves | PSARA ENERGY, LTD. |
|---|---|---|
| Date | Attorney-at-law | Attorney for |

| (267) 324-3773 | (267) 519-9463 | reeves@lawofsea.com |
|---|---|---|
| Telephone | Fax | Email Address |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PSARA ENERGY, LTD. | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| SPACE SHIPPING, LTD.; ADVANTAGE | : | |
| AVENUE SHIPPING, LLC; GENEL | : | CIVIL ACTION NO. |
| DENIZCILIK NAKLIYATI A.S. A/K/A | : | |
| GEDEN LINES; ADVANTAGE TANKERS, | : | |
| LLC; ADVANTAGE HOLDINGS, LLC; | : | |
| FORWARD HOLDINGS, LLC; MEHMET | : | |
| EMIN KARAMEHMET and GULSUN NAZLI | : | |
| KARAMEHMET WILLIAMS | : | |
| | : | |
| Defendants. | : | |

**CASE MANAGEMENT TRACK DESIGNATION FORM**

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through §2255 ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

[c] Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that Are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks ( X )

| | | |
|---|---|---|
| ~~[illegible]~~ 9/8/16 | Mary Elisa Reeves | PSARA ENERGY, LTD. |
| Date | Attorney-at-law | Attorney for |
| (267) 324-3773 | (267) 519-9463 | reeves@lawofsea.com |
| Telephone | Fax | Email Address |