**EXHIBIT 15**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **No. 1:18-cv-00178** |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS:** | | |
| **LTD.; ADVANTAGE ARROW SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC; FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI KARAMEHMET -** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

Plaintiff PSARA ENERGY, LTD., by and through undersigned counsel, for its Verified

Complaint against Defendants: SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.;

ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A

GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC;

FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI

KARAMAEHMET - WILLIAMS; and TUĞRUL TOKGÖZ alleges and pleads as follows:

### I. JURISDICTION, VENUE, AND PARTIES

1.      This is an admiralty and maritime claim within the meaning of rule 9(h) of the

Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract,

*i.e.* an executed bareboat charter party for the employment of a seagoing cargo vessel.  This case

also falls under this court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and

is brought under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or

Maritime Claims, and Asset Forfeiture Actions (hereinafter "Supplemental Rule B") and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

2.     At all times material hereto Plaintiff, PSARA ENERGY, LTD. (hereinafter "PSARA" or "Plaintiff"), was a corporation organized under the laws of the Republic of the Marshall Islands and the registered owner of the Motor Tanker CV STEALTH (hereinafter "CV STEALTH" or "Vessel"), a crude oil tanker vessel registered in Malta.

3.     At all times material hereto Defendant, SPACE SHIPPING, LTD. (hereinafter "SPACE"), was and is a foreign company organized under the laws of Malta and the bareboat charterer of the M/T CV STEALTH under a bareboat charter party contract dated February 23, 2010 ("the bareboat charter"). A copy of the bareboat charter and addenda thereto are attached to this Original Verified Complaint as **EXHIBIT 1**.  Though SPACE is incorporated in Malta, the business of SPACE is actually carried on entirely by Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

4.     At all times material hereto GEDEN HOLDINGS, LTD. (hereinafter "GEDEN HOLDINGS"), was and is a foreign company organized under the laws of Malta with its operating office at the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey. Though GEDEN HOLDINGS is incorporated in Malta, its business is actually carried on entirely by GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

5.     At all times material hereto Defendant ADVANTAGE ARROW SHIPPING, LLC (hereinafter "ADVANTAGE ARROW SHIPPING"), was and is a limited liability company organized under the laws of the Republic of the Marshall Islands, and the registered owner of the

Motor Tanker ADVANTAGE ARROW, a tanker vessel registered in the Marshall Islands, with IMO No. 9419448 and international call sign V7KZ7. Though ADVANTAGE ARROW SHIPPING is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

6.     At all times material hereto Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES (hereinafter "GEDEN LINES"), was and is a foreign corporate entity organized under the laws of Turkey with its principal place of business located at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey.

7.     At all times material hereto ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  ADVANTAGE TANKERS, LLC is a holding company that owns 100% of Defendant ADVANTAGE ARROW SHIPPING. Though ADVANTAGE TANKERS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

8.     At all times material hereto ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS"), was a foreign limited liability company organized under the Laws of the Marshall Islands.  ADVANTAGE HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE TANKERS. Though ADVANTAGE HOLDINGS is incorporated in the Marshall Islands, its business is carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

9.     At all times material hereto FORWARD HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  FORWARD HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE HOLDINGS.  Though FORWARD HOLDINGS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

10.     At all times material hereto MEHMET EMIN KARAMEHMET (hereinafter "EMIN KARAMEHMET"), is an individual person and a citizen and resident of the Republic of Turkey and, respectively, through a Panamanian corporation that he entirely controls - Buselten Finance, S.A - is the 100% shareholder of GEDEN HOLDINGS and SPACE SHIPPING. Through another Turkish business entity he controls - Cukurova Holdings - he is 100% shareholder of Defendant GEDEN LINES.

11.     At all times material hereto, Tuğrul Tokgöz (hereinafter "TOKGÖZ") is an individual person and a citizen of the Republic of Turkey and a resident of Turkey. TOKGÖZ is the Chief Executive Officer of ADVANTAGE ARROW SHIPPING; ADVANTAGE TANKERS; and a director of GEDEN HOLDINGS and GEDEN LINES and, through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, is 15% controlling shareholder of ADVANTAGE TANKERS.

12.     At all times material hereto, GULSUN NAZLI KARAMEHMET–WILLIAMS (hereinafter "KARAMEHMET WILLIAMS") is an individual person and a dual citizen of the Republic of Turkey and the Swiss Confederation, and a resident of the United Kingdom. KARAMEHMET WILLIAMS is the adult daughter and only child of EMIN KARAMEHMET,

and through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, she is the 85% controlling shareholder of ADVANTAGE TANKERS.

13.     The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants, to wit:  the M/T ADVANTAGE ARROW that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules as pled more fully in Section **V** of this Verified Complaint.

## II. THE SUBSTANTIVE CLAIMS

14.     Under the bareboat charter party dated February 23, 2010 and addenda thereto dated:  June 2, 2010; June 21, 2010; and January 29, 2010, Plaintiff chartered its vessel CV STEALTH for a "a term of 5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period" to "Geden Holdings Limited,[1] Malta or nominee always guaranteed by Geden Line."  *See* **EXHIBIT 1**, box 21.  The vessel was delivered to the service of the nominee of GEDEN HOLDINGS, *i.e.* SPACE, and to GEDEN LINES, and was used and operated for profit by them as part of GEDEN LINES' non-owned, chartered-in fleet.

15.     By subsequent addendum to the bareboat charter, GEDEN HOLDINGS became the performance guarantor of SPACE.  *See* **EXHIBIT 1**.  *See* also Addendum dated June 2, 2010, and performance guarantee of GEDEN HOLDINGS, dated March 4, 2010 hereto attached as **EXHIBIT 2.**

16.     Under Part II Clause  10 of the bareboat charter, SPACE was obligated to maintain the vessel in a good state of repair, with all of her class certificates up to date.

---

[1] Geden Holdings Limited (hereinafter "Geden Holdings") was a holding company incorporated in Malta. It held 100% of the shares of SPACE and 100% of the shares of several one-ship-companies as is more specifically pled in this Original Verified Complaint.

17.    Under Part II Clause 15 of the bareboat charter, SPACE was obligated to redeliver the vessel at the end of the bareboat charter party term "…in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted."  Moreover, the same clause provides that "…upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed…".

18.    Under Part II Clause  17 of the bareboat charter, SPACE was obligated "to indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the vessel by the Charterers..." and under Rider Clause 9, SPACE, as charterer undertook to indemnify the owners of the vessel "against, all costs charges, expenses, claims proceedings (whether civil or criminal), liabilities, losses, penalties, duties and fees…and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management, control, chartering, sub-chartering…use, operation, return, redelivery…of the Vessel…and regardless of when the same shall arise".

19.    Pursuant to clause 7 of a Settlement Agreement dated 8 December 2016, and entered into between Plaintiff as Owners, in settlement of interim disputes regarding an outstanding arbitration award in favor of Owners for unpaid charter hire; and Defendant SPACE as Charterers, and Geden Holdings as performance guarantors, the hire amount payable under the Charterparty was amended to USD 9,875 per day from 1 January 2017 onwards.

20.     Plaintiff delivered the vessel into the bareboat chartered service and rendered the contractual performance required of it.  However, Defendant SPACE (hereinafter also referred to as "Charterer"), though possessing and using the CV STEALTH, has failed and refused to perform

its obligations under the bareboat charter party contract, and is in breach thereof as is further pled below.

21.     On April 10, 2014, SPACE time chartered the Vessel to ST Shipping & Transport Pte. Ltd. (hereinafter "ST"), a Singapore business entity, for a term of approximately twelve months. ST, operating out of its Stamford, Connecticut branch office, where it is registered as a foreign corporation and carries on business as a cargo ship operator, sub-chartered the vessel on a voyage charter party dated September 4, 2014 to lift a cargo up to 400,000 barrels of Venezuelan crude oil from Puerto La Cruz for discharge at a terminal in the U.S.A.

22.     The Vessel was directed by ST to Puerto la Cruz, Venezuela to load her cargo where after arriving, and tendering her notice of readiness to load, she was boarded by local police and prosecutorial authorities on or about September 13, 2014 and was detained by them on suspicion of attempting to carry a stolen cargo of crude oil.

23.     At Puerto La Cruz, the CV STEALTH was further detained by court order, and at the request of the prosecutorial authorities, for a period exceeding three years, which was beyond the agreed bareboat charter party contractual redelivery date.

24.     Under the terms of the bareboat charter, the latest date for the redelivery of the CV STEALTH to Plaintiff was on June 22, 2015. However, SPACE, in breach of the bareboat charter, failed to redeliver her to Plaintiff - her lawful owner - and at the same time was failing to pay hire as the bareboat charter requires.

25.     Owners commenced London maritime arbitration to enforce their claims against SPACE for unpaid hires. The arbitration tribunal ruled in favor of Plaintiff, requiring SPACE to

keep paying monthly bareboat charter hire until the Vessel was released and was actually redelivered to Plaintiff.

26. On October 3, 2017, SPACE claimed the Venezuelan authorities' detention of the CV STEALTH had terminated and gave PSARA notice of its intent to redeliver the Vessel within approximately 30 days. However, the Vessel was incapable of being redelivered as she was out of class with her attending classification society the American Bureau of Shipping. Moreover, the Vessel was so extensively damaged due to SPACE's neglect and lack of maintenance throughout her 3 years long detention that she was incapable of sailing under her own power and was in need of extensive repairs.

27. Ultimately SPACE arranged to have the vessel towed from Puerto La Cruz, Venezuela to Port of Spain, Trinidad where she was redelivered and taken over by Plaintiff's personnel on or about March 24, 2018 out of class, and in the same heavily damaged condition as she was before she was towed by SPACE to Port of Spain.

### *Breach of Charterers' Maintenance/Redelivery Obligations*

28. Pursuant to Clause 10(a) of Part II the bareboat charter, SPACE was under an obligation to keep the Vessel well maintained and in a good state of repair throughout the duration of the charter. SPACE was also under an obligation to keep the Vessel's Class fully up to date and to maintain all other necessary certificates in full force at all times.

29. Further, pursuant to Clause 15 of Part II of the bareboat charter, SPACE was obliged to: redeliver the Vessel to Owners "in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted; " with her survey cycles up to date and trading and class certificates valid. Box 17 of part I of the bareboat charter required the Vessel to have passed her Special Survey dry docking without

extensions.

30.     In breach of Clauses 10(a) and/or 15 of Part II and/or Box 17 of the bareboat charter, SPACE did not undertake any (or any non-negligible) maintenance on the Vessel, which since September 2014, failed to pass her Special Survey dry docking, and instead redelivered the Vessel in a severely damaged condition on 24 March 2018 with all Class and statutory certificates expired.

31.     The work needed in order for the Vessel to be restored to the required redelivery condition; to pass Special Survey; and to have all Class and statutory certificates reinstated, includes the following non-exhaustive list of works:

(i)      complete overhauling and/or repair and/or replacement of all machinery and equipment and extensive renewals of major and miscellaneous spares;

(ii)     extensive piping system renewals, overhauling of valves, sensors and gauges;

(iii)    full hull and deck blasting and extensive steel renewals and recoating;

(iv)     extensive renewal of outfitting, supports, ladders;

(v)      extensive steel renewals in cargo and ballast tanks;

(vi)     re-tubing and/or replacement of auxiliary boilers and exhaust gas boilers;

(vii)    overhauling and renewal of cargo system, cargo piping, cargo monitoring and cargo equipment and machinery;

(viii)   steam lines and heating coils renewals;

(ix)     deck machinery overhauling and renewal including cranes and their hydraulic systems;

(x)      electrical, electronics and automation system service, repair and renewal;

(xi)     extensive rewiring;

(xii)    bridge navigation and communication equipment service and renewals;

(xiii)  overhauling, repairs and renewal of steering and shafting system;

(xiv)  overhauling, service, repair and renewals of all safety equipment, firefighting systems and appliances including lifesaving equipment; and

(xv)  fitting of ballast water treatment system.

32.    As a consequence of the extensive damage to the Vessel, it would cost more to tow her to repair facilities and repair her than her (repaired) market value. Plaintiff, the Owner of the Vessel, has submitted in London Maritime arbitration a claim for damages in an amount equivalent to the (repaired) market value of the Vessel, which is USD 18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS).

*Unpaid Bareboat Charter Hire*

33.    SPACE has failed to pay outstanding hire that was earned during the month of February 2018, for which PSARA has obtained an award from the London maritime arbitration tribunal - that has jurisdiction over the merits of the case - in the amount of USD 276,500. In addition to this amount, the arbitration tribunal has awarded PSARA Pounds Sterling 4,550.00 (USD 6,515.50)  by way of arbitration costs for this particular reference relating to the February 2018 charter hire, with annual interests on each of the two amounts at the rate of 5%, compounded quarterly.

34.    SPACE has also failed to pay Plaintiff the charter hire for the month of March 2018 in the amount of USD 233,708.33, which Plaintiff is claiming in the ongoing London maritime arbitration.  This amount is also claimed in London maritime arbitration.

### III. UNDERLYING PROCEEDINGS ON THE MERITS

35.    Box 35 and clause 30(a) of the bareboat charter party (**EXHIBIT 1**) provide for arbitration of all disputes arising out of the contract in London.

36.     Plaintiff is claiming in London maritime arbitration the amount of USD 18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS) as the repaired value of the vessel; and the unpaid hire for the month of March 2018 in the amount of USD 233,708.33, together with interest and costs.

37.     Plaintiff is also owed charter hire for the month of February 2018 under the London maritime arbitration award together with arbitration costs in the total amount of USD 283,015.50.

38.     Plaintiff estimates the legal costs that will be incurred to pursue these claims in London maritime arbitration proceedings will be approximately USD 400,000.00. As it is customary in London arbitration, legal costs, including lawyers' fees, are awarded to the prevailing party.

39.     This action is an ancillary proceeding, brought to obtain jurisdiction over Defendant Charterer and to obtain security for Plaintiff's claims in the London maritime arbitration proceedings.[2]

## IV. IDENTITY OF THE CORPORATE AND INDIVIDUAL DEFENDANTS AND THEIR INTERRELATIONSHIPS

40.     In June of 2015, when SPACE had fallen substantially in arrears in its bareboat charter hire payment obligations, and the contractual redelivery of the Vessel to Plaintiff was approaching, Plaintiff became concerned and made enquiries regarding the status of the CV STEALTH and the other crude oil tanker vessels that were being operated by Defendant GEDEN HOLDINGS.   Plaintiff was astounded to discover the entire "owned" – as opposed to the

---

[2]  Plaintiff is also filing a Rule B attachment against another vessel of Defendant in the Eastern District of Louisiana, in which it has sought the attachment of the M/T ADVANTAGE START.  It appears from the Marshall Islands mortgage records of the said vessel that the equity of the Defendants in the said vessel is approximately $ 8,000,000.00 and therefore insufficient to secure Plaintiff's claim, considering the lender mortgagee's interest.

"chartered-in" fleet - of GEDEN HOLDINGS had been surreptitiously transferred to new owners, as shown in **TABLE I** below:

**TABLE I**

| VSL FORMER NAME | FORMER OWNER | VSL NEW NAME | NEW OWNER |
|---|---|---|---|
| PROFIT | Profit Shipping, Ltd. | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |
| TARGET | Target Shipping, Ltd. | ADVANTAGE ARROW | Advantage Arrow Shipping, LLC |
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |
| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |
| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, Ltd. |
| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, Ltd. |

41.     Not only had the said vessels been transferred to new corporate owners, but they had been renamed and reflagged from the Maltese shipping register to that of the Marshall Islands.

42.     Investigation into the ship register/ship mortgage record of the Republic of the Marshall Islands revealed that all of the above 11 crude oil tanker vessels which were formerly owned by one-ship-companies, and in turn, 100% controlled by shareholder GEDEN HOLDINGS, had been transferred in approximately the first 5 months of 2015 - without any notice to or the knowledge of Plaintiff - to new one-ship-companies 100% controlled by a new holding company:

ADVANTAGE TANKERS, LLC. ADVANTAGE TANKERS is ultimately 85% controlled by the daughter and only child of Defendant EMIN KARAMEHMET, *i.e.* Defendant KARAMEHMET WILLIAMS and 15% by Defendant TOKGÖZ. The said ship mortgage records contain a diagrammatic representation of the said new ownership structure which is hereto attached as **EXHIBIT 3**.

A. *SUCCESSOR CORPORATION RELATIONSHIP*

43. The grouping of the following corporate entities: ADVANTAGE TANKERS; its subsidiary ADVANTAGE ARROW SHIPPING; ADVANTAGE HOLDINGS; FORWARD HOLDINGS; and 10 other one-ship-company entities that are subsidiaries of ADVANTAGE TANKERS[3] (said grouping hereinafter collectively referred to for the sake of brevity as "Advantage-Group") comprise, respectively, successor corporate business entities of the grouping formerly constituted of: GEDEN HOLDINGS; Target Shipping, Ltd., GEDEN LINES; SPACE SHIPPING; and 10 other former one-ship-companies[4], as shown in TABLE I (hereinafter collectively referred to, for the sake of brevity, as "Geden-Group").

44. As particularized in the following paragraphs 45-55 the Advantage-Group corporate entities are successor corporations of the Geden-Group corporate entities in that: a) the former have acquired and are respectively in possession of the trading assets of the latter[5]

---

[3] Foreign limited liability companies: Advantage Solar Shipping, LLC; Advantage Sky Shipping, LLC; Advantage Start Shipping, LLC; Advantage Arrow Shipping, LLC; Advantage Avenue Shipping, LLC; Advantage Award Shipping, LLC; Advantage Atom Shipping, LLC; Advantage Summer Shipping, LLC; Advantage Spring Shipping, LLC; Advantage Sun Shipping, LLC

[4] Foreign limited liability companies: Profit Shipping, Ltd.; Blue Shipping, Ltd.; Blank Shipping, Ltd.; Target Shipping, Ltd.; True Shipping Ltd.; Value Shipping, Ltd; Bravo Shipping, Ltd; Barbaros Maritime, Ltd; Pink Shipping, Ltd; Reef Shipping Ltd.; Prima Shipping, Ltd.

[5] The said assets are the tankers: PROFIT now renamed ADVANTAGE SOLAR; BLUE now renamed ADVANTAGE SKY; BLANK now renamed ADVANTAGE START; TARGET now renamed ADVANTAGE ARROW; TRUE now renamed ADVANTAGE AVENUE; VALUE now renamed ADVANATGE AWARD; BRAVO now renamed ADVANTAGE ATOM; POWER now renamed ADVANTAGE ANTHEM; PINK now renamed ADVANTAGE SUMMER; REEF now renamed ADVANTAGE SPRING; ROYAL now renamed ADVANATGE SUN. For the sake of brevity these vessels will be collectively referred to as "the 11 tanker vessels".

(hereinafter "the 11 tanker vessels"), as illustrated in the foregoing Table I; b) they occupy and carry on business from the same business premises, *i.e.* Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey; c) they transact their business by and through identical personnel as the latter; d) they share common officers and directors with the latter; e) they have taken over and are servicing the same customers as were being served by the latter; f) they have virtually the same financing banks financing their business as the latter; g) they have assumed numerous of the latter's obligations, including long term charter parties with Shell Western Supply and Trading, Ltd.; h) there is continuity of shareholders, GEDEN HOLDINGS retains ultimate control over the corporate entities of the Advantage-Group that own the 11 tanker vessels; i) the controlling shareholder of GEDEN HOLDINGS and GEDEN LINES - EMIN KARAMEHMET – continues to maintain a substantial financial interest in the Advantage-Group companies, as GEDEN LINES (which is 100% controlled by him) manages and operates all of its 11 tanker vessels formerly held by the one-ship-companies of the Geden-Group; j) GEDEN LINES exercises complete control over all of the corporate entities of the Advantage-Group as its administrative, operations, technical, commercial, and safety manager; k) following the purported sale of the 11 tanker vessels, GEDEN HOLDINGS formally ceased its ordinary business operations, through its subsidiary one ship companies and wound down its remaining business of operating chartered-in tonnage.

45.     As part of a business reorganization arrangement conceived and implemented by the management of the Geden-Group, in concert with EMIN KARAMEHMET, KARAMEHMET WILLIAMS, and TOKGÖZ, the one-ship-companies of the Geden-Group "sold" the respective vessels each one of them had owned to its homologous Advantage-Group one-ship-company, with these transactions occurring approximately during the first and second quarter of 2015. The said

"sales", were in actual fact part of a "reorganization" and makeover of the ownership structure, whereby newly minted corporate one-ship-companies of the Advantage-Group would take over ownership of the assets with the control, however, remaining with GEDEN HOLDINGS. *See* "Consent Letter" agreement dated February 6, 2015 between GEDEN HOLDINGS and Shell Western Supply and Trading, Ltd. hereto attached as **EXHIBIT 4** at Bates No. D01248, at ¶ 2 thereof, wherein GEDEN HOLDINGS assures Shell Western Supply and Trading, Ltd that each of the Advantage-Group one-ship-companies would be "wholly owned by the Shareholder", *i.e.* GEDEN HOLDINGS.

46.     Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies, to the respective Advantage-Group one-ship-companies, all of the time charter parties under which the said respective vessels, before and at the time of the transfer, were being employed by Shell Western Supply and Trading, Ltd. continued seamlessly with the Advantage-Group one-ship-companies. This was accomplished under contractual arrangements with Shell Western, worked out by GEDEN HOLDINGS / GEDEN LINES, KARAMEHMET-WILLIAMS, and TOKGÖZ, whereby the said charter parties, several of which had significant unexpired terms, were renewed for a 5-year period, at rates and on such other terms as were agreed on behalf of the Advantage-Group one-ship-companies by GEDEN HOLDINGS. *Id.* at D01248 - D01250.

47.     Notwithstanding the purported transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, GEDEN HOLDINGS represented and warranted to the Geden-Group's sole customer - Shell Western Supply and Trading, Ltd - that it retained ownership over the Advantage-Group one-ship-companies. *Id*. at Bates No. D01248, at ¶ 2 thereof. Said representations and warranties regarding

the ultimate ownership and control of the Advantage-Group one-ship-companies by GEDEN HOLDINGS were accepted by Shell Western Supply and Trading, Ltd in agreeing to enter into new time charters with the said Advantage-Group one-ship-companies. *See* relevant extract from the deposition of the General Manager of Shell Western Supply & Trading, Ltd. specifically identifying GEDEN HOLDINGS as the "shareholder" retaining the ultimate control over the Advantage-Group one-ship-companies, hereto attached as **EXHIBIT 5.**

48. Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, all day-to-day shore-side operations of the 11 tanker vessels continue to be performed by and through GEDEN LINES, including safety management, security management, crewing, victualing, supplying, technical monitoring and supervision, drydocking, repairs, accounting, insuring, and generally every function necessary in order to keep and maintain the said vessels trading as merchant vessels in the same manner and to the same extent that GEDEN LINES had performed before the said transfer of ownership of the 11 tanker vessels. *See e.g*. Ship Management Agreement for the M/T ADVANTAGE ARROW dated February 25, 2015, hereto attached as **EXHIBIT 6** at pp. 2405-2414; *See* also extract from Loan Agreement dated February 4, 2015 of Norddeutsche Landesbank Girozentale (hereinafter "NLDB") Loan Agreement with ADVANTAGE ARROW SHIPPING extract hereto attached as **EXHIBIT 7** at p. 2**,** defining "Approved Manager" as "Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (Manager)", and designating "Genel Denizcilik" as Technical Manager and Operations Manager. *Id.* at p.133.

49. The operation and management of the 11 tanker vessels of the Advantage-Group is performed by EMIN KARAMEHMET's GEDEN LINES, using the same employees; working out

16

of the same address (Buyukdere Ca., Yapi Kredi Plaza, A Blok K: 12 34330-Levent-Istanbul-Turkey), as previously, before the same 11 tanker vessels were transferred to the Advantage-Group.

50.     Notwithstanding the transfer of ownership of the 11 tanker vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, the majority of the lenders that financed the acquisition of the vessels by the Advantage-Group one-ship companies remained the same, with new rollover-like refinancing arrangements and ship mortgaging arrangements having been negotiated and worked out by GEDEN HOLDINGS / GEDEN LINES executives and directors on behalf of ADVANTAGE TANKERS. *See* **EXHIBIT 4** at ANNEX I.

51.     Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, which is controlled by EMIN KARAMAHMET, continues to maintain a substantial financial interest in the 11 tanker vessels enjoying a significant economic benefit as operator and manager of the ADVANTAGE TANKERS fleet of approximately USD 4,015,000.00 annually as compensation for its services.

52.     Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, in its capacity as the sole operator and manager of the 11 tanker vessels, and thereby its controlling shareholder EMIN KARAMEHMET, exercise complete control over all of the operational, technical, and all other business activities of the 11 one-ship-companies of the Advantage-Group.

53.     GEDEN HOLDINGS, GEDEN LINES, ADVANTAGE TANKERS, and the respective one-ship-companies of the Geden-Group and Advantage-Group have in common key management personnel including: the same Chief Executive Officer, who is also a director of

GEDEN HOLDINGS, GEDEN LINES and ADVANTAGE TANKERS; and the same Chief Financial Officer, who is also a director of GEDEN HOLDINGS.

54.     Following the "sale" of the 11 tanker vessels, their respective former one-ship-company owners ceased to own vessels.

55.     The holding company role of GEDEN HOLDINGS and the one-ship-companies of the Geden-Group, following the transfer of the 11 tanker vessels, was taken over by ADVANTAGE TANKERS and its subsidiary one-ship-companies. ADVANTAGE TANKERS and its subsidiary one-ship-companies thereby have assumed the obligations previously incumbent on GEDEN HOLDINGS and its one-ship-subsidiaries.

56.     By reason of the foregoing facts pled in averments ¶¶ 45-55, ADVANTAGE TANKERS and the one-ship-companies it holds, and GEDEN HOLDINGS and the one-ship-companies and single-vessel chartering companies it holds, have either entered into a *de facto* merger; or ADVANTAGE TANKERS and the one-ship-companies it holds are a mere continuation of the business of GEDEN HOLDINGS.

57.     In the alternative the transfer of the assets of the Geden-Group to the Advantage-Group in the manner set out in the foregoing averments ¶¶ 45-55 was a transaction entered into by the parties involved to avoid liabilities.

58.      The one-ship companies that formerly owned the 11 tanker vessels were absorbed by the Advantage-Group, as evidenced by the identity of assets, location, management, personnel, and stockholders.

59.     Accordingly, ADVANTAGE TANKERS and the one-ship-companies it holds, including ADVANTAGE ARROW SHIPPING, are liable for Plaintiff's claims respectively as the successor corporations of EMIN KARAMEHMET - controlled GEDEN HOLDINGS, SPACE

18

SHIPPING and TARGET SHIPPING, LTD, and the M/T ADVANTAGE ARROW may be attached as security for Plaintiff's claims.

### B. FRAUDULENT TRANSFER ALLEGATIONS

60. Plaintiff realleges ¶¶ 1-59 of the above and foregoing Original Verified Complaint and further avers as follows:

61. In agreeing to bareboat charter its vessel the CV STEALTH to SPACE, a Maltese corporation without any known tangible assets or business performance record, and to accept the performance guarantee of GEDEN HOLDINGS, Plaintiff relied on express affirmative representations of fact made on behalf of GEDEN HOLDINGS / GEDEN LINES by their common CEO and director TOKGÖZ. Specifically, TOKGÖZ represented that GEDEN HOLDINGS was the parent company of the "special purpose companies", *i.e.* the-one-ship companies which at the time owned the 11 tanker vessels. A Copy of the March 4, 2010 letter of GEDEN HOLDINGS containing such representations in writing is hereto attached as **EXHIBIT 8**.

62. The performance guarantee of GEDEN HOLDINGS (**EXHIBIT 2**) contemporaneously issued with the March 4, 2010 letter, is a continual guarantee extending over the entire duration of the performance of the charter party, and indeed, for at least 7 years past the delivery of the vessel, and specifically provides in relevant part that that it is given in consideration of Plaintiff's refraining from arresting or otherwise detaining any of the assets of GEDEN HOLDINGS.

63. Plaintiff relied on the representations made in the March 4, 2010 letter (**EXHIBIT 8**), particularly the representation that GEDEDN HOLDINGS owned and would continue to own through its one-ship-companies the 11 tanker vessels, and thereby agreed to continue chartering the CV STEALTH to SPACE and accept the performance guarantee of GEDEN HOLDINGS.

64. GEDEN HOLDINGS purports that during the first 5 months of 2015 it divested itself of its entire interest in the 11 tanker vessels and "sold" same to the Defendants comprising the Advantage-Group through legitimate arm's length transactions. In actual fact, the Defendants implemented a fraudulent restructuring scheme that had been in their planning and contemplation as pled below[6].

65. During 2012 and 2013 as a result of a faltering tanker market, the high prices it had paid for the construction of the 11 tanker vessels and the acquisition of other tonnage, the Geden-Group experienced severe economic difficulties and pressing demands by various creditors that included attachment of vessels of the group. In consultation with the group's lending banks, GEDEN LINES commissioned business restructuring specialist AlixPartners UK LLP to develop a proposed plan for the restructuring of their business. A report was prepared by AlixPartners, dated March 6, 2013 under the title "Project Hermitage Restructuring". *See* Report of AlixPartners hereto attached as **EXHIBIT 9**[7] (hereinafter referred to as "Project Hermitage").

66. Project Hermitage recommended the replacement of GEDEN HOLDINGS as the group's holding company by another new business entity - a "newco" - which, under the recommended plan, "[p]rovides for recategorization of exposure from "Geden Holdings Ltd." to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing

---

[6] In a similar manner GEDEN HOLDINGS purportedly "sold" its fleet of product carrier tankers to new buyers while it continued to maintain control over their operation and to profit from trading same under FUTURE HOLDINGS, LTD. a management company controlled by Defendants KARAMEHMET-WILLIAMS and TOKGÖZ.

[7] The Alix Partners' report specifically states: "This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). EXHIBIT 10 at Bates No. P-001832. As to the factual content of the AlixPartners report it provides in relevant part: "The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company" *Id.* at Bates No. P-001833. *Emphasis added.*

support." *See* **EXHIBIT 9** at Bates No. P-001870. The plan of Project Hermitage also recommended the sale of the vessels or the one-ship-companies to "Newco"; the continuation of the management of the vessels by GEDEN LINES; the rollover financing of the existing debt to the financing banks; the retention of the equity of GEDEN HOLDINGS; the transfer of the surplus of equity in the assets to Newco (**EXHIBIT 9** (flow chart) Bates No. P-001846); and the ring-fencing of potential sources of disruption (such as arrests and sister-ship arrests). *Id.* at Bates No. P-001870.

67. Even though the recommendations of Project Hermitage were not adopted by Defendants in their exact proposed form, they were nonetheless substantially adopted and implemented as evidenced by the following events: a) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the incorporation of Advantage Tankers, LLC, in the Marshall Islands, *i.e.* the "Newco" contemplated by Project Hermitage[8]; b) GEDEN HOLDINGS / GEDEN LINES, by and through their common chief executive officer and chief financial officer, made arrangements for the rollover financing of the loans of GEDEN HOLDINGS' one-ship-companies with ADVANTAGE TANKERS taking on the role of corporate guarantor; c) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the one-ship-companies controlled by GEDEN HOLDINGS to "sell" their vessels to newly minted Marshall Islands corporate entities that comprise the Advantage-Group shown in the foregoing TABLE I; d) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, arranged for the management of the 11 tanker vessels to continue

---

[8] At all times material hereto, all Defendants have the same Chief Executive officer - Tugrul Tokgoz- and the same Chief Financial Officer -Mehmet Matt - who also hold overlapping roles as directors and /or officers of the respective corporate Defendants of the one-ship-companies controlled by ADVANTAGE TANKERS.

being performed by GEDEN LINES under new 5 year contracts; e) by transferring all of the tangible operating assets of GEDEN HOLDINGS to the ADVANTAGE TANKERS one-ship-companies, *i.e.* the 11 tanker vessels, GEDEN HOLDINGS effectively "ringfenced" them, thereby blocking creditors of GEDEN HOLDINGS from seeking recourse against its assets.

68.     Project Hermitage specifically referred to the bareboat charter of the CV STEALTH and other chartered-in tonnage of other owners in the following terms: "Group D, Geden Oldco: 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable." With specific reference to Plaintiff's vessel the CV STEALTH Project Hermitage notes: "not ours". *See* **EXHIBIT 9** at P-001856.

69.     The actions of the Defendants in implementing the recommendations of Project Hermitage in the manner described in the foregoing, manifests the design, plan, and intent of the Defendants to deal with their assets in a fraudulent manner to the detriment and prejudice of their creditors, specifically including Plaintiff as noted in ¶ 68 *supra*.

70.     Defendant SPACE SHIPPING, LLC's sole business is to act as the nominee of GEDEN HOLDINGS in the performance of the bareboat charter. As pled in the foregoing, Plaintiff entered in the bareboat charter relying on the representations and warranties that GEDEN HOLDINGS was the owner of the 11 tanker vessels and several other vessels, and on its performance guarantee.

71.     At all times material hereto and as pled in the foregoing, GEDEN HOLDINGS through the machinations of its equity holder EMIN KARAMEHMET "restructured" the ownership of its assets, by arranging their transfer to ADVANTAGE TANKERS, a company 85% controlled by his only child KARAMEHMET WILLIAMS, and 15% by his hand-picked CEO of

GEDEN LINES and GEDEN HOLDINGS, TOKGÖZ. As a result, Plaintiff was left without any of the recourse that it had agreed to forego (*i.e.* the attachment of Geden Holdings' owned vessels) in consideration for GEDEN HOLDING's performance guarantee.

72.     Notwithstanding the fraudulent restructuring of the ownership of its shipping assets, GEDEN HOLDINGS provided in confidence express assurances to Shell Western Supply & Trading, Ltd. that it remained the controlling shareholder of the same 11 tanker vessels through its complete control of the Advantage-Group one-ship companies.

73.     Though Defendants KARAMEHMET WILLIAMS and TOKGÖZ have warranted to the lenders of the Advantage-Group that they hold respectively 85% and 15% of the ultimate beneficial interest in ADVANTAGE TANKERS, which, in turn, warrants it controls 100% of the 11 tanker vessels, (See **EXHIBIT 3**), TOKGÖZ, who is the Chief Executive Officer of ADVANTAGE TANKER and a director of GEDEN HOLDINGS, has also warranted to Shell Western Supply & Trading, Ltd. that it is actually GEDEN HOLDINGS, which controls the Advantage-Group corporate entities, that own the same vessels even after their purported transfer to the Advantage Group. Based on the foregoing and the conflicting representations of Defendants, the ownership of the ADVANTAGE ARROW (ex TARGET) was fraudulently transferred to the detriment of unsecured creditors.

74.     Plaintiff invokes the power of this honorable court as a court of admiralty "…to protect its jurisdiction from being thwarted by a fraudulent transfer, [by] …. authorizing an attachment to secure an independent maritime claim." *Swift Co Packers v. Compania Colombiana Del Caribe,* 339 U.S. 684, 694-695 (1950).

75.     Based on the expressed rationale underlying the transfer of the 11 tanker vessels from GEDEN HOLDINGS to ADVANTAGE TANKERS noted in the foregoing, *i.e.* the

"ringfencing" of the assets in order to avoid "arrests"; the close family relationship between EMIN KARAMEHMET and KARAMEHMET WILLIAMS that constitutes the latter an insider of the former in relation to his status as 100% shareholder of Plaintiff's obligors GEDEN HOLDINGS / GEDEN LINES and SPACE; the transfer of what was substantially all of the assets of the said obligors of Plaintiff; the failure of the Defendants to disclose to Plaintiff the impending transfer of the assets from the Geden-Group to the Advantage-Group; the Defendants express intent to fraudulently restructure the ownership of the corporate holding structures for the benefit of the equity holders and to the detriment of unsecured non-lending creditors; and all of the factual circumstances pled in the foregoing ¶¶ 60-74, there are reasonable grounds and probable cause to believe that the said transfer was intended to hinder, delay, or defraud the creditors of SPACE and same may and should be set aside as a fraudulent conveyance.

## V. APPLICATION FOR ATTACHMENT UNDER
## SUPPLEMENTAL ADMIRALTY RULE B

76.    None of the Defendants are or were at the time of the filing of this suit present within the District or can be found in the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Law Claims and under the laws of Texas governing personal jurisdiction. *See* Attorney Declaration of George Gaitas attached hereto as **EXHIBIT 10**. Nevertheless, Defendants have within the District tangible or intangible personal property in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment consisting of debts, credits, or effects.

77.    More specifically there is presently, or imminently due to arrive in the Eastern District of Texas, the Motor Tanker ADVANTAGE ARROW, a tanker vessel registered in the Marshall Islands, with IMO No. 9419448 and international call sign V7KZ7, as pled in the foregoing.

78.    Defendants have used and continue to use the purportedly corporate separateness, and incorporated status of their surrogate entities ADVANTAGE ARROW, ADVANTAGE TANKERS, ADVANTAGE HOLDINGS, and FORWARD HOLDINGS abusively, to wit: to engage in fraudulent corporate restructuring and asset reallocation practices in order to escape their lawful obligation to repair or pay the cost of repairs of the CV STEALTH and also pay bareboat charter hire until the redelivery of the CV STEALTH to Plaintiff - her lawful owner.

79.    Plaintiff has maritime claims against the Defendants arising out of the breach of a maritime contract (*i.e.* – the bareboat charter party with CV STEALTH dated February 23, 2010, and the performance guarantee dated April 4, 2010).

80.    The amounts of Plaintiff's claims as reasonably as it can be estimated is as follows:

A.    The repaired cost of the CV STEALTH……………......$    18,000,000.00

B.    Unpaid Charter Hire due and owing………………….$    510,208.33

C.    Awarded legal costs……………………………...........$    6,515.50

C.    Interest at 6% compounded quarterly for 1 year………..$    943,340.00

E.    Recoverable Legal Fees and Costs……………………. $    400,000.00

**Total Claim……………………………………………………………$ 19,860,063.80**

Therefore, Plaintiff's total claim for breach of the maritime contracts against Defendants is in the aggregate sum of **USD 19,860,063.80 (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)**

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A.    That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants be cited to appear and answer the allegations of this Original Verified Complaint;

B.      That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, all of the assets of the Defendants presently within this District, or assets expected in this District during the pendency of this action, including, but not limited to the M/T ADVANTAGE ARROW and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.      That judgment be entered against each of the Defendants and each of them in the sum of Nineteen Million Eight Hundred Sixty Thousand Sixty Three Dollars and eighty cents **(USD 19,860,063.80) (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)** together with interest and costs, be applied in satisfaction thereof;

E.      That the Court grant such other and further relief as it deems, just, equitable and proper.

Respectfully submitted,

By:    GAITAS, KENNEDY & CHALOS, P.C.

/s/George A. Gaitas
George A. Gaitas
State Bar No. 24058885
Federal Bar No. 705176
Sean D. Kennedy
State Bar No. 24102006
Federal Bar No. 1007545
Jonathan M. Chalos
State Bar No. 24097482

26

Federal Bar No. 3008683
6250 Westpark Dr.
Suite 222
Houston, Texas 77057
Telephone: 281-501-1800
Fax: 832-962-8178
E-mail: gaitas@gkclaw.com
          kennedy@gkclaw.com
          chalos@gkclaw.com

*Attorneys for Plaintiff*
Psara Energy, Limited

# EXHIBIT 1

**2nd original**

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon A" and "Barecon B". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's *idea*

The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

Copyright, published by
The Baltic and International Maritime Council (BIMCO)

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER |
|---|---|
| **Arrow Tankers A/S** <br> **Bredgade 31 B, 4.** <br> **DK-1260 Copenhagen K** <br> **Denmark** | **CODE NAME: "BARECON 2001"**    **PART I** |

| 2. Place and date |
|---|
| **Copenhagen, 23rd February 2010** |

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
|---|---|
| **Psara Energy Limited** <br> **Ajeltake Road, Ajeltake Island** <br> **Majuro, MH 96960** <br> **Marshall Island** | **Geden Holdings Limited, Malta or nominee always guaranteed by Geden Line. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed.** |

| 5. Vessel's name, call sign and flag (Cl. 1 and 3) |
|---|
| **Name: m.t. CV STEALTH** <br> **Flag: Malta** |

| 6. Type of Vessel | 7. GT/NT |
|---|---|
| **Crude oil carrier** | **58,418 / 31,117** |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
|---|---|
| **2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | **104,499** |

| 10. Classification Society (Cl. 3) | 11. Date of last special survey by the Vessel's classification society |
|---|---|
| **ABS** | **N/A** |

| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3) |
|---|
| **Attached Vessel's Q88. Vessel to be redeliverd with SS passed** |

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
|---|---|---|
| **WW DLOSP at one safe port / safe anchorage ATDNSHINC** <br> **Vessel to be delivered with SS passed** | **15th April 2010, 00:01 hrs lt** | **30th August 2010, 23:59 hrs lt** |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15) |
|---|---|
| **DLOSP at one safe port, berth or anchorage WW in CHOPT always within trading limits ATDNSHINC** | **SS/DD passed without extensions** |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g)) |
|---|---|
| **See Rider Clause 15.** | **As required by class without extensions** |

| 20. Trading limits (Cl. 6) |
|---|
| **Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.** <br><br> **The vessel not to trade in ice, break ice nor follow ice breakers in ice.** |

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
|---|---|
| **5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period** | **USD 9,750 gross pdpr the first 365 days after delivery** <br> **USD 10,750 gross pdpr for the 2nd charter year** <br> **USD 11,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year** <br> **USD 10,750 gross pdpr for 4th charter year** <br> **USD 10,750 gross pdpr for 5th charter year** <br> **USD 13,250 for the optional period** |

| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii)) |
|---|
| **10%** |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

## "BARECON 2001" STANDARD BAREBOAT CHARTER

PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br><br>**As per Clause 10 F** | 25. Currency and method of payment (Cl. 11)<br><br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br><br>**TBA** | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br><br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br><br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br><br>**N/A** | 33. Brokerage commission and to whom payable (Cl. 27)<br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br><br>**Seven (7) working days** | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br><br>**30a** |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br><br>**N/A** | 38. Name and place of Builders (only to be filled in if PART III applies)<br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br>**N/A** | 40. Date of Building Contract (only to be filled in if PART III applies)<br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br><br>  a) **N/A**<br><br>  b) **N/A**<br><br>  c) **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

PART I

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | | |
|---|---|---|
| **1.** | **Definitions** | 1 |
| | In this Charter, the following terms shall have the | 2 |
| | meanings hereby assigned to them: | 3 |
| | *"The Owners"* shall mean the party identified in Box 3; | 4 |
| | *"The Charterers"* shall mean the party identified in Box 4; | 5 |
| | *"The Vessel"* shall mean the vessel named in Box 5 and | 6 |
| | with particulars as stated in Boxes 6 to 12. | 7 |
| | *"Financial Instrument"* means the mortgage, deed of | 8 |
| | covenant or other such financial security instrument as | 9 |
| | annexed to this Charter and stated in Box 28. | 10 |

| | | |
|---|---|---|
| **2.** | **Charter Period** | 11 |
| | In consideration of the hire detailed in Box 22, | 12 |
| | the Owners have agreed to let and the Charterers have | 13 |
| | agreed to hire the Vessel for the period stated in Box 21 | 14 |
| | ("The Charter Period"). | 15 |

| | | |
|---|---|---|
| **3.** | **Delivery** | 16 |
| | *(not applicable when Part III applies, as indicated in Box 37)* | 17 |
| | **(a)** The Owners shall before and at the time of delivery | 18 |
| | exercise due diligence to make the Vessel seaworthy | 19 |
| | And in every respect ready in hull, machinery and | 20 |
| | equipment for service under this Charter. | 21 |
| | The Vessel shall be delivered by the Owners and taken | 22 |
| | over by the Charterers at the port or place indicated in | 23 |
| | Box 13 in such ready safe berth as the Charterers may | 24 |
| | direct. | 25 |
| | **(b)** The Vessel shall be properly documented on | 26 |
| | delivery in accordance with the laws of the flag State | 27 |
| | indicated in Box 5 and the requirements of the | 28 |
| | classification society stated in Box 10. The Vessel upon | 29 |
| | delivery shall have her survey cycles up to date and | 30 |
| | trading and class certificates valid for at least the number | 31 |
| | of months agreed in Box 12. | 32 |
| | **(c)** The delivery of the Vessel by the Owners and the | 33 |
| | taking over of the Vessel by the Charterers shall | 34 |
| | constitute a full performance by the Owners of all the | 35 |
| | Owners' obligations under this Clause 3, and thereafter | 36 |
| | the Charterers shall not be entitled to make or assert | 37 |
| | any claim against the Owners on account of any | 38 |
| | conditions, representations or warranties expressed or | 39 |
| | implied with respect to the Vessel but the Owners shall | 40 |
| | be liable for the cost of but not the time for repairs or | 41 |
| | renewals occasioned by latent defects in the Vessel, | 42 |
| | her machinery or appurtenances, existing at the time of | 43 |
| | delivery under this Charter, provided such defects have | 44 |
| | manifested themselves within twelve (12) months after | 45 |
| | delivery unless otherwise provided in Box 32. | 46 |

| | | |
|---|---|---|
| **4.** | **Time for Delivery** | 47 |
| | *(not applicable when Part III applies, as indicated in Box 37)* | 48 |
| | The Vessel shall not be delivered before the date | 49 |
| | indicated in Box 14 without the Charterers' consent and | 50 |
| | the Owners shall exercise due diligence to deliver the | 51 |
| | Vessel not later than the date indicated in Box 15 as per | 52 |
| | Box 18. | |
| | ~~Unless otherwise agreed in Box 18, the Owners shall~~ | 53 |
| | ~~give the Charterers not less than thirty (30) running days'~~ | 54 |
| | ~~preliminary and not less than fourteen (14) running days'~~ | 55 |
| | ~~definite notice of the date on which the Vessel is~~ | 56 |
| | ~~expected to be ready for delivery.~~ | 57 |
| | The Owners shall keep the Charterers closely advised | 58 |
| | of possible changes in the Vessel's position. | 59 |

| | | |
|---|---|---|
| **5.** | **Cancelling** | 60 |
| | *(not applicable when Part III applies, as indicated in Box 37)* | 61 |
| | **(a)** Should the Vessel not be delivered latest by the | 62 |
| | cancelling date indicated in Box 15, the Charterers shall | 63 |
| | have the option of cancelling this Charter by giving the | 64 |
| | Owners notice of cancellation within thirty-six (36) | 65 |
| | running hours after the cancelling date stated in Box | 66 |
| | 15, failing which this Charter shall remain in full force | 67 |
| | and effect. | 68 |
| | **(b)** If it appears that the Vessel will be delayed beyond | 69 |
| | the cancelling date, the Owners may, as soon as they | 70 |
| | are in a position to state with reasonable certainty the | 71 |

| | | |
|---|---|---|
| | day on which the Vessel should be ready, give notice | 72 |
| | thereof to the Charterers asking whether they will | 73 |
| | exercise their option of cancelling, and the option must | 74 |
| | then be declared within one hundred and sixty-eight | 75 |
| | (168) running hours of the receipt by the Charterers of | 76 |
| | such notice or within thirty-six (36) running hours after | 77 |
| | the cancelling date, whichever is the earlier. If the | 78 |
| | Charterers do not then exercise their option of cancelling, | 79 |
| | the seventh day after the readiness date stated in the | 80 |
| | Owners' notice shall be substituted for the cancelling | 81 |
| | date indicated in Box 15 for the purpose of this Clause 5. | 82 |
| | **(c)** Cancellation under this Clause 5 shall be without | 83 |
| | prejudice to any claim the Charterers may otherwise | 84 |
| | have on the Owners under this Charter. | 85 |

| | | |
|---|---|---|
| **6.** | **Trading Restrictions** | 86 |
| | The Vessel shall be employed in lawful trades for the | 87 |
| | carriage of suitable lawful merchandise within the trading | 88 |
| | limits indicated in Box 20. | 89 |
| | The Charterers undertake not to employ the Vessel or | 90 |
| | suffer the Vessel to be employed otherwise than in | 91 |
| | conformity with the terms of the contracts of insurance | 92 |
| | (including any warranties expressed or implied therein) | 93 |
| | without first obtaining the consent of the insurers to such | 94 |
| | employment and complying with such requirements as | 95 |
| | to extra premium or otherwise as the insurers may | 96 |
| | prescribe. **When required by Owner, the Charterers** | 97 |
| | **shall keep the Owners and Mortgages advised on** | |
| | **intended employment of Vessel.** | |
| | The Charterers also undertake not to employ the Vessel | 98 |
| | or suffer her employment in any trade or business which | 99 |
| | is forbidden by the law of any country to which the Vessel | 100 |
| | may sail or is otherwise illicit or in carrying illicit or | 101 |
| | prohibited goods or in any manner whatsoever which | 102 |
| | may render her liable to condemnation, destruction, | 103 |
| | seizure or confiscation. | 104 |
| | Notwithstanding any other provisions contained in this | 105 |
| | Charter it is agreed that nuclear fuels or radioactive | 106 |
| | products or waste are specifically excluded from the | 107 |
| | cargo permitted to be loaded or carried under this | 108 |
| | Charter. This exclusion does not apply to radio-isotopes | 109 |
| | used or intended to be used for any industrial, | 110 |
| | commercial, agricultural, medical or scientific purposes | 111 |
| | provided the Owners' prior approval has been obtained | 112 |
| | to loading thereof. | 113 |

| | | |
|---|---|---|
| **7.** | **Surveys on Delivery and Redelivery** | 114 |
| | *(not applicable when Part III applies, as indicated in Box 37)* | 115 |
| | The Owners and Charterers shall each appoint | 116 |
| | surveyors for the purpose of determining and agreeing | 117 |
| | in writing the condition of the Vessel at the time of | 118 |
| | delivery and redelivery hereunder. The Owners shall | 119 |
| | bear all expenses of the On-hire Survey including loss | 120 |
| | of time, if any, and the Charterers shall bear all expenses | 121 |
| | of the Off-hire Survey including loss of time, if any, at | 122 |
| | the daily equivalent to the rate of hire or pro rata thereof. | 123 |

| | | |
|---|---|---|
| **8.** | **Inspection** | 124 |
| | The Owners shall have the right at any time after giving | 125 |
| | reasonable notice to the Charterers to inspect or survey | 126 |
| | the Vessel or instruct a duly authorised surveyor to carry | 127 |
| | out such survey on their behalf:- **provided it does not** | 128 |
| | **interfere with the operation of the Vessel a/o crew,** | |
| | **but not to be unreasonably withheld.** | |
| | **(a)** to ascertain the condition of the Vessel and satisfy | 129 |
| | themselves that the Vessel is being properly repaired | 130 |
| | and maintained. The costs and fees for such inspection | 131 |
| | or survey shall be paid by the Owners unless the Vessel | 132 |
| | is found to require repairs or maintenance in order to | 133 |
| | achieve the condition so provided; | 134 |
| | **(b)** in dry-dock if the Charterers have not dry-docked | 135 |
| | Her in accordance with Clause 10(g). The costs and fees | 136 |
| | for such inspection or survey shall be paid by the | 137 |
| | Charterers; and | 138 |
| | **(c)** for any other commercial reason they consider | 139 |
| | necessary (provided it does not unduly interfere with | 140 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**2nd original**

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and 141
fees for such inspection and survey shall be paid by the 142
Owners. 143
All time used in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9. Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10. Maintenance and Operation** 168
(a)(i) <u>Maintenance and Repairs</u> - During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, except as 177
provided for in <u>Clause 14(l)</u>, if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in <u>Box 10</u> and maintain all other 181
necessary certificates in force at all times. If 182
**necessary as deemed by class, the Charterers to**
**take immediate steps to have the necessary**
**repairs done within a reasonable time (prior to or**
**upon SS-drydocking) failing which the Owners**
**shall have the right of withdrawing the Vessel**
**from the service of the Charterers and without**
**prejudice to any claim the Owners may**
**otherwise have against the Charterers under this**
**Charter.**

(ii) <u>New Class and Other Safety Requirements</u> - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) 188
more than the percentage stated in <u>Box 23</u>, or if 189
<u>Box 23</u> is left blank, 5 per cent. of the Vessel's 190
insurance value as stated in <u>Box 29</u>, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196
regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be referred to the dispute resolution 199
method agreed in <u>Clause 30</u>. 200

(iii) <u>Financial Security</u> - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204

or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
**(b)** <u>Operation of the Vessel</u> - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
**(c)** The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
**(d)** <u>Flag and Name of Vessel</u> – **Charterers have the** 238
**right to reflag the ship and install and display their**
**funnel insignia and fly their own house flag, but name**
**cannot be changed.** <s>During the Charter</s>
<s>Period, the Charterers shall have the liberty to paint their</s> 239
<s>Vessel in their own colours, install and display their</s> 240
<s>funnel insignia and fly their own house flag. The</s> 241
<s>Charterers shall also have the liberty, with the Owners'</s> 242
<s>consent, which shall not be unreasonably withheld, to</s> 243
<s>change the flag and/or the name of the Vessel during</s> 244
<s>the Charter Period. Painting and re-painting, instalment</s> 245
<s>and re-instalment, registration and re-registration, if</s> 246
<s>required by the Owners, shall be at the Charterers'</s> 247
<s>expense and time.</s> 248
**(e)** <u>Changes to the Vessel</u> - Subject to <u>Clause 10(a)(ii)</u>, 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
**(f)** <u>Use of the Vessel's Outfit, Equipment and</u> 257
<u>Appliances</u> - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations. — 277–282

**(g)** Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State. — 283–289

**11. Hire** — 290
**(a)** The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence. — 291–293
**(b)** Payment of hire shall be made as per daily hire in Box 22 basis per calender month in advance. First hire payable prorata upto end of the month starting from vessel's actual delivery date/time. ~~The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated in Box 22 which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.~~ — 294–300
**(c)** Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26. — 301–303
**(d)** Final payment of hire, if for a period of less than ~~thirty (30) running days~~ a month, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly. — 304–308
**(e)** Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. ~~The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.~~ — 309–315
**(f)** Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply. — 316–322
**(g)** Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date. — 323–327

**12. Mortgage** — 328
(only to apply if Box 28 has been appropriately filled in) — 329
*) ~~(a)   The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~ — 330–333
*) **(b)** The Vessel chartered under this Charter is financed by a mortgage according to the Financial Instrument. The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with the Financial Instrument. The Charterers confirm that, for this purpose, they have acquainted — 334–344

themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s). The Owners warrant that they have not effected any mortgage(s) other than stated in Box 28 and that they shall not agree to any ~~amendment of the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~ — 345–354
*) (Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28). — 355–356

**13. Insurance and Repairs** — 357
**(a)** During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve, which approval shall not be un-reasonably withheld. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any), and The Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the Financial Instrument, if any, and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for. — 358–380
The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances. — 381–386
All time used for repairs under the provisions of sub-clause 13(a) and for repairs of latent defects according to Clause 3(c) above, including any deviation, shall be for the Charterers' account. — 387–390
**(b)** If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary. — 391–400
**(c)** The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to comply with the insurance provisions of the Financial Instrument. — 401–405
**(d)** Subject to the provisions of the Financial Instrument, if any, should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 13(a), all insurance payments for such loss shall be paid to the Owners who shall distribute the moneys between the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a total loss as defined in this Clause. — 406–416
**(e)** The Owners shall upon the request of the Charterers, promptly execute such documents as may — 417–418

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss. 420
(f)    For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in Box 29. 424

14.    Insurance, Repairs and Classification 425
(Optional, only to apply if expressly agreed and stated 426
in Box 29, in which event Clause 13 shall be considered 427
deleted). 428
(a)   During the Charter Period the Vessel shall be kept 429
insured by the Owners at their expense against hull and 430
machinery and war risks under the form of policy or 431
policies attached hereto. The Owners and/or insurers 432
shall not have any right of recovery or subrogation 433
against the Charterers on account of loss of or any 434
damage to the Vessel or her machinery or appurt- 435
enances covered by such insurance, or on account of 436
payments made to discharge claims against or liabilities 437
of the Vessel or the Owners covered by such insurance. 438
Insurance policies shall cover the Owners and the 439
Charterers according to their respective interests. 440
(b)   During the Charter Period the Vessel shall be kept 441
insured by the Charterers at their expense against 442
Protection and Indemnity risks (and any risks against 443
which it is compulsory to insure for the operation of the 444
Vessel, including maintaining financial security in 445
accordance with sub-clause 10(a)(iii)) in such form as 446
the Owners shall in writing approve which approval shall 447
not be unreasonably withheld. 448
(c)   In the event that any act or negligence of the 449
Charterers shall vitiate any of the insurance herein 450
provided, the Charterers shall pay to the Owners all 451
losses and indemnify the Owners against all claims and 452
demands which would otherwise have been covered by 453
such insurance. 454
(d)   The Charterers shall, subject to the approval of the 455
Owners or Owners' Underwriters, effect all insured 456
repairs, and the Charterers shall undertake settlement 457
of all miscellaneous expenses in connection with such 458
repairs as well as all insured charges, expenses and 459
liabilities, to the extent of coverage under the insurances 460
provided for under the provisions of sub-clause 14(a). 461
The Charterers to be secured reimbursement through 462
the Owners' Underwriters for such expenditures upon 463
presentation of accounts. 464
(e)   The Charterers to remain responsible for and to 465
effect repairs and settlement of costs and expenses 466
incurred thereby in respect of all other repairs not 467
covered by the insurances and/or not exceeding any 468
possible franchise(s) or deductibles provided for in the 469
insurances. 470
(f)   All time used for repairs under the provisions of 471
sub-clauses 14(d) and 14(e) and for repairs of latent 472
defects according to Clause 3 above, including any 473
deviation, shall be for the Charterers' account and shall 474
form part of the Charter Period. 475
The Owners shall not be responsible for any expenses 476
as are incident to the use and operation of the Vessel 477
for such time as may be required to make such repairs. 478
(g)   If the conditions of the above insurances permit 479
additional insurance to be placed by the parties such 480
cover shall be limited to the amount for each party set 481
out in Box 30 and Box 31, respectively. The Owners or 482
the Charterers as the case may be shall immediately 483
furnish the other party with particulars of any additional 484
insurance effected, including copies of any cover notes 485
or policies and the written consent of the insurers of 486
any such required insurance in any case where the 487
consent of such insurers is necessary. 488
(h)   Should the Vessel become an actual, constructive, 489
compromised or agreed total loss under the insurances 490
required under sub-clause 14(a), all insurance payments 491
for such loss shall be paid to the Owners, who shall 492

distribute the moneys between themselves and the 493
Charterers according to their respective interests. 494
(i)   If the Vessel becomes an actual, constructive, 495
compromised or agreed total loss under the insurances 496
arranged by the Owners in accordance with sub-clause 497
14(a), this Charter shall terminate as of the date of such 498
loss. 499
(j)   The Charterers shall upon the request of the 500
Owners, promptly execute such documents as may be 501
required to enable the Owners to abandon the Vessel 502
to the insurers and claim a constructive total loss. 503
(k)   For the purpose of insurance coverage against hull 504
and machinery and war risks under the provisions of 505
sub-clause 14(a), the value of the Vessel is the sum 506
indicated in Box 29. 507
(l)   Notwithstanding anything contained in sub-clause 508
10(a), it is agreed that under the provisions of Clause 509
14, if applicable, the Owners shall keep the Vessel's 510
Class fully up to date with the Classification Society 511
indicated in Box 10 and maintain all other necessary 512
certificates in force at all times. 513

15.    Redelivery 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the Charterers Owners may 518
direct. The 519
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than 5/3/2/1 fourteen (14) running days' 522
definite 523
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period.  Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded.  All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

16.    Non-Lien 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

17.    Indemnity 560
(a)   The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

by the Charterers, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail. 564-571

Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents. 572-576

(b) If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, **by the mortgage holder the** 577-578

Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail. 579-581

In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention. 582-586

**18. Lien** 587
The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned. 588-593

**19. Salvage** 594
All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers. 595-598

**20. Wreck Removal** 599
In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation. 600-605

**21. General Average** 606
The Owners shall not contribute to General Average. 607

**22. Assignment, Sub-Charter and Sale** 608
(a) The Charterers shall not assign this Charter nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve. 609-613
(b) The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting an assignment of this Charter. 614-618

**23. Contracts of Carriage** 619
*) (a) The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause. 620-628
*) (b) The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their 629-633

luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto. 634-638
*) Delete as applicable. 639

**24. Bank Guarantee** 640
(Optional, only to apply if Box 27 filled in) 641
The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter. **Corporate Guarantee to be attached to the BBCHP.** 642-646

**25. Requisition/Acquisition** 647
(a) In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter. 648-666
(b) In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as at the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition". 667-677

**26. War** 678
(a) For the purpose of this Clause, the words "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel. 679-692
(b) **The Charteres shall be at liberty to trade the Vessel in War Risk Areas and any applicable additional premium shall be for the Charterers' account, but with full indemnity to Owners in regards to ransoms/accidents/deaths or loss of cargo, Charterers to show evidence of extra premia being paid.** The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Owners, may be, or are likely to be, 693-699

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

~~exposed to War Risks. Should the Vessel be within any~~ 700
~~such place as aforesaid, which only becomes danger-~~ 701
~~ous, or is likely to be or to become dangerous, after her~~ 702
~~entry into it, the Owners shall have the right to require~~ 703
~~the Vessel to leave such area.~~ 704

**(c)** The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
she shall be subject, or is likely to be subject to 711
a belligerent's right of search and/or confiscation. 712

~~(d)    If the insurers of the war risks insurance, when~~ 713
~~Clause 14 is applicable, should require payment of~~ 714
~~premiums and/or calls because, pursuant to the~~ 715
~~Charterers' orders, the Vessel is within, or is due to enter~~ 716
~~and remain within, any area or areas which are specified~~ 717
~~by such insurers as being subject to additional premiums~~ 718
~~because of War Risks, then such premiums and/or calls~~ 719
~~shall be reimbursed by the Charterers to the Owners at~~ 720
~~the same time as the next payment of hire is due.~~ 721

**(e)** The Charterers shall have the liberty: 722
**(i)** to comply with all orders, directions, recommend- 723
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
**(ii)** to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
**(iii)** to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
**(f)** In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; ~~France;~~ and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

**27.    Commission** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. ~~If no rate is indicated in Box 33,~~ 767
~~the commission to be paid by the Owners shall cover~~ 768
~~the actual expenses of the Brokers and a reasonable~~ 769
~~fee for their work.~~ 770
~~If the full hire is not paid owing to breach of the Charter~~ 771
~~by either of the parties the party liable therefor shall~~ 772
~~indemnify the Brokers against their loss of commission.~~ 773

~~Should the parties agree to cancel the Charter, the~~ 774
~~Owners shall indemnify the Brokers against any loss of~~ 775
~~commission but in such case the commission shall not~~ 776
~~exceed the brokerage on one year's hire.~~ 777

**28.    Termination** 778
**(a)    Charterers' Default** 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
**(i)** the Charterers fail to pay hire in accordance with 783
Clause 11. However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
**(ii)** the Charterers fail to comply with the requirements of: 800
**(1)** Clause 6 (Trading Restrictions) 801
**(2)** Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
**(iii)** the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
**(b)    Owners' Default** 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
**(c)    Loss of Vessel** 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss. For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
~~(d)    Either party shall be entitled to terminate this~~ 837
~~Charter with immediate effect by written notice to the~~ 838
~~other party in the event of an order being made or~~ 839
~~resolution passed for the winding up, dissolution,~~ 840
~~liquidation or bankruptcy of the other party (otherwise~~ 841
~~than for the purpose of reconstruction or amalgamation)~~ 842
~~or if a receiver is appointed, or if it suspends payment,~~ 843
~~ceases to carry on business or makes any special~~ 844
~~arrangement or composition with its creditors.~~ 845
**(e)** The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

| | |
|---|---|
| prior to the date of termination and to any claim that | 848 |
| either party might have. | 849 |

**29. Repossession** — 850

In the event of the termination of this Charter in — 851
accordance with the applicable provisions of Clause 28, — 852
the Owners shall have the right to repossess the Vessel — 853
from the Charterers at her current or next port of call, or — 854
at a port or place convenient to them without hindrance — 855
or interference by the Charterers, courts or local — 856
authorities. Pending physical repossession of the Vessel — 857
in accordance with this Clause 29, the Charterers shall — 858
hold the Vessel as gratuitous bailee only to the Owners. — 859
The Owners shall arrange for an authorised represent- — 860
ative to board the Vessel as soon as reasonably — 861
practicable following the termination of the Charter. The — 862
Vessel shall be deemed to be repossessed by the — 863
Owners from the Charterers upon the boarding of the — 864
Vessel by the Owners' representative. All arrangements — 865
and expenses relating to the settling of wages, — 866
disembarkation and repatriation of the Charterers' — 867
Master, officers and crew shall be the sole responsibility — 868
of the Charterers. — 869

**30. Dispute Resolution** — 870

\*)   **(a)**   This Contract shall be governed by and construed — 871
in accordance with English law and any dispute arising — 872
out of or in connection with this Contract shall be referred — 873
to arbitration in London in accordance with the Arbitration — 874
Act 1996 or any statutory modification or re-enactment — 875
thereof save to the extent necessary to give effect to — 876
the provisions of this Clause. — 877
The arbitration shall be conducted in accordance with — 878
the London Maritime Arbitrators Association (LMAA) — 879
Terms current at the time when the arbitration proceed- — 880
ings are commenced. — 881
The reference shall be to three arbitrators. A party — 882
wishing to refer a dispute to arbitration shall appoint its — 883
arbitrator and send notice of such appointment in writing — 884
to the other party requiring the other party to appoint its — 885
own arbitrator within 14 calendar days of that notice and — 886
stating that it will appoint its arbitrator as sole arbitrator — 887
unless the other party appoints its own arbitrator and — 888
gives notice that it has done so within the 14 days — 889
specified. If the other party does not appoint its own — 890
arbitrator and give notice that it has done so within the — 891
14 days specified, the party referring a dispute to — 892
arbitration may, without the requirement of any further — 893
prior notice to the other party, appoint its arbitrator as — 894
sole arbitrator and shall advise the other party — 895
accordingly. The award of a sole arbitrator shall be — 896
binding on both parties as if he had been appointed by — 897
agreement. — 898
Nothing herein shall prevent the parties agreeing in — 899
writing to vary these provisions to provide for the — 900
appointment of a sole arbitrator. — 901
In cases where neither the claim nor any counterclaim — 902
exceeds the sum of US$50,000 (or such other sum as — 903
the parties may agree) the arbitration shall be conducted — 904
in accordance with the LMAA Small Claims Procedure — 905
current at the time when the arbitration proceedings are — 906
commenced. — 907

\*)   ~~**(b)**   This Contract shall be governed by and construed~~ — 908
~~in accordance with Title 9 of the United States Code~~ — 909
~~and the Maritime Law of the United States and any~~ — 910
~~dispute arising out of or in connection with this Contract~~ — 911
~~shall be referred to three persons at New York, one to~~ — 912
~~be appointed by each of the parties hereto, and the third~~ — 913
~~by the two so chosen; their decision or that of any two~~ — 914
~~of them shall be final, and for the purposes of enforcing~~ — 915
~~any award, judgement may be entered on an award by~~ — 916
~~any court of competent jurisdiction. The proceedings~~ — 917
~~shall be conducted in accordance with the rules of the~~ — 918
~~Society of Maritime Arbitrators, Inc.~~ — 919
~~In cases where neither the claim nor any counterclaim~~ — 920

~~exceeds the sum of US$50,000 (or such other sum as~~ — 921
~~the parties may agree) the arbitration shall be conducted~~ — 922
~~in accordance with the Shortened Arbitration Procedure~~ — 923
~~of the Society of Maritime Arbitrators, Inc. current at~~ — 924
~~the time when the arbitration proceedings are commenced.~~ — 925

\*)   ~~**(c)**   This Contract shall be governed by and construed~~ — 926
~~in accordance with the laws of the place mutually agreed~~ — 927
~~by the parties and any dispute arising out of or in~~ — 928
~~connection with this Contract shall be referred to~~ — 929
~~arbitration at a mutually agreed place, subject to the~~ — 930
~~procedures applicable there.~~ — 931

**(d)**   Notwithstanding (a), (b) or (c) above, the parties — 932
may agree at any time to refer to mediation any — 933
difference and/or dispute arising out of or in connection — 934
with this Contract. — 935
In the case of a dispute in respect of which arbitration — 936
has been commenced under (a), (b) or (c) above, the — 937
following shall apply:- — 938

**(i)**   Either party may at any time and from time to time — 939
elect to refer the dispute or part of the dispute to — 940
mediation by service on the other party of a written — 941
notice (the "Mediation Notice") calling on the other — 942
party to agree to mediation. — 943

**(ii)**   The other party shall thereupon within 14 calendar — 944
days of receipt of the Mediation Notice confirm that — 945
they agree to mediation, in which case the parties — 946
shall thereafter agree a mediator within a further — 947
14 calendar days, failing which on the application — 948
of either party a mediator will be appointed promptly — 949
by the Arbitration Tribunal ("the Tribunal") or such — 950
person as the Tribunal may designate for that — 951
purpose. The mediation shall be conducted in such — 952
place and in accordance with such procedure and — 953
on such terms as the parties may agree or, in the — 954
event of disagreement, as may be set by the — 955
mediator. — 956

**(iii)**   If the other party does not agree to mediate, that — 957
fact may be brought to the attention of the Tribunal — 958
and may be taken into account by the Tribunal when — 959
allocating the costs of the arbitration as between — 960
the parties. — 961

**(iv)**   The mediation shall not affect the right of either — 962
party to seek such relief or take such steps as it — 963
considers necessary to protect its interest. — 964

**(v)**   Either party may advise the Tribunal that they have — 965
agreed to mediation. The arbitration procedure shall — 966
continue during the conduct of the mediation but — 967
the Tribunal may take the mediation timetable into — 968
account when setting the timetable for steps in the — 969
arbitration. — 970

**(vi)**   Unless otherwise agreed or specified in the — 971
mediation terms, each party shall bear its own costs — 972
incurred in the mediation and the parties shall share — 973
equally the mediator's costs and expenses. — 974

**(vii)**   The mediation process shall be without prejudice — 975
and confidential and no information or documents — 976
disclosed during it shall be revealed to the Tribunal — 977
except to the extent that they are disclosable under — 978
the law and procedure governing the arbitration. — 979
(Note: The parties should be aware that the mediation — 980
process may not necessarily interrupt time limits.) — 981

**(e)**   If Box 35 in Part I is not appropriately filled in, sub-clause — 982
30(a) of this Clause shall apply. Sub-clause 30(d) shall — 983
apply in all cases. — 984

\*)   Sub-clauses 30(a), 30(b) and 30(c) are alternatives; — 985
indicate alternative agreed in Box 35. — 986

**31. Notices** — 987

**(a)**   Any notice to be given by either party to the other — 988
party shall be in writing and may be sent by fax, telex, e- — 989
mail — 
registered or recorded mail or by personal service. — 990
**(b)**   The address including e-mail(s) of the Parties for — 991
service of such — 
communication shall be as stated in Boxes 3 and 4 — 992
respectively. — 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# "BARECON 2001" Standard Bareboat Charter

### PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

OPTIONAL PART

1. Specifications and Building Contract
(a) The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.
(b) No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.
(c) The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.
(d) The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein. Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers) The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties. The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.

2. Time and Place of Delivery
(a) Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel

and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.
(b) If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.
(c) If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon
(i) if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or
(ii) if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and or take delivery of the Vessel from the Builders and deliver her to the Charterers;
(iii) in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;
(iv) if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.
(d) Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.

3. Guarantee Works
If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.

4. Name of Vessel
The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.

5. Survey on Redelivery
The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery. Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred. The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

## "BARECON 2001" Standard Bareboat Charter

### PART IV
### HIRE/PURCHASE AGREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 42)*

OPTIONAL PART

On expiration of this Charter and provided the Charterers 1
have fulfilled their obligations according to Part I and II 2
as well as Part III, if applicable, it is agreed, that on 3
payment of the final payment of hire as per Clause 11 4
the Charterers have purchased the Vessel with 5
everything belonging to her and the Vessel is fully paid 6
for. 7

In the following paragraphs the Owners are referred to 8
as the Sellers and the Charterers as the Buyers. 9

The Vessel shall be delivered by the Sellers and taken 10
over by the Buyers on expiration of the Charter. 11

The Sellers guarantee that the Vessel, at the time of 12
delivery, is free from all encumbrances and maritime 13
liens or any debts whatsoever other than those arising 14
from anything done or not done by the Buyers or any 15
existing mortgage agreed not to be paid off by the time 16
of delivery. Should any claims, which have been incurred 17
prior to the time of delivery be made against the Vessel, 18
the Sellers hereby undertake to indemnify the Buyers 19
against all consequences of such claims to the extent it 20
can be proved that the Sellers are responsible for such 21
claims. Any taxes, notarial, consular and other charges 22
and expenses connected with the purchase and 23
registration under Buyers' flag, shall be for Buyers' 24
account. Any taxes, consular and other charges and 25
expenses connected with closing of the Sellers' register, 26
shall be for Sellers' account. 27

In exchange for payment of the last month's hire 28
instalment the Sellers shall furnish the Buyers with a 29
Bill of Sale duly attested and legalized, together with a 30
certificate setting out the registered encumbrances, if 31
any. On delivery of the Vessel the Sellers shall provide 32
for deletion of the Vessel from the Ship's Register and 33
deliver a certificate of deletion to the Buyers. 34
The Sellers shall, at the time of delivery, hand to the 35
Buyers all classification certificates (for hull, engines, 36
anchors, chains, etc.), as well as all plans which may 37
be in Sellers' possession. 38

The Wireless Installation and Nautical Instruments, 39
unless on hire, shall be included in the sale without any 40
extra payment. 41

The Vessel with everything belonging to her shall be at 42
Sellers' risk and expense until she is delivered to the 43
Buyers, subject to the conditions of this Contract and 44
the Vessel with everything belonging to her shall be 45
delivered and taken over as she is at the time of delivery, 46
after which the Sellers shall have no responsibility for 47
possible faults or deficiencies of any description. 48

The Buyers undertake to pay for the repatriation of the 49
Master, officers and other personnel if appointed by the 50
Sellers to the port where the Vessel entered the Bareboat 51
Charter as per Clause 3 (Part II) or to pay the equivalent 52
cost for their journey to any other place. 53

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

## "BARECON 2001" Standard Bareboat Charter

OPTIONAL
PART

### PART V
### PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY
*(Optional, only to apply if expressly agreed and stated in Box 43)*

| | |
|---|---|
| 1. ~~Definitions~~ | |
| ~~For the purpose of this PART V, the following terms shall~~ | 1 |
| ~~have the meanings hereby assigned to them:~~ | 2 |
| ~~"The Bareboat Charter Registry" shall mean the registry~~ | 3 |
| ~~of the State whose flag the Vessel will fly and in which~~ | 4 |
| ~~the Charterers are registered as the bareboat charterers~~ | 5 |
| ~~during the period of the Bareboat Charter.~~ | 6 |
| ~~"The Underlying Registry" shall mean the registry of the~~ | 7 |
| ~~state in which the Owners of the Vessel are registered~~ | 8 |
| ~~as Owners and to which jurisdiction and control of the~~ | 9 |
| ~~Vessel will revert upon termination of the Bareboat~~ | 10 |
| ~~Charter Registration.~~ | 11 |
| | 12 |
| 2. ~~Mortgage~~ | |
| ~~The Vessel chartered under this Charter is financed by~~ | 13 |
| ~~a mortgage and the provisions of Clause 12(b) (Part II)~~ | 14 |
| ~~shall apply.~~ | 15 |
| | 16 |

| | |
|---|---|
| 3. ~~Termination of Charter by Default~~ | 17 |
| ~~If the Vessel chartered under this Charter is registered~~ | 18 |
| ~~in a Bareboat Charter Registry as stated in Box 44, and~~ | 19 |
| ~~if the Owners shall default in the payment of any amounts~~ | 20 |
| ~~due under the mortgage(s) specified in Box 28, the~~ | 21 |
| ~~Charterers shall, if so required by the mortgagee, direct~~ | 22 |
| ~~the Owners to re-register the Vessel in the Underlying~~ | 23 |
| ~~Registry as shown in Box 45.~~ | 24 |
| ~~In the event of the Vessel being deleted from the~~ | 25 |
| ~~Bareboat Charter Registry as stated in Box 44, due to a~~ | 26 |
| ~~default by the Owners in the payment of any amounts~~ | 27 |
| ~~due under the mortgage(s), the Charterers shall have~~ | 28 |
| ~~the right to terminate this Charter forthwith and without~~ | 29 |
| ~~prejudice to any other claim they may have against the~~ | 30 |
| ~~Owners under this Charter.~~ | 31 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original



ARROW
TANKERS A/S

## RIDER CLAUSES TO CHARTER PARTY
## M.T. "CV STEALTH "
## DATED 23rd February 2010

**CLAUSE 1. CANCELLATION OF BAREBOAT CHARTER:**

Owners during this charter have the right to sell the Vessel to a third party at any time hereunder with the following conditions:

(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and the new owner shall comply in full with a] I the terms and conditions of this Charter Party.

(b) Charterers always to have the right of first refusal to buy the Vessel.

(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably withheld.

**CLAUSE 2. DRY DRY-DOCKS:**

Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always un-extended at Charterers cost and expenses.

**CLAUSE 3. BUNKER CLAUSE:**

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time.

**CLAUSE 4. CHARTERERS LIABILITIES:**

Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage, costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

**CLAUSE 5. OIL POLLUTION:**

Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident, provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

1

2nd original



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

## CLAUSE 6. RISKS AND INSURANCE OF THE VESSEL:

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk of the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and

2

2nd original



**m.t. CV STEALTH – CP dated 23rd February 2010**

to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv) To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v) Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi) To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x) Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi) Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

3

2nd original



(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii) all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers expense, such alternative insurance as the Owners may in their discretion determine to be necessary to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

## CLAUSE 7.   **INTEREST:**

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers

to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges


2nd original



m.t. CV STEALTH – CP dated 23rd February 2010

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

## CLAUSE 8. **CHARTERERS' COVENANTS:**

The Charterers Covenant with the Owners undertake throughout the term of this
Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel's dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;







ARROW
TANKERS A/S

**m.t. CV STEALTH – CP dated 23rd February 2010**

(e) They will notify the Owners forthwith by telex, telefax or e -mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.

## CLAUSE 9.   INDEMNITY:

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof

6





is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

## CLAUSE 10. **TERMINATION EVENTS:**

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen  (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d)  Any license, approval, consent authorization or registration at any time necessary for  the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

7

2nd original



**m.t. CV STEALTH – CP dated 23rd February 2010**

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

## CLAUSE 11.  OWNERS' RIGHTS ON A TERMINATION EVENT:

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

(i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

(ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

8



**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their abso1ute discretion think fit.

## CLAUSE 12. <u>CONTRADICTION CLAUSE</u>

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

## CLAUSE 13. <u>THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:</u>

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.

2nd original



m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 14.**

MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

**CLAUSE 15.**

Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery.
Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

**CLAUSE 16.**

Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

**CLAUSE 17.**

Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

**CLAUSE 18.**

Local time for laycan, GMT for hire calculation.

**CLAUSE 19.**

Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)



10

2nd original



**m.t. CV STEALTH – CP dated 23rd February 2010**

**ARROW**
TANKERS A/S

## CLAUSE 20.

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET ) to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Charterers

For the Owners

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :

Charterers:

By     : Himoza Dimareli
Title : Director

By     : Bjonar Tordcca
Title : Director

# ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**

USD 8,750 gross pdpr for the first 365 days after delivery

USD 9,750 gross pdpr for the 2nd charter year

USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year

USD 9,750 gross pdpr for the 4th charter year

USD 9,750 gross pdpr for the 5th charter year

USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**

To be deleted.

**Delivery:**

Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :

By : Mimoza Dimaseli
Title : DIRECTOR

Charterers:

By : Tugran Tokan
Title : DIRECTOR

**ADDENDUM NO 3**

Dated 23 January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")
as amended by an Addendum No 1 dated 2nd June 2010
and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed that:

1.  The payment of a portion of the daily charter hire of an amount of USD 3.225 arising from the charter hires starting 1st December 2012 until 1st December 2013 shall be deferred. With effect from 1st December 2013 the total amount of deferred charter hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal instalments until 22nd June 2015 and added to the daily charter hire.

2.  Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box 22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3.  In the event of default of payment by the charterers under the bareboat charters of the Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or undertakings thereto remain unaltered and in full force and effect.

---------------------
For and on behalf of
the Charterers

---------------------
For and on behalf of
the Guarantor

---------------------
For and on behalf of
the Owners

Georgios Amanatidis
Sole Director

# EXHIBIT 2

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island


### IRREVOCABLE PERFORMANCE GUARANTEE

In consideration of you, Psara Energy Limited / Marshall Island (hereinafter the
"Company" ), entering into a Bareboat Charterparty and MoA as per rider clause
13 of "BARECON 2001" dated 23 February 2010 and any and all subsequent
addenda thereto (the "Contract") with Space Shipping Ltd / Malta (the
"Charterer") as charterer and or buyer, we, subject to the provision of the
paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and
irrevocably guarantee as primary obligor on first demand the full and timely
performance by the Charterer of all its obligations under the Contract, including,
but not limited to, the punctual payment of the hire and or the purchase price of
the vessel MT CV STEALTH under the Charterparty according to the Contract,
providing the Charterer with sufficient funds to fulfill the Contract, due and
punctual payment to you of all amounts (if any) owing by the Charterer under or
pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due
to you and remains unpaid for a period of seven (7) calendar days from the due
date and (ii) copies of the hire statement for the relevant period, we especially
undertake to make any payment which was due to you under the above-
mentioned Contract but has not been paid on the due date by the Charterers to
you to your account as specified in the Contract. Such demand is to specify the
amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking,
confirmed by your countersignature hereunder, that subject to our payment of
any overdue amount under this guarantee within 7 days of receipt of your
demand, you will not execute your right of withdrawal of the Vessel as per the
Contract and you will refrain from arresting or otherwise detaining any of our
assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgement orders the Charterers to make repayment. If the Charterers fails to honour the judgement within seven (7) days after that the final judgement had been rendered in the proceedings then we shall pay to you to the extent the judgement orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00  Fax +90 212 283 1604

04, March, 2010            GEDEN HOLDINGS LTD of MALTA

Countersigned:
04, March, 2010            SUPER SHIPPING LTD of MALTA

# EXHIBIT 3

SCHEDULE 11 – Organisational Chart



All Nine Advantage Shipping Entities are Member-managed

1.14.6180.00 21327756 v4

# EXHIBIT 4

CONSENT LETTER

From:   Geden Holdings Ltd (the "Shareholder")
        85 St.John's Street, Valletta, Malta

To:     Shell Western Supply and Trading Limited (the "Charterer")
        Barbados

                                                              06.02. 2015

Dear Sirs

1   We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel
    "Royal", dated 17 October 2012) (the "Existing Charters") and entered into between the
    companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in
    respect of the vessels listed in Annex 1 hereto (the "Vessels").

2   As part of certain reorganisation efforts being conducted by the existing shareholders of each
    Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all
    its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as
    new owners (and each wholly owned by the Shareholder, the "New Owners").

3   Upon each Vessel Sale:

    (a)   the relevant Existing Owner will delete that Vessel from Maltese flag and the relevant
          New Owner will register that Vessel in its name under Marshall Islands flag;

    (b)   the relevant ship mortgage over that Vessel registered in the name of the banks and
          financial institutions listed in Annex 1 hereto as Existing Mortgagees shall be discharged
          and shall be replaced (as part of the financing and/or refinancing arrangements between
          that New Owner and its financiers) with a new ship mortgage s to be registered in the
          name of the banks and financial institutions listed in Annex 1 hereto as New
          Mortgagees;

    (c)   subject to the respective New Owners being acceptable to Charterer following
          Charterer's KYC and other relevant checks, the Existing Charters will be terminated by
          mutual agreement between the respective Existing Owners and Charterer and new
          charters (the "New Charters") will be entered into between the Charterer and the
          relevant New Owner on terms, inter alia, as follows:

          (i)     each New Charter shall come into effect on the time on which the relevant Vessel
                  is delivered to, and accepted by, the relevant New Owner from the relevant
                  Existing Owner pursuant to that Vessel Sale (the "Vessel Sale Effective Dates");

          (ii)    the duration of each New Charter shall be 5 years from the Vessel Sale Effective
                  Date plus the optional period (3 years for aframaxes and 1 year for suezmaxes);

          (iii)   the charter hire (the "Hire") will be the aggregate of a base rate and profit sharing
                  amount (the "PSA"). The Base Rate payable by the Charterer to the relevant New
                  Owner shall be US$17,500 per day other than the vessels Advantage Sun,
                  Advantage Sky, Advantage Solar, Advantage Start whereas the base rate shall be
                  US$18,500 during the initial period of 24 months (the "Base Rate"); The PSA will
                  be calculated as the monthly averages of certain trading routes as described in
                  the relevant charter parties.

                                                              54142984v2      D01248

(iv) the terms of each New Charter shall otherwise be substantially the same as the terms of its corresponding Existing Charter, save as contemplated by this paragraph 3(c) and for logical amendments.

4    A pro-forma of New Charter is annexed to this Letter as Annex 2.

5    The Shareholder confirms to the Charterer that:

(a) it shall procure that an opinion on matters of Maltese law relating to the Title Transfers is given from Fenech & Fenech to the Charterer, in form and substance reasonably satisfactory to the Charterer, within 30 days from the date of this Letter;

(b) it shall provide to the Charterer promptly on reasonable request such information regarding the New Owners as the Charterer requires for KYC purposes.

6    The Shareholder hereby:

(a) notifies the Charterer of its intention to complete the Vessel Sales;

(b) confirms that it shall be keep the Charterer (i) updated of the intended dates and schedule for the completion of each Vessel Sale and (ii) notified on the date on which each Vessel Sale is completed; and

(c) requests that the Charterer consents to the termination of the Existing Charters and entry into the New Charters (substantially on the terms above), each to come into effect on the relevant Vessel Sale Effective Date.

(d) agrees to procure that upon each Vessel Sale the relevant Existing Owner executes a Memorandum of Termination with Charterer agreeing and confirming that all rights and obligations of the parties under the Existing Charter shall cease and determine with effect from the date of termination provided that this shall not affect or prejudice any claim or demand that either party may have against the other under or in connection with the Existing Charter arising before the date of termination (it being acknowledged and agreed by the Existing Owner that it shall have no claim against the Charterer for early or wrongful termination of the Charter or early redelivery of the Ship.

(e) agrees to procure that upon each Vessel Sale each New Owner and the respective New Mortgagee enters into a subordination and non-disturbance agreement with Charterer in a form acceptable to the Charterer and New Mortgagee.

7    For the avoidance of any doubt, if, due to any reason whatsoever, any of the above matters fails to be fulfilled until 30 April 2015 , as a consequence the matters contained in this letter becomes null and void. The Existing Charters shall however remain valid and binding in all respects between the parties thereof.

8    The Charterer, by countersigning this Letter, hereby agrees and consents to the contents contained herein.



54142984v2

D01249

9  This Letter and any non-contractual obligations arising under or in connection with it shall be governed by English law.

Yours faithfully

..................................

For and on behalf of
GEDEN HOLDINGS LTD.

Name: Tuğrul Tokgöz
Title:  Director

Agreed, consented and accepted:

..................................

For and on behalf of
SHELL WESTERN SUPPLY AND TRADING LIMITED

Name: David Chapman
Title:  General Manager

54142904v2

D01250

ANNEX 1

VESSELS

| Vessel | Existing Owner | New Owner | Existing Mortgagee | New Mortgagee |
|---|---|---|---|---|
| Profit (tbr Advantage Solar) | Profit Shipping Ltd. of Malta | Advantage Solar Shipping LLC of the Marshall Islands | DVB Bank NV | DVB Bank NV |
| Target (tbr Advantage Arrow) | Target Shipping Ltd. of Malta | Advantage Arrow Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Bravo (tbr Advantage Atom ) | Bravo Shipping Ltd. of Malta | Advantage Atom Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| True (tbr Advantage Avenue) | True Shipping Ltd. of Malta | Advantage Avenue Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Blue (tbr Advantage Sky) | Blue Shipping Ltd. of Malta | Advantage Sky Shipping LLC of the Marshall Islands | Commerzbank AG | Hayfin Capital Management LLP |
| Blank (tbr Advantage Start ) | Blank Shipping Ltd. of Malta | Advantage Start Shipping LLC of the Marshall Islands | Bank of America NA | CIT Finance LLC |



54142964v2

D01251

| Value (tbr Advantage Award) | Value Shipping Ltd. of Malta | Advantage Award Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
|---|---|---|---|---|
| Power (tbr Advantage Anthem) | Barbaros Maritime Ltd. of Malta | Advantage Anthem Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Royal (tbr Advantage Sun) | Prima Shipping Ltd. of Malta | Advantage Sun Shipping LLC of the Marshall Islands | Credit Europe NV | CIT Finance LLC |



54142964v2

# EXHIBIT 5

Dave Chapman

1

1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2    PSARA ENERGY, LTD.,          )
3         Plaintiff,              )
                                  )
4    VS.                          )  CIV. ACTION NO. 16-CV-04840
                                  )
5    SPACE SHIPPING, LTD.;        )
     ADVANTAGE AVENUE             )
6    SHIPPING, LLC; GENEL         )
     DENIZCILIK NAKLIYATI A.S.    )
7    A/K/A GEDEN LINES;           )
     ADVANTAGE TANKERS, LLC,      )
8    ADVANTAGE HOLDINGS, LLC;     )
     FORWARD HOLDINGS, LLC;       )
9    MEHMET EMIN KARAMEHMET        )
     and GULSUN NAZLI             )
10   KARAMEHMET WILLIAMS,         )
         Defendants.              )

11          ***********************************

12

13                  ORAL DEPOSITION OF
                       DAVE CHAPMAN
14                  NOVEMBER 30, 2016

            ***********************************

15

16        ORAL DEPOSITION of DAVE CHAPMAN, produced as a

17   witness at the instance of the Plaintiff, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on November 30, 2016, from 1:22 p.m. to 2:32 p.m.,

20   before Patricia L. Fairley, RPR, CSR in and for the

21   State of Texas, reported by machine shorthand at the

22   offices of DepoTexas, 13101 Northwest Freeway,

23   Suite 210, Houston, Texas, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated in the

25   record or attached hereto.

Dave Chapman

2

```
 1                A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       Mr. George A. Gaitas
         Mr. Jonathan M. Chalos
 5       CHALOS & CO., P.C.
         7210 Tickner Street
 6       Houston, Texas   77055
         (713)936-2427          (866)702-4577 Facsimile
 7       georgegaitas@chaloslaw.com
         jmc@chaloslaw.com
 8
 9   FOR THE DEFENDANTS ADVANTAGE AVENUE SHIPPING, LLC,
     ADVANTAGE TANKERS, LLC AND ADVANTAGE HOLDINGS, LLC:
10
         Mr. Marc Matthews (Not Present)
11       PHELPS DUNBAR, LLP
         500 Dallas Street
12       Suite 1300
         Houston, Texas   77002
13       (713)626-1386          (713)626-1388 Facsimile
         marc.matthews@phelps.com
14
15   FOR SHELL OIL COMPANY:
16       Mr. Marcus A. Carter
         SHELL OIL COMPANY
17       P.O. Box 2463
         Houston, Texas   77252-2463
18       (713)241-1232          (713)241-1427 Facsimile
         m.carter2@shell.com
19
20                     *  *  *  *  *
21
22
23
24
25
```

Dave Chapman

42

1    A.   I believe that's correct.

2    Q.   It was acknowledged on behalf of Shell Western?

3    A.   Yes.

4    Q.   And would -- would you agree with me that these

5    were binding contracts on Shell Western?

6    A.   Yes, I would agree.

7    Q.   And if someone told you in one of these time

8    charters that the daily rate was going to be $50,000 a

9    day and the charter itself said 18 1/2 thousand, they

10   would be wrong?  The charter party would be correct?

11   What it says in the charter would be correct?

12   A.   Well, it depends upon what other agreements

13   were entered into beyond the charter party agreement.

14   You can write amendments to various agreements.

15   Q.   Of course.  But if -- if the charter party

16   specifies 18 1/2 thousand dollars daily rate, that would

17   be correct?  These are correct documents that you were

18   signing; they were not fictitious or --

19   A.   No.  Those are binding documents that I signed.

20   Q.   Binding and accurate?

21   A.   They should be accurate.

22   Q.   Truthful?

23   A.   Yes.  Correct.

24   Q.   So I want to show you now a document,

25   Exhibit 17.

Dave Chapman

51

1    executing the document.  There were people in Shell that

2    had done that work, I'm certain, because I would have

3    asked for evidence to that effect; but I wouldn't have

4    done the work myself.

5         Q.  So if you look at Paragraph 2 again, "It has

6    been proposed that each Existing Owner will sell, the

7    Vessel Sales, all its title, interest to and right in

8    its Vessel to the relevant companies listed in Annex 1

9    hereto as new owners, and each wholly owned by the

10   Shareholder, the New Owners."

11              What sense does this make to you?  Who owns

12   the new owners?

13        A.  It says, "each wholly owned by the Shareholder,

14   the New Owner."  I mean, I can't -- I can't interpret it

15   any differently than it says in the paragraph.

16        Q.  Right.  And would you -- would you look at the

17   very first line, please, where it says, "From" --

18        A.  Yes.

19        Q.  -- "Geden Holdings, Limited" --

20        A.  Yes.

21        Q.  -- "the Shareholder"?

22        A.  Correct.

23        Q.  Do you have any reason to believe -- reason to

24   believe this is -- there is anything in here that's

25   untrue or inaccurate?

Dave Chapman

52

1     A.  No, I have no reason to believe that.

2     Q.  Give us a minute.

3     A.  Yeah, please.

4          (Discussion off the record)

5     Q.  (BY MR. GAITAS)  All right.  Let's go back on

6  the record.

7     A.  Okay.

8     Q.  Or do you want to take a break?

9     A.  No, I'm good.  I just don't normally talk this

10  much.  No one at the office lets me.

11     Q.  Right.  Then I'll -- I'll ask you to please

12  look at -- there's -- there's an Appendix 1 that is --

13  Annex 1 that is attached to this.

14     A.  Yes.

15     Q.  Do you see that?

16     A.  I do see that.

17     Q.  And if you -- if you go to the Consent Letter,

18  the front -- the front page --

19     A.  Yes.

20     Q.  -- Item 3, "Upon each Vessel Sale:  the

21  relevant Existing Owner will delete the Vessel from the

22  Maltese flag and the relevant New Owner will register

23  the vessel in its name under the Marshall Islands flag."

24     A.  Yes, I can see that.

25     Q.  From -- from the documents that we saw before,

Dave Chapman

53

1    Exhibits 1 with the exception of that letter of

2    Mr. Soudant, this was done?

3        A.  I presume so.  I --

4        Q.  If you look -- if you look at the -- if you

5    look at the Appendix 1 -- Annex 1 --

6        A.  Yes.

7        Q.  -- vessel PROFIT was renamed ADVANTAGE SOLAR?

8        A.  Correct, and went from --

9        Q.  And --

10       A.  -- the Malta flag to the Marshall flag.

11       Q.  -- went -- and from the charter parties you've

12   seen or if you can see, if you want to -- to look at

13   them closely, indeed, the flag changed?

14       A.  I -- yes, I presume so.

15       Q.  Yeah.  And from the documents we have seen

16   before, the previous exhibits, the condition of this

17   Consent Letter, (b), "the relevant ship mortgage

18   registered in the name of the banks and financial

19   institutions listed in Annex 1 hereto as Existing

20   Mortgagees shall be discharged and shall be replaced

21   with a new ship mortgage to be registered in the name of

22   the banks and financial institutions listed in Annex 1

23   hereto as New Mortgagees," again, from the documents you

24   have seen, this has taken place, has it not?

25       A.  I presume so.

# EXHIBIT 6

| SHIP MANAGEMENT AGREEMENT | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD SHIP MANAGEMENT AGREEMENT CODE NAME: "SHIPMAN 98"    PART I |
|---|---|

| 1. Date of Agreement 10 February 2015 | Name of Vessel ADVANTAGE ARROW |
|---|---|

| 2. Owners (name, place of registered office and law of registry) (Cl. 1) | 3. Managers (name, place of registered office and law of registry) (Cl. 1) |
|---|---|
| Name Advantage Arrow Shipping LLC | Name Genel Denizcilik Nakliyati A.Ş. |
| Place of registered office Trust Company Complex, Ajeltake Road, Ajeltake Islands, Majuro, Marshall Islands MH96960 | Place of registered office Büyükdere Caddesi Yapı Kredi Plaza A Blok Kat:12 34330 Levent / İstanbul |
| Law of registry MARSHALL ISLAND | Law of registry Türkiye |

| 4. Day and year of commencement of Agreement (Cl. 2)     February 2015 | |
|---|---|

| 5. Crew Management (state "yes" or "no" as agreed) (Cl. 3.1) YES | 6. Technical Management (state "yes" or "no" as agreed) (Cl.3.2) YES |
|---|---|
| 7. Commercial Management (state "yes" or "no" as agreed) (Cl. 3.3) YES | 8. Insurance Arrangements (state "yes" or "no" as agreed)  Cl. 3.4 YES |
| 9. Accounting Services (state "yes" or "no" as agreed) (Cl. 3.5) YES | 10. Sale or purchase of the Vessel (state "yes" or "no" as agreed) (Cl.3.6) YES |
| 11. Provisions (state "yes" or "no" as agreed) (Cl. 3.7) YES | 12. Bunkering (state "yes" or "no" as agreed) (Cl, 3.8) YES |
| 13. Chartering Services Period (only to be filled in if "yes" stated in Box 7) (Cl. 3.3 (i)) 5 YEARS | 14. Owners' Insurance (state alternative (i), (ii) or (iii) of Cl. 6.3) YES |
| 15. Annual Management Fee (state annual amount) (Cl. 8.1) USD 365,000 (per annum) | 16. Severance Costs (state maximum amount) (Cl. 8.4(ii)) As per Crewing agreement |
| 17. Day and year of termination of Agreement (Cl. 17) 5 YEARS FROM DATE OF AGREEMENT | 18. Law and Arbitration (state alternative 19.1, 19.2 or 19.3; if 19.3 place of arbitration must be stated) (Cl. 19) English Law |
| 19. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Owners (Cl. 20) operations@advantagetankers.com | 20. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Managers) (Cl. 20) Genel Denizcilik Nakliyati A.Ş. Büyükdere Caddesi Yapı Kredi Plaza A Blok Kat:12 34330 Levent / İstanbul Fax: +90 212 283 16 04-05 Tel: +90 212 319 51 00 |

It is mutually agreed between the party stated in Box 2 and the party stated in Box 3 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel), "B" (Details of Crew) "C" ("Initial Budget") and "D" (Associated Vessels) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes "A", "B", "C" and "D" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) Signed by: For & On behalf of the Owner TUGRUL TOKGOZ | Signature(s) (Managers) Signed by: For & On behalf of the Manager ORHAN KARADEMIR / COO |
|---|---|

D02405

"Shipman 98" Standard Ship Management Agreement

<table>
<tr><td>

1. **Definitions**
In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.
"Owners" means the party identified in Box 2.
"Managers" means the party identified in Box 3.
"Vessel" means the vessel or vessels details of which are set out in <u>Annex "A"</u> attached hereto.
"Crew" means the Master, officers and ratings of the numbers, rank and nationality specified in <u>Annex "B"</u> hereto.
"Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.
"Severance Costs" means the costs which the employers are legally obliged to pay to or in respect of the Crew as a result of the early termination of any employment contract for service on the Vessel.
"Crew Insurances" means insurances against crew risks which shall include but not limited to death, sickness, repatriation, injury, shipwreck unemployment indemnity and loss of personal <u>effects.</u>
"Management Services" means the services specified in sub-clauses 3.1 to 3.8 as indicated affirmatively in Boxes <u>5</u> to <u>12</u>.
"ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention as adopted by the International Maritime Organization (IMO) by resolution A.741 (18) or any subsequent amendment thereto.
"STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 or any subsequent amendment thereto.

2. **Appointment of Managers**
With effect from the day and year stated in <u>Box 4</u> and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers, and the Managers hereby agree to act as the Managers of the Vessel.

3. **Basis of Agreement**
Subject to the terms and conditions herein provided, during the period of this Agreement, the Managers shall carry out Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform this Agreement in accordance with sound ship management practice.

</td><td>

3.1 **Crew Management**
(only applicable if agreed according to <u>Box 5</u>)
The Managers shall provide suitably qualified Crew for the Vessel as required by the Owners in accordance with the STCW 95 requirements, provision of which includes but is not limited to the following functions:
(i) selecting and engaging the Vessel's Crew, including payroll arrangements, pension administration, and insurances for the Crew other than those mentioned in Clause 6;
(ii) ensuring that the applicable requirements of the law of the flag of the Vessel are satisfied in respect of manning levels, rank, qualification and certification of the Crew and employment regulations including Crew's tax, social insurance, discipline and other requirements;
(iii) ensuring that all members of the Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate flag State requirements. In the absence of applicable flag State requirements the medical certificate shall be dated not more than three months prior to the respective Crew members leaving their country of domicile and maintained for the duration of their service on board the Vessel;
(iv) ensuring that the Crew shall have a command of the English language of a sufficient standard to enable them to perform their duties safely;
(v) arranging transportation of the Crew, including repatriation;
(vi) training the Crew and supervising their efficiency;
(vii) conducting union negotiations;
(viii) operating the Managers' drug and alcohol policy unless otherwise agreed.

3.2 **Technical Management**
(only applicable if agreed according to <u>Box 6</u>)
The Managers shall provide technical management, which includes, but is not limited to, the following functions:
(i) provision of competent personnel to supervise the maintenance and general efficiency of the Vessel;
(ii) arrangement and supervision of dry dockings, repairs, alterations and the upkeep of the Vessel to the standards required by the Owners provided that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with the law of the flag of the Vessel and of the places where she trades, and all requirements and recommendations of the classification society;

</td></tr>
</table>

127 (iii) arrangement of the supply of necessary
128 stores, spares and lubricating oil;
129 (iv) appointment of surveyors and
130 technical consultants as the
131 Managers may consider from time to
132 time to be necessary;
133 (v) development, implementation and
134 maintenance of a Safety
135 Management System (SMS)in
136 accordance with the ISM Code (see
137 sub-clauses 4.2 and 5.3).
138 (vi) development, implementation and
139 compliance with International Port Facility
140 Security Code (ISPS)

141 **3.3 Commercial Management**
142 (only applicable if agreed according to Box 7)
143 The Managers shall provide the commercial
144 operation of the Vessel, as required by the
145 Owners, which includes, but is not limited to, the
146 following functions:
147 (i) providing chartering services in
148 accordance with the Owners'
149 instructions which include, but are not
150 limited to, seeking and negotiating
151 employment for the Vessel and the
152 conclusion (including the execution
153 thereof) of charter parties or other
154 contracts relating to the employment
155 of the Vessel. If such a contract
156 exceeds the period stated in Box 13,
157 consent thereto in writing shall first be
158 obtained from the Owners.
159 (ii) arranging of the proper payment to
160 Owners or their nominees of all hire
161 and/or freight revenues or other
162 moneys of whatsoever nature to which
163 Owners may be entitled arising out of
164 the employment of or otherwise in
165 connection with the Vessel.
166 (iii) providing voyage estimates and
167 accounts and calculating of hire,
168 freights, demurrage and/or despatch
169 moneys due from or due to the
170 charterers of the Vessel;
171 (iv) issuing of voyage instructions;
172 (v) appointing agents;
173 (vi) appointing stevedores;
174 (vii) arranging surveys associated with
175 the commercial operation of the
176 Vessel.

177 **3.4 Insurance Arrangements**
178 (only applicable if agreed according to Box 8)
179 The Managers shall arrange insurances in
180 accordance with Clause 6, on such terms and
181 conditions as the Owners shall have instructed or
182 agreed, in particular regarding conditions, insured
183 values, deductibles and franchises.
184

185 **3.5 Accounting Services**
186 (only applicable if agreed according to Box 9)
187 The Managers shall
188 (i) establish an accounting system which
189 meets the requirements of the
190 Owners and provide regular

191 accounting services, supply regular
192 reports and records,
193 (ii) maintain the records of all costs and
194 expenditure incurred as well as data
195 necessary or proper for the
196 settlement of accounts between the
197 parties.
198

199 **3.6 Sale or Purchase of the Vessel**
200 (only applicable if agreed according to Box 10)
201 The Managers shall, in accordance with the
202 Owners' instructions, supervise the sale or
203 purchase of the Vessel, including the performance
204 of any sale or purchase agreement, but not
205 negotiation of the same.
206 **3.7 Provisions** (only applicable if agreed according
207 to Box 11)
208 The Managers shall arrange for the supply of
209 provisions.
210 **3.8 Bunkering** (only applicable if agreed according
211 to Box 12)The Managers shall arrange for the
212 provision of bunker fuel of the quality specified by
213 the Owners as required for the Vessel's trade.
214

215 **4. Managers' Obligations**
216 **4.1** The Managers undertake to use their best
217 endeavors to provide the agreed Management
218 Services as agents for and on behalf of the
219 Owners in accordance with sound ship
220 management practice and to protect and promote
221 the interests of the Owners in all matters relating
222 to the provision of services hereunder.
223     Provided, however, that the Managers in the
224 performance of their management responsibilities
225 under this Agreement shall be entitled to have
226 regard to their overall responsibility in relation to
227 all vessels as may from time to time be entrusted
228 to their management and in particular, but
229 without prejudice to the generality of the
230 foregoing, the Managers shall be entitled to
231 allocate available supplies, manpower and
232 services in such manner as in the prevailing
233 circumstances the Managers in their absolute
234 discretion consider to be fair and reasonable.
235 **4.2** Where the Managers are providing Technical
236 Management in accordance with sub-clause 3.2,
237 they shall procure that the requirements of the
238 law of the flag of the Vessel are satisfied and they
239 shall in particular be deemed to be the
240 "Company" as defined by the ISM Code, assuming
241 the responsibility for the operation of the Vessel
242 and taking over the duties and responsibilities
243 imposed by the ISM Code when applicable.
244 **5. Owners' Obligations**
245 **5.1** The Owners shall pay all sums due to the
246 Managers punctually in accordance with the
247 terms of this Agreement.
248 **5.2** Where the Managers are providing Technical
249 Management in accordance with sub-clause 3.2,
250 the Owners shall:
251 (i) procure that all officers and ratings
252 supplied by them or on their behalf comply
253 with the requirements of STCW 95;
254 (ii) instruct such officers and ratings to obey
255 all reasonable orders of the Managers in

D02407

256 connection with the operation of the
257 Managers' safety management system.
258 5.3 Where the Managers are not providing
259 Technical Management in accordance with sub-
260 clause 3.2, the Owners shall procure that the
261 requirements of the law of the flag of the Vessel
262 are satisfied and that they, or such other entity as
263 may be appointed by them and identified to the
264 Managers, shall be deemed to be the "Company"
265 as defined by the ISM Code assuming the
266 responsibility for the operation of the Vessel and
267 taking over the duties and responsibilities
268 imposed by the ISM Code when applicable.
269     6.   Insurance Policies
270 The Owners shall procure, whether by instructing
271 the Managers under sub-clause 3.4 or otherwise,
272 that throughout the period of this Agreement:
273 6.1 at the Owners' expense, the Vessel is insured
274     for not less than her sound market value or
275     entered for her full gross tonnage, as the
276     case may be for:
277         (i)   usual hull and machinery marine
278             risks (including crew negligence)
279             and excess liabilities;
280         (ii)  protection and indemnity risks
281             (including pollution risks, and Crew
282             Insurances); and
283         (iii) war risks (including protection and
284             indemnity and crew risks) in
285             accordance with the best practice
286             of prudent owners of vessels of a
287             similar type to the Vessel, with first
288             class insurance companies
289             underwriters or associations ("the
290             Owners' Insurances");
291 6.2 all premiums and calls on the Owners'
292     Insurances are paid promptly by their due
293     date,
294 6.3 the Owners' Insurances name the Managers
295     and, subject to underwriters' agreement, any
296     third party designated by the Managers as a
297     joint assured, with full cover, with the
298     Owners obtaining cover in respect of each of
299     the insurances specified in sub-clause 6.1:
300     (i)    on terms whereby the Managers
301         and any such third party are liable
302         in respect of premiums or calls
303         arising in connection with the
304         Owners' Insurances; or
305     (ii)  If reasonably obtainable, on terms
306         such that neither the Managers nor
307         any such third party shall be under
308         any liability in respect of premiums
309         or calls arising in connection with
310         the Owners' Insurances or
311     (iii)  on such other terms as may be
312         agreed in writing.
313     Indicate alternative (i), (ii) or (iii) in Box 14. If
314     Box 14 is left blank then (i) applies
315 6.4 written evidence is provided, to the
316     reasonable satisfaction of the Managers, of
317     their compliance with their obligations under
318     Clause 6 within a reasonable time of the
319     commencement of the Agreement, and of
320     each renewal date and, if specifically

321     requested, of each payment date of the
322     Owners' Insurances.
323     7.   Income Collected and Expenses Paid on
324         Behalf of Owners
325 7.1 All moneys collected by the Managers under
326     the terms of this Agreement (other than
327     moneys payable by the Owners to the
328     Managers) and any interest thereon shall be
329     held to the credit of the Owners in a
330     separate bank account.
331 7.2 All expenses incurred by the Managers under
332     the terms of this Agreement on behalf of the
333     Owners (including expenses as provided in
334     Clause 8) may be debited against the Owners
335     in the account referred to under sub-clause
336     7.1 but shall in any event remain payable by
337     the Owners to the Managers on demand.
338     8.   Management Fee
339 8.1 The Owners shall pay to the Managers for
340 their services as Managers under this Agreement
341 an annual management fee as stated in Box 15,
342 which shall be payable by equal monthly
343 instalments in advance, the first instalment being
344 payable on the commencement of this Agreement
345 (see Clause 2 and Box 4) and subsequent
346 instalments being payable every month.
347 8.2 The management fee is fixed (see Box 15) for
348 the first two years and increasing by 5% per year
349 thereafter.
350 8.3 The Managers shall, at no extra cost to the
351 Owners, provide their own office accommodation,
352 office staff, facilities and stationery. Without
353 limiting the generality of Clause 7 the Owners shall
354 reimburse the Managers for postage and
355 communication expenses, travelling expenses, and
356 other out of pocket expenses properly incurred by
357 the Managers in pursuance of the Management
358 Services.
359 8.4 In the event of the appointment of the
360 Managers being terminated by the Owners or the
361 Managers in accordance with the provisions of
362 Clauses 17 and 18 other than by reason of default
363 by the Managers, or if the Vessel is lost, sold or
364 otherwise disposed of, the "management fee"
365 payable to the Managers according to the
366 provisions of sub-clause 8.1, shall continue to be
367 payable for a further period of three calendar
368 months as from the termination date. In addition,
369 provided that the Managers provide Crew for the
370 Vessel in accordance with sub-clause 3.1:
371 (i) the Owners shall continue to pay Crew Support
372     Costs during the said further period of *three*
373     *calendar months and*
374 (ii) The Owners shall pay an equitable proportion
375     of any Severance Costs which may materialize,
376     not exceeding the amount stated in Box 16.
377 8.5 If the Owners decide to lay-up the Vessel
378 whilst this Agreement remains in force and such
379 lay-up lasts for more than three months, an
380 appropriate reduction of the management fee for
381 the period exceeding three months until one
382 month before the Vessel is again put into service
383 shall be mutually agreed between the parties.
384 8.6 Unless otherwise agreed in writing all
385 discounts and commissions obtained by the

386 Managers in the course of the management of the
387 Vessel shall be credited to the Owners.
388     **9.  Budgets and Management of Funds**
389
390 **9.1** The Managers shall present to the Owners
391 annually a budget for the following twelve
392 months in such form as the Owners require. The
393 budget for the first year hereof is set out in
394 Annex "C" hereto. Subsequent annual budgets
395 shall be prepared by the Managers and
396 submitted to the Owners not less than three
397 months before the anniversary date of the
398 commencement of this Agreement (see Clause 2
399 and Box 4).
400 **9.2** The Owners shall indicate to the Managers
401 their acceptance and approval of the annual
402 budget within one month of presentation and in
403 the absence of any such indication the Managers
404 shall be entitled to assume that the Owners have
405 accepted the proposed budget.
406 **9.3** Following the agreement of the budget, the
407 Managers shall prepare and present to the
408 Owners their estimate of the working capital
409 requirement of the Vessel and the Managers
410 shall each month update this estimate, based
411 thereon, the Managers shall each month request
412 the Owners in writing for the funds required to
413 run the Vessel for the ensuing month including
414 the payment of any occasional or extraordinary
415 item of expenditure, such as emergency repair
416 costs, additional insurance premiums, bunkers,
417 or provisions. Such funds shall be received by the
418 Managers within ten running days after the
419 receipt by the Owners of the Managers' written
420 request and shall be held to the credit of the
421 Owners in a separate bank account.
422 **9.4** The Managers shall produce a comparison
423 between budgeted and actual income and
424 expenditure of the Vessel in such form as
425 required by the Owners monthly or at such other
426 intervals as mutually agreed.
427 **9.5** Notwithstanding anything contained herein
428 to the contrary, the Managers shall in no
429 circumstances be required to use or commit
430 their own funds to finance the provision of the
431 Management Services.
432     **10.  Managers' Right to Sub-Contract**
433 The Managers shall ~~not~~ have the right to sub-
434 contract any of their obligations hereunder,
435 including those mentioned in sub-clause 3.1
436 without the prior written consent of the Owners
437 which shall not be unreasonably withheld. In the
438 event of such a sub-contract, the Managers shall
439 remain fully liable for the due performance of
440 their obligations under this Agreement.
441     **11.  Responsibilities**
442 **11.1 Force Majeure** - Neither the Owners nor
443 the Managers shall be under any liability for any
444 failure to perform any of their obligations
445 hereunder by reason of any cause whatsoever of
446 any nature or kind beyond their reasonable
447 control.
448 **11.2** Liability to Owners –
449     (i)

450     Without prejudice to sub-clause 11.1, the
451 Managers shall be under no liability
452 whatsoever to the Owners for any loss,
453 damage, delay or expense of whatsoever
454 nature, whether direct or indirect,
455 (including but not limited to loss of profit
456 arising out of or in connection with
457 detention of or delay to the Vessel) and
458 howsoever arising in the course of
459 performance of the Management
460 Services UNLESS same is proved to have
461 resulted solely from the negligence, gross
462 negligence or wilful default of the
463 Managers or their employees, or agents
464 or sub-contractors employed by them in
465 connection with the Vessel, in which case
466 (save where loss, damage, delay or
467 expense has resulted from the Managers'
468 personal act or omission committed with
469 the intent to cause same or recklessly
470 and with knowledge that such loss,
471 damage, delay or expense would
472 probably result) the Managers' liability
473 for each incident or series of incidents
474 giving rise to a claim or claims shall never
475 exceed a total of ten times the annual
476 management fee payable hereunder.
477     (ii)    Notwithstanding anything that
478 may appear to the contrary in this
479 Agreement, the Managers shall not be
480 liable for any of the actions of the Crew,
481 even if such actions are negligent, grossly
482 negligent or wilful, except only to the
483 extent that they are shown to have
484 resulted from a failure by the Managers
485 to discharge their obligations under sub-
486 clause 3.1, in which case their liability
487 shall be limited in accordance with the
488 terms of this Clause 11.
489 **11.3 Indemnity** - Except to the extent and solely
490 for the amount therein set out that the Managers
491 would be liable under sub- clause 11.2, the
492 Owners hereby undertake to keep the Managers
493 and their employees, agents and sub-contractors
494 indemnified and to hold them harmless against all
495 actions, proceedings, claims, demands or
496 liabilities whatsoever or howsoever arising which
497 may be brought against them or incurred or
498 suffered by them arising out of or in connection
499 with the performance of the Agreement, and
500 against and in respect of all costs, losses, damages
501 and expenses (including legal costs and expenses
502 on a full indemnity basis) which the Managers
503 may suffer or incur (either directly or indirectly) in
504 the course of the performance of this Agreement.
505 **11.4 "Himalaya"** - It is hereby expressly agreed
506 that no employee or agent of the Managers
507 (including every sub - contractor from time to
508 time employed by the Managers) shall in any
509 circumstances whatsoever be under any liability
510 whatsoever to the Owners for any loss, damage or
511 delay of whatsoever kind arising or resulting
512 directly or indirectly from any act, neglect or
513 default on his party while acting in the course of
514 or in connection with his employment and,

D02409

without prejudice to the generality of the foregoing provisions in this Clause 11, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 11 the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

**12. Documentation**

Where the Managers are providing Technical Management in accordance with sub-clause 3.2 and/or Crew Management in accordance with sub-clause 3.1, they shall make available, upon Owners' request, all documentation and records related to the Safety Management System (SMS) and/or the Crew which the Owners need in order to demonstrate compliance with the ISM Code and STCW 95 or to defend a claim against a third party.

**13. General Administration**

**13.1** The Managers shall notify Owners of all claims arising out of the Management Services hereunder and keep the Owners informed regarding any incident of which the Managers become aware which gives or may give rise to claims or disputes involving third parties.

**13.2** The owners shall bring or defend actions, suits or proceedings in connection with matters entrusted to the Managers according to this Agreement.

**13.3** The Owners shall obtain legal or technical or other outside expert advice in relation to the handling and settlement of claims and disputes or all other matters affecting the interests respect of the Vessel.

**13.4** The Owners shall arrange for the provision of any necessary guarantee bond or other security.

**13.5** Any costs reasonably incurred by the Managers in carrying out their obligations according to Clause 13 shall be reimbursed by the Owners.

**14. Auditing**

The Managers shall at all times maintain and keep true and correct accounts and shall make the same available for inspection and auditing by the Owners at such times as may be mutually agreed. On the termination, for whatever reasons, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all such accounts and all documents specifically relating to the Vessel and her operation.

**15. Inspection of Vessel**

The Owners shall have the right at any time after giving reasonable notice to the Managers to

inspect the Vessel for any reason they consider necessary.

**16. Compliance with Laws and Regulations**

The Managers will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Vessel's flag, or of the places where she trades.

**17.    Duration of the Agreement**

This Agreement shall come into effect on the day and year stated in Box 4 and shall continue until the date stated in Box 17. Thereafter it shall continue until terminated by either party giving to the other notice in writing, in which event the Agreement shall terminate upon the expiration of a period of two months from the date upon which such notice was given.

**18.    Termination**

**18.1  Owners' Default**

(i) The Managers shall be entitled to terminate the Agreement with immediate effect by notice in writing if any moneys payable by the Owners under this Agreement and/or ~~the owners of any associated vessel, details of which are listed in Annex "D",~~ shall not have been received in the Managers' nominated account within ten running days of receipt by the Owners of the Manager's written request or if the Vessel is repossessed by the Mortgagees.

(ii) If the Owners:

(a)   fail to meet their obligations under clause 5.2 and 5.3 of this Agreement for any reason within their control, or

(b)   proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper,

The Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible. In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice in writing.

**18.2  Managers' Default**

If the Managers fail to meet their obligations under Clauses 3 and 4 of this Agreement for any reason within the control of the Managers, the Owners may give notice to the Managers of the default, requiring them to remedy it as soon as practically possible. In the event that the Managers fail to remedy it within a reasonable time to the satisfaction of the Owners, the Owners shall be entitled to terminate the Agreement with immediate effect by notice in writing.

**18.3  Extraordinary Termination**

This Agreement shall be deemed to be terminated in the case of the sale of the Vessel or if the Vessel becomes a total loss or is declared as a

D02410

644  constructive or compromised or arranged total
645  loss or is requisitioned.
646  **18.4** For the purpose of sub-clause 18.3 hereof
647      (i) the date upon which the Vessel is to be
648         treated as having been sold or otherwise
649         disposed of shall be the date on which the
650         Owners cease to be registered as Owners
651         of the Vessel;
652      (ii) the Vessel shall not be deemed to be lost
653         unless either she has become an actual
654         total loss or agreement has been reached
655         with her underwriters in respect of her
656         constructive, compromised or arranged
657         total loss or if such agreement with her
658         underwriters is not reached it is adjudged
659         by a competent tribunal that a
660         constructive loss of the Vessel has
661         occurred.
662  **18.5** This Agreement shall terminate forthwith in
663  the event of an order being made or resolution
664  passed for the winding up, dissolution, liquidation
665  or bankruptcy of either party (otherwise than for
666  the purpose of reconstruction or amalgamation)
667  or if a receiver is appointed, or it if suspends
668  payment, ceases to carry on business or makes
669  any special arrangement or composition with its
670  creditors.
671  **18.6** The termination of this Agreement shall be
672  without prejudice to all rights accrued due
673  between the parties prior to the date of
674  termination.
675  **19.  Law and Arbitration**
676  **19.1** This Agreement shall be governed by and
677  construed in accordance with English law and any
678  dispute arising out of or in connection with this
679  Agreement shall be referred to arbitration in
680  London in accordance with the Arbitration Act
681  1996 or any statutory modification or re-
682  enactment thereof save to the extent necessary
683  to give effect to the provisions of this Clause. The
684  arbitration shall be conducted in accordance with
685  the London Maritime Arbitrators Association
686  (LMAA) Terms current at the time when the
687  arbitration proceedings are commenced.
688  The reference shall be to three arbitrators. A
689  party wishing to refer a dispute to arbitration shall
690  appoint its arbitrator and send notice of such
691  appointment in writing to the other party
692  requiring , the other party to appoint its own
693  arbitrator within 14 calendar days of that notice
694  and stating that it will appoint its arbitrator as
695  sole arbitrator unless the other party appoints its
696  own arbitrator and gives notice that it has done so
697  within the 14 days specified. If the other party
698  does not appoint its own arbitrator and give
699  notice that it has done so within the 14 days
700  specified, the party referring a dispute to
701  arbitration may, without the requirement of any
702  further prior notice to the other party, appoint its
703  arbitrator as sole arbitrator and shall advise the
704  other party accordingly. The award of a sole
705  arbitrator shall be binding on both parties as if he
706  had been appointed by agreement.

707  Nothing herein shall prevent the parties agreeing
708  in writing to vary these provisions to provide for
709  the appointment of a sole arbitrator.
710  In cases where neither the claim nor any
711  counterclaim exceeds the sum of USD 50,000 (or
712  such other sum as the parties may agree) the
713  arbitration shall be conducted in accordance with
714  the LMAA Small Claims Procedure current at the
715  time when the arbitration proceedings are
716  commenced.
717  ~~**19.2** This Agreement shall be governed by and~~
718  ~~construed in accordance with Title 9 of the~~
719  ~~United States Code and the Maritime Law of the~~
720  ~~United States and any dispute arising out of or in~~
721  ~~connection with this Agreement shall be referred~~
722  ~~to three persons at New York, one to be~~
723  ~~appointed by each of the parties hereto, and the~~
724  ~~third by the two so chosen; their decision that of~~
725  ~~any two of them shall be final, and for the~~
726  ~~purposes of enforcing any award, judgment may~~
727  ~~be entered on an award by any court of~~
728  ~~competent jurisdiction. The proceedings shall be~~
729  ~~conducted in accordance with the rules of the~~
730  ~~Society of Maritime Arbitrators, Inc. In cases~~
731  ~~where neither the claim nor any counterclaim~~
732  ~~exceeds the sum of USD 50,000 (or such other~~
733  ~~sum as the parties may agree) the arbitration~~
734  ~~shall be conducted in accordance with the~~
735  ~~Shortened Arbitration Procedure of the Society~~
736  ~~of Maritime Arbitrators, Inc. current at the time~~
737  ~~when the arbitration proceedings are~~
738  ~~commenced.~~
739  **19.3** This Agreement shall be governed by and
740  construed in accordance with the laws of the
741  ~~place mutually agreed by the parties and any~~
742  ~~dispute arising out of or in connection with this~~
743  ~~Agreement shall be referred to arbitration at a~~
744  ~~mutually agreed place, subject to the procedures~~
745  ~~applicable there.~~
746  **19.4** If Box 18 in Part I is not appropriately filled
747  in, sub-clause 19.1 of this Clause shall apply.
748  Note: 19.1, 19.2 and 19.3 are alternatives;
749  indicate alternative agreed in Box 18.
750  **20.  Notices**
751  **20.1** Any notice to be given by either party to the
752  other party shall be in writing and may be sent
753  by fax, telex, registered or recorded mail or by
754  personal service.
755  **20.2** The address of the Parties for service of
756  such communication shall be as stated in Boxes
757  19 and 20, respectively.

D02411

ANNEX "A" (DETAILS OF VESSEL OR VESSELS) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| | |
|---|---|
| NAME OF VESSEL : | ADVANTAGE ARROW |
| OWNER: | ADVANTAGE ARROW SHIPPING LLC |
| IMO no: | 9419448 |
| Type: | Oil Tanker / Double Hull |
| Built: | 2009 - SAMSUNG HEAVY INDUSTRIES CO. LTD. KOJE, KOREA |
| Class: | Det Norske Veritas |
| Tonnage: | 61341 GT / 35396 NT |
| Deadweight: | 115804 mt |
| LOA: | 240,63 mtrs |
| Breadth: | 43,80 mtrs |
| Main Engine: | MAN B&W 6S60MC-C , 13560 kW @ 105 RPM |
| Auxilliary Boilers: | KANGRIM PB-25 25000 kg/hr 6/16 kg/cm2 |

ANNEX "B" (DETAILS OF CREW) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| | | |
|---|---|---|
| Date of Agreement | : | As mentioned in box 1 |
| Detail of Crew | : | 25 Crew Members in total |
| Contract Duration | : | abt 4 months Senior Officers |
| | | abt 5 -7 months Junior Officers, |
| | | abt 6 months Ratings |

| Numbers | Rank | Nationality |
|---|---|---|
| 1 | Master | Turkish |
| 1 | Chief Officer | Turkish |
| 1 | 2nd Officer | Turkish |
| 1 | 3rd Officer | Turkish |
| 1 | 4th Officer | Turkish |
| 1 | Extra Officer | Turkish |
| | | |
| 1 | Chief Engineer | Turkish |
| 1 | 2nd Engineer | Turkish |
| 1 | 3rd Engineer | Turkish |
| 1 | 4th Engineer | Turkish |
| 1 | Elect. Eng. | Turkish |
| | | |
| 1 | Pumpman | Turkish |
| 5 | Able Seaman | Turkish |
| 2 | Ordinary Seaman | Turkish |
| | | |
| | | |
| 1 | Fitter | Turkish |
| 3 | Oiler | Turkish |
| 1 | Chief Cook | Turkish |
| 1 | Steward | Turkish |

This complement is for standard trade. In case of Special requirements (STS, Storage etc.) the complement may be
adopted accordingly.

ANNEX "C" (BUDGET) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

Date of Agreement                     :          10 FEBRUARY 2015
Manager's Budget for the first year with the effect from the commencement date of this agreement:
Please refer to operating Expense budget with detailed break down of the operating expenses

Estimated budget for 2015 in USD for MT ADVANTAGE ARROW

|  | Budget In USD |
| --- | --- |
|  | Perday |
| Crewing | 4,400 |
| Victualing | 250 |
| Luboil | 500 |
| Technical | 1,000 |
| Insurance and other miscellaneous items | 1,100 |
| G&A - Inclusive of management fees | 1,000 |
| Total | 8,250 |

Remarks:
Crewing is based on complement of 25 crew members with Turkish officers & ratings.
Luboil based on 270 seagoing days and on today's prices.
Technical expenses include all costs for stores , spares services,class for engine and deck department
General include all costs for ; communication,represantations,travelling,vetting,transportation,ISM/ISPS,port expenses.
Excluding dry docking and related costs.

D02414

# EXHIBIT 7

Execution copy

USD64,000,000

## TERM LOAN FACILITY

Dated                                                            2015

(1)        The Companies listed in Schedule 1
                    as Borrowers

(2)        Advantage Tankers LLC
                    as Guarantor

arranged by

(3)        Norddeutsche Landesbank Girozentrale
                    as Arranger

with

(4)    The financial institutions listed in Schedule 1
                    as Lenders

(5)        Norddeutsche Landesbank Girozentrale
                    as Agent

(6)        Norddeutsche Landesbank Girozentrale
                    as Security Trustee

(7)        Norddeutsche Landesbank Girozentrale
                    as Swap Bank

---

## FACILITY AGREEMENT

relating to the financing of

MV "TRUE" (tbr "ADVANTAGE AVENUE") and MV "TARGET" (tbr "ADVANTAGE ARROW")

---

Ince & Co LLP
International House
1 St Katharine's Way
London, E1W 1AY
Tel: +44 20 7481 0010
Fax: +44 20 7481 4968

**"Advance"** means each of the TRUE Advance A, the TRUE Advance B, the TARGET Advance A and the TARGET Advance B being each borrowing (maximum of four (4)) of a proportion of the Total Commitments by the Borrowers or (as the context may require) the outstanding principal amount of such borrowing.

**"Affiliate"** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

**"Agent"** includes any person who may be appointed as agent under this Agreement.

**"Annex VI"** means Annex VI (Regulations for the Preventions of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

**"Approved Manager"** means Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (*Manager*).

**"Approved Valuer"** means any of the ship brokers included in the list set out in Schedule 9 or such other independent reputable ship broker in respect of the crude tanker market approved by the Lenders from time to time.

**"Assignment Agreement"** means an agreement substantially in the form set out in Schedule 7 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

**"Auditors"** means any firm approved in advance by the Lenders (such approval not to be unreasonably withheld or delayed).

**"Authorisation"** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

**"Availability Period"** means the period from and including the date of this Agreement to and including

(i) in respect of Loan A the earlier of:

(a)     31 March 2015 or such other date as the Agent, acting with the authorisation of the Lenders, may agree;

(b)     the Delivery Date of the second Vessel to be delivered; and

(c)     the date on which the Available Commitments are fully borrowed, cancelled or terminated

and (ii) in respect of Loan B the earlier of:

(a)     31 March 2015 or such other date as the Agent, acting with the authorisation of the Lenders, may agree; and

(b)     the date on which the Available Commitments are cancelled or terminated.

**"Available Commitment"** means a Lender's Commitment less (a) the amount of its participation in any outstanding Advance and (b) in relation to any proposed Utilisation, the

| Borrower: | Advantage Arrow Shipping LLC |
|---|---|
| Seller: | Target Shipping Ltd |
| Name: | 115,000 dwt oil tanker, built 2009 at Samsung Heavy Industries South Korea m.v. "TARGET" (tbr "ADVANTAGE ARROW") with IMO No 9419450 |
| Scheduled Delivery Date: | Tba |
| Date and description of MoA: | Memorandum of Agreement made or to be made between the Seller as seller and the Borrower as buyer |
| Contract Price: | USD37,750,000 |
| Vessel Commitment: | USD27,700,000 plus USD3,300,000 |
| Flag State: | Malta, to be reflagged to Marshall Islands |
| Charter description: | Time charter made or to be made between the Borrower and the Charterer for a term of five years commencing on or before the Utilisation Date at the Floor Rate plus any Additional Hire Payments. |
| Charterer: | Shell Western Supply and Trading of Barbados |
| Classification: | 115,000 dwt type crude oil tanker |
| Classification Society: | Det norske Veritas (DNV) |
| Technical Manager: | Genel Denizcilik |
| Commercial Manager: | Genel Denizcilik |
| Management Agreement: | Management Agreement dated made or to be made between the Technical Manager and the Commercial Manager as manager and the Borrower as owner |

# EXHIBIT 8

# GEDEN HOLDINGS LTD.

85 St.John's Street , Valletta . Malta

Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 14

Messrs.

PSARA ENERGY LIMITED

Ajeltake Road, Ajeltake Island

Majuro, MH 96960

Marshall Island

04. March. 2010

We hereby confirm that Geden Holdings Ltd., Malta is the Holding Company for all single purpose companies which owns one vessel each. The borrowers for the bank loans are SPCs, not Geden Holdings Ltd., Malta. Geden Holdings Ltd., Malta is the guarantor for the bank loans.

GEDEN HOLDINGS LTD of MALTA

# EXHIBIT 9


Enterprise Improvement


Corporate Turnaround and Restructuring


Financial Advisory Services


Information Management Services



AlixPartners
*When it really matters.*

Chicago   Dallas   Detroit   Düsseldorf   London   Los Angeles   Milan   Munich   New York   Paris   San Francisco   Shanghai   Tokyo   Washington, DC

# Project Hermitage
# Restructuring

March 6 2013



EXHIBIT
F

www.alixpartners.com

DEKABANK copy, March 6 2013

# Important Disclaimer

This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). THIS REPORT IS NOT INTENDED TO BE RELIED UPON BY ANYONE OTHER THAN THE COMPANY, OR INDUCE ACTION OR FORBEARANCE BY ANYONE OTHER THAN THE COMPANY. This Report is strictly confidential and subject to the confidentiality provisions of the Engagement Letter.

The addressee of the Report is the Company. The Report may be made available to the following lenders: HSH Nordbank AG, DVB SE, Dekabank, Commerzbank AG, Bremer Landesbank, Norddeutsche Landesbank, Lloyds TSB Bank Plc, Natixis, Santander (the "Lenders") on a strict non-reliance basis only and subject to the provisions of this disclaimer. By taking receipt of this Report, the Lenders accept and agree to the non-reliance limitation set forth in the preceding sentence and the other provisions in this disclaimer. No other person other than the Company and the Lenders is authorized to have access to this Report, unless he has received AlixPartners' prior written consent and has signed and returned to AlixPartners an acceptable non-reliance report letter.

Should any unauthorized person obtain access to and read this Report, such person accepts and agrees to the following terms:

1.  The unauthorized reader of this Report understands that the work performed by AlixPartners was performed in accordance with the instructions provided by the Company and was performed exclusively for the Company's sole benefit and internal use.

2.  The unauthorized reader of this Report acknowledges that this Report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of the unauthorized reader.

3.  The unauthorized reader agrees that AlixPartners, its partners, employees and agents neither owe nor accept any duty or responsibility to the unauthorized reader, whether in contract or in tort (including without limitation, negligence and breach of statutory duty), and shall not be liable in respect of any loss, damage or expense of whatsoever nature which is caused by any use the unauthorized reader may choose to make of this Report, or which is otherwise consequent upon the gaining of access to the Report by the unauthorized reader. Further, the unauthorized reader agrees that this Report is not to be referred to or quoted, in whole or in part, in any prospectus, registration statement, offering circular, public filing, loan, other agreement or document, and this Report is not to be distributed without AlixPartners prior written.

DEKABANK copy  March 6 2013

AlixPartners

# Important Disclaimer

The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company. AlixPartners further relied on the assurance of management and staff of the Company that they were unaware of any facts that would make the information provided to AlixPartners incomplete or misleading. In preparing the Report, AlixPartners has assumed, without any independent verification, the accuracy and completeness of all information received from the Company, available from public sources, or which was otherwise provided to us. AlixPartners is not responsible whatsoever for any misrepresentations made to AlixPartners during the course of its review. AlixPartners has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards.

Accordingly, AlixPartners cannot and does not express an opinion on the financial information and does not assume any responsibility for the accuracy or correctness of the projected financial or other data, information and assessments upon which the enclosed document is presented. AlixPartners expresses no view as to the accuracy, completeness or likelihood of the Company's business plan, scenarios, projections or forecasts contained in this Report.

The recipients of the Report, including the Lenders, accept that they will make their own investigation, analysis and decision relating to the possible or actual transaction/financing/credit relationship and/or matter related to such and will not use or rely upon this Report to form the basis of any such decisions. The Report cannot in any way serve as a substitute for inquiries and procedures which the Lenders will or should be undertaking for the purposes of satisfying themselves regarding the Client's business or financial position or for any other purpose in connection with the Lenders' relationship or transaction with the Client.

AlixPartners makes no representation or warranty regarding any actions the Lenders may or may not take in reliance on or in reference to matters presented in the Report. The Lenders accept and agree that AlixPartners, its affiliates, members, officers, partners, employees and agents (the "AlixPartners Entities") neither owe nor accept any duty or responsibility to the Lenders, whether in contract or in tort (including without limitation, negligence and breach of duty of any sort) or however otherwise arising. Any reliance the Lenders choose to place on the information or the Report is a matter of their judgment exclusively and at their own risk. Accordingly, no liability or responsibility whatsoever is accepted by the AlixPartners Entities for any loss howsoever arising from any use of, or in connection with, the Report.

The information in this Report is non-public and considered strictly confidential by the Company and AlixPartners.

AlixPartners

DEKABANK copy, March 6 2013

# Important Disclaimer

This Report includes analyses of the Company's financial projections. These projections may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro- or macro-economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial uncertainty. Such assumptions involve significant elements of subjective judgment, which may or may not prove to be accurate, and consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The report is incomplete without reference to, and should be viewed solely in connection with, the oral briefing provided by AlixPartners which forms part of the Report.

The information in the Report reflects conditions and the views of AlixPartners as of this date, all of which are subject to change. AlixPartners undertakes no obligation to update or provide any revisions to the Report to reflect events, circumstances or changes that occur after the date the Report was prepared.

To the extent that any of the AlixPartners Entities provide any recipient of this Report with an oral presentation or explanations in relation to the Report or Client, the recipient of this Report acknowledges that such presentation and explanation will be given subject to the same terms and conditions as those specified in this disclaimer.

Neither the Report nor any of its contents may be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document, with or without attribution to AlixPartners, at any time or in any manner other than for the internal use of the Company, without the express, prior written consent of AlixPartners.

AlixPartners

DEKABANK copy, March 8, 2013



# Contents

I. Executive Summary / Remarks from the Company

II. Background

III. Restructuring Proposal

IV. Financial Analysis

V. Conclusions

DEKABANK copy. March 6 2013

5

AlixPartners



I. Executive Summary

DEKABANK copy, March 6 2013

AlixPartners

# Executive Summary

DRAFT & PRIVILEGED

▸ The November 20 Proposal provides the basis for a formal or informal standstill period during which the Company can develop, negotiate and implement a structure providing a viable long term solution

▸ The November 20 Proposal has shown to be effective as an interim measure providing liquidity and stability to the Company but it is unlikely to provide a definitive solution. One significant obstacle to its long-term implementation is the transfer of cash flows away from banks towards charterers

▸ In considering alternatives for a financial restructuring, the Company sought to achieve the following key objectives:
  – Compensate stakeholders adequately for their risk-weighted capital exposure and concessions
  – Constrain cross subsidization between stakeholders related to different underlying assets
  – Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)
  – Maximize options for stakeholders and potential for self-selection

▸ A long term plan involves grouping and ringfencing assets according to their debt service capacity and sensitivity to a recovery in rates.

▸ This can be achieved by executing arms-length sale transactions of the [SPVs] at market value into appropriate newcos:
  a) Newco Alpha: up to 29 vessels (mostly Tanker operations) financed by "Hamburg" banks, Natixis, Credit Europe (including Second Lien), NSF Second Lien and Lloyds; Alpha to be partially recapitalized with new equity and financed through 5 different facilites
  b) Newco Beta: 4 vessels financed by CCB and CDB.
  c) Group C: GB Global, NSF (South and East)
  d) Group D: the remaining vessels, essentially comprised of Icon, Octavian, Stealth, FSL

DEKABANK copy, March 6 2013

AlixPartners



II. Background

DEKABANK copy, March 6 2013

AlixPartners



# Background
## The Market

▸ Neither the tanker nor the bulker market recovered through 2012 and vessel earnings have remained low
  – The tanker market has shown signs of firmness in Q1 2013 but there is little optimism for a sustained recovery before Q3 2013
  – The bulker market continues to be very weak and has performed slightly below the Nov 20 Business Plan forecast during Q1 2013

▸ Asset values have continued to deteriorate through the end of 2012. The latest levels as per Clarkson Research sustained decline to multiyear lows:
  – 5yr old VLCC, Aframax and Product tankers at $57m, $28m, and $22m
  – 5yr old Capesize, Panamax, and Handysize at $33m, $18m, and $16m





Source: Clarkson Research

9

AlixPartners

DEKABANK copy, March 6 2013



# Background
## The Company

▸ The Company has actively been managing its portfolio since 2008, mainly via:
  – The investment of c.$700m in equity along with $1.8B of bank and sale-leaseback (18) financing
  – The Sale of 12 vessels upon delivery for net proceeds of $136m
  – The Sale of 17 vessels operating within the fleet for net proceeds of $79m
  – The sale –leaseback of 18 vessels to finance $665m in deliveries of which 7 in 2013 ($171m)

▸ Earnings from vessels financed by banks have fallen $45m short of debt service in the period 2011-2012. Similarly, earnings from bareboat vessels have fallen $43m short of obligations in the period 2011-2012.

▸ In order to maintain minimum operational liquidity, the Company has instituted a moratorium during the first quarter including the following measures
  – Deferral of 100% from all lenders other than CCB and CDB who have already agreed to a debt rescheduling starting from Q4 2012
  – Deferral of some November and December 2012 principal repayments
  – Deferral of 35% of the bareboat hire payments
  – Refinancing of Royal via Credit Europe facility; Repayment of 2012 bank principal overdue [1]
  – Management of supplier overdue through the quarter

▸ While all stakeholders have reserved their rights, some specific stakeholder actions have affected the cash flows
  – Unicredit has drawn on its deposit accounts
  – Icon issued a lien notice to the charterers and has directly received charter income

▸ With above measures and actions, available cash is projected at only c.$23.8m including retention at the end of March and c.$7.5m in restricted cash deposits

---

[1] Does not include default interest, margin increases and bank fees

AlixPartners



# Company and Fleet Overview

## The Company – Recent Events

- Flash
    1. The Flash ran aground at the end of June and is currently arrested in Tunisia
    2. The customer has invoked damage of goods (wet coal) and has refused to take delivery
    3. 180 days have elapsed as of Feb 2013, potentially giving rise to a Constructive Total Loss on a hull coverage of $110m
    4. The claim has been rejected by the Club on the basis that the damage is to cargo
    5. An arbitrator is to be appointed week of Mar 4 2013

- Baytur
    1. Baytur is expected to be delivered in the first week of April for $13.6m in proceeds

- Royal Refinancing
    1. The Royal was refinanced through a $37.5m facility with Credit Europe
    2. Credit Europe has cross-collateralized its second lien on the Namrun and the Scope (behind Natixis) with a second mortgage on the Royal
    3. $10m has been paid to HSH and $10m is outstanding to the yard

AlixPartners

# Company and Fleet Overview

Employment, Tanker

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Tankers** | | | | | |
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
| 1 | MT AQUA | Aframax Tanker | 12,675 | CHEVRON | Apr-13 | - | 12,675 | Oct-13 | 6 |
| 2 | MT ACTION | Aframax Tanker | 12,706 | URSA SHIPPING | Mar-13 | - | 12,706 | May-13 | 2 |
| 3 | MT TARGET | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 4 | MT TRUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 5 | MT SPIKE | Aframax Tanker | 12,825 | URSA SHIPPING | Mar-13 | - | 12,825 | Oct-13 | 6 |
| 6 | MT AVOR | Aframax Tanker | 13,063 | URSA SHIPPING | Aug-13 | - | 13,063 | Feb-14 | 6 |
| 7 | MT VALUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 8 | MT BRAVO | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 9 | MT POWER | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 10 | MT PROFIT | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 11 | MT CENTER | Suezmax Tanker | 15,675 | NIDAS | Jun-13 | - | 19,500 | Jun-14 | 12 |
| 12 | MT BLUE | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 13 | MT PINK | Suezmax Tanker | 36,834 | GLENCORE | Jun-15 | - | 36,834 | Jun-15 | - |
| 14 | MT BLANK | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 15 | MT REEF | Suezmax Tanker | 37,080 | GLENCORE | Jul-15 | - | 37,080 | Jul-15 | - |
| 16 | MT HERO | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 17 | MT ROYAL | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 18 | MT ENJOY | Panamax Tanker | 13,825 | CSSA | Mar-14 | - | - | Mar-14 | - |
| 19 | MT MARKA | Panamax Tanker | 11,959 | Panamax International (P.I.) | Jun-13 | - | 12,925 | Dec-13 | 6 |
| 20 | MT CITRON | MR Pro/Chem Tanker | 13,380 | SHELL | May-13 | - | 13,380 | Jul-13 | 2 |
| 21 | MT CITRUS | MR Pro/Chem Tanker | 13,380 | SHELL | Jul-13 | - | 13,380 | Sep-13 | 2 |
| 22 | MT ACOR | Ice Class Pro/Chem Tanker | 11,700 | NORDEN | Apr-13 | - | - | May-13 | 1 |
| 23 | MT CARRY | Ice Class Pro/Chem Tanker | 11,150 | NORDEN | Aug-13 | - | - | Sep-13 | 1 |
| 24 | MT ROVA | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 25 | MT COTTON | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 26 | MT CARGO | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | May-13 | - | - | Apr-13 | 1 |
| 27 | MT ROCK | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Mar-13 | - | - | Apr-13 | 1 |
| 28 | MT ROCKET | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Jun-13 | - | - | Jul-13 | 1 |

DEKABANK copy, March 6 2013

AlixPartners



DRAFT - PRELIMINARY

# Company and Fleet Overview

Employment, Bulk

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Bulkers** | | | | | | | | | |
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
| 31 | MV SCOPE | Capesize Bulk Carrier | 10,000 | SWISS MARINE | Oct-13 | - | - | - | May-14 | 7 |
| 32 | MV FLASH | Capesize Bulk Carrier | | ARRESTED | | - | - | - | Jan-00 | - |
| 33 | MV PROUD | Capesize Bulk Carrier | 56,000 | COSCO | Jun-14 | - | - | - | Jun-14 | - |
| 34 | MV ANGEL | Capesize Bulk Carrier | 4,533 | SWISS MARINE | Mar-13 | - | - | - | Mar-13 | - |
| 35 | MV PRETTY | Capesize Bulk Carrier | 7,600 | SWISS MARINE | Feb-13 | - | - | - | May-13 | 3 |
| 36 | MV CASH | Kamsarmax Bulk Carrier | | N/A | | - | - | - | Jan-00 | - |
| 37 | MV COLLECTION | Kamsarmax Bulk Carrier | | N/A | - | | - | - | Jan-00 | - |
| 38 | MV CITY | Kamsarmax Bulk Carrier | | N/A | | - | - | - | Jan-00 | - |
| 39 | MV ASIA | Supramax Bulk Carrier | 7,014 | SUPREME BULK CARRIERS | Jan-13 | - | - | 7,014 | Apr-13 | 3 |
| 40 | MV FANTASTIC | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | | - | - | 6,978 | Apr-13 | 3 |
| 41 | MV AMAZING | Supramax Bulk Carrier | 7,267 | SUPREME BULK CARRIERS | Feb-13 | - | - | 7,267 | May-13 | 3 |
| 42 | MV TARSUS | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | May-13 | - | - | 6,978 | Jul-13 | 2 |
| 43 | MV SPOT | Supramax Bulk Carrier | 10,925 | COPA | Feb-13 | - | - | - | Feb-13 | - |
| 44 | MV CLEAR | Supramax Bulk Carrier | 5,850 | Denmar Chartering & Trading GMBH Hamburg, Germany | May-13 | - | - | 5,850 | May-13 | - |
| 45 | MV NAMRUN | Supramax Bulk Carrier | 7,256 | SUPREME BULK CARRIERS | Jan-13 | - | - | 7,256 | Apr-13 | 3 |
| 46 | MV BAYTUR | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | - | 6,978 | Apr-13 | 3 |
| 47 | MV SOUTH | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | - | 6,978 | Apr-13 | 3 |
| 48 | MV EAST | Supramax Bulk Carrier | 8,422 | WORLDWIDE INVESTMENT | Feb-13 | - | - | 8,422 | Feb-13 | - |
| 49 | MV WEST | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Jan-13 | - | - | 7,219 | Apr-13 | 3 |
| 50 | MV SECRET | Supramax Bulk Carrier | 8,422 | SUPREME BULK CARRIERS | Jan-13 | - | - | 8,422 | Apr-13 | 3 |
| 51 | MV SHARP | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | - | Jan-00 | 2 |
| 52 | MV CAPITAL | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | - | Jan-00 | 2 |
| 53 | MV METROPOL | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Mar-13 | - | - | - | Jan-00 | - |
| 54 | MV WORLD | Supramax Bulk Carrier | 8,265 | SIVA BULK | Apr-13 | - | - | 8,265 | Jul-13 | - |
| 55 | MV EARTH | Mini Bulk Carrier | | On Spot | | - | - | - | Jan-00 | - |
| 56 | MV WIND | Mini Bulk Carrier | | On Spot | | - | - | - | Jan-00 | - |
| 29 | MT CV STEALTH | Aframax Tanker | 11,700 | PT Armada | Mar-13 | - | - | 11,700 | Apr-13 | 1 |
| 30 | MT CS STEALTH | Aframax Tanker | 12,255 | Petrovietnam Transport Corp | Mar-13 | - | - | 12,255 | Mar-13 | - |

DEK - BANK copy March 5 2013

AlixPartners



III. Restructuring Proposal

DEKABANK copy, March 6 2013

14

AlixPartners



# Restructuring Proposal
## Key Assumptions

▸ Key assumptions under the Plan include
  - All ships sold **at minimum of market value or value of loan** and on an arms-length basis.
  - There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa - type jurisdictions)
  - Stakeholders in groups **C and D will have the option to move into A** subject to loan modifications adhering to the conditions prevalent in that entity.
  - Stakeholders in **C and D can have their vessels redelivered** subject to acceptable terms for termination.

▸ The Company would prefer a coordinated financing approach in Newco

▸ The Second Lien debt relating to NSF and Credit Europe is transferred/novated upon the sale. There may be an opportunity to renegotiate terms of mezzanine debt (NSF, Credit Europe) as part of the sale but it has not been contemplated here

▸ Deposits related to facilities (Unicredit, Profit, etc.) are netted the outstanding loan amounts; the loans are reconstituted after the transaction and the deposits are eliminated

DEKABANK copy, March 8 2013

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco A
## Newco A Example

▸ **Newco Alpha:** Intended to form a viable standalone entity of up to 29 vessels (21 Tanker and 8 Bulker) in which the quality of vessel earnings would enable limited deferrals compared to those required in the November 20 proposal; New equity provided in the transaction to reduce total bank exposure and improve LTV coverage ratio for the majority of the facilities

▸ **Assumptions : 1)** Sale of ships at market value from Olco to Newco **2)** Equity to fund any shortfall in collateral in Oldco **3)** New bank financing in Newco provided at 95% LTV **4)** New Equity in Newco as required for 95% LTV.



Note: Indicative transaction structure subject to legal due diligence
(1) Equity of $1.1m also as a result of transfer of Namrun at value greater than senior debt
(2) $52.6m financed in excess of market value of assets

16

AlixPartners

# Plan B – Split of Fleet via Newco: Alpha

## Structuring: Facility #1

▸ **Facility#1:** Newco Alpha financing at 95% LTV, LIBOR +3% on a 15 year loan profile from delivery date based 20 year working life minus 5 years. Pro Forma debt in Facility#1 includes second liens behind Natixis related to Credit Europe ($16.1m)

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan [1] | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FACILITY #1 | | Hamburg banks paid down to 95% LTV including any current shortfalls | | | | | | | | | |
| Aframax | NLB | Target | 99% | 95% | 28.7 | 29.0 | 0.3 | 1.5 | 1.5 | 0.3 | 27.6 |
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | (2.4) | 1.6 | 4.0 | 0.0 | 29.5 |
| Aframax | Unicredit | Value | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Bravo | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Power | 97% | 95% | 31.9 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |
| Suezmax | CB NLB BrLB | Blue | 99% | 95% | 40.5 | 41.0 | 0.5 | 2.1 | 2.1 | 0.5 | 39.0 |
| Suezmax | HSH 1 | Hero | 99% | 95% | 48.5 | 49.0 | 0.5 | 2.5 | 2.5 | 0.5 | 46.6 |
| MR | HSH 2 | Citron | 107% | 95% | 22.5 | 21.0 | (1.5) | 1.1 | 2.6 | 0.0 | 20.0 |
| MR | HSH 2 | Citrus | 107% | 95% | 23.6 | 22.0 | (1.6) | 1.1 | 2.7 | 0.0 | 20.9 |
| Handy | DVB NLB SAN | Acor | 96% | 95% | 20.1 | 21.0 | 0.9 | 1.1 | 1.1 | 0.9 | 20.0 |
| Handy | DVB NLB SAN | Carry | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB SAN | Rova | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cotton | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cargo | 91% | 95% | 21.0 | 23.0 | 2.0 | 1.2 | 1.2 | 2.0 | 21.9 |
| Handy | DVB NLB | Rock | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handy | DVB NLB | Rocket | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handymax | DVB | Asia | 102% | 95% | 19.4 | 19.0 | (0.4) | 1.0 | 1.3 | 0.0 | 18.1 |
| Mini Bulker | DVB | Earth | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| Mini Bulker | DVB | Wind | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Subtotal Facility #1** | | **20** | **99%** | **95%** | **504.7** [1] | **511.0** | **(5.9)** [2] | **25.6** | **31.5** [3] | **12.2** | **485.5** |

[1] To be adjusted for repayments before closing of the transaction (figures do not include principal repayments made week ending Feb 22)

[2] Represents sum of shortfall only

[3] Total amount of equity related to sale / purchase of vessels in Facility #1

[4] $4.1m related to excess collateral in Unicredit facility could be eliminated and repaid/refinanced through NSF 2nd Lien

DEKABANK copy, March 8 2013

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

## Structuring – Example #1

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | 2.4 | 1.6 | 4.0 | 0.0 | 29.5 |

1. True is sold from Oldco to Newco Alpha at market value $31m (B)
2. Any shortfall against the mortgage is funded by $2.4m new equity (C) and the whole of the Oldco debt is paid down. If there is value above the mortgage, the excess cash remains in Oldco
3. NLB and New Equity recapitalize Newco at a maximum of 95% LTV; NLB has reduced its exposure by $3.9m and improved LTV by 13%



Note: Indicative transaction structure subject to legal due diligence

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

## Structuring – Example #2

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |

1. Profit is sold from Oldco to Newco Alpha at $41m market value (B)
2. If there is value above the mortgage, the <u>excess cash remains in Oldco (C)</u>. Any shortfall would need to be funded via additional equity
3. DVB and New Equity recapitalize Newco at maximum of 95% LTV; NLB has reduced its exposure by $0.4m and improved LTV by 1%



DEKABANK copy. March 6 2013

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha
## Structuring

- Facility#2: Lloyds vessels sold and refinancing provided on the same terms
- Facility#3: Natixis vessels sold and refinancing provided on the same terms; Namrun facility extended and ship potentially sold in 2-3 yrs
- Facility#4: Credit Europe sold and refinancing provided on the same terms
- Facility#5: Dekabank vessels sold and refinancing provided on PAYC basis and no covenants
- Facility#6: NSF Second Lien behind Unicredit on the same terms

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #2** | **Lloyds facility rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |
| Suezmax | Lloyds | Blank | 68% | 68% | 32.2 | 47.0 | 14.8 | 14.8 | 14.8 | 14.8 | 32.2 |
| Suezmax | Lloyds | Reef | 75% | 75% | 34.6 | 46.0 | 11.4 | 11.4 | 11.4 | 11.4 | 34.6 |
| **FACILITY #3** | **Natixis facilities rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Capesize | Natixis 1 | Scope | 87% | 87% | 23.4 | 27.0 | n/a | n/a | n/a | n/a | 23.4 |
| Handymax | Natixis 2 | Namrun | 88% | 88% | 14.0 | 16.0 | n/a | n/a | n/a | n/a | 14.0 [2] |
| **FACILITY #4** | **Loan includes $37.5m new refinancing from Credit Europe plus $16.1m 2nd priority loans relating to the Scope and the Namrun** | | | | | | | | | | |
| Suezmax | Credit Europe | Royal | 107% [1] | 107% | 53.6 | 50.0 | n/a | n/a | 0.0 | 0.0 | 53.6 |
| **FACILITY #5** | **Deka facility rolled over into Newco but paid only from available cash from these vessels** | | | | | | | | | | |
| Handymax | Deka | Tarsus | 133% | 133% | 24.0 | 18.0 | n/a | n/a | n/a | n/a | 24.0 |
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| Handymax | Deka | Clear | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| **FACILITY #6** | **NSF 2nd Lien facilities** | | | | | | | | | | |
| | | | n/a | n/a | 25.5 | n/a | | | | | 25.5 |
| **TOTAL Newco Alpha** | | | **29** | **97%** | **95%** | **799.3** | **795.0** | **(5.9)** [3] | **58.5** | **64.4** | **44.6** | **784.0** |

MV of Newco Alpha Assets

Total Capital required

New Alpha debt

(1) Royal refinancing includes second lien ; LTV on first lien is 75%
(2) Equity value from the rollover of the Namrun loan on $16m in MV; equity not retained by Oldco due to 2nd Lien by Credit Europe
(3) Represents sum of shortfall only

20

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #3

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|------|----------|------|-------------|---------------|------|------|------|------|------|------|------|
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |

1. Pink is sold from Oldco to Newco Alpha at market value (B)
2. The excess cash over the mortgage value remains in Oldco (C)
3. Lloyds and New Equity recapitalize Newco at a maximum of 95% LTV; Given that coverage is lower than 95% (85%,) <u>no new equity is required upon refinancing of Newco with $37.3m in debt</u>



DEKABANK copy, March 5 2013



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #4



| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | | 0.0 | 0.0 | 0.0 | 25.0 |

1. Spot is sold from Oldco to Newco Alpha at $25m being equivalent to outstanding loans
2. Loans are novated to Newco
3. Loans are paid out of available cash on the vessel only

> Amount of loan novated is beyond market value at the time of the transaction; no recapitalization



Note: indicative transaction structure subject to legal due diligence

DEKABANK copy March 6 2013

AlixPartners

DRAFT – FOR DISCUSSION

# Plan B – Split of Fleet via Newco: Alpha
## Structuring – Sources and Uses, Pro Forma Balance Sheet

| Sources | | Uses | |
|---|---:|---|---:|
| New equity [1] | 64.4 | Purchase of assets | 784.0 |
| New financing | 784.0 | Net bank debt paydown | 19.3 |
| | | Equity to cover collateral shortfall and excess value | 45.1 |
| **Total Sources** | **$848.4** | **Total Uses** | **$848.4** |

[1] Does not include additional liquidity for operational cash

DEKABANK copy. March 6 2013

AlixPartners



DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Beta

Structuring

▸ **Newco Beta:** Contains 4 Bulkers financed by Chinese banks. These are considerably under water yet they must be offered attractive terms given that the Chinese banks benefit from a Corporate Guarantee.

▸ **Assumptions :** Loans novated to Newco Beta on existing terms. **Subject to an appropriate rescheduling of obligations we do not envisage equity being required for Newco Beta.**

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Capesize | CCB | Flash | 100% | 100% | 33.1 | 33.0 |
| Capesize | CCB | Proud | 100% | 100% | 33.1 | 33.0 |
| Capesize | CDB | Angel | 119% | 119% | 43.0 | 36.0 |
| Capesize | CDB | Pretty | 125% | 125% | 45.1 | 36.0 |
| **Total Newco Beta** | | **4** | **112%** | **112%** | **154.3** | **138.0** |

DEKABANK copy. March 6 2013

AlixPartners



## Plan B – Split of Fleet via Newco: Group C
Structuring

▸ **Group C:** Contains 11 Bulkers financed by GB Global as well as the NSF-financed vessels.

▸ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Subject to adequate concessions, facilities could opt into Newco Alpha or desist from participation and take ships back

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Kamsarmax | GB Global | Cash | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | Coll./Chance | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | City | 96% | 96% | 26.0 | 27.0 |
| Handymax | NSF | South | 84% | 84% | 19.3 | 23.0 |
| Handymax | NSF | East | 84% | 84% | 19.3 | 23.0 |
| Handymax | GB Global | West | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Secret | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Sharp | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Capital | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Metropol | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | World | 103% | 103% | 23.7 | 23.0 |
| **Total Group C** | | **11** | **98%** | **98%** | **258.8** | **265.0** |

DEKA BANK copy, March 8 20

AlixPartners



# Plan B – Split of Fleet: Residual Oldco: Group D
## Structuring

▸ **Group D, Geden Oldco:** 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable. Baytur will be sold April 2013.

▸ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Proceeds from the sale to Newco Alpha would provide liquidity to pay down payables.

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan (PV of leases) | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Aframax | FSL | Aqua | 234% | 234% | 60.8 | 26.0 |
| Aframax | FSL | Action | 234% | 234% | 60.8 | 26.0 |
| Aframax | Stealth | Spike | 177% | 177% | 55.0 | 31.0 |
| Aframax | Stealth | Avor | 176% | 176% | 54.5 | 31.0 |
| Suezmax | Icon 1 | Center | 145% | 145% | 67.9 | 47.0 |
| Panamax | Octavian 1 | Enjoy | 141% | 141% | 42.2 | 30.0 |
| Panamax | Octavian 2 | Marka | 128% | 128% | 41.0 | 32.0 |
| Handymax | Icon 2 | Fantastic | 157% | 157% | 29.9 | 19.0 |
| Handymax | Icon 2 | Amazing | 157% | 157% | 29.9 | 19.0 |
| Chartered - Afra_Tanker | not ours | CV Stealth | | | | |
| Chartered - Afra_Tanker | not ours | CS Stealth | | | | |
| Subtotal SPVs | | 11 (1) | 169% | 169% | 441.9 | 261.0 |
| Corporate facility | Bank Asya | | | | 39.5 | |
| Total Group D | | | | | 481.4 | |

(1) Baytur sold before the transaction

DEKABANK copy, March 2013

26

AlixPartners

DRAFT

# Plan B – Summary

Bank Exposure: By Facility

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 60.0 | 62.1 | 104% | 57.0 | 95% | (5.1) | -9% |
| HSH 2 | 43.0 | 46.1 | 107% | 40.9 | 95% | (5.3) | -12% |
| DVB | 25.0 | 25.3 | 101% | 23.8 | 95% | (1.5) | -6% |
| CB NLB BrLB | 41.0 | 40.5 | 99% | 39.0 | 95% | (1.5) | -4% |
| DVB NLB SAN | 63.0 | 62.1 | 99% | 59.9 | 95% | (2.3) | -4% |
| HSH 1 | 49.0 | 48.5 | 99% | 46.6 | 95% | (2.0) | -4% |
| DVB NLB | 131.0 | 125.2 | 96% | 124.5 | 95% | (0.8) | -1% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 38.5 | 84% | 38.5 | 84% | 0.0 | 0% |
| Natixis 1 | 27.0 | 23.4 | 87% | 23.4 | 87% | 0.0 | 0% |
| Natixis 2 | 16.0 | 14.0 | 88% | 14.0 | 88% | 0.0 | 0% |
| Octavian 2 | 32.0 | 41.0 | 128% | 41.0 | 128% | 0.0 | 0% |
| Octavian 1 | 30.0 | 42.2 | 141% | 42.2 | 141% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon 1 | 47.0 | 67.9 | 145% | 67.9 | 145% | 0.0 | 0% |
| Icon 2 | 38.0 | 59.7 | 157% | 59.7 | 157% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,628.8** | **112%** | **1,609.5** | **110%** | **(19.3)** | **-1%** |

DEKABANK copy. March 6 2012

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Summary

Bank Exposure: By Bank

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 170.1 | 168.8 | 99% | 161.6 | 95% | (7.1) | -4% |
| DVB | 106.3 | 103.4 | 97% | 100.9 | 95% | (2.5) | -2% |
| Commerzbank | 14.8 | 14.6 | 99% | 14.0 | 95% | (0.6) | -4% |
| BrLB | 13.1 | 13.0 | 99% | 12.5 | 95% | (0.5) | -4% |
| Santander | 23.8 | 22.5 | 95% | 22.0 | 93% | (0.6) | -2% |
| HSH | 92.0 | 94.6 | 103% | 87.4 | 95% | (7.2) | -8% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,635.0** | **112%** | **(19.3)** | **-1%** |

DEKABANK copy, March 6 2013

28

AlixPartners



IV. Financial Analysis

DEKABANK copy, March 6 2013

AlixPartners



# Assumptions
## General

▸ Business plan is based on the following main assumptions:

### Operations

— 20 offhire days for drydocking
— Rates applied to reflect type of vessel, adjusted for contract terms

— Charter-out options exercised if below market rate
— No Opex inflation
— No working capital movements

### Investments

— Dry docking taken from technical management schedule
— No asset sales
— Capex as per financing commitments

— Charter-in come off upon expiry
— Purchase obligations resold at loss/gain equal to current differential between market value and financial obligation

### Financing

— No variation in current base rate
— Margins as per specific facilities (following pages)
— Amortization as per specific facilities
— No interest rate swap

— Refinancing of Royal providing $27.5m net liquidity post HSH repayment and before any repayment to yard ($10m)
— Extension of Namrun on same terms upon Nov-13 maturity; likely to be sold within 2-3 years

### Restructuring

— No mechanism for bareboat catch-up
— Bareboat purchase options not exercised

— No restructuring fees
— All bank deferrals assumed to take on new profile or bullet repayment (no assumption on bareboat deferrals)

DEKABANK copy, March 6 2013

AlixPartners

DRAFT PRELIMINARY

## Assumptions
Rates

▸ The Company's market projections imply CAGR increases of 8-11% for the majority of the fleet:

| $/day | 2013 | 2014 | 2015 | 2016 | 2017 | CAGR (12-17) |
|---|---|---|---|---|---|---|
| Aframax Tanker | 14,000 | 14,000 | 17,500 | 19,000 | 21,000 | 8% |
| Suezmax Tanker | 15,000 | 15,000 | 22,000 | 24,000 | 24,000 | 8% |
| Panamax Tanker | 13,500 | 13,500 | 14,500 | 17,500 | 17,500 | 5% |
| MR Pro/Chem Tanker | 13,000 | 13,000 | 15,000 | 15,000 | 15,000 | 3% |
| Ice Class Pro/Chem Tanker | 12,500 | 12,500 | 14,000 | 14,000 | 14,000 | 3% |
| Capesize Bulk Carrier | 15,000 | 17,500 | 20,000 | 22,000 | 22,000 | 11% |
| Kamsarmax Bulk Carrier | 12,500 | 15,000 | 15,000 | 20,000 | 20,000 | 15% |
| Supramax Bulk Carrier | 10,000 | 11,000 | 15,000 | 17,500 | 17,500 | 17% |
| Mini Bulk Carrier | 5,000 | 6,000 | 7,000 | 8,000 | 8,000 | 15% |

▸ The actual revenue increase accruing to the fleet through the projection differs as a result of the exercise of charter options and the JV structure on certain vessels (mainly Shell). Revenue CAGR through the period is 6.6%



Total Fleet Revenue by quarter ($m)

DEKABANK Copy March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

| NewCoAlpha #1 | Terms |
|---|---|
| Senior Facilities | - NLB, Uni, DVB NLB, CB NLB BrLB, HSH1, HSH2, DVB NLB SAN, DVB NLB, DVB |
| Amount | - $485.5m ($504.7m outstanding pre-transaction) |
| Interest | - Base Rate: LIBOR<br>- Margin: 300bps w/ potential step-up based on prevalent rates |
| Amortization | - 9-month grace period<br>- Straight line profile based on first 15 years of vessel life<br>- 5 year maturity |
| Covenants | - 95% LTV at close<br>- 85% in Q4 14; 80% in Q4 15 |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts |

| NewCoAlpha #2 | Terms |
|---|---|
| Senior Facilities | - Lloyds |
| Amount | - $104.1m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin: No change (300bps) |
| Amortization | - Current profile<br>- Elimination of cash sweep |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #3 | Terms |
|---|---|
| Senior Facilities | - Natixis |
| Amount | - $37.4m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Scope: 160bps<br>- Margin Namrun: 120bbps<br>- 300bps starting with refinancing of Namrun |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

| NewCoAlpha #4 | Terms |
|---|---|
| Senior Facilities | - Credit Europe 1st and 2nd Lien on Royal, Namrun, Scope |
| Amount | - $53.6m ($37.5m 1st plus $16.1m 2nd) |
| Interest | - Base Rate: n/a<br>- Interest Royal 1st Lien : 800bps<br>- Interest 2nd Lien: 1,000bps |
| Amortization | - Current profile |
| Covenants | - 2 year grace and 5 year profile |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #6 | Terms |
|---|---|
| Senior Facilities | - NSF 2nd Lien (behind Unicredit) |
| Amount | - $25.5m (no change) |
| Interest | - Base Rate: n/a<br>- Fixed Margin: 1,150bps |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - 2nd Mortgages with possibility of additional 2nd priority mortgages on entire facilities |
| Other | - n/a |

| NewCoAlpha #5 | Terms |
|---|---|
| Senior Facilities | - Dekabank |
| Amount | - $74.0 (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Tarsus: 245bps<br>- Margin Spot: 185bps<br>- Margin Clear: 245bps |
| Amortization | - Amortisation on a cash/pay-as-you-can basis from vessel earnings |
| Covenants | - Suspended |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts<br>- Coordination agreement prohibiting recourse to the remainder of the group |

DEKABANK Copy, March 6 2013

33

AlixPartners

# Financial Analysis

Summary of Terms: Newco Alpha

---

‣ The below tables summarises the features of debt on Newco Alpha



Note: surface area represents percentage share of total facility

DEKABANK copy. March 6 2013

AlixPartners

# Financial Analysis
## Newco Alpha Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 36.0 | 35.5 | 36.2 | 37.2 | 37.9 | 37.5 | 44.7 | 44.8 | 42.9 | 42.7 |
| OPEX | - | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) |
| Drydock | - | (0.4) | (1.0) | (0.5) | - | (0.9) | (0.8) | (0.9) | (1.8) | (0.9) | - |
| **EBITDA** | - | 18.7 | 17.8 | 19.1 | 20.3 | 20.0 | 19.9 | 27.2 | 26.1 | 25.1 | 26.0 |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 18.7 | 17.8 | 19.1 | 20.3 | 20.0 | 19.9 | 27.2 | 26.1 | 25.1 | 26.0 |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | 74.4 | - | - | - | - | - | - | - | - | - |
| Bank Interest (Senior) | - | (6.9) | (6.9) | (6.8) | (6.8) | (6.6) | (6.4) | (6.2) | (6.0) | (5.9) | (5.7) |
| Bank Principal Repayments [1] | - | - | (4.5) | (4.5) | (15.5) | (18.3) | (18.3) | (19.0) | (19.3) | (19.4) | (19.4) |
| NSF Interest (2nd lien) | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | 66.7 | (12.2) | (12.1) | (23.0) | (25.6) | (25.4) | (26.0) | (26.1) | (26.0) | (25.9) |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | | | | | | | | | | | |
| Asset Purchases [2] | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net cashflow for period** | - | 21.0 | 5.6 | 7.1 | (2.7) | (5.6) | (5.5) | 1.2 | 0.0 | (1.0) | 0.1 |
| **Cumulative net cash balance** | - | 20.8 | 26.4 | 33.5 | 30.7 | 25.1 | 19.6 | 20.8 | 20.8 | 19.9 | 20.0 |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| Senior Debt Balance | - | (754.5) | (754.5) | (750.0) | (745.5) | (730.0) | (711.7) | (693.4) | (674.4) | (655.1) | (635.6) |
| NSF 2nd lien Balance | - | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 0.00x | 10.44x | 10.96x | 10.13x | 9.49x | 9.44x | 9.26x | 6.60x | 6.70x | 6.79x | 6.36x |
| Hamburg Jumbo Facility LTV | | 95% | 96% | 97% | 98% | 97% | 96% | 95% | 94% | 93% | 92% |
| Hamburg Jumbo Value (depreciated) | | 511.0 | 504.7 | 498.5 | 492.2 | 485.9 | 479.6 | 473.4 | 467.1 | 460.8 | 454.5 |
| Vessels | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

[1] 9 months principal deferral on the Jumbo facility would be necessary to establish minimum liquidity requirements. Shortfall in absence of this shown above.
[2] Asset purchases net of new financing
[3] Equity cure for 85% covenant in Q4 14 and 80% for Q4 16
[4] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners
DEKABANK copy. March 6 2013

# Financial Analysis
## Summary of Terms: Newco Beta

▸ The below tables summarises the features of debt on Newco Beta

| NewCo Beta: | Terms |
|---|---|
| Senior Facilities | - CCB, CDB |
| Amount | - $154.3m (no change) |
| Interest | - No change to existing agreements |
| Amortization | - No change to existing agreements |
| Covenants | - No change to existing agreements |
| Security | - No change to existing agreements |
| Other | - n/a |

DEKABANK copy, March 8 2013

AlixPartners

# Financial Analysis
## Newco Beta Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 9.3 | 9.2 | 9.4 | 8.8 | 6.4 | 6.4 | 7.2 | 7.4 | 7.4 | 7.3 |
| OPEX | - | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Drydock | - | - | - | (0.9) | (0.9) | - | - | - | - | - | - |
| **EBITDA** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | - | (1.3) | (1.3) | (1.2) | (1.2) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (0.9) |
| Bank Principal Repayments | - | (6.1) | (6.1) | (6.1) | (6.4) | (6.4) | (6.4) | (6.4) | (6.4) | (3.4) | (3.4) |
| Bareboat Payments | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | (7.4) | (7.4) | (7.3) | (7.6) | (7.6) | (7.5) | (7.4) | (7.4) | (4.4) | (4.4) |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | (0.4) | (0.4) | (0.9) | (1.8) | (3.3) | (3.3) | (2.4) | (2.3) | 0.8 | 0.7 |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | (0.4) | (0.8) | (1.7) | (3.5) | (6.8) | (10.2) | (12.6) | (14.8) | (14.1) | (13.3) |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Debt Balance* | - | (161.3) | (155.2) | (149.0) | (142.9) | (136.5) | (130.0) | (123.6) | (117.2) | (110.8) | (107.3) |
| *Bareboat balance* | - | - | - | - | - | - | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 0.00x | 5.69x | 5.54x | 5.82x | 6.20x | 8.06x | 7.77x | 6.13x | 5.69x | 5.37x | 5.27x |
| Loan to value | 0% | 118% | 115% | 111% | 108% | 104% | 100% | 96% | 92% | 88% | 86% |
| Value (depreciated) | 138.0 | 136.7 | 135.4 | 134.1 | 132.8 | 131.4 | 130.1 | 128.8 | 127.5 | 126.2 | 124.9 |
| Vessels | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

[1] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

DEKABANK copy. March 6 2013

AlixPartners

# Financial Analysis

## Geden Oldco Quarterly Cashflow

| | Q1-13 | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | | |
| Income | 64.9 | 59.0 | 24.3 | 24.3 | 25.5 | 26.3 | 25.9 | 25.6 | 31.6 | 32.3 | 29.0 | 28.8 |
| OPEX | (29.8) | (28.9) | (12.5) | (12.4) | (12.3) | (12.5) | (12.5) | (12.4) | (12.3) | (12.5) | (11.4) | (11.0) |
| Drydock | (0.4) | (0.8) | - | - | (0.5) | - | - | - | - | (0.7) | (1.3) | - |
| **EBITDA** | **34.7** | **29.3** | **11.8** | **11.9** | **12.7** | **13.7** | **13.3** | **13.2** | **19.3** | **19.1** | **16.3** | **17.7** |
| Working capital changes [1] | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | **34.7** | **29.3** | **11.8** | **11.9** | **12.7** | **13.7** | **13.3** | **13.2** | **19.3** | **19.1** | **16.3** | **17.7** |
| | | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | (10.6) | (9.8) | - | - | - | - | - | - | - | - | - | - |
| Bank Principal Repayments | (23.8) | (29.9) | (39.5) | - | - | - | - | - | - | - | - | - |
| Bareboat Payments | (17.8) | (19.8) | (20.8) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| Pre-Del Drawdown | 45.0 | 8.5 | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | 119.3 | 25.3 | 25.3 | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | (57.9) | (12.2) | (13.2) | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | **54.0** | **(38.0)** | **(48.2)** | **(20.8)** | **(20.4)** | **(20.6)** | **(20.7)** | **(20.7)** | **(20.3)** | **(20.5)** | **(18.6)** | **(18.6)** |
| | | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | | |
| Capex | (82.7) | (42.3) | - | - | - | - | - | - | - | - | (23.9) [2] | - |
| Asset Sale net proceeds | - | 5.5 | 44.6 | - | - | - | - | - | - | - | - | - |
| **Net Investment** | **(82.7)** | **(36.8)** | **44.6** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(23.9)** | **-** |
| | | | | | | | | | | | | |
| **Net cashflow for period** | **6.0** | **(45.5)** | **8.2** | **(8.9)** | **(7.7)** | **(6.9)** | **(7.4)** | **(7.6)** | **(0.9)** | **(1.4)** | **(26.2)** | **(0.8)** |
| | | | | | | | | | | | | |
| **Cumulative net cash balance** | **41.0** | **(4.5)** | **3.7** | **(5.3)** | **(12.9)** | **(19.8)** | **(27.2)** | **(34.8)** | **(35.7)** | **(37.1)** | **(63.4)** | **(64.2)** |
| | | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | | |
| *Debt Balance* | *(1,109.5)* | *(1,064.2)* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| *Bareboat balance* | *(471.3)* | *(453.4)* | *(433.7)* | *(412.8)* | *(392.0)* | *(371.7)* | *(351.1)* | *(330.3)* | *(309.6)* | *(289.3)* | *(268.8)* | *(250.3)* |
| Vessels | 56 | 55 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 20 | 20 |

[1]  Working Capital change reflects paydown of corporate facility with cash from sale transaction; $10m outstanding to Rongsheng is left unpaid
[2]  Purchase obligations on sale leasebacks assumed to generate cash loss equivalent to deficiency between current outstanding obligation and market value

AlixPartners

DEKABANK copy, March 2013



V. Conclusions

DEKABANK copy, March 6 2013

AlixPartners

# Current Proposal
## Strategy and Objectives

▸ The solution provides, directly or indirectly, for the primary objectives held by the different stakeholders.

| Objective | Comments |
|---|---|
| 1. Compensate stakeholders adequately for their risk-weighted capital exposure and concessions | • Assets with similar risk profile pooled together provides for better aligned incentives<br>• Lenders provided with adequate equity cushion, margins, and covenants<br>• Provides for recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support |
| 2. Constrain formal or informal cross subsidization between stakeholders related to different underlying assets | • While it reduces the portfolio effect of a broader fleet, combining similar assets together limits risk of cross subsidies going from high to low collateral vessels<br>• Pooling through creation of unique syndicate facility would facilitate granting of a second priority mortgage through the fleet as well as increase liquidity of bank assets, enabling lenders to sell out of assets without disrupting operations |
| 3. Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests) | • Common set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position<br>• Sister-ship arrest risk minimized given shareholding structure in Newco |
| 4. Maximize options for stakeholders and potential for self-selection | • Rebasing of assets can provide mechanism for transfer from one Newco profile to another (ie. Group C and D into A)<br>• Opting out of the scheme can be achieved via mutually agreed terms for redelivery of vessel to relevant lender |

DEKABANK copy March 6 2013

40

AlixPartners



# Contents

A. Facility Description
B. Financials: Existing
C. Market Overview

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Appendix
## Facility Description

| Facility | HSH1 | HSH2 | Natixis1 | Natixis2 | Icon1 | Icon2 | Octavian1 | Octavian2 |
|---|---|---|---|---|---|---|---|---|
| Debt / Bareboat | Debt | Debt | Debt | Debt | Bareboat | Bareboat | Bareboat | Bareboat |
| Vessels | Hero | Citron / Citrus | Scope | Namrun | Center | Fantasic / Amazing | Enjoy | Marka |
| Lender group | HSH | HSH | Natixis | Natixis | Icon [DVB] | Icon [DVB NLB] | Octavian [DVB] | Octavian [NLB] |

AlixPartners

# Appendix: Transaction Analysis

Newco Beta Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Existing debt rollover | 154.3 | Purchase at outstanding debt level | 154.3 |
| **Total Sources** | **$154.3** | **Total Uses** | **$154.3** |

Additional liquidity to maintain operational cash balance not shown; Estimated at $20m and could be financed via equity of deferrals

DEKABANK copy, March 6 2013

AlixPartners

# Appendix: Transaction Analysis
Residual Oldco Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Alpha Sale Receipts | 828.6 | Alpha Vessels Debt Repayment | 780.0 |
| Beta Sale Receipts | 154.3 | Beta Vessels Debt Repayment | 154.3 |
| Baytur Sale Receipts | 13.6 | Baytur Debt Repayment | 8.4 |
| Group C Sale Receipts | 258.8 | Group C Repayment | 258.8 |
| | | Change in Working Capital (Repayment of A/P) & corp. facility | 53.8 |
| **Total Sources** | **$1,255.3** | **Total Uses** | **$1,255.3** |

DEKABANK copy, March 6 2013

44

AlixPartners



## Assumptions
Revenue





DEKABANK copy March 6 2013

AlixPartners

DRAFT & PRELIMINARY

## Assumptions

Revenue





# Appendix: Additional Financial Analysis

Newco Alpha Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 71.5 | 148.8 | 175.2 | 181.3 | 186.7 |
| OPEX | (33.7) | (67.2) | (67.2) | (67.3) | (67.2) |
| Drydock | (1.4) | (2.3) | (3.6) | (6.3) | (2.3) |
| **EBITDA** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | 74.4 | - | - | - | - |
| Bank Interest (Senior) | (13.8) | (26.7) | (23.8) | (20.8) | (17.6) |
| Bank Principal Repayments | (4.7) | (56.6) | (77.2) | (79.1) | (78.2) |
| NSF Interest (2nd lien) | (1.5) | (2.9) | (2.9) | (2.9) | (2.9) |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **54.4** | **(86.2)** | **(104.0)** | **(102.7)** | **(98.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | (64.4) | - | - | - | - |
| **Net Investment** | **(64.4)** | - | - | - | - |
| | | | | | |
| **Net cashflow for period** | **26.4** | **(6.8)** | **0.4** | **4.9** | **18.4** |
| | | | | | |
| **Cumulative net cash balance** | **26.4** | **19.6** | **20.0** | **24.9** | **43.3** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Senior Debt Balance* | *(754.5)* | *(749.8)* | *(693.2)* | *(616.0)* | *(536.9)* |
| *NSF 2nd lien Balance* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* |
| Leverage: (Debt/EBITDA) | 21.40x | 9.77x | 6.88x | 5.96x | 4.80x |
| Hamburg Jumbo Facility LTV | 95% | 97% | 95% | 91% | 86% |
| Value (depreciated) | 511.0 | 498.5 | 473.4 | 448.3 | 423.2 |
| Vessels | 29 | 29 | 29 | 29 | 29 |

DEKABANK Copy, March 8 2013

AlixPartners

# Appendix: Additional Financial Analysis
Newco Beta Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 18.5 | 31.0 | 29.2 | 31.3 | 32.1 |
| OPEX | (4.4) | (8.8) | (8.8) | (8.8) | (8.8) |
| Drydock | - | (1.7) | - | (1.3) | - |
| **EBITDA** | 14.1 | 20.6 | 20.4 | 21.3 | 23.4 |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | 14.1 | 20.6 | 20.4 | 21.3 | 23.4 |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (2.6) | (4.6) | (3.9) | (3.3) | (2.7) |
| Bank Principal Repayments | (12.3) | (25.4) | (19.7) | (20.2) | (20.2) |
| Bareboat Payments | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | (14.8) | (30.0) | (23.6) | (23.5) | (22.8) |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - |
| | | | | | |
| **Net cashflow for period** | (0.8) | (9.4) | (3.2) | (2.2) | 0.5 |
| | | | | | |
| **Cumulative net cash balance** | (0.8) | (10.2) | (13.3) | (15.6) | (15.0) |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | (161.3) | (149.0) | (123.6) | (103.9) | (83.8) |
| *Bareboat balance* | | | | | |
| Leverage: (Debt/EBITDA) | 11.45x | 7.24x | 6.05x | 4.89x | 3.59x |
| Loan to value | 117% | 112% | 97% | 85% | 72% |
| Value (depreciated) | 138.0 | 132.8 | 127.5 | 122.3 | 117.0 |
| Vessels | 4 | 4 | 4 | 4 | 4 |

DEKABANK conf., March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis
Residual Oldco Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 172.5 | 103.2 | 121.6 | 121.3 | 105.5 |
| OPEX | (83.7) | (49.7) | (47.2) | (39.6) | (33.6) |
| Drydock | (1.2) | (0.5) | (2.0) | (1.9) | (2.3) |
| **EBITDA** | 87.7 | 52.9 | 72.4 | 79.7 | 69.6 |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | 87.7 | 52.9 | 72.4 | 79.7 | 69.6 |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (20.5) | - | - | - | - |
| Bank Principal Repayments | (93.2) | - | - | - | - |
| Bareboat Payments | (79.2) | (82.4) | (77.9) | (64.0) | (49.6) |
| Pre-Del Drawdown | 53.4 | - | - | - | - |
| Bareboat Drawdowns | 169.8 | - | - | - | - |
| Pre-Del Repayments | (83.3) | - | - | - | - |
| **Net Financing Cashflow** | (53.0) | (82.4) | (77.9) | (64.0) | (49.6) |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | (125.0) | - | - | - | - |
| Asset Sale net proceeds | 50.1 | - | (23.9) | (37.2) | (24.1) |
| **Net Investment** | (75.0) | - | (23.9) | (37.2) | (24.1) |
| | | | | | |
| **Net cashflow for period** | (40.3) | (29.5) | (29.4) | (21.5) | (4.2) |
| | | | | | |
| **Cumulative net cash balance** | (5.3) | (34.8) | (64.2) | (85.7) | (89.9) |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | (1,109.5) | - | - | - | - |
| *Bareboat balance* | (471.3) | (392.0) | (309.6) | (231.7) | (167.7) |
| Vessels | 56 | 22 | 20 | 17 | 14 |

DEKABANK copy, March 6 2013
AlixPartners

DRAFT & PRELIMINARY

# Appendix

Bank Exposure: Hamburg reduced to 90% LTV

▸ Equity required if LTV improved to 90% is $90.0m ($25.6m more than at an LTV of 95%)

| | Estimated Value | Current debt | LTV Before | New Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 89.1 | 90% | (5.8) | -6% |
| NLB | 170.1 | 168.8 | 99% | 153.1 | 90% | (15.7) | -9% |
| DVB | 106.3 | 103.4 | 97% | 95.6 | 90% | (7.8) | -7% |
| Commerzbank | 14.8 | 14.6 | 99% | 13.3 | 90% | (1.3) | -9% |
| BrLB | 13.1 | 13.0 | 99% | 11.8 | 90% | (1.1) | -9% |
| Santander | 23.8 | 22.5 | 95% | 21.2 | 89% | (1.4) | -6% |
| HSH | 92.0 | 94.6 | 103% | 82.8 | 90% | (11.8) | -13% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,609.4** | **110%** | **(44.8)** | **-3%** |

DEKABANK copy. March 2013

AlixPartners



# Appendix
## Potential loss on bareboat purchase obligations

▸ There exist a number of obligations to purchase at future dates under the following bareboat agreements. The cashflows reflect the following losses occurring via purchase and resale at the obligation date. It assumes no changes to market values but applies depreciation to current estimated values over the time until the purchase and resale date. If the vessels were retained rather than crystallize the loss, then there would be a greater cash outflow for refinancing plus further ongoing loss on vessels were these occur.

|  | Purchase obligation ($m) | Estimated value today ($m) | Loss on resale | Depreciated value ($m) | Loss on resale | Purchase Ob. Date | Years | Monthly depreciation |
|---|---|---|---|---|---|---|---|---|
| Avor | 51.5 | 31 | -20.5 | 27.6 | -23.9 | Aug-15 | 2.6 | 0.11 |
| Enjoy | 38.5 | 30 | -8.5 | 25.5 | -13.0 | Apr-16 | 3.2 | 0.11 |
| Centre | 64.5 | 47 | -17.5 | 40.2 | -24.3 | Jun-16 | 3.4 | 0.17 |
| Marka | 37 | 32 | -5 | 26.0 | -11.0 | Apr-17 | 4.2 | 0.12 |
| Fantastic | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| Amazing | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| **TOTAL** | **234.5** | **178** | **-56.5** | **149.2** | **-85.3** | | | |

DEKABANK copy. March 6 2013

AlixPartners

## Global Locations

AlixPartners is ready to field a team of relevant experts whenever and wherever they are needed. Our professionals work from 15 global offices in more than a dozen different countries. They speak more than 50 languages, and have experience in every corner of the world. Call us, we'll be there when it really matters.

**Chicago**
300 N. LaSalle Street
Suite 1900
Chicago, IL 60654
312.346.2500

**Dallas**
2101 Cedar Springs Road
Suite 1100
Dallas, TX 75201
214.647.7500

**Detroit**
2000 Town Center
Suite 2400
Southfield, MI 48075
248. 358.4420

**Dubai**
Gate Village 10, Level 03
P.O. Box 125115
Dubai Intl Financial Centre
Dubai, United Arab Emirates
+971.4.401.9246

**Düsseldorf**
Königsalle 59 a
40215 Düsseldorf
Germany
+49.211.97.55.10.00

**London**
20 North Audley Street
London W1K 6WE
United Kingdom
+44.20.7098.7400

**Los Angeles**
515 S. Flower Street
Suite 3050
Los Angeles, CA 90071
213.437.7100

**Milan**
Corso Matteotti 9
20121 Milan
Italy
+39.02.360.12000

**Munich**
Mauerkircherstr. 1 a
81679 München
Germany
+49.89.20.30.40.00

**New York**
40 West 57th Street
New York, NY 10019
212.490.2500

**Paris**
49/51 Avenue George V
75008 Paris
France
+33.1.76.74.72.00

**San Francisco**
4 Embarcadero Center
31st Floor, Suite 3110
San Francisco, CA 94111
415.848.0283

**Shanghai**
Suite 6111
Plaza 66 Building I
1266 Nan Jing West Road
Shanghai, 200040 China
+8621.6171.7555

**Tokyo**
Marunouchi Building 33F
2-4-1 Marunouchi
Chiyoda-ku
Tokyo 100-6333 Japan
+81.3.5533.4800

**Washington, DC**
1602 L Street, NW
Suite 300
Washington, DC 20036
202.756.9000

© AlixPartners, LLP, 2010

AlixPartners

DEKABANK copy, March 8 2013

# EXHIBIT 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| PSARA ENERGY, LTD. | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| SPACE SHIPPING, LTD.; GEDEN HOLDINGS | : | |
| LTD.; ADVANTAGE ARROW SHIPPING, | : | |
| LLC; GENEL DENIZCILIK NAKLIYATI A.S. | : | |
| A/K/A GEDEN LINES; ADVANTAGE | : | |
| TANKERS, LLC; ADVANTAGE HOLDINGS, | : | **ADMIRALTY** |
| LLC;  FORWARD HOLDINGS, LLC; | : | |
| MEHMET EMIN KARAMEHMET; | : | |
| GULSUN NAZLI  KARAMEHMET - | : | |
| WILLIAMS; and TUĞRUL TOKGÖZ | : | |
| | : | |
| **Defendants** | : | |

## ATTORNEY DECLARATION

Pursuant to 28 U.S.C. § 1746, this declaration is executed by George A. Gaitas, counsel for Plaintiff, PSARA ENREGY, LTD., in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-captioned Admiralty Cause.  I, George A. Gaitas, declare under the penalty of perjury:

I am a Member of the firm of GAITAS, KENNEDY & CHALOS, P.C., attorneys for Plaintiff in the above referenced matter.

I am familiar with the circumstances of the Original Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendants, SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.; ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET;

1

GULSUN NAZLI KARAMEHMET WILLIAMS; TUGRUL TOKGOZ, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the Defendants in this District.

I have directed attorneys in my firm to check with the office of the Texas Secretary of State, using the Secretary of State's database, to determine whether the Defendants can be located within this District. SPACE SHIPPING LTD.; ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI KARAMEHMET WILLIAMS; TUGRUL TOKGOZ is not registered with the Texas Secretary of State. Accordingly, I have determined that, as of April 20, 2018, none of these Defendants are incorporated or registered as foreign corporations pursuant to the laws of Texas, and have neither nominated nor appointed any agent for the service of process within this District.

GEDEN HOLDINGS, LTD. is registered with the Texas Secretary of State[1], but cannot be found within this District. GEDEN HOLDINGS, LTD. is not subject to the jurisdiction of the Eastern District of Texas nor amenable to service of process within the Eastern District of Texas.

I have directed attorneys in my firm to engage a search of the Superpages telephone directory on the internet, and determined that there are no telephone listings or addresses for the Defendants within this District.

---

[1] GEDEN HOLDINGS, LTD. has appointed an agent for service of process located in the Northern District of Texas.

I have directed attorneys in my firm to engage in a Google search as to whether the Defendants can be located within this District. The Google search results did not provide a listing for the named Defendants.

I am unaware of any general or managing agent(s) of the named Defendants within this District.

In that I have been able to determine that the Defendants have not appointed an agent for service of process within the Eastern District of Texas and that I have found no indication that the Defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief based on the investigation of the attorneys under my direction that the Defendant does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon an investigation performed by attorneys in my firm under my direction that the Defendant cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: April 20, 2018                    Respectfully submitted,
       Houston, Texas

                                   Gaitas, Kennedy & Chalos, P.C.

                     By:    /s/ George A. Gaitas
                                   George A. Gaitas
                                   State Bar No. 24058885
                                   Federal Bar No. 705176
                                   6250 Westpark Dr.
                                   Suite 222
                                   Houston, Texas 77057
                                   Telephone: 281-501-1800
                                   Fax: 832-962-8178

E-mail: gaitas@gkclaw.com

*Attorneys for Plaintiff*

PSARA ENERGY, LTD.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** | : | |
| **LTD.; ADVANTAGE ARROW SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC; FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI KARAMEHMET-** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Despoina Bacha, declares under the penalty of perjury:

1.  I am an individual of sound mind, and have never been convicted of a crime of moral turpitude.

2.  I am a citizen of Greece and a resident of Athens and a lawful representative of the Plaintiff in the above action and duly authorized on its behalf to make this verification.

3.  I have read the foregoing Verified Complaint and exhibits thereto in the above captioned action and know the contents thereof; and

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed in Athens, Greece this 20th day of April, 2018.

Despoina Bacha

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| | Space Shipping, Ltd.; Geden Holdings, Ltd.; Advantage Arrow Shipping, LLC; Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines; Advantage Tankers, LLC; Advantage Holdings, LLC; Forward Holdings, LLC; Mehmet Emin Karamehmet; Gulsun Nazli Karamehmet Williams; Tugrul Tokgoz |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1 U.S. Government Plaintiff
❏ 2 U.S. Government Defendant
❏ 3 Federal Question *(U.S. Government Not a Party)*
❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | | ❏ 820 Copyrights | ❏ 450 Commerce |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 460 Deportation |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

❏ 1 Original Proceeding
❏ 2 Removed from State Court
❏ 3 Remanded from Appellate Court
❏ 4 Reinstated or Reopened
❏ 5 Transferred from Another District *(specify)*
❏ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ❏ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.**  Place an "X" in one of the six boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.